**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

    - v. -

NIKHIL GUPTA,

               Defendant.

No. 23 Cr. 289 (VM)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT NIKHIL GUPTA'S**
**MOTIONS TO SUPPRESS CERTAIN EVIDENCE AND STATEMENTS AND TO DISMISS**
**COUNT THREE OF THE SECOND SUPERSEDING INDICTMENT**

Nola B. Heller
Matthew Laroche
Peter Farag
Isabel C. Pitaro
MILBANK LLP
55 Hudson Yards,
New York, NY 10001
(212) 530-5108

*Counsel for Defendant Nikhil Gupta*

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 2

    A.    U.S. and Czech Law Enforcement Worked in Concert to Prepare for Mr. Gupta's Arrest ................................................................................................. 2

    B.    Czech Law Enforcement Arrested, Strip Searched, and Interrogated Mr. Gupta While in Constant Communication With U.S. Law Enforcement and in Violation of Mr. Gupta's Rights .............................................................. 4

    C.    The DEA Interrogated Mr. Gupta Shortly After His Arrest by Czech Authorities .. 6

    D.    The DEA's Account of Mr. Gupta's Interrogation Conflicts With Mr. Gupta's Sworn Declaration and Documents Produced by the Government and the Czech Republic ................................................................................ 8

    E.    The Government Searches Mr. Gupta's Phones and Uses the Passwords Obtained by Czech Law Enforcement in Violation of Mr. Gupta's Rights .......................... 10

    F.    Extradition Proceedings and Scope of Charges ...................................................... 11

    G.    Post-Extradition Developments Concerning Count Three ..................................... 12

ARGUMENT .......................................................................................................... 14

I.    MR. GUPTA'S STATEMENTS TO CZECH AND U.S. LAW ENFORCEMENT ON THE DAY OF HIS ARREST MUST BE SUPPRESSED ................................................. 14

    A.    Applicable Law ........................................................................................................ 15

    B.    Mr. Gupta's Statements to Czech Law Enforcement Should Be Suppressed ........ 17

        1.    Czech Law Enforcement Arrested and Interrogated Mr. Gupta at the Direction of and in Coordination With the United States ...................................... 17

        2.    Mr. Gupta Was in Custody when Czech Law Enforcement Interrogated Him ........................................................................................................... 20

        3.    The Passwords Mr. Gupta Provided to Czech Law Enforcement During his Custodial Interrogation Must Be Suppressed ........................................ 20

        4.    Evidence Obtained From Subsequent Czech and American Searches of Mr. Gupta's Phones That Relied on the Illegally Obtained Passwords Must Also Be Suppressed ........................................................................... 21

     C.     Mr. Gupta's Statements to U.S. Law Enforcement Should Be Suppressed ........... 23

          1.   Mr. Gupta Was in Custody When the DEA Interrogated Him in the Czech Republic ........................................................................................................... 23

          2.   Any Statements That Mr. Gupta Made to the DEA During His Custodial Interrogation in the Czech Republic Must Be Suppressed Because He Did Not Receive Proper Miranda Warnings ....................................................................... 24

          3.   Even if Mr. Gupta Was Provided a Proper Miranda Warning, His Statements Must Be Suppressed Because They Were Not Given Knowingly, Intelligently, and Voluntarily. ........................................................................................................... 25

II.    THE COURT SHOULD HOLD AN EVIDENTIARY HEARING IF THE GOVERNMENT RAISES CONTESTED ISSUES OF FACT ........................................... 28

III.   COUNT THREE OF THE INDICTMENT SHOULD BE DISMISSED FOR VIOLATING THE RULE OF SPECIALTY ............................................................................................. 29

     A.     Mr. Gupta is Charged With a New "Separate Offense" ......................................... 29

     B.     Mr. Gupta Has Standing to Invoke the Rule of Specialty...................................... 31

     C.     Specialty Protections Are Also Provided by 18 U.S.C. § 3192. ............................ 33

CONCLUSION ....................................................................................................................... 35

## <u>Table of Authorities</u>

**Page(s)**

**Cases**

*Colorado v. Connelly*,
    479 U.S. 157 (1986)............................................................................................25

*Fiocconi v. Att'y Gen. of the United States*,
    462 F.2d 475 (2d Cir. 1972)....................................................................29, 32, 34

*Lego v. Twomey*,
    404 U.S. 477 (1972)............................................................................................15

*Matta-Ballesteros v. Henman*,
    896 F.2d 255 (7th Cir. 1990) ..............................................................................31

*Miranda v. Arizona*,
    384 U.S. 436 (1966).................................................................................. *passim*

*Moran v. Burbine*,
    475 U.S. 412 (1986)............................................................................................27

*Ohio v. Reiner*,
    532 U.S. 17 (2001)..............................................................................................21

*Oregon v. Mathiason*,
    429 U.S. 492 (1977)............................................................................................20

*Schneckloth v. Bustamonte*,
    412 U.S. 218 (1973)............................................................................................16

*Shapiro v. Ferrandina*,
    478 F.2d 894 (2d Cir. 1973)...............................................................................29

*Stansbury v. California*,
    511 U.S. 318 (1994)............................................................................................20

*United States v. Abu Ali*,
    528 F.3d 210 (4th Cir. 2008) .............................................................................17

*United States v. Alvarez-Machain*,
    504 U.S. 655 (1992)............................................................................................29

*United States v. Amirov*,
    2025 WL 660197 (S.D.N.Y. Feb. 28, 2025)................................................13, 33

*United States v. Anderson,*
   929 F.2d 96 (2d Cir. 1991)........................................................................15, 16, 25

*United States v. Baez,*
   349 F.3d 90 (2d Cir. 2003)..................................................................................29

*United States v. Barinas,*
   865 F.3d 99 (2d Cir. 2017).......................................................................31, 32, 33

*United States v. Bary,*
   978 F. Supp. 2d 356 (S.D.N.Y. 2013).................................................................16

*United States v. Bin Laden,*
   132 F. Supp. 2d 168 (S.D.N.Y. 2001).................................................................23

*United States v. Brown,*
   125 F.4th 1186 (D.C. Cir. 2025).....................................................................21, 22

*United States v. Butler,*
   59 F. Supp. 3d 648 (D. Vt. 2014).......................................................................27

*United States v. Carter,*
   489 F.3d 528 (2d Cir. 2007)................................................................................15

*United States v. Dijbo,*
   151 F. Supp. 3d 297 (E.D.N.Y. 2015) ...........................................................21, 22

*United States v. Familetti,*
   878 F.3d 53 (2d Cir. 2017)..................................................................................15

*United States v. Fontana,*
   869 F.3d 464 (6th Cir. 2017) ..............................................................................31

*United States v. Gogic,*
   2025 WL 836493 (E.D.N.Y. Mar. 17, 2025) ......................................................21

*United States v. Harun,*
   232 F. Supp. 3d 282 (E.D.N.Y. 2017) ................................................................17

*United States v. Juvenile Male,*
   968 F. Supp. 2d 490 (E.D.N.Y. 2013) ................................................................15

*United States v. Levy,*
   905 F.2d 326 (10th Cir. 1990) ............................................................................31

*United States v. Levy,*
   947 F.2d 1032 (2d Cir. 1991)..............................................................................29

*United States v. Marquez*,
    594 F.3d 855 (11th Cir. 2010) ...............................................................................29

*United States v. Martinez*,
    992 F. Supp. 2d 322 (S.D.N.Y. 2014)..............................................................16, 28

*United States v. Mathurin*,
    148 F.3d 68 (2d Cir. 1998)...................................................................................28

*United States v. McFarland*,
    424 F. Supp. 2d 427 (N.D.N.Y. 2006) .................................................................27

*United States v. Mendonca*,
    88 F. 4th 144 (2d Cir. 2023) ................................................................................26

*United States v. Murphy*,
    703 F.3d 182 (2d Cir. 2012)...................................................................16, 25, 26

*United States v. Najohn*,
    785 F.2d 1420 (9th Cir. 1986) .............................................................................31

*United States v. Nosov*,
    153 F. Supp. 2d 477 (S.D.N.Y. 2001) ..................................................................30

*United States v. Paroutian*,
    299 F.2d 486 (2d Cir. 1962)............................................................................29, 30

*United States v. Plugh*,
    648 F.3d 118 (2d Cir. 2011).................................................................................16

*United States v. Puentes*,
    50 F.3d 1567 (11th Cir. 1995) .............................................................................31

*United States v. Rahman*,
    189 F.3d 88 (2d Cir. 1999)...................................................................................23

*United States v. Rauscher*,
    119 U.S. 407 (1886)...............................................................................29, 31, 34

*United States v. Reyes-Laguna*,
    2009 WL 1396359 (S.D. Cal. May 18, 2009)........................................................26

*United States v. Shvartsman*,
    722 F. Supp. 3d 276 (S.D.N.Y. 2024)...................................................................21

*United States v. Sultanov*,
    2024 WL 3520443 (E.D.N.Y. July 24, 2024).........................................................26

*United States v. Taylor*,
    745 F.3d 15 (2d Cir. 2014)..................................................................15, 16, 26, 27

*United States v. Thirion*,
    813 F.2d 146 (8th Cir. 1987) ..............................................................................31

*United States v. Thomas*,
    322 F. App'x 177 (3d Cir. 2009) .........................................................................31

*United States v. Yong Wang*,
    2013 WL 452215 (S.D.N.Y. Feb. 5, 2013)..........................................................28

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003).....................................................................16, 17, 29, 31

*United States v. Zhukov*,
    537 F. Supp. 3d 431 (E.D.N.Y. 2021) ...........................................................16, 17

**Statutes**

18 U.S.C. § 2..............................................................................................................30

18 U.S.C. § 1956........................................................................................................11

18 U.S.C. § 1958........................................................................................................30

18 U.S.C. § 3192...................................................................................................33, 34

**Other Authorities**

U.S. Const. amend. V.................................................................................................15

Defendant Nikhil Gupta respectfully submits this Memorandum of Law; the Declaration of Nikhil Gupta ("Gupta Decl."); the Declaration of Nola B. Heller ("Heller Decl."); and the accompanying exhibits thereto ("Ex.") in support of Mr. Gupta's motions to suppress certain evidence and statements and to dismiss Count Three of the Second Superseding Indictment (the "S2 Indictment").

## PRELIMINARY STATEMENT

On June 30, 2023, Mr. Gupta was arrested at Václav Havel Airport in Prague, Czech Republic ("Prague Airport"), by Czech law enforcement acting at the direction and request of U.S. law enforcement. Czech law enforcement officers interrogated Mr. Gupta in violation of his Fifth Amendment rights, obtained the passwords to two of his phones during that interrogation, ███████████████████████████████████, searched his phones using the illegally obtained passwords, and provided the full contents of those searches to U.S. law enforcement. Although the U.S. government later obtained a warrant to carry out its own searches of Mr. Gupta's phones, its ability to search two of those phones was dependent on the illegally obtained passwords, compounding the effect of the first violation of Mr. Gupta's constitutional rights. The unconstitutional interrogations did not end there—on the day of his arrest, shortly after Czech law enforcement had arrested, strip searched, and interrogated Mr. Gupta, personnel from the Drug Enforcement Administration ("DEA") questioned Mr. Gupta without advising him of his rights, again in violation of the Fifth Amendment. Accordingly, the contents of Mr. Gupta's password-protected phones and the statements that Mr. Gupta made during the Czech and American interrogations should be suppressed.

Separately, the government has violated the rule of specialty by prosecuting Mr. Gupta for conspiracy to commit money laundering, which is currently charged as Count Three of the S2 Indictment. This charge was not included in the U.S. request for Mr. Gupta's extradition, nor was

it authorized by the Czech authorities.  The addition of Count Three introduces a substantially expanded factual narrative that was never disclosed to the Czech Republic during Mr. Gupta's extradition proceedings and adds twenty years to Mr. Gupta's sentencing exposure.  The inclusion of this charge in the operative indictment violates the longstanding principle that a defendant arrested abroad may only be tried in the U.S. for offenses for which he was extradited.  Because the government is seeking to prosecute Mr. Gupta for an offense outside the scope of the extradition request, Count Three must be dismissed.

For these reasons, Mr. Gupta moves to suppress his statements and the contents of his password-protected phones or, in the alternative, requests that the Court hold an evidentiary hearing.  Mr. Gupta also moves to dismiss Count Three of the S2 Indictment.

## BACKGROUND

The events leading up to Mr. Gupta's arrest and the circumstances of the arrest itself make clear that Mr. Gupta's constitutional rights were violated.  Czech and U.S. law enforcement authorities worked together to obtain and search Mr. Gupta's phones and to question him, all without advising him of his rights under U.S. law, requiring suppression of both the evidence seized from those phones and the statements Mr. Gupta made to law enforcement.  Czech authorities also never authorized the extradition of Mr. Gupta to be tried in the U.S. on money laundering charges, requiring the dismissal of Count Three of the S2 Indictment.

### A.    U.S. and Czech Law Enforcement Worked in Concert to Prepare for Mr. Gupta's Arrest

The evidentiary record makes clear that U.S. and Czech law enforcement authorities worked together to arrest Mr. Gupta.  After obtaining an indictment against Mr. Gupta on charges of murder for hire and conspiracy to commit murder for hire, *see* Dkt. No. 3, the government submitted a request to the Czech government to "execute a provisional arrest" of Mr. Gupta "for

the purpose of [his] extradition." Ex. 1 at 1.  The government's request explicitly asked the Czech authorities to seize and eventually surrender to the United States "all articles, instruments, objects of value, documents and other evidence" relating to the accusations against Mr. Gupta.  *Id.* at 3. The Czech Republic never conducted an independent investigation into Mr. Gupta or considered charging him with any crimes.  *See* Ex. 2B at 8.

After issuing a provisional arrest warrant, Czech law enforcement officers worked at the direction of U.S. law enforcement officials to track and eventually arrest Mr. Gupta.  U.S. law enforcement clearly directed and coordinated the joint operation.

On June 28, 2023, 

Ex. 3.

Czech and U.S. law enforcement personnel continued to collaborate closely on the day of Mr. Gupta's arrest.

---

[1] Because the ███████████ produced by the government and attached as Exhibits 3 and 4 are in eastern standard time ("EST"), this motion also uses EST for the sake of consistency.  For reference, the Czech Republic is six hours ahead of EST.

[2] Certain discovery materials have been provided to the defense as "Attorney's Possession Only" and designated as "Sealed Material" per the terms of the Court-ordered protective order.  *See* Dkt. No. 19.  We have therefore applied redactions to that content wherever it appears in the publicly filed version of this memorandum, and have filed any accompanying exhibits under seal.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████     That day, DEA agents and officers,

including SA Franks and Task Force Officer ("TFO") Jose Sandobal (together, the "DEA

Personnel") met with Czech law enforcement officers from the National Drug Headquarters Police

("NDH") and then traveled with the officers to Prague Airport.  *See* Ex. 5 (the "July DEA 6").

     **B.**     **Czech Law Enforcement Arrested, Strip Searched, and Interrogated Mr. Gupta While in Constant Communication With U.S. Law Enforcement and in Violation of Mr. Gupta's Rights**

When Czech and U.S. law enforcement personnel arrived at Václav Havel Airport on June

30, 2023, the DEA Personnel "waited in the van" while the Czech NDH officers entered the airport

to arrest Mr. Gupta.  *Id.*  Although no U.S. law enforcement agents physically entered the airport,

the Czech officers ████████████████████ as they closed in on, arrested, strip searched,

and interrogated Mr. Gupta, further demonstrating that the operation was done at the direction of

the DEA. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

Mr. Gupta was in the process of leaving Prague Airport when he was surrounded by six or

seven Czech law enforcement officers, physically grabbed, and told that he was under arrest and

needed to go with them so the officers could search him.  *See* Gupta Decl. ¶ 2.  The officers did

not make Mr. Gupta aware of any rights he might have, including his right to remain silent or to

an attorney.  *See id.* ¶ 3.  ████████████████████████████████████████████

████████████  Ex. 3.

At this point, Mr. Gupta was in Czech custody.  The Czech officers brought Mr. Gupta to a windowless private room in the airport and closed the only door behind them.  *See* Gupta Decl. ¶ 4.  The officers searched Mr. Gupta's luggage and ordered Mr. Gupta to take off all his clothing so they could strip search him.  *See id.* ¶¶ 5-6.  After those searches were complete and Mr. Gupta was allowed to put his clothing back on, the officers told Mr. Gupta they wanted to look at the three phones (an iPhone 11, iPhone 14, and Samsung Vivo[3]), which they had placed on the table in the room.  *See id.* ¶¶ 6, 8-9.  The officers ordered Mr. Gupta to unlock the phones with their passwords.  *See id.* ¶ 9.  Mr. Gupta did not think he had any choice in the matter, so he told them the passwords for the two password-protected phones, the iPhone 11 and the iPhone 14, and entered them into those phones.  *See id.* ¶¶ 8-9.  The officers wrote down the passwords and took the phones, putting them into a bag.  *See id.* ¶ 10.  The third phone, the Vivo, was not password protected.  At no time during this interaction was Mr. Gupta advised of his rights.  *See id.* ¶¶ 3, 8.

Immediately after the Czech officers seized Mr. Gupta's phones, one of the male officers took out his own phone, called someone, and left the room while speaking English.  *See id.* ¶ 11. Up until that point, the Czech officers had only spoken English when they needed to communicate with Mr. Gupta.  *See id.* ¶ 7.  After the officer who had made the call re-entered the room, he told Mr. Gupta that he was under arrest because "America wanted" him.  *See id.* ¶ 12.  The officer added that he did not know why Mr. Gupta was being arrested.  *See id.*  At that point, the Czech officers handcuffed Mr. Gupta and ████████████████████████████████████████

---

[3] The iPhone 11 bears the IMEI number ███████████ and the iPhone 14 bears the IMEI number ███████████.  The Vivo bears IMEI Slot 1 number ███████████ and IMEI Slot 2 number ███████████.

*See id.*; *see also* Ex. 8. ██████████████████ a video depicting Mr. Gupta verbally providing his phone passwords to the Czech officers. *See* Ex. 9. Then, the Czech officers escorted Mr. Gupta out of Prague Airport through a non-public exit. *See* Gupta Decl. ¶ 14.

At around 6:30 p.m. that same day, AUSA Alexander Li texted SA Franks and TFO Sandobal and asked "[d]id we grab phones?" Ex. 10. TFO Sandobal responded "[y]es" and "[h]e gave the codes to unlock them to the arrest team." *Id.* These messages and the chain of events after Mr. Gupta's arrest make clear that the government was the driving force directing the Czech officers' efforts to obtain Mr. Gupta's phone passwords.

### C.    The DEA Interrogated Mr. Gupta Shortly After His Arrest by Czech Authorities

After exiting the airport, Mr. Gupta and the Czech officers approached a dark colored SUV with tinted windows and three rows of seats. *See id.* ¶ 15. As Mr. Gupta approached the SUV, escorted by the Czech agents, a man opened the door to the SUV and stepped out, and Mr. Gupta saw another man sitting inside the van in the back row. *See id.*; *see also* Ex. 5. Mr. Gupta would later learn that these men were SA Franks and TFO Sandobal, respectively. Mr. Gupta was directed to sit in the last row of the SUV between them, and he overheard one of the Czech officers tell SA Franks and TFO Sandobal in English that they were taking the "long route" to give the Americans more time to speak with Mr. Gupta. *See* Gupta Decl. ¶¶ 16-17. Mr. Gupta's hands remained cuffed for the entire car ride and Mr. Gupta did not have access to his glasses, which he relies on to read. *See id.* ¶ 18. Five Czech officers were also in the SUV. *See id.* ¶ 16.

At this point, SA Franks and TFO Sandobal began interrogating Mr. Gupta. Before doing so, SA Franks and TFO Sandobal did not inform Mr. Gupta of his *Miranda* rights. *See id.* ¶ 21. In fact, other than informing Mr. Gupta that they were "Americans," SA Franks and TFO Sandobal

did not identify themselves or tell Mr. Gupta that they were law enforcement officials. *See id.* ¶ 19.

Once the SUV began moving, TFO Sandobal asked the Czech officers for Mr. Gupta's phones, reinforcing the DEA's focus on accessing Mr. Gupta's devices. *See id.* ¶ 20. The female Czech officer, who had been holding the bag with the phones, took the phones out of the bag and handed them to SA Franks. *See id.* SA Franks and TFO Sandobal continued asking questions, like why Mr. Gupta was in the Czech Republic and whether he came alone. *See id.* At no point during the car ride did Mr. Gupta say anything about having someone in New York City killed. *See id.* ¶ 22. The DEA Personnel also looked through the phones that the Czech officer had handed to SA Franks, and Mr. Gupta observed them photographing the phones. *See id.* ¶ 23. At no point during the car ride did either SA Franks or TFO Sandobal inform Mr. Gupta that he had any rights, including the rights to remain silent or to an attorney. *See id.* ¶ 21.

Around the end of the car ride, TFO Sandobal handed Mr. Gupta a piece of paper, which Mr. Gupta would later learn was an Advice of Rights form, and told him to print his name. *See id.* ¶ 24. English is Mr. Gupta's second language, and he is not always comfortable reading or understanding it, which is why he uses the services of a Hindi interpreter when he appears in court. *See id.* It was also dark in the car, and Mr. Gupta did not have his glasses, so he could not read the paper. *See id.*

Mr. Gupta printed his name on the form without reviewing the document. *See id.* TFO Sandobal then told him to sign the form. *See id.* ¶ 25. At this point, Mr. Gupta became suspicious and asked TFO Sandobal what he was signing. *See id.* Instead of reading the form, TFO Sandobal told him the form allowed questioning of Mr. Gupta without an attorney present. *See id.* Mr. Gupta did not read the document independently because he could not, given the dim light, his poor

vision without his glasses, and his limited English reading proficiency. *See id.* Mr. Gupta refused to sign his name and did not write anything else on the form. *See id.*; *see also* Ex. 11. He was then taken out of the SUV and held in Czech custody.

### D. The DEA's Account of Mr. Gupta's Interrogation Conflicts With Mr. Gupta's Sworn Declaration and Documents Produced by the Government and the Czech Republic

The DEA's narrative of Mr. Gupta's arrest, which is sparsely recounted in the July DEA 6, conflicts in numerous respects with Mr. Gupta's account, as well as with other documents produced by the government and Czech officials. SA Franks drafted the July DEA 6 twelve days after the arrest took place. To the defense's knowledge, TFO Sandobal did not make a contemporaneous record of his interactions with Mr. Gupta in the Czech Republic.

Without precisely specifying the timing, the July DEA 6 states that "[d]uring the drive, SA Franks read GUPTA his rights advice for an individual in a foreign country" and that Mr. Gupta "agreed to speak with SA Franks and TFO Sandobal." *See* Ex. 5. As explained above, this did not occur. *See* Gupta Decl. ¶ 21. Although the July DEA 6 notes that Mr. Gupta wrote his name on the advice of rights but refused to sign it, the July DEA 6 neglects to mention that Mr. Gupta was not provided the form until the very end of the car ride. *See id.* ¶ 24; *see also* Ex. 5. And when recently asked to describe the circumstances of their interrogation of Mr. Gupta, neither SA Franks nor TFO Sandobal mentioned reading Mr. Gupta his *Miranda* rights or providing him with the Advice of Rights form. *See* Exs. 30-31.

The July DEA 6 also states that Mr. Gupta discussed the allegations in this case in detail, and that he admitted to "facilitat[ing a] murder in New York City," but Mr. Gupta recalls having no such conversation. *Compare* Ex. 5 *and* Gupta Decl. ¶ 22. Further, the July DEA 6 states that the DEA Personnel "were unable to ask any more questions due to the short transit time from Prague airport and the Prague holding facility." Ex. 5. However, Mr. Gupta recalls a much longer

car ride, *see* Gupta Decl. ¶ 24, a recollection that is supported by the timestamps on the Vivo phone, which show that roughly an hour and fifteen minutes passed between when Mr. Gupta was compelled to provide the passwords to his phones to the Czech officers and when the DEA took a photo of the screen of his Vivo phone while in the SUV.  *Compare* Ex. 27 *and* Ex. 9.

SA Franks's account in the July DEA 6 is further undermined by *his own text messages* with prosecutors, which the government recently produced in response to defense discovery requests.  Those messages reflect that on the day of Mr. Gupta's arrest, AUSA Camille Fletcher asked SA Franks and TFO Sandobal, in a group that also included AUSA Li, whether Mr. Gupta was "talking?"  Ex. 10.  SA Franks responded "[w]e had limited time.  He did but he was playing fuck fuck games.  We think he will ultimately cooperate."  *Id.*  That is not the text one would expect from an agent who had allegedly (according to the July DEA 6) just obtained an outright confession from a suspect, but rather is consistent with Mr. Gupta's recollection that he did not mention "facilitating a murder in New York City."  Gupta Decl. ¶ 22.

Finally, the DEA's description of Mr. Gupta's interrogation is inconsistent with the account provided by Czech officials.  Specifically, according to the Czech authorities, U.S. law enforcement authorities were not present for Mr. Gupta's interrogation and detention.  *See* Ex. 13B.  According to the U.S. authorities, however, they were in fact present.  *See* Exs. 5, 30-31. This serious discrepancy casts doubt on the accuracy of all the law enforcement narratives that have been provided to the defense.[4]

---

[4] On February 13, 2024, Mr. Gupta's Czech attorney wrote to the Czech Police to ask that they "disclose whether agents of the U.S. Drug Enforcement Administration (DEA) or other representatives of the United States of America were present during [Mr. Gupta's] escort in a police vehicle from the place of detention – Terminal 1, Václav Havel International Airport in Prague – to the Police Department(s) of the Czech Republic or other locations between June 30 and July 1, 2023."  Ex. 12B.  On February 27, 2024, the Czech Public Prosecutor responded that Mr. Gupta's interrogation and detention "were not attended by agents of the Drug Enforcement Administration . . . or other representatives of the US authorities."  Ex. 13B.

E.        **The Government Searches Mr. Gupta's Phones and Uses the Passwords Obtained by Czech Law Enforcement in Violation of Mr. Gupta's Rights**

Czech law enforcement provided U.S. law enforcement with access to the contents of Mr. Gupta's phones on an expedited basis, providing further evidence that U.S. law enforcement was the driving force behind the Czech officers' efforts to gain access to those phones. On July 12, 2023, less than two weeks after Mr. Gupta's arrest, Czech law enforcement provided U.S. law enforcement with a "Pre-MLAT Czech Courtesy Phone Production" which contained full extractions from both the iPhone 14 and the Vivo phone. The DEA made immediate use of this data—by September 5, they had provided the Czech extractions to the Federal Bureau of Investigation ("FBI") for use in its own separate investigation, which the government recently disclosed to the defense. *See* Ex. 14. Then, on September 19, 2023, in response to an MLAT request, Czech law enforcement provided the government with a full set of extractions for all three phones. *See* Ex. 15B at 1.

On September 28, 2023, the government applied for and received a warrant to search Mr. Gupta's phones. *See* Ex. 16. TFO Sandobal, apparently mindful of the impropriety of the DEA's prior warrantless review of Mr. Gupta's phones, stated that he is "aware that Czech authorities previously provided forensic extraction of two of the Subject Devices to U.S. law enforcement, and that U.S. law enforcement members have reviewed those extractions. The content of those extractions is not being relied upon in this application for the requested warrant to search the Subject Devices." *See id.* at 7. After obtaining the warrant, the government completed a "Cell Phone Analysis Worksheet" for each of the phones describing its extraction plans. *See* Ex. 17. On the worksheets for the two iPhones, the government wrote the password for each phone that Mr. Gupta had provided to Czech law enforcement during his interrogation in the Czech Republic, as discussed above. *See id.*

F.    **Extradition Proceedings and Scope of Charges**

On June 19, 2023, the government submitted a request to the International Department for Criminal Matters within the Ministry of Justice of the Czech Republic seeking the provisional arrest and extradition of Mr. Gupta.  *See* Ex. 1.  That request referenced only Counts One and Two of the original indictment.  *See id.*; *see also* Dkt. No. 3.  No mention was made in the request to what is now Count Three of the current indictment, which charges conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956.  On June 28, 2023, the request was transferred to the Municipal State Prosecutor's Office ("MSZ") in Prague, Czech Republic.  *See* Ex. 18 ¶ 17.  Two days later, on June 30, 2023, a prosecutor at MSZ granted written consent for Mr. Gupta's detention, and he was taken into custody that same day.  *Id.*

On July 1, 2023, Mr. Gupta appeared for an initial detention hearing at the Municipal Court in Prague.  *See* Ex. 19B at 3.  The justification for the hearing, consistent with the original request, was the charges he was facing in Counts One and Two of the original indictment.  During that proceeding, Mr. Gupta allegedly "consented" to extradition, but explicitly stated, "I am not giving up the principle of specialty."  *Id.* at 4.  Following further proceedings, the Municipal Court found extradition permissible.  The decision was affirmed on appeal by the High Court of Prague.  *See* Ex. 20B at 15.  On August 3, 2023, AUSA Ashley Nicolas and SA Franks submitted affidavits in support of extradition, both of which outlined allegations relating solely to the two original counts and made no mention of a money laundering conspiracy.  *See* Ex. 21.  On August 23, 2023, the government formally requested Mr. Gupta's extradition via diplomatic note, again referencing only the charges in the original indictment, the related arrest warrant, and the affidavits from AUSA Nicolas and SA Franks.  *See* Ex. 22.  On October 4, 2023, the MSZ requested that the Municipal Court grant extradition on that basis.  *See* Ex. 23B at 11.

On November 7, 2023, the Municipal Court held an extradition hearing, and on November

11

23, 2023, ruled in favor of extradition for "the criminal act of conspiracy to commit murder-for-hire . . . and for the criminal act of murder-for-hire and assisting and soliciting to commit this criminal act." Ex. 2B at 1. Five days later, on November 28, 2023, the Government filed the first superseding indictment ("S1 Indictment"). *See* Dkt. No. 9. While it still contained just two counts, it included significantly expanded factual allegations. Mr. Gupta challenged the scope of extradition in the Czech courts, arguing that the expanded factual narrative exceeded the bounds of the extradition grant. On May 22, 2024, the Czech Constitutional Court upheld the extradition order. *See* Ex. 18B ¶ 40.

### G.  Post-Extradition Developments Concerning Count Three

On June 14, 2024, Mr. Gupta was extradited to the United States. On October 17, 2024, the Government filed the S2 Indictment. *See* Dkt. No. 28. This new indictment, for the first time, added Count Three, alleging conspiracy to commit money laundering, which adds twenty years to Mr. Gupta's potential sentence. Count Three also incorporated paragraphs 1 through 34 of the S1 Indictment—which contain factual allegations that were not part of the original indictment submitted for extradition considerations by the Czech authorities. *See* Dkt. Nos. 3, 28.

For nearly a year Mr. Gupta has challenged his detention in this matter on, among other things, rule of specialty grounds. On January 3, 2025, the government informed Mr. Gupta's prior counsel by email that it intended to seek a waiver of the rule of specialty for the money laundering conspiracy charge in Count Three. *See* Ex. 24 at 5. Prior counsel responded that Mr. Gupta did not consent and subsequently wrote an extensive letter to the Czech Ministry of Justice on February 18, 2025, outlining the reasons why Mr. Gupta's extradition should not be extended to Count Three, formally requesting that the Czech Republic deny any such waiver, and asking for local Czech counsel to be appointed. *See* Ex. 25 (the "February 18 Letter").

On February 25, 2025, the government advised this Court that the Ministry of Justice had

conveyed that no waiver of the rule of specialty was necessary because the money laundering conspiracy charge is "based upon the same alleged facts submitted in the extradition proceedings." Dkt. No. 40.  Mr. Gupta asked the government to provide written confirmation of this position by the Czech Republic as well as any indication that the Czech Republic had reviewed Mr. Gupta's arguments.  No such confirmation was provided.

Instead, on March 2, 2025, the government referred Mr. Gupta to a letter filed in a separate matter in which the government represented that the Czech Republic informed the Department of Justice's Office of International Affairs ("OIA") that a waiver of the Rule of Specialty was unnecessary.  *See United States v. Amirov*, No. 22 Cr. 438 (CM) (S.D.N.Y.), Dkt. 126.  According to that filing, the Czech Republic had considered Mr. Gupta's February 18 Letter and notified OIA "that, under Czech law" a waiver was unnecessary "because the extradition was granted as to the facts stated in the extradition request and supporting materials, and not the legal charges."  *Id.*  The filing also referred to "clarifying correspondence" about this determination, which has not been produced by the government despite defense requests.  *Id.*

The government's representation that the Czech Republic determined that no waiver was necessary directly contradicts formal correspondence received from the Czech Ministry of Justice in response to Mr. Gupta's February 18 Letter.  On April 10, 2025, the Ministry sent Mr. Gupta's prior counsel a letter stating, among other things, that (1) it was responding to Mr. Gupta's February 18 Letter, which asked the Ministry not to waive the Rule of Specialty as to the money laundering conspiracy charge; (2) the Ministry had not received any requests for additional consent for Mr. Gupta to be prosecuted for money laundering conspiracy and no such proceedings were pending; (3) the United States needed to request permission for additional consent pursuant to the terms of the Treaty between the Czech Republic and United States; and (4) if the appropriate

13

proceedings were initiated, the court in the Czech Republic would appoint counsel for Mr. Gupta.

Specially, the Ministry stated, among other things:

> To date, the Ministry of Justice of the Czech Republic has not received any request for additional consent with the extension of the extradition of Mr. Nikhil Gupta from the authorities of the United States of America.  Therefore, there are currently no proceedings pending to grant additional consent to extend Mr. Gupta's extradition to the United States.
>
> The assessment of whether the additional consent to the extension of extradition has to be requested in accordance with the applicable provisions of the international treaty based on which the extradition was granted lies entirely within the competence of the requesting State, not the requested State.
>
> In case that any request for additional consent of the authorities of the Czech Republic with the extension of the extradition of Mr. Nikhil Gupta was addressed to the Ministry of Justice of the Czech Republic and the appropriate proceedings was thus initiated, the competent court of the Czech Republic would serve a notice to select a defense counsel on Mr. Nikhil Gupta.  In case that Mr. Gupta did not select a defense counsel within the time period set by the court in the notice, the court would rule on the appointment a defense counsel for Mr. Gupta ex officio.

Ex. 26.  By underscoring the absence of any request, waiver, or review, the Ministry made clear that the prosecution of Mr. Gupta under Count Three exceeds the bounds of what the Czech Republic authorized in connection with Mr. Gupta's extradition.  As a result, Count Three must be dismissed.

## **ARGUMENT**

## I.    MR. GUPTA'S STATEMENTS TO CZECH AND U.S. LAW ENFORCEMENT ON THE DAY OF HIS ARREST MUST BE SUPPRESSED

On the day of his arrest in the Czech Republic, Mr. Gupta was taken into custody at the direction of U.S. law enforcement agents and twice interrogated without being read his *Miranda* rights.  As a result, the statements that he made—and the searches that stemmed from those statements—must be suppressed.  Specifically, the Court should suppress: (1) Mr. Gupta's

14

statements to Czech law enforcement officers regarding the passwords to the iPhone 11 and the iPhone 14; (2) the various searches of the iPhone 11 and 14 conducted by Czech and U.S. law enforcement based on the passwords provided by Mr. Gupta; and (3) any statements allegedly made by Mr. Gupta to SA Franks and TFO Sandobal while he was interrogated in the SUV.

### A.    Applicable Law

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Consistent with *Miranda v. Arizona*, 384 U.S. 436 (1966), "a statement made by the accused during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived *Miranda* rights when making the statement." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (cleaned up). Custodial interrogation means "'questioning initiated by law enforcement officers after a person has been taken into custody,'" and "includes engagement short of a formal interview." *United States v. Familetti*, 878 F.3d 53, 57-58 (2d Cir. 2017) (quoting *Miranda*, 384 U.S. at 444). "The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007).

Accordingly, for a defendant's custodial statements to be admissible at trial, the government must show, by a preponderance of the evidence, that: (i) the defendant was advised of his constitutional rights under *Miranda*, *see United States v. Juvenile Male*, 968 F. Supp. 2d 490, 503 (E.D.N.Y. 2013) (citing *Lego v. Twomey*, 404 U.S. 477, 482-89 (1972)); (ii) the defendant "knowingly, intelligently, and voluntarily waived those rights," *id.*; and (iii) the defendant's subsequent statements were knowingly and voluntarily made—*i.e.*, were "truly the product of free choice," *see United States v. Anderson*, 929 F.2d 96, 98-99 (2d Cir. 1991) (burden on the

government); *see also United States v. Murphy*, 703 F.3d 182, 192 (2d Cir. 2012) (same).

"In th[is] context, 'knowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." *Taylor*, 745 F.3d at 23 (citing *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011)); *see also United States v. Martinez*, 992 F. Supp. 2d 322, 334 (S.D.N.Y. 2014). In assessing whether the defendant's choices were knowing, intelligent, and voluntary, the Court must conduct "a careful evaluation of the totality of all the surrounding circumstances, including [(i)] the accused's characteristics, [(ii)] the conditions of interrogation, and [(iii)] the conduct of law enforcement." *Anderson*, 929 F.2d at 99 (citations omitted); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (noting that "none of [the Court's cases on the subject] turned on the presence or absence of a single controlling criterion" and that "each reflected a careful scrutiny of all the surrounding circumstances").

Foreign law enforcement officials are required to comply with *Miranda* when they are engaged in a "joint venture" with U.S. law enforcement. *United States v. Bary*, 978 F. Supp. 2d 356, 366 (S.D.N.Y. 2013). Under the joint venture doctrine, "statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings must be suppressed whenever United States law enforcement agents actively participate in questioning conducted by foreign authorities." *United States v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003). "Active participation requires 'coordination and direction' of a foreign investigation or interrogation." *United States v. Zhukov*, 537 F. Supp. 3d 431, 435 (E.D.N.Y. 2021) (citing cases). In the Second Circuit, the analysis focuses on "the U.S. agents' efforts to direct the specific *questioning* at issue," and on the involvement of American officials in the foreign government's actions. *Id.* at 436. While "[t]here is no bright-line test defining what it means to actively participate," "'coordination and

direction of an investigation or interrogation does'" qualify as active participation.  *United States v. Harun*, 232 F. Supp. 3d 282, 287 (E.D.N.Y. 2017) (quoting *United States v. Abu Ali*, 528 F.3d 210, 229 (4th Cir. 2008)).  Where United States officials "use foreign officials as their interrogation agents in order to circumvent the requirements of *Miranda*," the joint venture doctrine likely applies and requires suppression of a defendant's unwarned statements.  *Yousef*, 327 F.3d at 146.

### B.    Mr. Gupta's Statements to Czech Law Enforcement Should Be Suppressed

1.    *Czech Law Enforcement Arrested and Interrogated Mr. Gupta at the Direction of and in Coordination With the United States*

The evidence reflects that U.S. law enforcement was involved in *every single step* taken by Czech law enforcement.  Czech law enforcement had no investigation into Mr. Gupta or plans to detain him until they were contacted by U.S. law enforcement.  *See* Ex. 2B.  Indeed, on the day of his arrest, the Czech officers arresting Mr. Gupta even told him that they did not know why he was under arrest, adding simply that it was because "America wanted [him]."  Gupta Decl. ¶ 12.  Because the Czech authorities did not have their own independent investigation of Mr. Gupta or consider holding him on local charges, they had no independent reason to take the significant steps of obtaining the passwords for his phones and imaging those phones.  The key action at issue—questioning Mr. Gupta so that he would provide the passwords to the phones—was clearly directed by the U.S. law enforcement authorities.  *See Zhukov*, 537 F. Supp. 3d at 436 ("In the Second Circuit in particular, the joint-venture analyses focuses . . . more on the U.S. agents' efforts to direct the specific *questioning* at issue.").

Specifically, DEA officials were *in Prague at the airport* for Mr. Gupta's arrest, ███
███████████████████████████████████████████████████████████████████████████
███████████████ and met with Czech NDH officers in-person in the hours before Mr. Gupta's flight landed.  *See* Exs. 3, 5. ████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████    *See id.*  Most importantly, as soon as the Czech

officers had obtained the passwords to Mr. Gupta's phone, ████████████████  *a video of*

*themselves obtaining the passwords* ████████████████████████  *and* left the room to

make a phone call in English.  *See* Gupta Decl. ¶ 11; *see also* Ex. 9.  And as soon as the Czech

officers had gotten the requested information from Mr. Gupta, they ceased their search and

interrogation and brought Mr. Gupta out to a van in which the DEA was waiting.  *See* Gupta Decl.

¶¶ 12-16.  At the van, the Czech officers *handed the phones to the DEA Personnel*, again

suggesting how little interest the Czech officers had in Mr. Gupta's phones absent the American

request.  *See id.* ¶ 20.  The Czech officers intentionally took the "long route" to give the DEA

Personnel an opportunity to question Mr. Gupta.  *See* Gupta Decl. ¶ 17; *see also* Ex. 5.  The DEA

Personnel also confirmed to the prosecutors that "the arrest team"  had "grab[bed]" Mr. Gupta's

phones and obtained "the codes to unlock them."  Ex. 10.

Under these circumstances, it is clear that the Department of Justice ("DOJ") and the DEA

were directing every step of the process, including instructing Czech law enforcement to obtain

information from Mr. Gupta when they interrogated him after his arrest.  ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████  This chain of events suggests that each occurrence from the moment

of Mr. Gupta's arrest until the moment he left the SUV was orchestrated by the DOJ and the DEA

to ensure that they obtained Mr. Gupta's phone passwords (for the purposes of an eventual

extraction) and that SA Franks and TFO Sandobal had the opportunity to question Mr. Gupta.  The

timestamps on the Vivo phone further support the conclusion that the Czech officers intentionally drove the DEA and Mr. Gupta around for longer than necessary to allow the DEA to question Mr. Gupta without interruption—roughly an hour and fifteen minutes passed between when Mr. Gupta provided the passwords to the phones and when the DEA searched one of the phones while in the SUV and took a photo of the results. *Compare* Ex. 27 *and* Ex. 9.

The close relationship between the DOJ/DEA and the Czech officials is also underscored by the speed at which Czech law enforcement provided full extractions of Mr. Gupta's phones to U.S. law enforcement. Rather than wait for an MLAT request, the Czech officials made a so-called "pre-MLAT Czech Courtesy Phone Production" to U.S. law enforcement in early July—in close temporal proximity to Mr. Gupta's arrest—of full images of two of the seized phones. The government provided no discovery—despite explicit defense requests—reflecting when or why the government requested a "Courtesy Phone Production" at that time, suggesting that this had previously been discussed and agreed between the DEA and the Czech officials. This is apparently why Czech officers rushed to extract data from Mr. Gupta's phones before an MLAT request was made. Then, roughly a month later, after finally receiving an official MLAT request, the Czech officials made a *second* production of full extractions of all three seized phones to U.S. law enforcement. Ex. 15B at 1

The timing of events suggests that the DEA emphasized to Czech law enforcement the importance of gaining immediate access to Mr. Gupta's phone data and providing it to U.S. law enforcement, and directed Czech law enforcement in its efforts to do so. The DEA's apparent urgency in accessing the phones is reinforced by the fact that the DEA even searched one of the phones, without a warrant, in the SUV—a search that was not recorded in the July DEA 6 and only recently disclosed in response to defense requests. *See* Ex. 27. Only later did U.S. law

enforcement officials seek to legitimize this rushed unofficial process by pursuing official MLAT channels.

Under these circumstances, the unavoidable conclusion is that the DEA directed and coordinated all aspects of Mr. Gupta's capture and interrogation by Czech law enforcement. Because the U.S. and Czech law enforcement personnel were engaged in a joint venture, Mr. Gupta's statements to the Czech officers providing his phone passwords must therefore be suppressed, as they were obtained in violation of his Fifth Amendment rights.

2.    *Mr. Gupta Was in Custody when Czech Law Enforcement Interrogated Him*

Law enforcement must administer *Miranda* warnings "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (citation omitted)). There is no doubt—and the government cannot sincerely contest—that Mr. Gupta was in custody when he was interrogated at the airport by the Czech officers. At the time of his interrogation, he had been told he was under arrest by the Czech officers, *see* Gupta Decl. ¶¶ 2, 12, █████████ ████████████████████████████████████████████████████████████ █████ *See* Ex. 3. Mr. Gupta was in a room from which he was not free to leave, strip searched, and later handcuffed. *See* Gupta Decl. ¶¶ 4, 12. The July DEA 6 also explicitly acknowledges that the Czech officers took Mr. Gupta "into custody without incident" at the airport. Ex. 5. Despite holding Mr. Gupta in custody at the direction of the DEA, the Czech officers did not read Mr. Gupta his rights or advise him of any protections he might have.

3.    *The Passwords Mr. Gupta Provided to Czech Law Enforcement During his Custodial Interrogation Must Be Suppressed*

Because the Czech law enforcement officers were acting at the direction of the DOJ and the DEA when they arrested Mr. Gupta, interrogated him, and learned the passwords to two of his

phones during the course of that interrogation, the passwords must be suppressed. "[T]he revelation of a passcode from a suspect's mind or memory is testimonial in character." *United States v. Gogic*, 2025 WL 836493, at *4 (E.D.N.Y. Mar. 17, 2025); *see also United States v. Brown*, 125 F.4th 1186, 1202-03 (D.C. Cir. 2025) ("If [the defendant] had instead been compelled to disclose whether he could open the phone, and made to say yes or to verbally disclose the password, those answers unquestionably would be testimonial communications."); *United States v. Shvartsman*, 722 F. Supp. 3d 276, 315-16 (S.D.N.Y. 2024) ("Under fundamental Fifth Amendment principles, [the defendant's] disclosure of his passcode [to a police officer] was both testimonial and incriminating."). The Fifth Amendment "privilege against self-incrimination applies where a witness' answers could reasonably furnish a link in the chain of evidence against him." *Ohio v. Reiner*, 532 U.S. 17, 19 (2001).

Here, it does not matter that Mr. Gupta's passwords may not have been "directly or inherently self-incriminating" because they "led to incriminating evidence stored on the iPhone[s]." *Gogic*, 2025 WL 836493, at *4. Because the passwords to Mr. Gupta's phones were obtained after an unconstitutional interrogation performed at the behest of U.S. law enforcement in violation of Mr. Gupta's Fifth Amendment rights, they must be suppressed. *See, e.g.*, *Brown*, 125 F.4th at 1204 ("Because the compelled opening of the cellphone was testimonial, both the message communicated by that action and any evidence obtained from that communication must be suppressed."); *United States v. Dijbo*, 151 F. Supp. 3d 297, 306 (E.D.N.Y. 2015) (holding that because the defendant was in custody when an agent "inquired about his phone numbers and his passcode," those statements should be suppressed).

4. *Evidence Obtained From Subsequent Czech and American Searches of Mr. Gupta's Phones That Relied on the Illegally Obtained Passwords Must Also Be Suppressed*

Because Mr. Gupta's statements regarding the passwords to his two iPhones must be

suppressed, any information obtained from searches or warrants premised on the use of those passwords must also be suppressed. The Czech Republic searched Mr. Gupta's phones using the illegally obtained passwords and provided U.S. law enforcement with a "pre-MLAT" extraction of one of the iPhones. Roughly a month later, pursuant to an MLAT request, the Czech Republic provided another copy of that same search to the government along with a copy of their search of the second iPhone. Not only did the DEA, which received the extractions, make use of the data— the evidence reflects that the DEA even *provided these extractions to another law enforcement agency, the FBI, to assist in their own investigation*. *See* Ex. 14. Those searches were premised on the unconstitutional interrogation of Mr. Gupta at Prague Airport and accordingly must be suppressed as the fruit of the poisonous tree. *See Dijbo*, 151 F. Supp. 3d at 310 (suppressing any documents obtained by virtue of the defendant providing his phone passwords to law enforcement as "fruit of the unlawful inquiry" by law enforcement).

The same logic applies to the government's separate search of the phones after it took physical possession of the devices. Although the government sought and obtained a separate warrant to search Mr. Gupta's phones,[5] *see* Ex. 16, its search expressly made use of the illegally obtained passwords, listing them on the analysis worksheet. *See* Ex. 17 (stating that the iPhones 11 and 14 are protected by a "PIN / PATTERN LOCK" and listing the pin for each). Accordingly, despite the warrant, the government's own search of Mr. Gupta's iPhones was made possible using passwords that had been obtained in violation of Mr. Gupta's Fifth Amendment rights, and so the results of those searches must be suppressed. *See Brown*, 125 F.4th at 1205-06 (holding that where a later search of the defendant's phone was made possible by using a password that had been

---

[5] This separate warrant appears to have been merely a formality—as discussed, there is ample evidence to suggest that the DEA began making full use of the Czech extractions as soon as they were received, including by providing them to the FBI.

obtained in violation of the defendant's Fifth Amendment rights, the government had not met its burden to show that it would have gained access to the phone's contents by independent lawful means and that accordingly, the contents of the phone should be suppressed).[6]

### C.    Mr. Gupta's Statements to U.S. Law Enforcement Should Be Suppressed

"[S]tatements obtained during overseas interrogation by U.S. law enforcement must meet the warning/waiver requirements of *Miranda* before they will be admitted into the Government's case-in-chief at trial."  *United States v. Bin Laden*, 132 F. Supp. 2d 168, 189 (S.D.N.Y. 2001). Because Mr. Gupta was subjected to a custodial interrogation by U.S. law enforcement agents in the Czech Republic, any statements he made are inadmissible unless the government can prove that:  (i) law enforcement administered *Miranda* warnings before he made those statements; (ii) Mr. Gupta knowingly and voluntarily waived his rights; and (iii) Mr. Gupta's subsequent statements were made knowingly and voluntarily.  Because the government cannot establish these elements, Mr. Gupta's statements must be suppressed.

####    1.    *Mr. Gupta Was in Custody When the DEA Interrogated Him in the Czech Republic*

The government cannot sincerely contest that Mr. Gupta was in custody when he was interrogated by the DEA in an SUV being transported from Prague Airport to a Czech Police holding facility.  Mr. Gupta had just been arrested, strip searched, and handcuffed, and he was being transported against his will by seven law enforcement agents in a confined vehicle.  The July DEA 6 also confirms that Mr. Gupta was in custody in the SUV, stating that after arresting Mr. Gupta at the airport, the Czech officers "came back to the van with GUPTA in custody."  Ex. 5.

---

[6] The defense reserves its right to challenge the Czech and U.S. searches of the Vivo phone should a hearing or additional discovery reveal that the government engaged in the kind of "outrageous investigatory conduct" that "shocks the conscience" and accordingly violates Mr. Gupta's substantive due process rights.  *United States v. Rahman*, 189 F.3d 88, 132 (2d Cir. 1999).

2.      *Any Statements That Mr. Gupta Made to the DEA During His Custodial Interrogation in the Czech Republic Must Be Suppressed Because He Did Not Receive Proper Miranda Warnings*

The government has not shown that Mr. Gupta received proper *Miranda* warnings *before* he spoke with the DEA.  Mr. Gupta recalls receiving a form, which he later learned was an Advice of Rights for Suspects in Foreign Custody form, only *after* he had spoken with the DEA for an extended period of time in the SUV and once the SUV had arrived at its destination, though even at that time he did not know anything about the form.  *See* Gupta Decl. ¶¶ 24-25.  SA Franks and TFO Sandobal did not read the form to Mr. Gupta before asking him to sign it nor did they give him sufficient time to review it and understand its contents.  *See id.*  In fact, they misrepresented the purpose of the form, telling Mr. Gupta it said that the Americans could question him without an attorney, and failing to notify him that he in fact had the right to an attorney or to choose to remain silent.  *See id.* ¶ 25.  Although Mr. Gupta printed his name on the form, his refusal to give consent to be questioned without a lawyer present is evidenced by the fact that he refused to sign the form once he became concerned about its contents.  *See id.* ¶¶ 24-25; *see also* Ex. 11.

The government's account of Mr. Gupta's interrogation stems solely from the July DEA 6, which was drafted by SA Franks almost two weeks after the interrogation took place.  *See* Ex. 5.  That document provides no clarity regarding *when* Mr. Gupta was purportedly advised of his rights.  *Id.*  While the July DEA 6 states at the beginning of the document that Mr. Gupta was read his rights and agreed to speak with the DEA, it only notes at the end (without situating the comment on a timeline) that Mr. Gupta was unwilling to sign the advice of rights form.  *Id.*  The accuracy of the DEA Personnel's account of Mr. Gupta's interrogation is questionable—when recently asked about the circumstances of Mr. Gupta's interrogation, SA Franks and TFO Sandobal did not mention advising Mr. Gupta of his rights.  *See* Exs. 30, 31.  Providing a form that the defendant does not read—and is not given sufficient time to read—cannot constitute a constitutionally

24

sufficient *Miranda* warning. This is especially the case when accompanied by an inaccurate description of the purpose of the form. *See* Gupta Decl. ¶ 25.

3. *Even if Mr. Gupta Was Provided a Proper Miranda Warning, His Statements Must Be Suppressed Because They Were Not Given Knowingly, Intelligently, and Voluntarily.*

Even if Mr. Gupta was provided proper *Miranda* warnings (he was not), his statements should be suppressed because they were not knowing, intelligent, and voluntary based on an assessment of his characteristics, the conditions of his interrogation, and the conduct of law enforcement. *See Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986).

Courts assessing the characteristics of the accused consider a variety of factors, including, as relevant here, the individual's experience with, and knowledge of, his constitutional rights. *Anderson*, 929 F.2d at 99. In *Anderson*, the Second Circuit found an involuntary waiver even though the defendant "had been arrested 12 times previously and on 11 occasions pled guilty to the crimes charged," and had "familiarity with the criminal justice system generally," because the defendant did not have familiarity with the legal rules relevant to his interrogation by the officers in the instant case. *See id*. Here, Mr. Gupta had *zero* familiarity with the legal rules relevant to an interrogation by U.S. law enforcement. Mr. Gupta is a foreign national, has no criminal history or prior convictions in the United States, and has had no prior dealings with U.S. law enforcement agents. Moreover, Mr. Gupta's first language is not English, and he was not provided the time necessary to allow him to read and understand the document he had been provided, nor was he given his glasses, without which he could not read the document. *See* Gupta Decl. ¶ 24.

Under these circumstances, including Mr. Gupta's refusal to sign the Advice of Rights form and the limited time he was given to review the form, it is difficult to imagine how Mr. Gupta can have understood the rights he was purportedly waiving. *See e.g.*, *Murphy*, 703 F.3d at 193 ("[A] waiver of rights could not be found unless the suspect knew what they were." (cleaned up)); *United*

*States v. Reyes-Laguna*, 2009 WL 1396359, at *4 (S.D. Cal. May 18, 2009) (defendant did not knowingly and intelligently waive his right to counsel despite reading waiver form, in part because police did not clarify ambiguities when defendant indicated he did not understand his rights).

Even if Mr. Gupta may have "verbally consented to waive his rights," which he vigorously contests, there is no basis for concluding that he had a "full awareness of the nature of the right[s] being abandoned" or "the consequences of abandoning [them]." *Taylor*, 745 F.3d at 23. "[T]he government must do more than show simply that a *Miranda* warning was given and the accused thereafter made a statement." *Murphy*, 703 F.3d at 194. To imply waiver, the government must make "the additional showing that the accused *understood* these rights," which it has not done here. *See id.*(citation omitted); *see also United States v. Sultanov*, 2024 WL 3520443, at *35 (E.D.N.Y. July 24, 2024) (defendant did not waive his *Miranda* rights where he refused to sign the written waiver form and showed confusion about the warnings).

The conditions of Mr. Gupta's interrogation also weigh in favor of finding that his statements were not freely and voluntarily given. *See United States v. Mendonca*, 88 F. 4th 144, 164 (2d Cir. 2023) (courts "look at the totality of circumstances surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and voluntariness") (citations omitted). As detailed above, Mr. Gupta had no advance warning that he would be arrested on that day. He was captured by foreign law enforcement officers who spoke only broken English in a foreign country. *See* Gupta Decl. ¶ 2. He was taken to a room by several foreign law enforcement officers, where he was strip searched, questioned, and handcuffed. He was then hustled from the airport into an SUV filled with seven law enforcement officers where he was then confronted by DEA Personnel who did not identify themselves as law enforcement, stating only that they were Americans, and then further barraged with questions. *See* Gupta Decl. ¶¶ 15-25. Nobody spoke

to him in his native language or explained to him precisely why he was being arrested or questioned. The presence of these factors made the situation confusing and coercive, and Mr. Gupta's mental state was one of discomfort, unease, and confusion, which is another relevant consideration for the voluntariness inquiry. *See Taylor*, 745 F.3d at 24; *United States v. Butler*, 59 F. Supp. 3d 648, 652-53 (D. Vt. 2014) ("[T]his entire chain of events softened [the defendant's] resistance, and ultimately overbore her will, and led to an involuntary waiver of her right to remain silent. Even though [the defendant] was not physically threatened or punished, the government has not carried its burden [of showing a knowing and voluntary waiver].").

Finally, the conduct of the DEA supports that Mr. Gupta's alleged waiver and statements were not "the product of a free and deliberate choice," and thus, not knowing and voluntary. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Because SA Franks and TFO Sandobal did not identify themselves as U.S. law enforcement officials, Mr. Gupta had no awareness of what impact anything he might say would have. *See* Gupta Decl. ¶ 19; *see also* Ex. 5. By all accounts, the DEA Personnel did not attempt to explain to Mr. Gupta, a foreign national, precisely what his *Miranda* rights were, or to what extent they applied on foreign soil. *See United States v. McFarland*, 424 F. Supp. 2d 427, 435-36 (N.D.N.Y. 2006) (explaining that statements are not the product of a free and deliberate choice if "the police engage in objective behavior constituting impermissible trickery, deceit or coercion," which "may undermine a suspect's essential knowledge of his rights and the effect of abandoning those rights" and his "ability to make a [sic] rationale choice about confessing" and lead him to "believe that he could speak without consequences").

The DEA Personnel also did not clarify whether Mr. Gupta intended to invoke his *Miranda* rights by refusing to add his signature to the waiver form. Mr. Gupta could understandably have

been confused about whether he was in Czech or American custody—and accordingly about what rights were available to him—since he was arrested in the Czech Republic by Czech officers but then brought to a car in which Americans interrogated him. Because the DEA Personnel obfuscated both their identities as U.S. law enforcement officials and the implications of Mr. Gupta's statements to them, his decision to speak cannot have been the product of a free or deliberate choice.

Given all the surrounding circumstances, Mr. Gupta was not in a position to knowingly, intelligently, or voluntarily appreciate the rights afforded to him by the Fifth Amendment or the consequences of abandoning those rights. *See, e.g.*, *United States v. Yong Wang*, 2013 WL 452215, at *6 (S.D.N.Y. Feb. 5, 2013) (recognizing that misrepresentations made to a suspect "might render a confession involuntary because they overcome his desire to remain silent").

## II. THE COURT SHOULD HOLD AN EVIDENTIARY HEARING IF THE GOVERNMENT RAISES CONTESTED ISSUES OF FACT

If, as the defense expects, the government raises contested issues of fact regarding the circumstances surrounding Mr. Gupta's arrest and interrogation, the Court should hold an evidentiary hearing. *See, e.g.*, *United States v. Mathurin*, 148 F.3d 68, 70 (2d Cir. 1998) (evidentiary hearing required to determine whether defendant's post-arrest statements were the result of a valid waiver of his constitutional rights because defendant submitted an affidavit asserting that he never administered his *Miranda* rights and did not waive those rights); *Martinez*, 992 F. Supp. 2d at 327 (evidentiary hearing required where defendant's affidavit concerning post-arrest statements raised disputed issues of material fact).

### III.    COUNT THREE OF THE INDICTMENT SHOULD BE DISMISSED FOR VIOLATING THE RULE OF SPECIALTY

#### A.    Mr. Gupta is Charged With a New "Separate Offense"

The rule of specialty was first recognized by the Supreme Court in *United States v. Rauscher*, 119 U.S. 407 (1886), which held that an extradited defendant may be tried only for the offense for which extradition was granted.  *See id.* at 430 ("[A] person who had been brought within the jurisdiction of the court by virtue of proceedings under an extradition treaty, can only be tried for one of the offences described in that treaty, and for the offence with which he is charged in the proceedings for his extradition.").  The doctrine provides that the requesting state may not, without the permission of the extraditing state, "try or punish the fugitive for any crimes committed before the extradition except the crimes for which he was extradited." *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir. 1973) (citation omitted).  The rule of specialty "generally requires a country seeking extradition to adhere to any limitations placed on prosecution by the surrendering country." *United States v. Baez*, 349 F.3d 90, 92 (2d Cir. 2003).

The rule of specialty has been extended to prohibit the prosecution of crimes that are listed in an extradition treaty, but for which extradition was not explicitly granted.  *United States v. Alvarez-Machain*, 504 U.S. 655, 659-60 (1992); *Ferrandina*, 478 F.2d at 905.  Once an extradition request has been granted, "[t]he doctrine [of specialty] limits the personal jurisdiction of the domestic court." *United States v. Levy*, 947 F.2d 1032, 1034 (2d Cir. 1991); *see also United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003); *United States v. Marquez*, 594 F.3d 855, 858-59 (11th Cir. 2010).

To determine whether the rule of specialty has been violated, courts in this circuit consider whether the challenged charges are "separate offenses" from those as to which extradition was granted.  *See United States v. Paroutian*, 299 F.2d 486, 490-91 (2d Cir. 1962); *Fiocconi v. Att'y*

*Gen. of the United States*, 462 F.2d 475, 481 (2d Cir. 1972) (holding that "[t]he 'principle of specialty' reflects a fundamental concern of governments that persons who are surrendered should not be subject to indiscriminate prosecution by the receiving government, especially for political crimes.").  "[T]he test whether trial is for a 'separate offense' should be not some technical refinement of local law, but whether the extraditing country would consider the offense actually tried 'separate.'"  *Paroutian*, 299 F.2d at 490-91.  Courts look to whether the government seeks to add charges that the requested state "was not aware [of] when it agreed to his extradition."  *United States v. Nosov*, 153 F. Supp. 2d 477, 480 (S.D.N.Y. 2001) (holding no specialty violation where new counts in superseding indictment applied only to co-defendants and not the extradited defendant).

Here, Count Three of the S2 Indictment was impermissibly added only after extradition was granted.  The criminal statute and factual allegations underlying Count Three are not referenced in the materials submitted to the Czech authorities, nor are they reflected in the Czech courts' rulings approving extradition.  Count Three also substantially increases Mr. Gupta's potential sentencing exposure, doubling the maximum penalty from twenty to forty years' imprisonment.  Mr. Gupta was extradited by Czech authorities for only two alleged crimes: murder-for-hire conspiracy and murder-for-hire, in violation of 18 U.S.C. §§ 2 and 1958.

There is no record that the United States notified the Czech Republic of the newly alleged money laundering conspiracy charge, nor did the Czech Republic consent to Mr. Gupta being extradited for it.  To the contrary, the Czech Ministry of Justice has expressly stated that it received no request to expand the scope of extradition and is not currently considering any such request.  *See* Ex. 26.  Because the Czech Republic granted extradition only on the charges in the original indictment, this Court lacks personal jurisdiction over Mr. Gupta as to Count Three, *see e.g.*,

30

*Yousef*, 327 F.3d at 115 (doctrine of specialty "limits a Court's personal jurisdiction over the defendant") (citation omitted), and it must be dismissed.

### B.    Mr. Gupta Has Standing to Invoke the Rule of Specialty

While the *Rauscher* Court did not expressly address the issue of standing, it implicitly did so by permitting the defendant to invoke the rule of specialty without requiring a formal protest from the extraditing country.  *See* 119 U.S. 407, 430 (1886).  At least six federal courts of appeal have since interpreted *Rauscher* as recognizing that an extradited defendant has standing to raise a specialty claim.  *See United States v. Fontana*, 869 F.3d 464, 468 (6th Cir. 2017) (holding that an extradited defendant may raise a specialty claim, and that refusing to recognize such standing is "flatly inconsistent" with *Rauscher); United States v. Thomas*, 322 F. App'x 177, 180 (3d Cir. 2009) (relying on *Rauscher* to confer standing on extradited defendant); *United States v. Puentes*, 50 F.3d 1567, 1573 (11th Cir. 1995) (relying on *Rauscher* for the holding that defendant had standing to raise a specialty challenge even without an objection from the surrendering state); *United States v. Levy*, 905 F.2d 326, 328 n.1 (10th Cir. 1990) (relying on *Rauscher* for the proposition that defendant had standing to raise a specialty challenge); *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir. 1986) (relying on *Rauscher* in holding that a "person extradited may raise whatever objections the rendering country might have."); *United States v. Thirion*, 813 F.2d 146, 151 (8th Cir. 1987) (same); *But see Matta-Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir. 1990) ("It is well established that individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereigns involved.").

Although the Second Circuit has not adopted the broad approach to standing embraced by its sister circuits, neither has it foreclosed the ability of an extradited defendant to assert the rule of specialty.  In *United States v. Barinas*, the court held that an extraditee may raise a specialty claim where the extradition treaty indicates a clear intent to permit individual enforcement or the

31

surrendering sovereign "would object" or has objected to the challenged prosecution.  865 F.3d 99, 105 (2d Cir. 2017); *see also Fiocconi*, 462 F.2d 475 at 479-80 (limiting the remedy to instances where "the surrendering state would regard the prosecution at issue as a breach").  In other words, even where a treaty does not provide an extraditee with an individual remedy, the court may evaluate specialty violations where the record reflects that the extraditing country would object or has objected to the prosecution as being in contravention of the extradition treaty.

That is precisely the case here.  The United States and the Czech Republic have an extradition treaty that supplements the U.S.-European Union extradition treaty.  *See* Ex. 28, Second Supplementary Treaty Between the United States of America and the Czech Republic, May 16, 2006 (herein "U.S.-Czech Treaty"); *see also* Ex. 29, Extradition Agreement Between the United States of American and the European Union.  The U.S.-Czech Treaty's structure and language make clear that extradition is limited to the offenses enumerated in the extradition request, absent specific waiver. Article Two of the U.S.-Czech Treaty provides that:

> If extradition is granted for an extraditable crime or offense, *it shall also be granted for any other crime or offense specified in the request* if the latter crime or offense is punishable by one year's deprivation of liberty or less, provided that all other requirements for extradition are met.

(emphasis added).  This clause implies that any offense not specified in the request is outside the scope of the grant.  The Czech Republic's grant of extradition is confined to the charges listed at the time of the request, reflecting a commitment to the rule of specialty.  Further, Article XIc of the U.S.-Czech Treaty, entitled "Simplified extradition procedures," reinforces this point by providing that:

> If the person sought consents to be surrendered to the Request State, the Requested State may, in accordance with the principles and procedures provided for under its legal system, surrender the person as expeditiously as possible without further proceedings. The

> consent of the person sought may include agreement to waiver of
> protection of the rule of specialty.

This provision presumes the existence of a rule of specialty.  Under the plain terms of the treaty, the addition of Count Three post-extradition, violates the treaty's structure and intent.

While the treaty does not appear to provide a private remedy to Mr. Gupta, the Czech Ministry of Justice's April 10, 2025, letter is a clear objection to the government's post-extradition addition of Count Three.  *See* Ex. 26.  In that correspondence, the Ministry stated that it had not received any request to expand the scope of extradition, that no such proceedings were pending, and that only the United States could initiate that process, which would allow the Czech government to assess whether waiver was appropriate.  The Ministry's letter underscores the absence of any Czech approval and affirmatively signals that the Czech Republic views such an expansion as unauthorized.  At a minimum, the letter provides compelling evidence that the Czech Republic would object to Count Three if it was formally asked to assess whether the government had appropriately followed the Treaty's requirements.  *See* Ex. 26.[7]  Thus, under *Barinas*, Mr. Gupta has standing to challenge the addition of Count Three.

### C.    Specialty Protections Are Also Provided by 18 U.S.C. § 3192.

Even if the Court finds that the U.S.-Czech Treaty does not confer standing on Mr. Gupta to make this motion, he is nevertheless protected from a specialty violation under 18 U.S.C. § 3192.  That statute provides:

> Whenever any person is delivered by any foreign government to an
> agent of the United States, for the purpose of being brought within
> the United States and tried for any offense of which he is duly

---

[7] *United States v. Amirov* does not support the government's position.  There, the court found that the defendant lacked standing to bring a rule of specialty challenge because the Czech Republic had not objected.  *United States v. Amirov*, 2025 WL 660197, at *3 (S.D.N.Y. Feb. 28, 2025).  Unlike in *Amirov*, the record here includes correspondence reflecting that the Czech Ministry of Justice views the government's addition of Count Three as inconsistent with the terms of the treaty. *See* Ex. 26.

accused, the President shall have power to take all necessary measures for the transportation and safekeeping of such accused person, and for his security against lawless violence, *until the final conclusion of his trial for the offenses specified in the warrant of extradition*, and until his final discharge from custody or imprisonment for or on account of such offenses, and for a reasonable time thereafter, and may employ such portion of the land or naval forces of the United States, or of the militia thereof, as may be necessary for the safe-keeping and protection of the accused.

(emphasis added).  This statute suggests that the Executive Branch is responsible for adhering to the rule of specialty regardless of whether a specialty provision is included in the treaty, or whether the extraditing country officially objects.  In *Fiocconi*, the Second Circuit held that Section 3192 is a "congressional recognition of the principle that a person who has been extradited should not be tried for an offense which the foreign country would consider to be outside the limits of its act of extradition."  462 F.2d at 482 (citing *Rauscher*).  The same logic applies here.  The government may only try Mr. Gupta for "the offenses specified in the warrant of extradition."  18 U.S.C. § 3192.

## <u>CONCLUSION</u>

For the foregoing reasons, the contents of Mr. Gupta's iPhones and his statements to Czech and U.S. law enforcement personnel should be suppressed or, in the alternative, the Court should hold an evidentiary hearing.  Additionally, Count Three of the S2 Indictment should be dismissed.

Dated: June 23, 2025

Respectfully submitted,

_____

Nola B. Heller
Matthew Laroche
Peter Farag
Isabel C. Pitaro
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5108

*Counsel for Defendant Nikhil Gupta*