UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.                                    S2 23 Cr. 289 (VM)

NIKHIL GUPTA,
         a/k/a "Nick,"

                    *Defendant*.

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN
OPPOSITION TO DEFENDANT NIKHIL GUPTA'S PRETRIAL MOTIONS**

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Alexander Li
Ashley C. Nicolas
Camille L. Fletcher
Assistant United States Attorneys
         *Of Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ....................................................................................................................... 3

    A.    May to June 2023:  Gupta Plots to Assassinate an Indian Dissident on U.S. Soil ............................................................................................... 3

    B.    June 2023:  Gupta Is Charged in the United States and Arrested in the Czech Republic ...................................................................... 5

    C.    July to September 2023: Czech Authorities Provide Gupta's Cellphones to the United States .......................................................................... 8

    D.    August 2023 to June 2024:  Gupta Is Extradited to the United States ................................................................................................................. 10

    E.    October 2024 to February 2025:  The Czech Republic Advises that No Waiver of the Rule of Specialty Is Needed for Count Three ................................................................................................ 11

ARGUMENT ......................................................................................................................... 14

    I.    Gupta's Motion to Suppress the iPhone Passcode He Provided to Czech Authorities Should Be Denied .................................................. 14

        A.    *Miranda* Permits Admission of the Passcode that Gupta Provided to the Czech Police ...................................................................... 14

        B.    Gupta's Provision of His Passcode Implicates No Fifth Amendment Privilege ...................................................................................... 22

    II.    Gupta's Motion to Suppress the Czech and U.S. Searches of His iPhones Should Be Denied .............................................................................. 23

        A.    Even If Gupta's Passcode Were Obtained in Violation of *Miranda*, the Contents of His iPhones Should Not Be Suppressed ................................................................................................... 23

        B.    If Necessary, the Government Will Establish at a Hearing That It Would Have Inevitably Discovered the Contents of Gupta's iPhones ............................................................................................... 26

    III.    Gupta's Motion to Suppress His Post-Arrest Statement to DEA Agents Should Be Denied After a Hearing .................................................. 27

IV.    Gupta's Motion to Dismiss Count Three Should Be Denied......................................28

    A.    Gupta Lacks Standing to Invoke the Rule of Specialty .......................................29

    B.    The Czech Republic Has Advised That No Waiver of the
Rule of Specialty is Needed for Count Three .......................................................32

CONCLUSION....................................................................................................................34

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Badalamenti v. Moyer*, No. 87 C 8503, 1988 WL 9125 (N.D. Ill. Feb. 4, 1988). ........................ 31

*Dickerson v. United States*, 530 U.S. 428 (2000). .................................................. 15, 26

*Fiocconi v. Att'y Gen. of U.S.* (*Fiocconi I*), 339 F. Supp. 1242, 1249 (S.D.N.Y.),
    *aff'd*, 462 F.2d 475 (2d Cir. 1972). ................................................................... 31

*Fiocconi v. Att'y Gen. of U.S.* (*Fiocconi II*), 462 F.2d 475 (2d Cir. 1972) ........................... 30, 31

*In re Terrorist Bombings of U.S. Embassies in E. Afr.* ("*Terrorist Bombings*"),
    552 F.3d 177 (2d Cir. 2008) ................................................................. 15, 27, 28

*Melo v. United States*, 825 F. Supp. 2d 457 (S.D.N.Y. 2011) ....................................... 16

*Miranda v. Arizona*, 384 U.S. 436 (1966) ........................................................ 1

*United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008) ........................................... 21

*United States v. Amirov* (*Amirov I*), No. 22 Cr. 438 (CM), 2025 WL 660197
    (S.D.N.Y. Feb. 28, 2025) ........................................................................ 32

*United States v. Amirov* (*Amirov II*), No. 22 Cr. 438 (CM), 2025 WL 720967
    (S.D.N.Y. Mar. 6, 2025) ........................................................................ 32

*United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991). ........................................... 15

*United States v. Barinas*, 865 F.3d 99 (2d Cir. 2017) ........................................... 29, 30

*United States v. Bary*, 978 F. Supp. 2d 356 (S.D.N.Y. 2013). ................................ 16, 20, 21

*United States v. Bendann*, No. 23 Cr. 278 (JKB), 2024 WL 2155235 (D. Md. May
    13, 2024) ...................................................................................... 25

*United States v. Brown*, 125 F.4th 1186 (D.C. Cir. 2025) ......................................... 26

*United States v. Campbell*, 300 F.3d 202 (2d Cir. 2002) ....................................... 11, 32

*United States v. Cortorreal*, No. 23-7195, 2024 WL 4635230 (2d Cir. Oct. 31,
    2024), *cert. denied*, 145 S. Ct. 1222 (2025) ...................................................... 30

*United States v. Cotroni*, 527 F.2d 708 (2d Cir. 1975). ........................................ 14, 15

*United States v. Ding*, No. 24 Cr. 141 (VC), 2025 WL 1745601 (N.D. Cal. June
    24, 2025) ...................................................................................... 24

*United States v. DiTommaso*, 817 F.2d 201 (2d Cir. 1987)............................................ 32

*United States v. Djibo*, 151 F. Supp. 3d 297 (E.D.N.Y. 2015),............................. 25, 26

*United States v. Eldarir*, 681 F. Supp. 3d 43 (E.D.N.Y. 2023) ................................... 27

*United States v. Ephron*, No. 24 Cr. 418 (MMG), 2025 WL 524027 (S.D.N.Y. Feb. 18, 2025) ........................................................................................................ 24

*United States v. Fritzinger*, No. 20 Cr. 81 (REM), 2024 WL 2868987 (E.D.N.C. June 6, 2024)....................................................................................................... 24

*United States v. Gasperini*, 894 F.3d 482 (2d Cir. 2018) ............................................ 19

*United States v. Gonzalez*, 275 F. Supp. 2d 483 (S.D.N.Y. 2003) .............................. 11

*United States v. Guzman Loera*, 24 F.4th 144 (2d Cir. 2022) ..................................... 29

*United States v. Hashmi*, No. 06 Cr. 442 (LAP), 2009 WL 2496272 (S.D.N.Y. Aug. 7, 2009). ............................................................................................. 15, 16

*United States v. Hearst*, No. 18 Cr. 54 (RWS), 2022 WL 8163946 (N.D. Ga. Oct. 14, 2022) ............................................................................................................ 25

*United States v. Heath*, 455 F.3d 52 (2d Cir. 2006)..................................................... 27

*United States v. Hernandez*, No. 18 Cr. 1888 (MJL), 2018 WL 3862017 (S.D. Cal. Aug. 13, 2018)............................................................................................. 25

*United States v. Kostin*, No. 24 Cr. 91 (GHW), 2025 WL 1504409 (S.D.N.Y. May 27, 2025) ........................................................................................................ 24, 26

*United States v. Lee*, 723 F.3d 134 (2d Cir. 2013)......................................................... 9

*United States v. Molina-Chacon*, 627 F. Supp. 1253 (E.D.N.Y. 1986)....................... 20

*United States v. Oloyede*, 933 F.3d 302 (4th Cir. 2019) ............................................. 24

*United States v. Orozco Ramirez*, No. 17 Cr. 185 (LMM) (AJB), 2019 WL 2165920 (N.D. Ga. Apr. 22, 2019), *report and recommendation adopted*, 2018 WL 8337421 (N.D. Ga. May 17, 2018) ......................................................... 25

*United States v. Patane*, 542 U.S. 630 (2004) ......................................... 2, 23, 24, 26

*United States v. Restrepo*, No. 01 Cr. 1113 (SAS), 2002 WL 10455 (S.D.N.Y. Jan. 3, 2002)..................................................................................................... 15

*United States v. Smith*, 706 F. Supp. 3d 404 (S.D.N.Y. 2023). .................................. 22

*United States v. Straker*, 800 F.3d 570 (D.C. Cir. 2015) ........................................................ 20, 21

*United States v. Suarez*, 791 F.3d 363 (2d Cir. 2015). ............................................................ 29

*United States v. Tuzman*, 301 F. Supp. 3d 430 (S.D.N.Y. 2017) .................................................. 30

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013). ................................................................ 27

*United States v. Welch*, 455 F.2d 211 (2d Cir. 1972) ................................................................ 15

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003).................................................. 14, 15, 16, 17

*United States v. Zhukov*, 537 F. Supp. 3d 431 (E.D.N.Y. 2021) .......................................... passim

**Statutes**

18 U.S.C. § 3192 ........................................................................................................ 31

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Nikhil Gupta's motions to (i) suppress the iPhone passcode he provided to Czech law enforcement authorities upon his arrest in the Czech Republic, (ii) suppress the extractions of his iPhone 11 and iPhone 14 performed by Czech authorities and provided to the United States upon its request for legal assistance, as well as the subsequent searches of the same phones performed by U.S. law enforcement authorities pursuant to a search warrant;[1] (iii) suppress the statements that Gupta made to U.S. Drug Enforcement Administration ("DEA") agents during a post-interview in the Czech Republic; and (iv) dismiss Count Three of the S2 Superseding Indictment (the "S2 Indictment," Dkt. 28). ("Mot.," Dkt. 66). Other than Gupta's motion to suppress his post-arrest statements to the DEA, the Court should deny all of Gupta's motions as a matter of law. The Court should deny Gupta's motion to suppress his post-arrest statements after a hearing on the limited issue of whether Gupta was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and then knowingly and voluntarily waived those rights.[2]

*First*, Gupta's motion to suppress the iPhone passcode he provided to Czech authorities should be denied because he does not contend that he provided his passcode involuntarily, and *Miranda* permits the admission of unwarned but voluntary statements to foreign police. In the alternative, the motion should be denied because it was a foregone conclusion that the iPhones belonged to Gupta and that Gupta knew the passcode.

---

[1] Gupta does not move to suppress the Czech or U.S. searches of his third phone, a Samsung Vivo. (Mot. 23 n.6).

[2] In accordance with the Court's Individual Rules of Practice, the Government respectfully requests leave to file a brief exceeding 8,750 words to fully respond to Gupta's brief, which totals approximately 11,739 words. This memorandum is 11,946 words. d

*Second*, even if Czech authorities should have but did not administer *Miranda* warnings to Gupta before requesting his iPhone passcode, the Czech and U.S. searches of the contents of his iPhones should not be suppressed because *United States v. Patane*, 542 U.S. 630, 634 (2004), bars application of the exclusionary rule to the "physical fruits of the suspect's unwarned but voluntary statements."[3]  In the alternative, the contents of Gupta's iPhones should not be suppressed because the Government would have inevitably discovered those contents even without the passcode that Gupta provided.

*Third*, Gupta's motion to suppress his post-arrest statements to DEA agents should be denied because the DEA agents gave him *Miranda* warnings and he knowingly and voluntarily waived his rights.  But because Gupta has filed a declaration disputing his warning and waiver, the Court should hold a hearing on this limited issue.

*Fourth*, Gupta's motion to dismiss Count Three should be denied because only the Czech Republic, and not Gupta, may object under the rule of specialty.  Gupta's motion should also be denied on the merits.  The Government submits, with this memorandum, a letter from the Czech Ministry of Justice explaining that under Czech law, "[i]f there are no new facts and the new charge is based upon the same facts (acts) for which the extradition was granted, it is not necessary to seek . . . waiver of the rule of specialty."  (Ex. A at 1.)[4]  Because the money laundering charge in Count Three is based upon the same facts upon which extradition was granted — as Gupta himself has conceded both to this Court and to the Czech Republic — no waiver of the rule of specialty is needed to proceed on Count Three.

---

[3] Unless otherwise specified, all case quotations omit internal quotation marks, citations, and prior alterations.

[4] Letter exhibits (*e.g.*, "Ex. A") are to exhibits to this opposition.  Number exhibits (*e.g.*, "Ex. 1") are exhibits to the Declaration of Nola B. Heller in support of Gupta's motions.  (Dkt. 68).

## BACKGROUND

**A.     May to June 2023:  Gupta Plots to Assassinate an Indian Dissident on U.S. Soil**

As alleged in the S2 Indictment, and as the Government will prove at trial, Gupta and co-defendant Vikash Yadav, a/k/a "Vikas," a/k/a "Amanat," worked together and with others to orchestrate the assassination of a political activist and U.S. citizen of Indian origin residing in New York City (the "Victim").  (S2 Indictment ¶ 1).  The Victim is a vocal critic of the Government of India and leads a U.S.-based organization that advocates for the secession of Punjab, a state in India that is home to a large population of Sikhs, an ethnoreligious minority group in India.  (*Id.*).  At relevant times, Yadav was employed by the Cabinet Secretariat of the Government of India, which houses India's foreign intelligence service, the Research and Analysis Wing.  (*Id.* ¶ 2).  At Yadav's direction, Gupta contracted someone he believed to be a hitman, but who was in fact an undercover U.S. law enforcement officer (the "UC"), to murder the Victim in exchange for $100,000.  (*Id.* ¶ 4).  In furtherance of their plot, Yadav and Gupta, who both lived in India, had a $15,000 advance payment delivered in cash to the UC in Manhattan, New York.  (*Id.* ¶¶ 2–4).

In or about early May 2023, Yadav, who has described his own position as a "Senior Field Officer" with responsibilities in "Security Management" and "Intelligence," asked Gupta to arrange the murder of the Victim in exchange for Yadav's assistance in dismissing a criminal case pending against Gupta in India.  (*Id.* ¶¶ 2, 10).  Gupta agreed.  (*Id.* ¶ 10).  Later that month, after Yadav assured Gupta that his criminal case "has already been taken care of," (*id.* ¶ 12), Gupta contacted someone he believed to be a criminal associate, but who was in fact a DEA confidential source (the "CS"), to arrange the murder of the Victim in the United States, (S2 Indictment ¶¶ 4, 13).  The CS introduced the UC as a hitman to Gupta.  (*Id.* ¶ 4).  Yadav approved the $100,000 contract price for the Victim's murder, (*id.* ¶ 15), and he worked with Gupta to deliver the $15,000 advance payment to the UC, (*id.* ¶¶ 17–23).

In or about June 2023, in furtherance of the assassination plot, Yadav provided Gupta with personal information about the Victim — including the Victim's home address in New York City — which Gupta then passed to the UC.  (*Id.* ¶ 5).  In extensive electronic and recorded communications, Gupta offered suggestions and pressed the CS and the UC for updates on the murder.  (*Id.* ¶ 14).  For example, Gupta asked the CS and UC to take GPS-stamped surveillance photographs of the Victim and the Victim's residence, and Gupta forwarded those photographs to Yadav.  (*Id.* ¶¶ 16, 18, 33–34).  Gupta directed the CS and the UC to carry out the murder as soon as possible, but Gupta also specifically instructed them not to commit the murder around the time of the Indian Prime Minister's official state visit to the United States, which was scheduled to begin on or about June 20, 2023.  (*Id.* ¶ 5).

On or about June 18, 2023, approximately two days before the Indian Prime Minister's state visit to the United States, masked gunmen murdered Hardeep Singh Nijjar — an associate of the Victim and another leader of the Sikh separatist movement — outside a Sikh temple in British Columbia, Canada.  (*Id.* ¶ 6).  Later that evening, Yadav sent Gupta a video clip that showed Nijjar's bloody body slumped in Nijjar's vehicle.  (*Id.* ¶ 29).  Gupta forwarded the video to the CS and the UC.  (*Id.* ¶ 30).  On an audio call the next day, Gupta told the UC that Nijjar "was also the target" and "we have so many targets."  (*Id.*).  Gupta added that in light of Nijjar's murder, there was "now no need to wait" to kill the Victim.  (*Id.*).  Separately, on an audio call with the CS, Gupta told the CS that the UC should kill the Victim as soon as possible, informing the CS that "we got the go-ahead to go anytime, even today, tomorrow — as early as possible."  (*Id.*).  Gupta urged the CS to "not give [the Victim] the chance, any chance," adding:  "If he is not alone, [if] there are two guys with him in the meeting or something . . . put everyone down, put everyone down."  (*Id.*).

**B.      June 2023:  Gupta Is Charged in the United States and Arrested in the Czech Republic**

On June 13, 2023, a grand jury returned Indictment 23 Cr. 289 (the "Indictment," Dkt. 3) charging Gupta in two counts:  murder-for-hire conspiracy, in violation of 18 U.S.C. § 1958 (Count One), and murder-for-hire, in violation of 18 U.S.C. §§ 1958 and 2 (Count Two).  The Court issued an arrest warrant for Gupta based upon the Indictment.

By letter dated June 19, 2023, the United States requested that Czech authorities "execute a provisional arrest, for the purpose of the extradition," of Gupta, who planned to travel to Prague to meet the CS, in accordance with the U.S.-Czech Extradition Treaty.  (Ex. 1 at 1).  In its June 19 letter, the United States also requested, pursuant to the Treaty, that Czech authorities seize and eventually surrender "all articles, instruments, objects of value, documents and other evidence relating to the offenses charged that are found in the possession of GUPTA at the time of his arrest." (*Id.* at 3).  Czech authorities granted the provisional arrest request.  (Ex. 2B at 10; Ex, 18B ¶ 17).

On June 30, 2023, Gupta arrived at the Prague airport.  (Ex. 5 ¶ 1).  Czech law enforcement officers went inside the airport to arrest Gupta, while two DEA agents — Special Agent Mark Franks and Task Force Officer Jose Sandobal — waited in a van outside.  (*Id.*).  In a group chat, a Czech officer updated the DEA agents as the Czech officers waited in the airport for Gupta to finish "shopping perfume," clear "border control" and then "take his luggage off the belt."  (Ex. 3).  The DEA agents received these updates without providing direction or asking follow-up questions as the Czech officers worked.  (*Id.*).  Finally, Czech authorities arrested Gupta after he retrieved his bags, and the Czech officer wrote in the group chat, "your man has just been arrested!!" (*Id.*).  No U.S. law enforcement officers were present at Gupta's arrest.

After taking Gupta into custody, the Czech officers processed his arrest at the airport. No U.S. law enforcement officers were present during this processing. A few minutes after announcing Gupta's arrest, (Ex. 3), a Czech officer sent photographs in the group chat of Gupta and his Indian passports, (*e.g.*, Ex. 8). The Czech officer also sent a video showing Gupta speaking and typing in the passcode to unlock an iPhone, and beginning to enter the passcode to unlock a second iPhone (the "Passcode Video"). (Ex. 9). The DEA agents received these updates in the group chat without providing any direction or comment. (Ex. 3). In total, Czech law enforcement seized three cellphones from Gupta — an iPhone 11 and iPhone 14, which were both locked with a six-digit passcode, and a Samsung Vivo, which was unlocked (collectively, the "Gupta Cellphones"). (Ex. 15B at 3–5). The Czech officers informed the DEA agents that Gupta had voluntarily provided his phone passcodes, (Ex. 5 ¶ 4), and in a text message that same day, Officer Sandobal informed two of the prosecutors on this case that Gupta "gave the codes to unlock [the phones] to the arrest team," (Ex. 10).[5]

With Gupta in custody, the Czech law enforcement officers left the airport and entered the van, where Agent Franks and Officer Sandobal were waiting. (Ex. 5 ¶ 1). As the Czech officers drove Gupta to a local jail, the two DEA agents conducted a short interview of Gupta in the van. (*Id.* ¶¶ 2–4). Before substantive questioning, Agent Franks read Gupta an advice-of-rights form, (*id.* ¶ 2), which informed Gupta, among other things, that "[y]ou have the right to remain silent," that "[a]nything you say can be used against you in court," that "[y]ou have the right to talk to a

---

[5] Gupta's motion erroneously attributes one of the messages in the text chain to Assistant United States Attorney ("AUSA") Alexander Li, who was not on the chain. (Mot. 6). The cited message was from AUSA Ashley Nicolas. (Ex. 10).

lawyer for advice before we ask you any questions," and that "[i]f you decide to answer questions now without a lawyer present, you have the right to stop answering at any time," (Ex. 11).[6]

Gupta agreed to speak with the DEA agents.[7] (Ex. 5 ¶ 2). Gupta told the agents, in substance and in part, that he had been approached in India by someone named "Amanat" — later identified as Yadav — who offered to assist Gupta in clearing a robbery summons in India in exchange for Gupta's assistance in having someone in New York City killed. (*Id.* ¶ 3). Gupta acknowledged that he knew someone (apparently referring to the CS) and admitted that Gupta had helped to facilitate the murder-for-hire. (*Id.*). Gupta identified the contact information for "Amanat" on one of his cellphones, and Agent Franks took a photograph of the contact name and associated phone number, as displayed on Gupta's phone. (Ex. 31). At the end of the car ride, when the vehicle arrived at the Czech jail, Gupta wrote his name on the advice-of-rights form but declined to sign it because he wanted to place a phone call first. (Ex. 5 ¶ 4; Ex. 11). Gupta's interview with the DEA agents lasted approximately ten to fifteen minutes. (Ex. 30).

---

[6] Agent Franks' reading of the advice-of-rights form is documented in a DEA report, and the advice-of-rights form is included in the file. (Exs. 5, 11). Gupta questions the "accuracy of the DEA Personnel's account" because "when recently asked about the circumstances of Mr. Gupta's interrogation, SA Franks and TFO Sandobal did not mention advising Mr. Gupta of his rights." (Mot. 24 (citing Exs. 30, 31)). But as Gupta's counsel is aware, the Government's interviews with the DEA agents on June 10, 2025 (as documented in Exhibits 30 and 31) were intended to address an eight-page list of discovery-related questions that Gupta's attorneys sent the Government on June 2, 2025, and were not full debriefings on Gupta's post-arrest statement. The Government's good-faith efforts to answer Gupta's inquiries should not be construed as a tacit concession on questions not raised.

[7] At a hearing, the Government expects to offer testimony that the DEA agents proceeded on Gupta's oral waiver due to the short drive from the airport to the jail, and because it would have been difficult to apply signatures during the bumpy car ride. As Gupta concedes, the DEA agents asked Gupta to sign the form "[a]round the end of the car ride." (Mot. at 7).

**C.    July to September 2023:  Czech Authorities Provide Gupta's Cellphones to the United States**

Consistent with the United States's June 19 provisional arrest request, and in accordance with Czech law, Czech law enforcement authorities requested that Gupta surrender the Gupta Cellphones as evidence in the case.  (Ex. 15B at 3–5).  In a written document signed by Gupta, Gupta's Czech attorney, an interpreter, and a Czech officer on June 30, 2023 (the date of Gupta's arrest), Gupta acknowledged that the three Gupta Cellphones belonged to him and that he had surrendered them to Czech authorities as required by the Czech Criminal Procedure Code.  (*Id.*). On July 12, 2023, Czech authorities provided forensic extractions of two of the Gupta Cellphones — the Samsung Vivo and the iPhone 14 (but not the iPhone 11) — to U.S. authorities (the "July 12 Extractions").[8]

On September 19, 2023, Czech authorities transferred custody of the physical Gupta Cellphones, along with forensic extractions made by the Czech authorities of all three Gupta Cellphones (the "MLAT Extractions"), to U.S. authorities pursuant to a Mutual Legal Assistance Treaty ("MLAT") request from the United States.  (Ex. 15B at 1).[9]  Czech authorities also furnished the passcode to the iPhone 11 and iPhone 14 — which was the same passcode that Gupta was recorded entering in the Passcode Video — pursuant to the MLAT request.  (*Id.* at 4).  On September 28, 2023, the Gupta Cellphones and MLAT Extractions were transported to this District.  (Ex. 16 ¶ 9(d)).  That same day, Magistrate Judge Ona T. Wang issued a search warrant

---

[8] In its subsequent search warrant application for the physical Gupta Cellphones, the Government disclosed that it had received the July 12 Extractions and that U.S. law enforcement members had reviewed those extractions.  (Ex. 16 ¶ 9(d) n.3).  The Government did not rely upon the content of the July 12 Extractions in its warrant application, (*id.*), and the Government will not offer the July 12 Extractions at trial.

[9] The Government's search warrant application for the Gupta Cellphones mistakenly stated the date of the transfer was September 14, 2023 (rather than September 19, 2023).  (Ex. 16 ¶ 9(c)).

for the physical Gupta Cellphones.[10]  (Ex. C).  The Government provided the passcode for the

iPhone 11 and iPhone 14 to a forensic examiner, who extracted the contents of all three Gupta

Cellphones (including the unlocked Samsung Vivo) pursuant to the warrant.  (Ex. 17).

**The iPhone 11.**  The Government then reviewed the extractions of the Gupta Cellphones

and identified materials responsive to the search warrant, including the following from Gupta's

iPhone 11:

- Approximately 475 text messages between Gupta and Yadav, who was saved on Gupta's iPhone 11 as "Amanat," on the encrypted messaging platform WhatsApp.  In the messages, which spanned the period May 6, 2023 to June 29, 2023, Gupta and Yadav planned the murder of the Victim on a day-to-day basis.  For example, on June 3, 2023, Gupta texted Yadav:  "my brother, I spoke with the NY group and they told me to send me evidence from the lawyer tomorrow, I told them that they have to discharge him as soon as possible."

- Approximately 16 text messages between Gupta and the CS, including messages that were forensically recovered in "scrambled" form (*i.e.*, with words out of order).  For example, Gupta's May 29, 2023 message to the CS that the Victim spent "[m]ost of time in New York" was recovered, in scrambled form, from Gupta's iPhone 11 as "of new most in york time."

- Contact information for "Amanat" associated with WhatsApp and with a second encrypted messaging application, Signal.

- Contact information for the UC and the CS.

- Cellphone location history information placing Gupta's iPhone 11 in the vicinity of New Delhi, India, at various times between May 1, 2023 and June 29, 2023.

**The Samsung Vivo.**  The Government also identified materials responsive to the search

warrant from Gupta's Samsung Vivo, including the following:

- Approximately 40 Signal messages between Gupta and Yadav, who was saved on Gupta's Samsung Vivo as "Amanat."  In the messages, which spanned the period June

---

[10] Although no warrant was necessary to review the MLAT Extractions provided by Czech authorities, *see United States v. Lee*, 723 F.3d 134, 139 (2d Cir. 2013) ("the Fourth Amendment's exclusionary rule . . . generally does not apply to evidence obtained by searches abroad conducted by foreign officials"), the Government did not review the MLAT Extractions until after receiving the search warrant for the physical Gupta Cellphones.

24, 2023 to June 30, 2023, Gupta and Yadav plotted the murder of the Victim. For example, on June 25, 2023, Gupta sent Yadav GPS-tagged photographs of the vicinity of the Victim's residence (which Gupta had received from the UC). Yadav replied: "Excellent . . . [t]hey are proving that they are quite serious now."

- Approximately five text messages from the UC, including a message in which the UC told Gupta to "[s]ave my this new number."

- Contact information for "Amanat" associated with WhatsApp and Signal.

- Contact information for the UC and the CS.

**The iPhone 14.**  The Government identified a small set of materials responsive to the search warrant from Gupta's iPhone 14, including a WhatsApp account in Gupta's name.

### D.    August 2023 to June 2024:  Gupta Is Extradited to the United States

By diplomatic note dated August 23, 2023, the United States requested the extradition of Gupta for prosecution on the Indictment.  (Ex. 22).  In a supporting affidavit, Agent Franks described the factual bases for the charges against Gupta.  (Ex. 21, Franks Affidavit).  Among other things, Agent Franks explained that Gupta had offered to pay "100 k" for the murder and had arranged for an associate (the "Money Courier") to deliver an advance payment of $15,000 in cash to the UC in New York.  (*Id.* ¶¶ 6–7).  Agent Franks also explained how Gupta planned to remit payment to the Money Courier in India:  "During the meeting with the Undercover Agent and the Money Courier, GUPTA called the Undercover Agent and asked to the speak to the Money Courier.  GUPTA and the Money Courier discussed GUPTA repaying the $15,000 to the Money Courier in India, where GUPTA lives and where the Money Courier has family and a construction business."  (*Id.* ¶ 8).

On November 29, 2023, while extradition proceedings were pending, a grand jury returned the S1 Superseding Indictment (the "S1 Indictment," Dkt. 9).  The S1 Indictment added factual details about the murder-for-hire plot but maintained the same two charges against Gupta.

By letter dated June 6, 2024, the Czech Ministry of Justice informed the U.S. Department of Justice that it had granted the extradition of Gupta to the United States.  (Ex. B).

On June 14, 2024, Gupta was extradited to the United States.

### E.    October 2024 to February 2025:  The Czech Republic Advises that No Waiver of the Rule of Specialty Is Needed for Count Three

On October 17, 2024, a grand jury returned the S2 Indictment.  The S2 Indictment added a third count against Gupta, charging him with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Three), in connection with his participation in the plan to send money from India to the United States to pay the purported hitman.  The S2 Indictment also added Yadav as a co-defendant in all three counts.

After obtaining the S2 Indictment, the Government informed Gupta's counsel that it intended to request a waiver of the rule of specialty (also known as an extension of extradition) from the Czech Republic based upon the Government's understanding, at the time, that the Czech Republic required such a waiver before the Government could proceed to trial against Gupta on Count Three.[11]  (Ex. 24).  At the Court conference on January 17, 2025, Gupta's counsel told the Court that "[l]ast week the government did notify us about their intent to provide a petition to the . . . Czech Ministry of Justice requesting waiver under the Rule of Specialty for the added charge in the superseding indictment."  (Transcript of January 17, 2025 Conference ("1/17/25 Tr."), Dkt. 59, at 5).  Gupta's counsel added that "it is our position that the post-extradition charge, the money

---

[11] "The principle of specialty, long recognized in international law, provides that the requisitioning state may not, without the permission of the asylum state, try or punish the fugitive for any crimes committed before the extradition except the crimes for which he was extradited."  *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir. 1973).  "[W]hether an extradition treaty permits prosecution for a certain crime or imposes a certain condition specified in the extradition request," however, "'is a matter for the extraditing country to determine.'"  *United States v. Gonzalez*, 275 F. Supp. 2d 483, 487 (S.D.N.Y. 2003) (quoting *United States v. Campbell*, 300 F.3d 202, 209 (2d Cir. 2002)).

laundering charge . . . is not based on any new conduct that was not known or discussed at the time of his extradition and under our, admittedly, lay-reading of Czech law[,] [w]e believe that it doesn't form a basis for expansion of the waiver." (*Id.* at 6).

Before the United States made any waiver request to the Czech Republic, Gupta asked the Czech Republic to deny the waiver. By letter dated February 18, 2025, Gupta, through his U.S. counsel, requested that the Czech Ministry of Justice "decline to provide waiver of the Rule of Specialty as to Count Three" because, among other reasons, the S2 Indictment "alleges no facts that were not already included in the June 13, 2023, Sealed First Indictment, the Affidavit in Support of Extradition, or the Diplomatic Note." (Ex. 25 at 1–2). Gupta argued that on his understanding of Czech law, a request to waive the rule of specialty must be supported by previously unalleged facts, but the S2 Indictment instead "re-alleges that the same pre-extradition conduct, that Mr. Gupta allegedly coordinated payment of the purported hitman, to support the additional post-extradition Money Laundering charge." (*Id.* at 2).

After receiving Gupta's letter, the Czech Ministry of Justice informed the U.S. Department of Justice that no waiver of the rule of specialty was necessary under Czech law because, as Gupta himself argued and agreed, the money laundering charge in Count Three was based upon the same alleged facts submitted in the underlying extradition proceedings. On February 25, 2025, the Government notified the Court of this development and advised that it intended to proceed to trial on Count Three. (Dkt. 40). At around the same time, another prosecution team in this District received a similar determination from the Czech Republic in *United States v. Amirov*, where charges were added after extradition but arose from the same facts submitted in the underlying extradition proceedings in that case. In *Amirov*, as here, the Czech Ministry of Justice advised, in substance, that a waiver of the rule of specialty "is not required where the additional charge is

12

based on the same facts, meaning acts, as the charges for which extradition previously was granted." *Amirov*, No. 22 Cr. 438 (CM), Doc. No. 126 (Mar. 1, 2025). Based upon this guidance from the Czech Republic, the Government determined that because Agent Franks' affidavit in the original extradition request had described Gupta's money laundering conduct, (Ex. 21, Franks Affidavit ¶¶ 6–8), it was unnecessary to request a waiver of the rule of specialty as to Count Three here. Accordingly, the United States did not transmit its previously-anticipated waiver request to the Czech Republic.

By letter dated April 10, 2025, the Czech Ministry of Justice responded to Gupta's counsel. (Ex. 26). The Czech Ministry of Justice informed Gupta that whether a waiver of the rule of specialty "has to be requested in accordance with the applicable provisions of the international treaty based on which the extradition was granted lies entirely within the competence of the requesting State [*i.e.*, the United States], not the requested State [*i.e.*, the Czech Republic]." (*Id.*). Because the United States had determined, based on the guidance provided by the Czech Republic, that it was unnecessary to request a waiver of the rule of specialty as to Count Three, and therefore had not made a waiver request, the Czech Ministry of Justice informed Gupta that "there are currently no proceedings pending to grant additional consent to extent Mr. Gupta's extradition to the United States." (*Id.*).

By letter dated July 7, 2025, the Czech Ministry of Justice further advised the U.S. Department of Justice on the Czech Republic's position regarding the application of the rule of specialty to this case. (Ex. A). The Czech Ministry of Justice quoted the relevant Czech statute, which provides that a waiver of the rule of specialty is necessary for "prosecution of the person for ***another act*** committed before the extradition, other than for which the extradition was granted." (*Id.* at 1 (emphasis added)). The Czech Ministry of Justice explained — consistent with

the Government's representations here and in *Amirov* — that this law means "[i]f there are no new facts and the new charge is based upon the same facts (acts) for which the extradition was granted, it is not necessary to seek . . . waiver of the rule of specialty." (*Id.*). The Czech Ministry of Justice further advised — consistent with its letter to Gupta — that the "requesting State," *i.e.,* the United States, "is competent to assess[] whether the new charge is based upon the same facts and there is no need to request the waiver of the rule of specialty." (*Id.* at 2).

## ARGUMENT

### I.    Gupta's Motion to Suppress the iPhone Passcode He Provided to Czech Authorities Should Be Denied

Gupta moves to suppress the iPhone passcode he provided to Czech authorities because they did not administer him *Miranda* warnings. (Mot. 17–21). The motion should be denied because *Miranda* does not require suppression of unwarned but voluntary statements made to foreign police. Alternatively, the motion should be denied because the compelled provision of Gupta's passcode would not violate the Fifth Amendment in any event.

### A.    *Miranda* Permits Admission of the Passcode that Gupta Provided to the Czech Police

#### 1.    Applicable Law

Although *Miranda* warnings are required before custodial interrogation in the United States to protect the Fifth Amendment right against self-incrimination, "the law is settled that statements taken by foreign police in the absence of *Miranda* warnings are admissible if voluntary." *United States v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003). "[I]nformation furnished American officials by foreign police need not be excluded simply because the procedures followed in securing it did not fully comply with our nation's constitutional requirements." *United States v. Cotroni*, 527 F.2d 708, 711 (2d Cir. 1975). Because "the threat of suppression in U.S. courts for failure to comply with *Miranda* holds little sway over foreign authorities," *In re Terrorist Bombings of U.S.*

*Embassies in E. Afr.* ("*Terrorist Bombings*"), 552 F.3d 177, 202 (2d Cir. 2008), and because "[t]he exclusionary rule is intended to inculcate a respect for the Constitution in the police of our own nation," *Cotroni*, 527 F.2d at 712, the Second Circuit has consistently "declined to suppress un-warned statements obtained overseas by foreign officials," *Terrorist Bombings*, 522 F.3d at 202.

Instead of applying *Miranda*, "[w]henever a court is asked to rule upon the admissibility of a statement made to a foreign police officer, the court must consider the totality of the circumstances to determine whether the statement was voluntary." *United States v. Welch*, 455 F.2d 211, 213 (2d Cir. 1972); *see also United States v. Restrepo*, No. 01 Cr. 1113 (SAS), 2002 WL 10455, at *7 (S.D.N.Y. Jan. 3, 2002) (denying motion to suppress un-*Mirandized* statements to Colombian police because "[n]owhere in his papers has Restrepo alleged that his statements were involuntary or coerced"). In evaluating the totality of the circumstances, courts generally consider the "accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). The core question is "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000).

"There are two recognized exceptions to the principle outlined in *Yousef* that voluntary statements made by un-*Mirandized* defendants in the presence of foreign officers are admissible." *United States v. Hashmi*, No. 06 Cr. 442 (LAP), 2009 WL 2496272, at *4 (S.D.N.Y. Aug. 7, 2009). First, under the "joint venture" doctrine, "statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings must be suppressed whenever United States law enforcement agents actively participate in questioning conducted by foreign authorities." *Yousef*, 327 F.3d at 145. "Importantly," however, and as relevant here, "'[e]vidence that the United States may have solicited the assistance of a foreign government in the arrest of a fugitive within

its borders is insufficient as a matter of law to constitute United States participation under the joint venture doctrine.'" *Hashmi*, 2009 WL 2496272 at *4–5 (quoting *Yousef*, 327 F.3d at 146). Second, "statements obtained under circumstances that 'shock the judicial conscience' will be suppressed." *Yousef*, 327 F.3d at 146.

Where, as here, a defendant invokes the "joint venture" doctrine, the Second Circuit has not "explicitly determined whether it is [the] defendant's burden to establish that a joint venture existed or the government's burden to prove that it did not." *United States v. Bary*, 978 F. Supp. 2d 356, 366 (S.D.N.Y. 2013). Assuming it is the Government's burden to prove the absence of a joint venture, that burden "is not a heavy one." *Bary*, 978 F. Supp. 2d at 367. "If the government can show that the United States and foreign law enforcement went no further than providing assistance and sharing information, a joint venture has been disproven. This is particularly true where U.S. authorities do not themselves conduct the interview in question." *Id.*

### 2. Discussion

Gupta does not claim that his provision of his passcode to Czech authorities was involuntary.[12] Instead, Gupta argues only that the Czech police should have administered *Miranda* warnings before taking his passcode because "the U.S. and Czech law enforcement personnel were engaged in a joint venture." (Mot. 20). Assuming without conceding that the Czech police gave Gupta no *Miranda* (or equivalent) warnings, there was no joint venture on the following undisputed facts:

---

[12] Should Gupta argue in his reply brief that the provision of his passcode was involuntary, the Court should dismiss the argument as forfeit. *See Melo v. United States*, 825 F. Supp. 2d 457, 464 (S.D.N.Y. 2011) (Marrero, J.) ("[T]he Court notes Melo waived this argument because he raised it for the first time in his Reply."); Individual Rules of Practice of United States District Judge Victor Marrero § II.D ("The Court will not consider new matters raised in replies for the first time.").

- The Czech Republic acted pursuant to a formal request from the United States to arrest Gupta in anticipation of extradition and to seize evidence in Gupta's possession.  (Ex. 1; Mot. 2–3).

- Czech and U.S. law enforcement officers discussed the arrest procedures before Gupta's arrest.  (Ex. 3; Mot. 3–4).

- On the day of the arrest, two DEA agents waited outside the Prague airport, while Czech law enforcement officers arrested and processed Gupta inside the airport.  (Exs. 5, 30, 31; Mot. 4).

- No U.S. law enforcement officers participated in Gupta's arrest or post-arrest processing at the Prague airport.  (Exs. 5, 30, 31; Mot. 4–5).

- No U.S. law enforcement officers were present when Gupta provided his passcode to Czech authorities at the Prague airport.  (Exs. 5, 30, 31; Mot. 5).

- Czech officers provided factual updates to the DEA agents during Gupta's arrest and processing at the airport.  The Czech officers solicited no input from the DEA agents, and the DEA agents gave none.  (Ex. 3; Mot. 4–6).

- After Czech officers arrested and processed Gupta at the Prague airport, DEA agents interviewed Gupta during the ride from the airport to the local jail.  (Ex. 5; Mot. 6–8).

- Czech authorities later provided U.S. authorities with extractions of two of Gupta's phones, and subsequently provided extractions of all three phones (along with the physical phones) pursuant to a MLAT request.  (Ex. 15B at 1; Ex. 16 ¶ 9(d) n.3; Mot. 10).

None of these facts, individually or together, amount to a "joint venture" between U.S. and Czech authorities to obtain Gupta's passcode.  Most importantly, there is no evidence that "United States law enforcement agents actively participate[d] in [the] questioning conducted by foreign authorities."  *Yousef*, 327 F.3d at 145; *see also United States v. Zhukov*, 537 F. Supp. 3d 431, 436 (E.D.N.Y. 2021) ("In the Second Circuit in particular, the joint-venture analysis focuses less on the overall level of cooperation between the two nations, and more on the U.S. agents' efforts to direct the *specific* questioning at issue.").  The undisputed fact is that the DEA agents were not even in the airport, much less the questioning room, when the Czech officers asked Gupta for his phone passcode.  Nor did the DEA agents direct the questioning from afar.  The contemporaneous

text messages between the Czech officers and DEA agents show that the updates flowed in one direction, from the Czech officers to the DEA agents, with no request by the DEA agents that the Czech officers ask anything of Gupta at all.  (Ex. 3).

The facts of this case are analogous to *Zhukov*, an EDNY case upon which Gupta relies. (Mem. 16–17).  In that case, Bulgarian police officers arrested Zhukov and searched his apartment in Bulgaria pursuant to a MLAT request from the United States.  *Zhukov*, 537 F. Supp. 3d at 433. There was no independent Bulgarian investigation, and the U.S. MLAT request expressly asked Bulgarian officials to coordinate the scheduling of all searches and interviews with the FBI attaché, to permit the FBI attaché to participate in the search and interview of Zhukov, and to seize certain electronic devices if identified during the search.  *Id*.  U.S. law enforcement officers "attended briefings before the search was executed" and dined with the lead Bulgarian police officer the night before the search.  *Id*. at 436.  On the day of the search, the lead Bulgarian police officer searched Zhukov's residence — with an FBI agent present as an observer — and asked Zhukov "questions about various items recovered, such as 'is this cell phone yours,' and 'is this computer yours.'"  *Id*. at 433.  Immediately after the search and arrest, FBI agents conducted their own post-arrest interview of Zhukov.  *Id*.

Judge Komitee declined to suppress Zhukov's statements to the Bulgarian police admitting ownership of the items seized during the search of his residence, holding that there was no "joint venture between United States and Bulgarian law enforcement" in obtaining those statements.  *Id*. Judge Komitee acknowledged that there was "some level of coordination between Bulgaria and the U.S. to carry out the search, arrest, and post-arrest interview," but found that this coordination did not amount to a directive to Bulgarian officers to pose the specific questions "asked during the search of Zhukov's apartment."  *Id*. at 433–34.  Under the joint-venture doctrine, Judge Komitee

observed, "it does not suffice that the questioning at issue may have taken place in response to an American request for the Defendant's arrest and for the search of his premises, or that an American FBI agent was on the search premises when the questioning occurred." *Id.* at 437.  At bottom, there was "no direct evidence demonstrating that the U.S. actively participated in [the Bulgarian] questioning, coordinated it, or used their foreign counterparts as their agents." *Id.* at 438.

Here, as in *Zhukov*, Gupta asks the Court to infer an agency relationship despite direct evidence — the contemporaneous chat messages between the Czech and U.S. officers, (Ex. 3) — showing that the U.S. officers did not direct the specific Czech questioning at issue.  Gupta protests that the "Czech authorities did not have their own independent investigation" of him and "had no independent reason to take the significant steps of obtaining the passwords for his phones and imaging those phones."  (Mot. 17).  But the law is clear that "a joint venture does not arise from the U.S. requesting investigative actions and arrest overseas, even where the recipient nation maintains no investigation of its own." *Zhukov*, 537 F. Supp. 3d at 436 (collecting authorities, including *United States v. Gasperini*, 894 F.3d 482, 489 (2d Cir. 2018) ("A mere request is not sufficient to show control.")).  Gupta rhetorically asks why "the Czech officers . . . sent a video to the WhatsApp Group of themselves obtaining the passwords to the phones," (Mot. 18), but it was no secret that the United States hoped to obtain evidence from Gupta's phone.  Here, like in *Zhukov*, the United States had expressly asked in its provisional arrest request to seize any evidence in Gupta's possession.  That the United States asked the Czech Republic to seize evidence from Gupta, including his cellphones, does not mean that the United States specifically directed Czech authorities to ask Gupta for his passcode.[13]  *See Zhukov*, 537 F. Supp. 3d at 437.

---

[13] Neither Officer Sandobal nor Agent Franks is aware of anyone from the DEA asking the Czech officers to obtain Gupta's cellphone passcode.  Consistent with the provisional arrest request,

*(continued on next page)*

19

Nor do the other facts cited by Gupta establish a joint venture.  Gupta emphasizes that "DEA officials were *in Prague at the airport* for Mr. Gupta's arrest, were engaged in WhatsApp communications with the Czech NDH officers charged with effectuating Mr. Gupta's arrest and met with Czech NDH officers in-person in the hours before Mr. Gupta's flight landed," (Mot. 17), but "providing assistance and sharing information" do not a joint venture make — particularly where, as here, "U.S. authorities do not themselves conduct the interview in question," *Bary*, 978 F. Supp. 2d at 367; *see also United States v. Molina-Chacon*, 627 F. Supp. 1253, 1263 (E.D.N.Y. 1986) ("The role of the United States in helping to plan the arrest of Molina-Chacon does not impose the requirements of *Miranda* on the 'interrogation' by Bermudian officials.").  Gupta says the Czech officers "intentionally took the 'long route' to give the DEA Personnel an opportunity to question Mr. Gupta," (Mot. 18), but it is not "enough that foreign law enforcement agents granted a U.S. law enforcement agent permission to question a suspect," *United States v. Straker*, 800 F.3d 570, 616 (D.C. Cir. 2015); *see also Zhukov*, 537 F. Supp. 3d at 438.  Gupta points out that Czech authorities later provided extractions of his phones to the United States, (Mot. 19), but this occurred in the weeks and months after Gupta's arrest.  The relevant inquiry is not "the overall level of cooperation between the two nations," but rather "the U.S. agents' efforts to direct the specific *questioning* at issue."  *Zhukov*, 537 F. Supp. 3d at 436 (citing, *inter alia*, *Bary*, 978 F.

---

Officer Sandobal does recall that at a meeting between DEA and Czech officers before Gupta's arrest, someone from the DEA said, in substance, that the DEA would like to get Gupta's phones, ideally with his consent, and if he unlocked it even better.  The DEA's expression of hope that Gupta would consent to a search of his phones was not a directive to Czech officers to ask Gupta for his passcode, just as the United States's request to Bulgarian authorities that "certain electronic devices and other property be seized, if identified during the search" of Zhukov's residence was not a directive to Bulgarian police to ask Zhukov "is this cell phone yours."  *Zhukov*, 537 F. Supp. 3d at 433.

Supp. 2d at 367).  The DEA agents' contemporaneous communications with the Czech officers reveals no direction by the DEA agents whatsoever.  (Ex. 3).

The undisputed facts thus show that Czech authorities asked Gupta for his passcode of their own accord.  Indeed, the fact that the Czech police did not even permit the DEA agents to be in the airport when they arrested and processed Gupta — even though the DEA agents' presence would have been entirely permissible under the joint-venture doctrine, *see Zhukov*, 537 F. Supp. 3d at 436; *Straker*, 800 F.3d at 616 ("silent observation does not make the [foreign] interrogation the FBI's own for purposes of *Miranda*"); *United States v. Abu Ali*, 528 F.3d 210, 229 (4th Cir. 2008) ("mere presence at an interrogation does not constitute the active or substantial participation necessary for a joint venture") — shows that the Czech authorities were acting under their own authorities, and not at the direction of the DEA agents.[14]  Were the limited and routine interactions cited by Gupta to rise to the level of a joint venture, "all manner of routine international cooperation would be subject to *Miranda*'s strictures regardless of whether U.S. law enforcement officers have any practical authority over or responsibility for the interrogations and investigative measures undertaken by foreign officials."  *Straker*, 800 F.3d at 617.  That is not the law.  "*Miranda* is a prophylaxis designed to regulate and deter the coercive conduct of domestic law enforcement officers.  It is not meant to police independent foreign investigative activities that U.S. law enforcement officers do not direct and cannot control."  *Id.*

---

[14] That Czech authorities prepared a written record on the day of Gupta's arrest, signed by (among others) Gupta and his Czech attorney and documenting Gupta's ownership and surrender of his cellphones in accordance with the Czech Criminal Procedure Code, further suggests that the Czech request for Gupta's passcodes was a regular feature of Czech police practice.  (Ex. 15B at 3–5).

Because there was no joint venture between U.S. and Czech authorities, *Miranda* does not bar the admission of the iPhone passcode that Gupta provided to the Czech police.  Gupta's motion to suppress the passcode, and the fruits of that passcode, should therefore be denied.

**B.      Gupta's Provision of His Passcode Implicates No Fifth Amendment Privilege**

Even if there was a joint venture — and there was not — Gupta's passcode should not be suppressed under the foregone conclusion doctrine of the Fifth Amendment.  "[T]he testimonial significance of unlocking a cellphone or providing the password is the implied statement:  'I am the person who knows the password for this phone.'"  *United States v. Smith*, 706 F. Supp. 3d 404, 408 (S.D.N.Y. 2023).  But where, as here, "the Government can independently show the phone belonged to the defendant and that the defendant knew the password, the foregone conclusion doctrine applies, and the Fifth Amendment is not violated by the act of compelled decryption."  *Id.*

Here, as in *Smith*, any Fifth Amendment rights that Gupta possessed in the Czech Republic "were not violated because the Government knew that [Gupta] was the owner of the phone and that [Gupta] knew the password to unlock it."  *Id.* at 409.  Not only were the iPhones found on Gupta's person, but Gupta expressly acknowledged in writing later that day, with the assistance of Czech counsel, that "[a]ll of the above-mentioned mobile phones belong to me.  This includes two Apple iPhones and one Samsung mobile phone."  (Ex. 15B at 5).  Moreover, because the iPhones were on Gupta's person, and because Gupta had been using a cellphone to communicate with the UC and the CS (including to meet the CS in Prague), it was self-evident that Gupta knew the passcode to unlock his iPhones.  Accordingly, even assuming *arguendo* that the Czech police compelled Gupta to produce his passcode, and even assuming further that the joint-venture doctrine makes *Miranda* applicable here, Gupta's passcode should not be suppressed.

**II.    Gupta's Motion to Suppress the Czech and U.S. Searches of His iPhones Should Be Denied**

Gupta next argues that the Czech authorities' extractions of his iPhone 11 and iPhone 14 provided with the MLAT Extractions, and the Government's search of the same two iPhones pursuant to a search warrant, both utilized his passcode and "accordingly must be suppressed as the fruit of the poisonous tree."[15] (Mot. 22). Gupta is wrong. Even if his iPhone passcode were obtained in violation of *Miranda* (and it was not), it is black-letter law that the "'fruit of the poisonous tree' doctrine" does not extend to "mere failures to warn." *Patane*, 542 U.S. at 642. Under the rule of *Patane*, the remedy for any *Miranda* violation would be suppression of Gupta's passcode but not the contents of his iPhones.

**A.    Even If Gupta's Passcode Were Obtained in Violation of *Miranda*, the Contents of His iPhones Should Not Be Suppressed**

In *Patane*, the Supreme Court considered whether "a failure to give a suspect the warnings prescribed by *Miranda* . . . requires suppression of the physical fruits of the suspect's unwarned but voluntary statements." 542 U.S. at 633–34. The Court answered the question in the negative. The plurality explained that "police do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*." *Id.* at 641. Instead, "[p]otential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial. And, at that point, the exclusion

---

[15] There were three searches of the Gupta Cellphones: (1) the July 12 Extractions, whereby Czech authorities provided extractions of Gupta's Samsung Vivo and iPhone 14 (but not his iPhone 11); (2) the MLAT Extractions, whereby Czech authorities provided extractions of all three Gupta Cellphones pursuant to a MLAT request; and (3) the Government's searches of all three Gupta Cellphones pursuant to a search warrant. The Government will not offer the July 12 Extractions at trial, and Gupta does not move to suppress the Samsung Vivo. (Mot. 23 n.6). Accordingly, the cellphone content that Gupta seeks to suppress are: (1) the Czech extractions of the iPhone 11 and iPhone 14 provided with the MLAT Extractions; and (2) the Government's searches of the same phones pursuant to the search warrant.

of unwarned statements is a complete and sufficient remedy for any perceived *Miranda* violation." *Id.* at 641–42. "There is therefore no reason to apply the 'fruit of the poisonous tree' doctrine" to the physical fruits of unwarned but voluntary statements, for "[t]he admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial." *Id.* at 642–43.

Applying *Patane*, nearly every court to have considered the question — including the Fourth Circuit and two judges in this District — has declined to suppress cellphone contents obtained using passcodes provided voluntarily but in violation of *Miranda*. *See United States v. Oloyede*, 933 F.3d 302, 310 (4th Cir. 2019) ("[T]he admission into evidence of data from Mojisola's phone — the fruit of her opening it — presented no risk that *coerced statements* (however defined) would be used against her at a criminal trial."); *United States v. Kostin*, No. 24 Cr. 91 (GHW), 2025 WL 1504409, at *27 (S.D.N.Y. May 27, 2025) ("Given the prophylactic nature of *Miranda*, the exclusion of evidence obtained using the content of the statement — the device's contents — is not an available remedy for the *Miranda* violation because the 'fruit of the poisonous tree doctrine' does not apply to mere failures to warn."); *United States v. Ephron*, No. 24 Cr. 418 (MMG), 2025 WL 524027, at *11 (S.D.N.Y. Feb. 18, 2025) ("[E]ven if Ephron's interview at the precinct had been . . . made in violation of *Miranda* . . . , the contents of the cellphone itself should not be suppressed so long as the statements were voluntary."); *United States v. Ding*, No. 24 Cr. 141 (VC), 2025 WL 1745601, at *1 (N.D. Cal. June 24, 2025) ("Ding's statements were obtained as a result of a *Miranda* violation, so they must be suppressed. But the evidence discovered on Ding's devices need not be suppressed, because his decision to give the officers his passwords was voluntary and nontestimonial."); *United States v. Fritzinger*, No. 20 Cr. 81 (REM), 2024 WL 2868987, at *8 (E.D.N.C. June 6, 2024) ("Because he provided his

24

passcode voluntarily, his arguments provide no basis to suppress the contents of his cellphone.");

*United States v. Bendann*, No. 23 Cr. 278 (JKB), 2024 WL 2155235, at *3 (D. Md. May 13, 2024)

("[E]ven though entering the passcode implicates the protections of *Miranda*, the exclusionary rule

does not apply because in the totality of the circumstances, the Defendant's will was not overborne

and he entered the passcode voluntarily."); *United States v. Hearst*, No. 18 Cr. 54 (RWS), 2022

WL 8163946, at *7 (N.D. Ga. Oct. 14, 2022) (declining to suppress contents of cellphone because

"a violation of *Miranda* does not bar admission of physical evidence that is the fruit of an

unwarned, but voluntary statement"); *United States v. Orozco Ramirez*, No. 17 Cr. 185 (LMM)

(AJB), 2019 WL 2165920, at *9 (N.D. Ga. Apr. 22, 2019) ("[B]ecause Orozco's statements were

voluntary . . . , *Patane* mandates that the subsequent search by warrant of Orozco's cell phone,

access into which was accomplished by the passcode that Orozco provided, was lawful and the

Government may seek to introduce at trial evidence seized as a result of that search."), *report and

recommendation adopted*, 2018 WL 8337421 (N.D. Ga. May 17, 2018); *United States v.

Hernandez*, No. 18 Cr. 1888 (MJL), 2018 WL 3862017, at *5 (S.D. Cal. Aug. 13, 2018)

("Defendant's demonstration of her passcode after requesting an attorney is subject to suppression

for violation of *Miranda*, but the contents of the phone which were accessed by virtue of the

passcode demonstration are not subject to suppression.").[16]

---

[16] Gupta identifies only a single decision, *United States v. Djibo*, 151 F. Supp. 3d 297 (E.D.N.Y. 2015), in which a court declined to apply *Patane* to the contents of a cellphone.  (Mot. 21–22). *Djibo* is distinguishable.  In that case, the Government obtained Djibo's passcode before giving *Miranda* warnings, used the passcode to conduct a warrantless "peek" into his phone during a border search, and then obtained a search warrant for the full contents of the phone.  151 F. Supp. 3d at 299–303, 307.  Consistent with traditional Fourth Amendment principles, Judge Johnson suppressed the final search as "the fruit of the illegal initial search," that is, the "peek."  *Id.* at 309. *Djibo* thus rests primarily on Fourth Amendment (not Fifth Amendment) grounds:  As Judge Johnson explained, while *Patane* "implicated only the Fifth Amendment's privilege against self-incrimination," the search of Djibo's phone "invokes the Fourth Amendment's freedom from

*(continued on next page)*

Consistent with this overwhelming weight of authority, the Court should not suppress the contents of Gupta's iPhones, even if the Court concludes that Czech authorities obtained the passcode to the iPhones in violation of *Miranda*. Gupta does not claim that he provided his passcode involuntarily.[17] *See supra* n.12. Nor does he challenge the lawfulness of the Czech or U.S. searches of his iPhones under the Fourth Amendment. Instead, Gupta argues that the contents of his iPhones are "premised on the unconstitutional interrogation of Mr. Gupta at Prague Airport and accordingly must be suppressed as the fruit of the poisonous tree." (Mot. 22). Because "the 'fruit of the poisonous tree' doctrine" does not apply to unwarned but voluntary statements, *Patane*, 542 U.S. at 642, "the exclusion of evidence obtained using the content of the statement — the device's contents — is not an available remedy for [a] *Miranda* violation," *Kostin*, 2025 WL 1504409, at *27. Here, as in *Kostin*, Gupta's "rights under the Fourth Amendment are protected because the Government had a warrant to search [his] phone and," if there was any *Miranda* violation, "his rights under *Miranda* are safeguarded by suppression of the statement." *Id.*

### B.    If Necessary, the Government Will Establish at a Hearing That It Would Have Inevitably Discovered the Contents of Gupta's iPhones

Should the Court determine that suppression of the content of Gupta's iPhones is warranted notwithstanding the rule of *Patane*, the Government respectfully requests a hearing to establish that it would have inevitably discovered the content of the iPhones even without the passcode

---

[17] Nor could he. The Passcode Video, (Ex. 9), shows Gupta calmly entering his passcode in a well-lit room. Gupta is not handcuffed. The Czech officers in the video are in shorts and sneakers. A Czech officer speaks calmly to Gupta in English, and Gupta responds calmly in English. It is clear from the video that Gupta's will was not "overborne by the circumstances surrounding the giving of" his passcode. *Dickerson*, 530 U.S. at 434.

unreasonable searches and seizures — in this case, a search." *Id.* at 308. Here, Gupta does not argue that there was any Fourth Amendment violation. Gupta also cites *United States v. Brown*, 125 F.4th 1186 (D.C. Cir. 2025), (Mot. 21–23), but — unlike Gupta — the defendant in *Brown* disputed that he provided his password voluntarily and the Government did not prove voluntariness. *Id.* at 1206. Accordingly, the court in *Brown* did not consider *Patane* at all.

provided by Gupta. "Under the inevitable discovery doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded if the government can prove that the evidence would have been obtained inevitably without the constitutional violation." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006); *see also United States v. Eldarir*, 681 F. Supp. 3d 43, 56 (E.D.N.Y. 2023) (applying inevitable discovery doctrine to the contents of a cellphone). At a hearing, if necessary, the Government will prove that "each event leading to the discovery of the evidence would have occurred with a sufficiently high degree of confidence for the district judge to conclude, by a preponderance of the evidence, that the evidence would inevitably have been discovered." *United States v. Vilar*, 729 F.3d 62, 84 (2d Cir. 2013). This would provide an alternative basis to deny Gupta's motion to suppress to the searches of his iPhones.

## III.   Gupta's Motion to Suppress His Post-Arrest Statement to DEA Agents Should Be Denied After a Hearing

In *Terrorist Bombings*, the Second Circuit assumed, without deciding, that "*Miranda* applies to overseas interrogations involving U.S. agents." 552 F.3d at 204. "[T]hat would not mean," however, "that U.S. agents must recite verbatim the familiar *Miranda* warnings to those detained in foreign lands." *Id.* The Court recognized that "where *Miranda* has been applied to overseas interrogations by U.S. agents, it has been so applied in a flexible fashion to accommodate the exigencies of local conditions." *Id.* at 205. Thus, the Court approved an advice of rights that warned defendants outside the United States that:

> under U.S. law: (1) they had the right to remain silent; (2) if they chose to speak, anything they said could be used against them in court; (3) in the United States, they would have had the right to consult with a lawyer and to have a lawyer present during questioning; (4) in the United States, a lawyer would have been appointed for them if they could not afford one; and (5) if they chose not to speak, that fact could not be used against them in a U.S. court. . . . It further advised them that "[b]ecause we are not in the United States, we cannot ensure that you will have a lawyer appointed for you before any questioning."

*Id.* While noting that the fifth warning was "normally not contained in *Miranda* warnings," *id.* at 206, and recommending certain adjustments to the advice of rights for future use, *id.* at 209, the Court held that these warnings "substantially complied with whatever *Miranda* requirements were applicable," *id.*

Assuming that the DEA agents were required to administer *Miranda* warnings before interviewing Gupta while in transit between the Prague airport and the Czech local jail,[18] the DEA agents complied with *Miranda* by reading Gupta an advice-of-rights form that contained all the warnings required by *Terrorist Bombings*, (Ex. 11), and by receiving his oral waiver before substantive questioning, (Ex. 5). Because Gupta has filed a declaration, however, claiming that "[n]either Special Agent Franks nor Task Force Officer Sandobal informed me that I had any rights, including the right to remain silent or to an attorney, before they began asking me questions," (Dkt. 67 ¶ 21), the Government respectfully requests a hearing on the limited issue of whether Gupta was given *Miranda* warnings and then knowingly and voluntarily waived his rights. (*See* Mot. 23–28).

## IV.    Gupta's Motion to Dismiss Count Three Should Be Denied

Gupta moves to dismiss Count Three under the rule of specialty, arguing he was "extradited by Czech authorities for only . . . murder-for-hire conspiracy and murder-for-hire," and that the charge of money laundering conspiracy in Count Three "was impermissibly added only after extradition was granted." (Mot. 30). Gupta's motion should be denied because he lacks standing to invoke the rule of specialty, which protects the rights of the extraditing sovereign and not the individual extraditee. Gupta's motion should also be denied on the merits because Czech authorities have informed the United States that proceeding on Count Three does not require a

---

[18] The Government does not dispute that Gupta was in custody at this time.

28

waiver of the rule of specialty where, as here — as Gupta has conceded — the new charge arises from the same facts upon which extradition was granted.

### A.    Gupta Lacks Standing to Invoke the Rule of Specialty

"International treaties establish rights and obligations between States-parties — and generally not between states and individuals, notwithstanding the fact that individuals may benefit because of a treaty's existence." *United States v. Barinas*, 865 F.3d 99, 104–05 (2d Cir. 2017). Accordingly, "[a]s a matter of international law, the principle of specialty has been viewed as a privilege of the asylum state, designed to protect its dignity and interests, rather than a right accruing to the accused." *United States v. Suarez*, 791 F.3d 363, 367 (2d Cir. 2015). "An extraditee lacks standing to complain of noncompliance with an extradition treaty unless the treaty contains language indicating that the intent of the treaty drafters was that such benefits could be vindicated through private enforcement." *Barinas*, 865 F.3d at 105; *see also United States v. Guzman Loera*, 24 F.4th 144, 151 (2d Cir. 2022) (reaffirming *Barinas*). This is true regardless of "whether a criminal defendant objects based on the rule of specialty or based on the interpretation of an extradition treaty or Diplomatic Note." *Suarez*, 791 F.3d at 367.

Gupta concedes that the U.S.-Czech Extradition Treaty "does not appear to provide a private remedy to Mr. Gupta." (Mot. 33). Accordingly, Gupta "would only have prudential standing to raise the claim" that Count Three violates the terms of his extradition if the Czech Republic "first makes an official protest."[19] *Suarez*, 791 F.3d at 367; *see also Barinas*, 865 F.3d

---

[19] Gupta loosens the standard, suggesting it suffices if one speculates that the Czech Republic "would object." (Mot. 32–33). That is not the law. The Second Circuit used the phrase "would object," *Barinas*, 865 F.3d at 105, in quoting a case footnote that said "the rule of domestic law conferring a judicial remedy on the extraditee can be a rule according him the remedy only if the surrendering government would object, since the underlying substantive wrong, which grows out of international law, is only to the latter," *Fiocconi v. Att'y Gen. of U.S.* (*Fiocconi II*), 462 F.2d

*(continued on next page)*

at 105 ("[B]ecause the provisions in question are designed to protect the sovereignty of states, it is plainly the offended states which must in the first instance determine whether a violation of sovereignty occurred, or requires redress."); *Cortorreal*, 2024 WL 4635230, at *3 ("Absent protest or objection by the offended sovereign, a defendant has no standing to raise the violation of international law as an issue."); *United States v. Tuzman*, 301 F. Supp. 3d 430, 458 (S.D.N.Y. 2017) ("Because Colombia has not objected to Tuzman's prosecution on the S8 Indictment, and because the U.S.-Colombia extradition treaty and diplomatic note do not provide for a private right of action, Tuzman's specialty challenge will be denied for lack of standing.").

The Czech Republic has made no "official protest" to the United States's decision to proceed on Count Three without seeking a waiver of the rule of specialty.  On the contrary, it was the Czech Republic that advised the United States that no such waiver was necessary because — as Gupta himself argued in his letter to the Czech Republic, (Ex. 25) — the money laundering charge in Count Three is based upon the same alleged facts submitted in the extradition proceedings.  (Dkt. 40).  Gupta now contends that the Czech Republic's response to his letter "affirmatively signals that the Czech Republic views such an expansion as unauthorized," (Mot. 33), but the response says no such thing.  What the Czech Republic's response says is that "[t]o date, the Ministry of Justice of the Czech Republic has not received any request" for a waiver of the rule of specialty, and that the assessment of whether a waiver must be requested "lies entirely within the competence of the requesting State."  (Ex. 26).  In other words, the Czech Republic

---

475, 479 n.8 (2d Cir. 1972).  As the full quotation makes clear, the Court's point was that any right of the extraditee derives from the extraditing state, which has sole authority to object.  In *Barinas* itself, the Court made clear that the extraditing state must actually (not hypothetically) object: "[T]he principle of specialty can be invoked here only by the Dominican Republic, which has not lodged any objection to these proceedings."  865 F.3d at 105; *see also United States v. Cortorreal*, No. 23-7195, 2024 WL 4635230, at *3 (2d Cir. Oct. 31, 2024) ("Here, the Dominican Republic has not sought to enforce any sentencing cap."), *cert. denied*, 145 S. Ct. 1222 (2025).

informed Gupta that it was for the United States to determine whether a waiver of the rule of specialty was necessary, and because the United States had not requested a waiver, Gupta's request that the waiver be denied was not ripe. Nowhere in its response did the Czech Republic say that it objected to Gupta's prosecution on Count Three.[20]

Nothing in 18 U.S.C. § 3192 alters the analysis. (*See* Mot. 33–34). That statute provides, in relevant part, that when a person is delivered by a foreign government to the U.S. Government for prosecution, "***the President shall have power*** to take all necessary measures for the transportation and safekeeping of such accused person . . . until the final conclusion of his trial for the offenses specified in the warrant of extradition, and until his final discharge from custody or imprisonment for or on account of such offenses, and for a reasonable time thereafter." 18 U.S.C. § 3192 (emphasis added). As the plain text makes clear, "Section 3192 is an enabling act authorizing the President to provide protection to an extradited person during his stay in the United States." *Badalamenti v. Moyer*, No. 87 C 8503, 1988 WL 9125, at *3 (N.D. Ill. Feb. 4, 1988). "Its basic purpose . . . is to provide the use of our national resources including the military, for the physical protection of an accused who has been extradited to face a state or federal prosecution, during the pendency and disposition of the charges and for a reasonable time thereafter." *Fiocconi v. Att'y Gen. of U.S.* (*Fiocconi I*), 339 F. Supp. 1242, 1249 (S.D.N.Y.), *aff'd*, *Fiocconi II*, 462 F.2d 475 (2d Cir. 1972). Though Section 3192 references the principle of specialty, *Fiocconi II*, 462 F.2d at 482, it does not command enforcement and certainly confers no private right of action.

---

[20] Gupta says that "[t]here is no record that the United States notified the Czech Republic of the newly alleged money laundering conspiracy charge," but his own letter to the Czech Republic informed that sovereign of Count Three. (Ex. 25). Indeed, it was Gupta's letter that apparently prompted the Czech Republic to inform the United States that no waiver of rule of specialty was necessary. (Dkt. 40 ("Before reaching this determination, the Czech Republic considered a letter sent by the defendant's counsel in the United States to the Czech Republic requesting that any waiver of the rule of specialty be denied.")).

Instead, the statute "merely guarantees that the President of the United States shall take all necessary measures for the transportation and safekeeping of an accused person who is delivered by a foreign government" for prosecution. *United States v. DiTommaso*, 817 F.2d 201, 212 (2d Cir. 1987).

Because the Czech Republic has not objected to Gupta's prosecution on Count Three, and because the U.S.-Czech Extradition Treaty does not afford Gupta a private right of action, Gupta's motion to dismiss Count Three should be denied for lack of standing. *See United States v. Amirov* (*Amirov I*), No. 22 Cr. 438 (CM), 2025 WL 660197, at *3 (S.D.N.Y. Feb. 28, 2025) ("Because the principle of specialty confers a right on the Czech Republic, not on Omarov individually, the latter's motion to dismiss Counts Four and Five as against him is DENIED, without prejudice to renewal if the Czech Government objects to prosecuting him on the added counts.  It does not appear that that will occur.").

### B.  The Czech Republic Has Advised That No Waiver of the Rule of Specialty is Needed for Count Three

Although his lack of standing is dispositive, Gupta's motion to dismiss Count Three also fails on the merits. *See United States v. Amirov* (*Amirov II*), No. 22 Cr. 438 (CM), 2025 WL 720967, at *1 (S.D.N.Y. Mar. 6, 2025) (agreeing that "Counts 1, 2 and 3 (the counts that were the subject of the extradition request) and Counts 4 and 5 (the counts which had not been charged when Omarov was extradited) arise out of the same operative facts").

"[T]he question of whether an extradition treaty allows prosecution for a particular crime that is specified in the extradition request is a matter for the extraditing country to determine." *Campbell*, 300 F.3d at 209.  Here, the Czech Republic has provided a letter explaining that:  (1) under Czech law, "[i]f there are no new facts and the new charge is based upon the same facts (acts) for which the extradition was granted, it is not necessary to seek . . . waiver of the rule of

specialty;" and (2) the "requesting State, which is conducting the criminal proceedings" — here, the United States — "is competent to assess[] whether the new charge is based upon the same facts and there is no need to request the waiver of the rule of specialty." (Ex. A at 1–2). Applying this guidance from the Czech Republic, no waiver of the rule of specialty is necessary to try Gupta on Count Three because the money laundering count plainly arises from "the same facts (acts) for which the extradition was granted."

Count Three is based upon Gupta's participation in the plan to send money from India to the United States to pay the purported hitman, including the $15,000 advance payment. In an affidavit in support of the United States' extradition request, Agent Franks explained that Gupta told the CS "that he would be willing to pay '100k' for the murder," that Gupta and the CS discussed "an advance payment of approximately $25,000 to be transferred before the murder," and that Gupta provided the CS with the phone number of the Money Courier "who, according, to GUPTA, would be delivering $15,000 (not $25,000) to a predetermined location in New York." (Ex. 21, Franks Affidavit ¶¶ 6–7). Agent Franks' affidavit also described the payment that occurred in Manhattan, and recounted Gupta's discussion with the Money Courier about how Gupta would "repay[] the $15,000 to the Money Courier in India, where GUPTA lives and where the Money Courier has family and a construction business." (*Id.* ¶ 8). In its resolution approving Gupta's extradition, the Prague Metropolitan Court discussed these payment-related allegations. (Ex. 2B at 1–2, 4–6). It is thus clear that the Czech Republic knew of Gupta's money-laundering conduct when it extradited him on the murder-for-hire counts, and that the money-laundering charge arises from the same underlying facts.

Indeed, Gupta has flatly conceded that Count Three arises from the same facts as Counts One and Two. To the Court, he argued that "the post-extradition charge, the money laundering

charge . . . is not based on any new conduct that was not known or discussed at the time of his extradition." (1/17/25 Tr. at 6). And to the Czech Republic, he argued that the S2 Indictment "does not allege any facts that were not previously alleged in the First Indictment and the Affidavit in Support of Extradition. Instead, the Government re-alleges that the same pre-extradition conduct, that Mr. Gupta allegedly coordinated payment of the purported hitman, to support the additional post-extradition Money Laundering charge." (Ex. 25 at 2). Having affirmatively made these arguments, Gupta should not now be heard to complain that the United States agrees with him that the new charge is based upon the same facts for which the extradition was granted, and, accordingly, that no waiver of the rule of specialty is needed for Count Three.

## CONCLUSION

For these reasons, Gupta's motions to suppress his iPhone passcode, to suppress the searches of his iPhones, and to dismiss Count Three should be denied as a matter of law, and his motion to suppress his post-arrest statements to the DEA should be denied after a hearing.


Dated: New York, New York
       July 21, 2025


Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____
    Alexander Li / Ashley C. Nicolas /
    Camille L. Fletcher
    Assistant United States Attorneys
    (212) 637-2265 /-2467 /-2383