UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.                                              S2 23 Cr. 289 (VM)

NIKHIL GUPTA,
      a/k/a "Nick,"

*Defendant*.

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Alexander Li
Ashley C. Nicolas
Camille L. Fletcher
Assistant United States Attorneys
      *Of Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ......................................................................................... 1

RELEVANT BACKGROUND ............................................................................................ 1

ARGUMENT ...................................................................................................................... 5

    I.     The Court Should Admit Evidence From Yadav's Google Accounts As Non-Hearsay and/or As Exceptions to the Rule Against Hearsay Under Federal Rules of Evidence 803(6) and 807 ......................................................................................................... 5

        A.    The Google Evidence ................................................................... 5

        B.    Applicable Law ........................................................................... 8

        C.    Discussion .................................................................................. 11

    II.    The Court Should Admit the Czech Cellphone Surrender Record Under the U.S.-Czech MLAT and As an Adoptive Admission By Gupta .................................................................................................. 18

        A.    The Czech Surrender Record ..................................................... 18

        B.    Applicable Law ......................................................................... 19

        C.    Discussion .................................................................................. 21

    III.   The Court Should Admit Evidence of Gupta's Solicitation of the Murder of Individuals Other Than the Victim, Narcotics and Weapons Trafficking, and International Money Laundering and Credit Card Fraud as Direct Evidence of the Charged Crimes or Under Federal Rule of Evidence 404(b) .................................................. 22

        A.    Applicable Law ......................................................................... 23

        B.    The Court Should Admit Evidence of Gupta's Solicitation of the Murder of Individuals Other Than the Victim in This Case ..................................................................... 25

        C.    The Court Should Admit Evidence of Gupta's Participation in Drug and Weapons Trafficking Between 2013 and June 2023 ............................................................ 31

D.      The Court Should Admit Evidence of Gupta's
        Participation in International Money Laundering and
        Credit Card Fraud in 2017 ................................................................. 34

IV.     The Court Should Take Certain Measures to Protect the UC and
        CS .................................................................................................................. 36

        A.      Relevant Facts ......................................................................... 37

        B.      The UC Should Be Permitted to Testify with the
                Courtroom Closed .................................................................... 38

        C.      The Government Should be Permitted to Withhold the
                True Name of the UC ................................................................ 43

        D.      The UC and CS Should Be Permitted to Testify Using
                Pseudonyms ............................................................................. 50

CONCLUSION ...................................................................................................... 51

# TABLE OF AUTHORITIES

**Cases**

*Alford v. United States*, 282 U.S. 687 (1931). .............................................................. 44

*Ayala v. Speckard*, 131 F.3d 62 (2d Cir. 1997).............................................. 39, 40, 41, 42

*Berrisford v. Wood*, 826 F.2d 747 (8th Cir. 1987)....................................................... 22

*Bowden v. Keane*, 237 F3d 125 (2d Cir. 2001).............................................................. 40

*Brown v. Artuz*, 283 F.3d 492 (2d Cir. 2002) .............................................................. 40

*Cotto v. Fischer*, No. 09 Civ. 9813, 2012 WL 5500575 (SAS) (MHD) (S.D.N.Y.
Aug. 23, 2012) ..................................................................................................... 46

*Davis v. Washington*, 547 U.S. 813 (2006).................................................................. 10

*Figueroa v. Mann*, No. 90 Civ. 1965 (PKL), 1992 WL 51542 (S.D.N.Y. Mar. 10,
1992) ................................................................................................................... 21

*Gonzalez v. Quinones*, 211 F.3d 735 (2d Cir. 2000)................................................... 40

*In re City of New York*, 607 F.3d 923 (2d Cir. 2010). ........................................... 43, 44

*Iorio v. Aramark Servicemaster*, No. 03 Civ. 40147 (FDS), 2005 WL 3728715 (D.
Mass. Sept. 30, 2005)........................................................................................... 15

*Ip v. Henderson*, 710 F. Supp. 915 (S.D.N.Y. 1989)................................................... 40

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) .............................................. 11

*New Era Publications Int'l, ApS v. Henry Holt & Co.*, 873 F.2d 576 (2d Cir.
1989) ..................................................................................................................... 9

Pennsylvania v. Ritchie, 480 U.S. 39 (1987)............................................................... 48

*Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627 (2d Cir. 1994). ......... 9

*Presley v. Georgia*, 558 U.S. 209 (2010).............................................................. 38, 39

*Press-Enter. Co. v. Superior Ct. of Cal.*, 464 U.S. 504 (1984).................................... 39

*Smith v. Arizona*, 602 U.S. 779 (2024) .................................................................... 21

*Smith v. Hollins*, 448 F.3d 533 (2d Cir. 2006)........................................................... 40

*United States v. Akasha*, No. 14 Cr. 716 (VM) (S.D.N.Y. Oct. 23, 2018) (Doc. No. 135) ................................................................................................ 50

*United States v. Alimehmeti*, 284 F. Supp. 3d 477 (S.D.N.Y. 2018) ................................ 41, 42, 43

*United States v. Amato*, No. 03 Cr. 1382 (NGG), 2006 WL 1495497 (E.D.N.Y. May 26, 2006) ................................................................................................ 31

*United States v. Arrington*, 618 F.2d 1119 (5th Cir. 1980) ........................................ 16

*United States v. Ayelotan*, 917 F.3d 394 (5th Cir. 2019) .......................................... 12

*United States v. Balouchzehi*, 21 Cr. 658 (JMF) (S.D.N.Y. 2023) (Doc. Nos. 71, 84) ...................................................................................................... 50

*United States v. Boles*, 914 F.3d 95 (2d Cir. 2019) ................................................ 13

*United States v. Bryce*, 208 F.3d 346 (2d Cir. 1999), *as amended* (2000). .................. 10

*United States v. Cadet*, 664 F.3d 27 (2d Cir. 2011). .............................................. 30

*United States v. Campo Flores*, 15 Cr. 765 (PAC) (S.D.N.Y. Dec. 6, 2016) (Doc. No. 135) ................................................................................................ 50

*United States v. Canieso*, 470 F.2d 1224 (2d Cir. 1972) .......................................... 15

*United States v. Carter*, No. 21 Cr. 681 (NSR), 2024 WL 268248 (S.D.N.Y. Jan. 24, 2024) ................................................................................................ 12

*United States v. Cavallaro*, 553 F.2d 300 (2d Cir. 1977) ........................................ 44

*United States v. Chavez*, 951 F.3d 349 (6th Cir. 2020) ............................................ 13

*United States v. Childs*, 539 F.3d 552 (6th Cir. 2008) ........................................ 9, 14

*United States v. Curley*, 639 F.3d 50 (2d Cir. 2011). .............................................. 25

*United States v. Delligatti*, No. 15 Cr. 491 (KBF), 2018 WL 1033242 (S.D.N.Y. Feb. 23, 2018) .......................................................................................... 28, 33

*United States v. Dinero Exp., Inc.*, No. 99 Cr. 75 (SWK), 2000 WL 1134484 (S.D.N.Y. Aug. 9, 2000) ................................................................................ 21

*United States v. Donovan*, No. 20 Cr. 374 (PKC) (E.D.N.Y. 2021) (Doc. No. 91) .................... 49

*United States v. El Gammal*, 831 F. App'x 539 (2d Cir. 2020) ................................ 8, 12

*United States v. Ellis,* 461 F.2d 962 (2d Cir. 1972) ............................................ 13

*United States v. Eusebio*, 22 Cr. 522 (GHW) (S.D.N.Y. Oct. 31, 2024) (Doc. No. 575) ................................................................................................ 47

*United States v. Feliz*, 467 F.3d 227 (2d Cir. 2006). .................................. 11

*United States v. Felton*, 17 Cr. 21 (WHP) (S.D.N.Y. Jan. 23, 2019) (Doc. No. 357) ................................................................................................ 41

*United States v. Fiumano*, No. 14 Cr. 518 (JFK), 2016 WL 1629356 (S.D.N.Y. Apr. 25, 2016). ...................................................................................... 24

*United States v. Flom*, 763 F. App'x 27 (2d Cir. 2019) ............................. 35

*United States v. Francisco*, 642 F. App'x 40 (2d Cir. 2016) ...................... 33

*United States v. Fuentes Ramirez*, No. 15 Cr. 379 (PKC) (S.D.N.Y. Feb. 12, 2021) (Doc. No. 251) ................................................................................ 50

*United States v. Gohari*, 227 F. Supp. 3d 313 (S.D.N.Y. 2017). ................ 28

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997). ..................... 24, 27

*United States v. Gordon*, 936 F.2d 573, 1991 WL 108723 (6th Cir. 1991) ................................ 14

*United States v. Gupta*, 699 F.3d 682 (2d Cir. 2012) ................................ 39

*United States v. Jimenez*, 789 F.2d 167 (2d Cir. 1986). ............................. 24

*United States v. Jinadu*, 98 F.3d 239 (6th Cir. 1996) ................................ 22

*United States v. Johnson*, 117 F.4th 28 (2d Cir. 2024). ........................ 10, 11

*United States v. Johnson*, No. 10 Cr. 184, 2011 WL 7782624 (E.D.N.Y. Oct. 24, 2011). ....................................................................................................... 44

*United States v. Kehoe*, 310 F.3d 579 (8th Cir. 2002) ............................... 22

*United States v. Kemp*, No. 21-1684-CR, 2023 WL 405763 (2d Cir. Jan. 26, 2023) ................ 33

*United States v. Kidd*, No. 18 Cr. 872 (VM) (S.D.N.Y. July 9, 2019) (Doc. No. 72) .......................................................................................................... 12

*United States v. Kuthuru*, 665 F. App'x 34 (2d Cir. 2016) .......................... 9

*United States v. Lemonakis*, 485 F.2d 941 (D.C. Cir. 1973) ...................... 22

*United States v. Machado-Erazo*, 951 F. Supp. 2d 148 (D.D.C. 2013) ....... 44

*United States v. Maxwell*, 20 Cr. 330 (AJN) (S.D.N.Y. Nov. 18, 2021) (Doc. No. 471) .................................................................................................... 36

*United States v. Mejias*, 552 F.2d 435 (2d Cir. 1977) ................................ 16

*United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009) ............................ 31

*United States v. Miller*, 116 F.3d 641 (2d Cir. 1997) ................................. 29

*United States v. Mills*, 895 F.2d 897 (2d Cir. 1990) .................................. 30

*United States v. Moskowitz*, 581 F.2d 14 (2d Cir. 1978) .............................. 9

*United States v. Mundle*, No. 15 Cr. 315 (NSR), 2016 WL 1071035 (S.D.N.Y. Mar. 17, 2016) .............................................................................. 29

*United States v. Naseer*, No. 10 Cr. 19 (RJD), 2015 WL 13843166 (E.D.N.Y. Jan. 26, 2015) ............................................................................... 46

*United States v. Odeh* (*Odeh I*), No. 13 Cr. 20772 (GAD), 2014 WL 5473042 (E.D. Mich. Oct. 27, 2014) ................................................................ 20

*United States v. Odeh* (*Odeh II*), 815 F.3d 968 (6th Cir. 2016) ................... 20

*United States v. Orense Azocar*, 21 Cr. 379 (VSB) (S.D.N.Y. Nov. 14, 2023) (Doc. No. 40) .................................................................................... 50

*United States v. Osarenkhoe*, 439 F. App'x 66 (2d Cir. 2011) ................... 36

*United States v. Padilla*, 374 F.2d 996 (2d Cir. 1967) ........................... 9, 14

*United States v. Palermo*, 410 F.2d 468 (7th Cir. 1969) ........................... 44

*United States* v. *Paulino*, 445 F.3d 211 (2d Cir. 2006) ............................. 25

*United States v. Pipola*, 83 F.3d 556 (2d Cir. 1996) .............................. 34, 36

*United States v. Qualls*, 613 F. App'x 25 (2d Cir. 2015) ........................... 12

*United States v. Ramos-Cruz*, 667 F.3d 487 (4th Cir. 2012) ..................... 46

*United States v. Raniere*, 18 Cr. 204 (May 6, 2019 Text Order) ................ 37

*United States v. Roldan Cardenas*, 21 Cr. 359 (LAK) (S.D.N.Y. May 6, 2024) (Doc. No. 185) ................................................................................. 50

*United States* v. *Roldan-Zapata*, 916 F.2, 795 (2d Cir. 1990) .............. 25, 31

*United States v. Romanello*, No. 22 Cr. 194 (EK), 2023 WL 8283435 (E.D.N.Y. Nov. 27, 2023) ........................................................................................... 13

*United States v. Roopnarine*, 718 F. App'x 797 (11th Cir. 2017). .............................................. 48

*United States v. Rosario*, 2014 WL 5870708 (S.D.N.Y. Nov. 13, 2014) ..................................... 31

*United States v. Rutkoske*, 506 F.3d 170, 176 (2d Cir. 2007). ...................................................... 25

*United States v. Saint Prix*, 672 F.2d 1077 (2d Cir. 1982) ..................................................... 14, 16

*United States v. Santos*, 541 F.3d 63 (2d Cir. 2008) .................................................................. 37

*United States v. Singer*, 687 F.2d 1135 (8th Cir. 1982)............................................................... 16

*United States v. Snow*, 517 F.2d 441 (9th Cir. 1975).................................................................. 13

*United States v. Sosa-Zarzuela*, 21 Cr. 41 (PAC), 2022 WL 16722329 (S.D.N.Y. Nov. 4, 2022) ............................................................................................. 50

*United States v. Strother*, 49 F.3d 869 (2d Cir. 1995). ................................................................. 9

*United States v. Taylor*, 44 F. App'x 852 (9th Cir. 2002) ........................................................... 22

*United States v. Taylor*, 707 F. Supp. 696 (S.D.N.Y. 1989)........................................................ 38

*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994) ....................................................................... 29

*United States v. Triplett*, 855 F.2d 864, 1988 WL 82817 (9th Cir. 1988) ................................... 16

*United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017)................................................................. 10

*United States v. Urena*, 8 F. Supp. 3d 568 (S.D.N.Y. 2014) ........................................... 41, 42, 47

*United States v. Webb*, 201 F. App'x 890 (3d Cir. 2006) ............................................................ 21

*United States* v. *Williams*, 205 F.3d 23 (2d Cir. 2000)............................................................... 25

*Waller v. Georgia*, 467 U.S. 39 (1984)................................................................................. 38, 39

*Washington v. Walsh*, No. 08 Civ. 6237 (DAB), 2010 WL 423056 (S.D.N.Y. Feb. 5, 2010) ................................................................................................... 46, 48

*Yung v. Walker*, 468 F.3d 169 (2d Cir. 2006) ............................................................................ 42

**Rules**

Fed. R. Evid. 104 ................................................................................................................... 10, 17

Fed. R. Evid. 401. ........................................................................................................ 23

Fed. R. Evid. 402 ........................................................................................................ 23

Fed. R. Evid. 801 ..................................................................................................... 8, 21

Fed. R. Evid. 802 .......................................................................................................... 8

Fed. R. Evid. 807 ........................................................................................................ 10

**Treaties**

Treaty Between the United States of America and the Czech Republic on Mutual
     Legal Assistance in Criminal Matters, S. Treaty Doc. No. 105-47, 1998 WL
     1784229 (Feb. 4, 1998) ........................................................................................... 1

**Constitutional Provisions**

U.S. Const., art. VI, cl.2 ............................................................................................ 20

## PRELIMINARY STATEMENT

The Government respectfully moves *in limine* for the following rulings with respect to the November 3, 2025 trial of defendant Nikhil Gupta:[1]

1. Evidence of the identity and Government of India ("GOI") affiliation of co-defendant Vikash Yadav, a/k/a "Vikas," a/k/a "Amanat," from Yadav's Google accounts, should be admitted as non-hearsay and/or as exceptions to the rule against hearsay under Federal Rules of Evidence 803(6) and 807;

2. Gupta's written admission of ownership over his cellphones, made to the Czech police, should be admitted pursuant to the U.S.-Czech Mutual Legal Assistance Treaty (the "U.S.-Czech MLAT"),[2] Federal Rule of Criminal Procedure 27, and Federal Rule of Civil Procedure 44, and as an adoptive admission by Gupta;

3. Evidence of Gupta's solicitation of other murders at the time of the charged murder-for-hire, as well as Gupta's efforts in the preceding years to arrange international drug trafficking, firearms trafficking, money laundering, and credit card fraud transactions with a Drug Enforcement Administration ("DEA") confidential source (the "CS") involved in this case, should be admitted as direct evidence of the charged crimes or, in the alternative, under Federal Rule of Evidence 404(b); and

4. The CS and a U.S. law enforcement undercover officer (the "UC") should be permitted to testify with certain protective measures — namely, for the UC, testimony in a closed courtroom and without disclosure of the UC's true name to the defense; and, for both the UC and the CS, the use of pseudonyms.

## RELEVANT BACKGROUND

Gupta and Yadav are charged in the operative S2 Indictment (the "Indictment"), (Dkt. 28), in three counts: murder-for-hire conspiracy, in violation of 18 U.S.C. § 1958 (Count One); murder-for-hire, in violation of 18 U.S.C. §§ 1958 and 2 (Count Two); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Three).

---

[1] In accordance with the Court's Individual Rules of Practice, the Government respectfully requests leave to file a brief exceeding 8,750 words to fully address the evidentiary issues presented herein. The defense does not object to this request. This memorandum is 17,752 words.

[2] Treaty Between the United States of America and the Czech Republic on Mutual Legal Assistance in Criminal Matters, S. Treaty Doc. No. 105-47, 1998 WL 1784229 (Feb. 4, 1998), *available at* https://2009-2017.state.gov/documents/organization/107829.pdf.

As alleged in the Indictment, and as the Government will prove at trial, Gupta and Yadav worked together and with others to orchestrate the assassination of a political activist and U.S. citizen of Indian origin residing in New York City (the "Victim"). (Indictment ¶ 1). The Victim is a vocal critic of the GOI and leads a U.S.-based organization that advocates for the secession of Punjab, a state in India that is home to a large population of Sikhs, an ethnoreligious minority group in India. (*Id.*). At relevant times, Yadav was employed by the GOI's Cabinet Secretariat, which houses India's foreign intelligence service, the Research and Analysis Wing ("RAW"). (*Id.* ¶ 2). At Yadav's direction, Gupta contracted the UC, whom Gupta believed to be a hitman, to murder the Victim in exchange for $100,000. (*Id.* ¶ 4). In furtherance of their plot, Yadav and Gupta, who both lived in India, had a $15,000 advance payment delivered in cash to the UC in Manhattan, New York. (*Id.* ¶¶ 2–4).

Gupta and Yadav began working together in or about early May 2023, when Yadav asked Gupta to arrange the murder of the Victim — and, as set forth below, the murder of another individual in Nepal or Pakistan — in exchange for Yadav's assistance in dismissing a criminal case pending against Gupta in India. (*Id.* ¶¶ 2, 10). Gupta agreed. (*Id.* ¶ 10). Later that month, after Yadav assured Gupta that his criminal case "has already been taken care of," (*id.* ¶ 12), Gupta contacted the CS — with whom, as discussed below, Gupta had communicated extensively over the years in pursuit of international narcotics trafficking, weapons trafficking, money laundering, and credit card fraud transactions — to request the CS's assistance in arranging the murder of the Victim in the United States, (*id.* ¶¶ 4, 13). The CS then introduced the UC as a hitman to Gupta. (*Id.* ¶ 4). Yadav approved the $100,000 contract price for the Victim's murder, (*id.* ¶ 15), and he worked with Gupta to deliver the $15,000 advance payment to the UC, (*id.* ¶¶ 17–23).

In or about June 2023, in furtherance of the assassination plot, Yadav provided Gupta with personal information about the Victim, including the Victim's home address in New York City, which Gupta then passed to the UC. (*Id.* ¶ 5). In extensive electronic and recorded communications, Gupta offered suggestions on how to carry out the plot and pressed the CS and the UC for updates on the murder. (*Id.* ¶ 14). For example, Gupta asked the CS and UC to take GPS-stamped surveillance photographs of the Victim and the Victim's residence, and Gupta forwarded those photographs to Yadav. (*Id.* ¶¶ 16, 18, 33–34). Similarly, Gupta directed the CS and the UC to carry out the murder as soon as possible, but Gupta also specifically instructed them not to commit the murder around the time of the Indian Prime Minister's official state visit to the United States, which was scheduled to begin on or about June 20, 2023. (*Id.* ¶¶ 5, 24–25).

On or about June 18, 2023, approximately two days before the Indian Prime Minister's state visit to the United States, masked gunmen murdered Hardeep Singh Nijjar — an associate of the Victim and another leader of the Sikh separatist movement — outside a Sikh temple in British Columbia, Canada. (*Id.* ¶¶ 6, 29). Later that evening, Yadav sent Gupta a video clip that showed Nijjar's bloody body slumped in Nijjar's vehicle (the "Nijjar Murder Video"). (*Id.* ¶ 29). Gupta forwarded the Nijjar Murder Video to the CS and the UC. (*Id.* ¶ 30). On an audio call the next day, Gupta told the UC that Nijjar "was also the target" and "we have so many targets." (*Id.*). Gupta added that in light of Nijjar's murder, there was "now no need to wait" to kill the Victim. (*Id.*). Separately, on an audio call with the CS, Gupta told the CS that the UC should kill the Victim as soon as possible, informing the CS that "we got the go-ahead to go anytime, even today, tomorrow — as early as possible." (*Id.*). Gupta urged the CS to "not give [the Victim] the chance, any chance," adding: "If he is not alone, [if] there are two guys with him in the meeting or something . . . put everyone down, put everyone down." (*Id.*).

On June 30, 2023, Czech law enforcement officers arrested Gupta in the Czech Republic at the request of the United States. (*Id.* ¶ 35). In a post-arrest interview with DEA agents, Gupta stated, in substance and in part, that he had been approached in India by someone named "Amanat" — later identified as Yadav — who offered to assist Gupta in clearing a robbery summons in India in exchange for Gupta's assistance in having someone in New York City killed. Gupta acknowledged that he knew someone (apparently referring to the CS) and admitted that Gupta had helped to facilitate the murder-for-hire.

During Gupta's arrest on June 30, 2023, Czech law enforcement officers seized three cellphones from Gupta (the "Gupta Cellphones"). In a written document signed later that day by Gupta, Gupta's Czech attorney, an interpreter, and a Czech officer (the "Czech Surrender Record"), Gupta acknowledged that the Gupta Cellphones belonged to him and that he had surrendered them to the Czech police. Czech authorities provided the Czech Surrender Record, along with the physical Gupta Cellphones, to U.S. authorities pursuant to the U.S.-Czech MLAT. The Government searched the Gupta Cellphones pursuant to a search warrant and found, among other things, hundreds of WhatsApp Messenger communications between Gupta and Yadav. In these messages, which span from May 6, 2023 through June 29, 2023, Gupta and Yadav planned the murder of the Victim on a day-to-day basis. Gupta and Yadav also discussed the murder of other individuals, including Nijjar and a person in Nepal or Pakistan, as well as Yadav's ability to supply Gupta with weapons for sale to the CS. In his initial WhatsApp messages to Gupta, Yadav wrote: "Nikhil ji" "This is Vikas... Save my name as Aman." Gupta duly saved Yadav as "Amanat," with a phone number ending in 9645 (the "Amanat Phone Number").

## ARGUMENT

I.   **The Court Should Admit Evidence From Yadav's Google Accounts As Non-Hearsay and/or As Exceptions to the Rule Against Hearsay Under Federal Rules of Evidence 803(6) and 807**

At trial, the Government will offer evidence from two of Yadav's Google accounts: onlybutt095@gmail.com and vikas0yadav@gmail.com. This evidence will establish that the true identity of the "Amanat" who worked with Gupta was Yadav, and that Yadav was an employee of the GOI. [3] This evidence is relevant to establish, among other things, the existence of the charged murder-for-hire and money-laundering conspiracies, Yadav's motive and intent in enlisting Gupta to orchestrate Victim's murder, and why Gupta and Yadav took certain actions in this case, such as their transmittal of the Nijjar Murder Video and Gupta's instruction that the UC should not kill the Victim around the time of the Indian Prime Minister's visit to the United States.

### A.   The Google Evidence

The Government intends to offer the following evidence, which is attached as Exhibits B through M,[4] from the Google accounts onlybutt095@gmail.com and vikas0yadav@gmail.com.

---

[3] The Government has noticed the expert testimony of Professor Nitasha Kaul, a professor of Politics, International Relations, and Critical Interdisciplinary Studies, and the director of the Center for the Study of Democracy at the University of Westminster's School of Social Sciences in London, United Kingdom. Professor Kaul will testify, among other things, that the Victim and Nijjar were publicly condemned by the GOI for the Sikh separatist activities. As relevant here, Professor Kaul will also testify that (1) RAW is a part of the GOI's Cabinet Secretariat; (2) RAW is headquartered at the Central Government Office ("CGO") Complex in New Delhi, India; (3) RAW often recruits officers from India's Central Reserve Police Force ("CRPF"); and (4) RAW's mission includes the suppression of Sikh separatists.

[4] An exhibit list is appended to this motion. In accordance with Federal Rule of Criminal Procedure 49.1 and Rules 21.3 and 21.4 of the SDNY Electronic Case Filing Rules & Instructions (July 24, 2023), the Government respectfully requests leave to redact from the public filing the contact information of witnesses and the sensitive financial and personal identifying information of individuals. To protect the privacy of witnesses, particularly given the heightened safety concerns in this case, as discussed in Section IV, *infra*, the Government also requests leave to redact the identities of civilian witnesses from the public filing.

This evidence, which the Government obtained pursuant to a judicial search warrant, has been certified as true and correct Google records by a Google records custodian. The Google custodial certification is attached as Exhibit A.[5] The parties are presently discussing a potential stipulation to the authenticity of the Google records and to the foundation set forth in the Google custodial certification. Nonetheless, the Government hereby notices its intent to offer the evidence described below under Federal Rules of Evidence 803(6) and 807, and to authenticate it by certification, pursuant to Federal Rules of Evidence 902(11) and (13), if necessary.

### 1. Evidence from onlybutt095@gmail.com (Ex. B-F)

The Government intends to offer the following evidence from the Google account onlybutt095@gmail.com:

- Ex. B: Google subscriber records demonstrating that (a) the Amanat Phone Number (*i.e.*, the phone number that "Amanat" used to communicate on WhatsApp with Gupta) was the recovery phone number for the onlybutt095@gmail.com account; (b) the onlybutt095@gmail.com account was subscribed in the name of "A Butt;" and (c) the onlybutt095@gmail.com account was, at times, accessed from the Internet Protocol ("IP") addresses 103.92.41.180 and 103.92.41.28. As discussed below, the vikas0yadav@gmail.com account was also accessed from these same IP addresses.

- Ex. C: A March 14, 2023 email from onlybutt095@gmail.com to another individual with the subject line "Photo from Amanat." Attached to the email is a photograph of a credit or debit card, a website, and an email address.

- Ex. D: An August 2, 2022 email from onlybutt095@gmail.com to an individual who, based on the correspondence described herein (*see* Ex. D, E, F, M, R, S), appears to be an accountant (the "Accountant"), stating: "For ITR [income tax return]." "Vikash yadav." "Email – vikas0yadav@gmail.com." Attached to the email are photographs of an Indian tax record titled "Form No. 16," which is described on the form as a "[c]ertificate under Section 203 of the Income-tax Act, 1961 for tax deducted at source on salary paid to an employee."[6] The Form 16, which covers the period April 1, 2021 through March 31, 2022, reports the amounts paid and taxes deducted for "Vikash Yadav" at the "CRPF Academy."

[5] The Government produced the Google search warrant content to the defense on September 18, 2024, and produced the Google custodial certificate on July 30, 2025.

[6] The Form 16 appears to be the Indian equivalent of the Form W-2, Wage and Tax Statement, in the United States.

The employer listed on the form is the "Cabinet Sectriate [sic]" at the "CGO Complex" in New Delhi, India.[7]

- Ex. E: An August 26, 2022 email from the Accountant to onlybutt095@gmail.com and vikas0yadav@gmail.com, stating: "SIR YOUR INCOME TAX RETURN 2021-22." Attached to the email is an "Annual Tax Statement" and its annexes for "Vikash Yadav" at the "CRPF Academy." The tax statement lists, for the financial year 2021-2022, amounts paid and taxes deducted by two deductors: the "Cabinet Sectriate" and the "Central Reserve Police Force."

- Ex. F: A July 13, 2023 email from onlybutt095@gmail.com to the Accountant, replying to the preceding August 26, 2022 email, stating: "Kindly find the form 16 attached." Attached to the email are photographs of a Form 16 for "Vikash Yadav" at the "CRPF Academy." This Form 16, which covers the period April 1, 2022 through March 31, 2023 — *i.e.*, five weeks before Yadav began texting Gupta on May 6, 2023 — again itemizes the salary paid and taxes deducted by the "Cabinet Sectriate" at the "CGO Complex" in New Delhi, India. As set forth below, the Accountant subsequently transmitted Yadav's 2022-2023 income tax return to the vikas0yadav@gmail.com account.

### 2.    Evidence from vikas0yadav@gmail.com (Ex. G-M)

The Government intends to offer the following evidence from the Google account vikas0yadav@gmail.com:

- Ex. G: Google subscriber records demonstrating that (a) the vikas0yadav@gmail.com account was subscribed in the name of "vikas yadav;" and (b) the vikas0yadav@gmail.com account was accessed, at times, from the IP addresses 103.92.41.180 and 103.92.41.28 — *i.e.*, IP addresses that also accessed the onlybutt095@gmail.com account.

- Ex. H: An April 7, 2016 email from another individual to vikas0yadav@gmail.com attaching a photograph of a man in a military uniform wearing the nameplate "Vikas Yadav." The email attaches other similar photographs; the Government intends to offer only the single photograph in Exhibit H.

- Ex I: An April 7, 2016 email from another individual to vikas0yadav@gmail.com attaching a photograph of the same man in uniform standing in front an airplane with the visible word "INDIAN."[8] The email attaches other similar photographs; the Government intends to offer only the single photograph in Exhibit I.

---

[7] As noted above, *see supra* note 3, Professor Kaul will testify that RAW is a component of the Cabinet Secretariat and that RAW is headquartered at the CGO Complex.

[8] Other photographs in the Google account indicate that the full phrase written on the airplane is "INDIAN AIR FORCE."

- Ex. J: A June 5, 2016 email from vikas0yadav@gmail.com to another individual attaching photographs of a passport. The passport bears the name "Vikash Yadav."

- Ex. K: A June 12, 2012 email from another individual to vikas0yadav@gmail.com attaching a document titled "DIRECT RECRUITMENT OF SENIOR FIELD OFFICERS." The document invites "Assistant Commandants" to apply to become "Senior Field Officers . . . in the junior executive cadre of R&AW" — *i.e.*, the Research and Analysis Wing, or RAW. The document also describes the recruited position as a "post in Cabinet Secretariat" and notes that "[t]he final selection will be made on the basis of an interview by a selection committee duly constituted by the Government of India."

- Ex. L: A June 5, 2017 email from vikas0yadav@gmail.com to another individual, stating: "Please find attached two months sale slip, residence proof and a photograph." The email is signed "Vikash Yadav." Attached to the email is a photograph and ID of Yadav, and two paystubs, dated April 2017 and May 2017, reflecting pay and deductions for "Vikash Yadav" from the "Directorate of Accounts Cabinet Secretariat (Main Wing)."

- Ex. M: A July 25, 2023 email from the Accountant to vikas0yadav@gmail.com, with the subject line: "INCOME TAX RETURN 2022-23." Attached to the email is an "Annual Tax Statement" and its annexes for "Vikash Yadav" at the "CRPF Academy." The tax statement lists, for the financial year 2022-2023, amounts paid and taxes deducted by the "Cabinet Sectriate."

## B.    Applicable Law

Hearsay, defined as an out-of-court "statement" that "a party offers in evidence to prove the truth of the matter asserted in the statement," Fed. R. Evid. 801(c)(2), is inadmissible unless another rule or statute provides otherwise. Fed. R. Evid. 802. Not all words are statements within the meaning of the hearsay rule. Rather, a "statement" is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). Thus, machine-generated information is not hearsay because it is not a statement of a person, *see United States v. El Gammal*, 831 F. App'x 539, 543 n.7 (2d Cir. 2020) (collecting cases for the principle that "a machine-generated record . . . is unlikely to be considered hearsay");[9] questions and commands are not statements because they are not assertions, *see United States v. Kuthuru*,

---

[9] Unless otherwise specified, all case quotations omit internal quotation marks, citations, and prior alterations.

665 F. App'x 34, 38 (2d Cir. 2016) (collecting authorities); and verbal acts, like invitations and encouragements to engage in a transaction, are not statements because they are not assertions and because they have independent legal significance, *see United States v. Childs*, 539 F.3d 552, 559 (6th Cir. 2008) (solicitation to commit murder not a statement); *United States v. Padilla*, 374 F.2d 996, 997–98 (2d Cir. 1967) (encouragement to participate in drug deal not hearsay); *cf. New Era Publications Int'l, ApS v. Henry Holt & Co.*, 873 F.2d 576, 592 (2d Cir. 1989) (Oakes, C.J., concurring) ("words of independent legal significance, such as a contract or slander, are verbal acts and not hearsay"). And photographs and sketches are not statements at all and thus do not implicate the hearsay rule. *See United States v. Moskowitz*, 581 F.2d 14, 21 (2d Cir. 1978).

One exception to the hearsay rule is the business-records exception. Pursuant to Federal Rule of Evidence 803(6), a record may be admitted as an exception to hearsay if it was made at or near the time by someone with knowledge, or who had the information transmitted to them by someone with knowledge; the record was kept in the course of a regularly conducted activity of a business or organization; making the record was a regular practice of that business activity; and the foregoing conditions are shown through the certification or testimony of a custodian. "The principal precondition to admission of documents as business records pursuant to Fed. R. Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable." *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994). The Second Circuit has taken a "generous view of the business records exception, construing it to favor the admission of evidence if it has any probative value at all." *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995).

In addition, Federal Rule of Evidence 807 provides for a "residual exception to the rule against hearsay where no other exception applies." *United States v. Ulbricht*, 858 F.3d 71, 123

(2d Cir. 2017). A hearsay statement is admissible under Rule 807 if it is (1) "supported by sufficient guarantees of trustworthiness — after considering the totality of the circumstances under which it was made and evidence, if any, corroborating the statement," and (2) "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a). In addition, the proponent must "give[] an adverse party reasonable notice of the intent to offer the statement — including its substance and the declarant's name — so that the party has a fair opportunity to meet it." Fed. R. Evid. 807(b).[10] The Court may consider inadmissible evidence in determining whether the requirements of Rule 807 are met. Fed. R. Evid. 104(a); *Bourjaily v. United States*, 483 U.S. 171, 175–81 (1987).

Where hearsay is offered at trial against a criminal defendant, the Confrontation Clause of the Sixth Amendment bars its admission if — and only if — the hearsay is "testimonial." *Davis v. Washington*, 547 U.S. 813, 823 (2006). "The Supreme Court has identified a core class of testimonial statements that includes *ex parte* in-court testimony or its functional equivalent; extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; and statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *United States v. Johnson*, 117 F.4th 28, 48 (2d Cir. 2024). "Testimonial statements also include statements made in the course of police interrogation when the primary purpose of the interrogation was to establish or prove past events potentially relevant to later criminal prosecution." *Id.* "[A] statement properly admitted under Fed. R. Evid. 803(6)," the

---

[10] The Second Circuit has summarized a prior version of Rule 807 as permitting "admission of hearsay if (i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party." *United States v. Bryce*, 208 F.3d 346, 350 (2d Cir. 1999), *as amended* (2000).

business-records exception, "cannot be testimonial because a business record is fundamentally inconsistent with what the Supreme Court has suggested comprise the defining characteristics of testimonial evidence." *United States v. Feliz*, 467 F.3d 227, 233–34 (2d Cir. 2006).

**C.    Discussion**

The evidence from Yadav's Google accounts that the Government seeks to introduce falls into five categories. The first category consists of the Google subscriber records documenting the names, phone numbers, and IP addresses tied to the two Google accounts (Ex. B, G). The second category consists of photographs of Yadav's person and IDs (Ex. H, I, J, L). The third category is the email from onlybutt095@gmail.com with the subject line "Photo from Amanat" (Ex. C). The fourth category is the email to vikas0yadav@gmail.com attaching an invitation to apply to join RAW (Ex. K). And the fifth category consists of Yadav's paystubs and tax records reflecting pay from the Cabinet Secretariat and from the CRPF (Ex. D, E, F, L, M).

Two initial points. *First*, none of these records are testimonial because they were not "generated as part of a police interrogation, investigation, or any other process that aimed to establish or prove past events potentially relevant to later criminal prosecution;" nor did they reflect any kind of communication with law enforcement. *Johnson*, 117 F.4th at 48; *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009) ("Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because — having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial."). *Second*, to the extent that these records reflect hearsay statements recorded by Google — such as account subscriber information or email transmittal data (*e.g.*, date, time, and sender and recipient information) — that hearsay is admissible pursuant to Federal Rules of Evidence 803(6), 902(11), and 902(13) because the Google custodial certificate (Ex. A) lays the proper foundation for its

admission as a business record. *See United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019) ("All the email records from this conspiracy included certificates. The certificates stated that Google or Yahoo! recorded the transmittal data automatically when users send emails, as part of the regular practice of a regularly conducted business activity. This satisfies Rule 803(6)'s requirements for admission."); *cf. United States v. Kidd*, No. 18 Cr. 872 (VM) (S.D.N.Y. July 9, 2019) (Doc. No. 72 at 9) (Google account records, among other business records, self-authenticating pursuant to Rule 902(13)).[11]

The core evidentiary inquiry is therefore whether the *content* of the Google records at issue is inadmissible hearsay. For the reasons set forth below, these records are either not hearsay or are admissible under Rules 803(6) or 807.[12] Addressing each category in turn:

**Google Subscriber Records (Ex. B, G):** The Google subscriber records contain machine-generated information, such as IP address logs, as well as subscriber-provided information, such as subscriber name and phone number. The machine-generated information is not a "statement" (and therefore cannot be hearsay) because it was "not made by a person." *El Gammal*, 831 F. App'x at 543 n.7. Even if it were a statement, the machine-generated information, as well as the subscriber-provided information, is recorded and maintained by Google in the regular course of its business and is therefore admissible as an exception to hearsay under Rule 803(6), as set forth above. *See United States v. Carter*, No. 21 Cr. 681 (NSR), 2024 WL 268248, at *3 (S.D.N.Y. Jan. 24, 2024) (admitting Apple and Facebook subscriber records); *United States v. Romanello*, No. 22

---

[11] The Government does not seek to enter the Google custodial certification into evidence. *See United States v. Qualls*, 613 F. App'x 25, 28 n.1 (2d Cir. 2015) (declining to reach the issue of whether "the Confrontation Clause would be implicated by admitting certifications prepared by records custodians solely to authenticate or lay the foundation for otherwise admissible business records").

[12] If the Court determines that any of the records contain inadmissible hearsay, the Government respectfully requests leave to redact the inadmissible portion of the record.

Cr. 194 (EK), 2023 WL 8283435, at *2 (E.D.N.Y. Nov. 27, 2023) (admitting Yaana and Verizon subscriber records).

**Photographs of Yadav's Person and IDs (Ex. H, I, J, L):** The photographs of Yadav in military uniform (Ex. H, I), of Yadav's passport (Ex. J), and of Yadav's person and ID (Ex. L), are not hearsay because they are not statements. The name on Yadav's uniform, as depicted in Exhibits H and I, is not an assertion. *See United States v. Chavez*, 951 F.3d 349, 359 (6th Cir. 2020) ("[T]he *name* 'Papo' can't assert a proposition because, by itself, it's *just* a name. It identifies a person, but it says nothing *about* that person."); *United States v. Snow*, 517 F.2d 441, 442–44 (9th Cir. 1975) (name written on a piece of tape affixed to case containing guns was not an assertion but rather circumstantial evidence of ownership). For similar reasons, the word "INDIAN" on the aircraft in Exhibit I is not a statement. *See United States v. Boles*, 914 F.3d 95, 109 (2d Cir. 2019) (expressing "doubt as to whether [country of origin] inscriptions are hearsay at all" and citing cases for "mechanical trace" theory, pursuant to which "markings on products designating country of origin are not 'statements' subject to the hearsay rule"). To the extent that Yadav's IDs (Ex. J, L) arguably contain factual assertions about his biographical information, the Government is not offering the photographs for the truth of those statements (*e.g.*, that Yadav really was born in 1984). Instead, the Government is offering the photographs as circumstantial proof that Yadav was the user of the Google accounts from which these documents were obtained, and, by extension, the "Amanat" who worked with Gupta to orchestrate the murder-for-hire plot. The photographs are not hearsay when offered for this purpose. *See United States v. Ellis,* 461 F.2d 962, 970 (2d Cir. 1972) ("D'Amico's driver's license, found inside his address book, also was not hearsay. It was not offered for the truth of the matter asserted therein, but rather as

circumstantial evidence to show that D'Amico was the owner of the address book and the coat in which the book and the license were found.").

**The "Photo from Amanat" Email (Ex. C):** For similar reasons, the email sent from onlybutt095@gmail.com bearing the subject line "Photo from Amanat" is not hearsay. The words "Photo from Amanat" do not assert anything. At most, the words might be construed to suggest the recipient should understand that "Amanat" had sent the photograph attached to the email. But the Government is not offering the email to show that "Amanat" really sent the photograph, but rather as circumstantial proof that the onlybutt095@gmail.com account was operated by someone who used the alias "Amanat." The email is not hearsay when offered for this purpose. *See United States v. Saint Prix*, 672 F.2d 1077, 1083 (2d Cir. 1982) (car dealership sales slips bearing defendant's name were not hearsay because they "were not admitted to prove that [the defendant] bought the vans" but rather to show that "someone using [the defendant's] name bought the vans, from which the jury could infer that the person using [the defendant's] name was [the defendant] himself");

**The Invitation to Apply to RAW (Ex. K):** The invitation to apply for a senior field officer position at RAW is not hearsay because it is a verbal act with independent legal significance. Like the solicitation to commit murder in *Childs*, 539 F.3d at 559, or the encouragement to participate in drug deal in *Padilla*, 374 F.2d at 998, the significance of the RAW invitation is that it was sent to Yadav — not that any factual statement contained in the invitation was true or false. Put differently, the invitation to join RAW is not a "statement" because it does not "assert anything." *United States v. Gordon*, 936 F.2d 573, 1991 WL 108723, at *3 (6th Cir. 1991) (unpublished disp.) ("The words allegedly spoken by the invitor do not rise to the dignity of a 'statement' because they do not constitute an 'assertion.'"); *Childs*, 539 F.3d at 559 ("The words allegedly spoken by the

14

solicitor are not a 'statement' because they do not constitute an 'assertion.'").  Alternatively, even if the RAW invitation (or its contents) is viewed as a statement, the Government is not offering the invitation for the truth of the matters stated therein, but rather to show that Yadav was invited in 2012 to join RAW and the GOI's Cabinet Secretariat — as circumstantial proof that Yadav was the type of employee who would receive such an invitation and that at the time of the charged crimes in 2023, Yadav worked there.  For example, the following sentence in the invitation is not probative because it is true:  "The final selection will be made on the basis of an interview by a selection committee duly constituted by the Government of India."  (Ex. K at 3).  It is immaterial whether the writer really planned to select RAW officers using "an interview by a selection committee" or through some other process.  Instead, that sentence is probative because it shows that Yadav was invited to apply for a job in the GOI.  *See Iorio v. Aramark Servicemaster*, No. 03 Civ. 40147 (FDS), 2005 WL 3728715, at *12 (D. Mass. Sept. 30, 2005) ("The e-mail invitation . . . is not hearsay; it is offered to show that Iorio . . . was invited to participate."); *cf. United States v. Canieso*, 470 F.2d 1224, 1232–33 (2d Cir. 1972) (letter found in co-defendant's wallet, which contained similar content to a letter found the defendant's wallet, was not hearsay but rather "circumstantial proof that [the defendant] was linked with [the co-defendant]").

**Yadav's Pay and Tax Records (Ex. D, E, F, L, M):**  Yadav's paystubs, Form 16 tax deduction statements, and income tax returns are not hearsay because the Government is not offering them for the truth of the matters asserted therein — *i.e.*, that Yadav really received a particular amount of pay, or really had a particular amount of tax deducted, during a particular time period.  Instead, the Government is offering these pay and tax records as circumstantial proof that Yadav was employed by the GOI when he engaged in the charged crimes.  This is akin to cases where courts admit physical documents as circumstantial proof of identity or association.

*See Saint Prix*, 672 F.2d at 1083 (car dealership sales slips bearing defendant's name admissible to prove "someone using [the defendant's] name bought the vans"); *United States v. Mejias*, 552 F.2d 435, 446 (2d Cir. 1977) (hotel receipt, luggage invoice, and travel agency business card seized from defendant were not hearsay because they "were not offered to prove either the payment of a hotel bill or the purchase of a piece of luggage, but were circumstantial evidence of [the defendant's] connection with the Skyline Motor Inn and the attache case seized therefrom"); *United States v. Triplett*, 855 F.2d 864, 1988 WL 82817, at *5 (9th Cir. 1988) (unpublished disp.) (check, motel receipt, and postal money order bearing defendant's name were not hearsay because they were not admitted "to prove that [the defendant] purchased something with the check, paid for the motel room, or sent the money order (i.e. for the truth of what the documents assert)," but rather as proof that the defendant "occupied the trailer"); *United States v. Singer*, 687 F.2d 1135, 1147 (8th Cir. 1982) (envelope addressed to defendant and "Carlos Almaden" containing notice to terminate their tenancy was not hearsay because "its purpose [was] to imply from the landlord's behavior — his mailing a letter to "Carlos Almaden," 600 Wilshire — that 'Almaden' lived there"), *aff'd in relevant part on reh'g en banc*, 710 F.2d 431 (8th Cir. 1983); *United States v. Arrington*, 618 F.2d 1119, 1122, 1126 (5th Cir. 1980) (utility bills found in house were not hearsay because they were not offered "to prove the truth of their contents" but rather to show that the defendant lived "in the house at the time of the search").

In the alternative, the Court should admit Yadav's pay and tax records under the residual exception to the hearsay rule. These records meet every requirement of Rule 807. *First*, the records are supported by significant guarantees of trustworthiness, including (a) the fact that the records were found in Yadav's personal email accounts, which he would have no reason to expect would be searched; (b) the consistency and years-long duration of the records, which extend from

Yadav's paystubs in 2016 to his Form 16 in 2023, all of which Yadav chose to maintain in his accounts; (c) other evidence corroborating Yadav's employment by the Cabinet Secretariat, including his 2012 invitation to apply to RAW (Ex. K) and the additional records attached as Exhibits N through S, which are emails and attachments found in the vikas0yadav@gmail.com account further corroborating Yadav's employment by the Cabinet Secretariat;[13] (d) the seals, signatures, logos, and transmittal codes displayed on Yadav's pay and tax records, all of which are indicia of authenticity; and (e) the substantial similarity of the Forms 16 at issue with a sample Form 16 found on an official Indian Government website,[14] attached as Exhibit T, further showing that the Forms 16 here are trustworthy. (*Compare* Ex. D, F (Yadav Forms 16) *with* Ex. T (sample Form 16)). *Second*, Yadav's pay and tax records are the most probative evidence of Yadav's employment by the GOI because they show he received income from the Cabinet Secretariat. Given Yadav was employed by a foreign government, apparently in a covert role, the Government cannot obtain any more probative evidence through reasonable efforts. *Third*, the Government has

---

[13] The Government provides Exhibits N through S here as proof of the guarantee of trustworthiness for Exhibits B through M, but does not intend to offer Exhibits N through S in its case-in-chief at trial and therefore does not address their admissibility for that purpose. *See* Fed. R. Evid. 104(a) (court may consider inadmissible evidence when deciding whether evidence should be admitted). Exhibit N is a March 12, 2020 email from Yadav attaching his curriculum vitae, in which he describes his position as a "Senior Field Officer" with the "Cabinet Secretariat, Govt. of India" since September 2013, and his prior position as an "Assistant Commandant" with the "Central Reserve Police Force, Ministry of Home Affairs, Govt. of India." Exhibit O is an October 29, 2013 email from Yadav attaching a letter, dated October 23, 2013, from an Assistant Director in the GOI certifying that "Vikash Yadav, Senior Field Officer(G) is presently working in the . . . Cabinet Secretariat (Govt. of India)." Exhibit P is an October 30, 2013 email from Yadav attaching an order, signed that day by the same Assistant Director, assigning Yadav to quarters. Exhibit Q is a November 3, 2016 email from Yadav describing a "seniority issue of senior field officers" who "joined cab sett in the year 2013." And Exhibits R and S are additional tax returns sent by the Accountant to Yadav, for the tax years 2019-2020 and 2020-2021, identifying Yadav's employer as the "Cabinet Sectriate."

[14] https://eportal.incometax.gov.in/iec/foservices/assets/pdf/1_Form16_Sample.pdf (retrieved September 21, 2025).

given the defense reasonable notice of its intent to offer Yadav's pay and tax records by specifically attaching them to this motion.

## II. The Court Should Admit the Czech Cellphone Surrender Record Under the U.S.-Czech MLAT and As an Adoptive Admission By Gupta

As set forth above, on the day of his arrest in the Czech Republic, Gupta acknowledged in writing that the Gupta Cellphones belonged to him and that he had surrendered the cellphones to the Czech police. Czech authorities subsequently provided this Czech Surrender Record to the United States, together with the physical Gupta Cellphones and a certification pursuant to the U.S.-Czech MLAT. The Government intends to offer the Czech Surrender Record at trial as proof of Gupta's ownership of the Gupta Cellphones and of his identity as the author and recipient of the contents of the Gupta Cellphones. The Czech Surrender Record is authentic and admissible under the U.S.-Czech MLAT, Federal Rule of Criminal Procedure 27, and Federal Rule of Civil Procedure 44, and as an adoptive admission by Gupta.

### A. The Czech Surrender Record

The Czech Surrender Record is attached as Exhibit U, and an English translation is attached as Exhibit U-T. In relevant part, the Czech Surrender Record states that "[o]n June 30, 2023, at 7:15 PM, in Terminal 1 of Václav Havel International Airport in Prague," Gupta "was requested to surrender" the following items: (1) an iPhone with the International Mobile Equipment Identity ("IMEI") 352859111674977, (2) an iPhone with the IMEI 356703851028422, and (3) a Samsung VIVO with the IMEIs 861531061236891 and 861531061236883. (Ex. U-T at 1). After reciting applicable provisions of Czech law, the Czech Surrender Record memorializes the following statement by Gupta:

> All of the above-mentioned mobile phones belong to me. This includes two Apple iPhones and one Samsung mobile phone.

> The aforementioned items were surrendered at the arrival hall of
> Terminal 1, Václav Havel International Airport, Prague Ruzyně.
>
> After reading this document, I declare that the record is accurate, I
> do not request any corrections or additions, and I sign it as correct
> and complete on June 30, 2023, at 8:58 PM.

(*Id.* at 2).  The Czech Surrender Record was signed by Gupta, his Czech attorney, an interpreter, and a Czech official.  (*Id.*).

The Czech Republic provided the Czech Surrender Record to the United States pursuant to the U.S.-Czech MLAT.  In accordance with that treaty, Czech authorities also provided a certification attesting that the Czech Surrender Record is a true and accurate copy of an official record maintained by the National Drug Headquarters of Criminal and Investigation Service of Czech Republic Police (the "Czech Certification").[15]  The Czech Certification, which Czech authorities provided in both Czech and English, is attached as Exhibit V.

B.      **Applicable Law**

The U.S.-Czech MLAT, attached here as Exhibit W, provides for the authentication and admission of records maintained by a government agency of either country.  Specifically, Article 10(2) of the Treaty provides that the "Requested State may provide copies of any records, including documents or information in any form, that are in the possession of a government department or agency or a court in that State, but that are not publicly available records, to the same extent and under the same conditions as such copies would be available to its own law enforcement or judicial authorities."  Article 10(3) provides that "[r]ecords of a government department or agency or a

---

[15] The Czech Surrender Record is listed as item (4) on the Czech Certification.  The Government produced the Czech Surrender Record to Gupta's counsel on September 18, 2024, and Gupta submitted it to the Court in support of his pretrial motions.  (Dkt. 68-18 at 4–6; Dkt. 68-19 at 4–6).  The Government produced a MLAT certification to Gupta's counsel on a different form on September 18, 2024, (*see* Dkt. 68-18 at 32 and Dkt. 68-19 at 32), and produced the Czech Certification attached to this motion on September 15, 2025.

court produced pursuant to this Article shall, upon request, be authenticated by an official responsible for maintaining them through the use of Form C appended to this Treaty." Article 10(3) further instructs that "[r]ecords authenticated by Form C . . . shall be admissible in evidence in the Requesting State as proof of the truth of the matters set forth therein."

Czech official records accompanied by an appropriate certification are thus self-authenticating and admissible directly under the U.S.-Czech MLAT, without regard for any rule of evidence. U.S. Const., art. VI, cl.2 ("[A]ll Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land."); *see also United States v. Odeh* (*Odeh I*), No. 13 Cr. 20772 (GAD), 2014 WL 5473042, at *5 (E.D. Mich. Oct. 27, 2014) (agreeing that documents produced in accordance with the U.S.-Israel MLAT "do not require further authentication and are admissible" without regard for Federal Rules of Evidence 901 and 902), *aff'd*, *United States v. Odeh* (*Odeh II*), 815 F.3d 968, 981 (6th Cir. 2016) (Israeli military documents properly admitted under the plain text of the U.S.-Israel MLAT).

Authentication of Czech official records by certification under the U.S.-Czech MLAT is also consistent with Federal Rule of Criminal Procedure 27, which provides that "[a] party may prove an official record . . . in the same manner as in a civil action." Federal Rule of Civil Procedure 44(a)(2)(A), in turn, provides that "the following evidences a foreign official record . . . that is otherwise admissible: . . . (ii) the record — or a copy — that is attested by an authorized person and is accompanied . . . by a certification under a treaty or convention to which the United States and the country where the record is located are parties." The U.S.-Czech MLAT is a treaty to which both the United States and the Czech Republic are parties. Accordingly, a Czech official record that is accompanied by a certification under the U.S.-Czech MLAT is also authentic under Federal Rule of Criminal Procedure 27 and Federal Rule of Civil Procedure 44.

## C.      Discussion

The Czech Surrender Record is authentic and admissible under Article 10 of the U.S.-Czech MLAT.  The Czech Surrender Record is a document "in the possession of a government department or agency" in the Czech Republic, (Ex. W art. 10(2)) — namely, the National Drug Headquarters of the Czech Republic Police.  The Czech Surrender Record has been "authenticated by an official responsible for maintaining" the record "through the use of Form C appended to [the] Treaty," (Ex. W art. 10(3)) — namely, the Czech Certification, which is made on Form C and bears the signature and seal of a Prague Department Deputy Chief.  (Ex. V).  The Czech Surrender Record is therefore authentic under Article 10(3) of the U.S.-Czech MLAT — as well as Federal Rule of Criminal Procedure 27 and Federal Rule of Civil Procedure 44 — and is "admissible in evidence . . . as proof of the truth of the matters set forth therein," (Ex. W art. 10(3)).

Admission of the Czech Surrender Record poses no Confrontation Clause issue because the entirety of the document is Gupta's adoptive admission.  *See* Ex. U-T ("After reading this document, I declare that the record is accurate, I do not request any corrections or additions, and I sign it as correct and complete on June 30, 2023, at 8:58 PM.").  The Confrontation Clause "bars only the introduction of hearsay," *Smith v. Arizona*, 602 U.S. 779, 785 (2024), and the adoptive admission of a party-opponent is not hearsay, Fed. R. Evid. 801(d)(2)(B).  This makes sense, because "adoptive admissions . . . become, in effect, [the defendant's] statements.  It is elementary that [the defendant] cannot claim a violation of his right to confront adverse witnesses based upon the introduction of hearsay statements made by him." *United States v. Dinero Exp., Inc.*, No. 99 Cr. 75 (SWK), 2000 WL 1134484, at *3 (S.D.N.Y. Aug. 9, 2000); *see also Figueroa v. Mann*, No. 90 Civ. 1965 (PKL), 1992 WL 51542, at *5 (S.D.N.Y. Mar. 10, 1992) (same), *aff'd*, 979 F.2d 845 (2d Cir. 1992); *accord, e.g.*, *United States v. Webb*, 201 F. App'x 890, 895 (3d Cir. 2006) (no Confrontation Clause violation because "an adoptive admission is tantamount to the defendant's

own statement, not the statement of another"); *United States v. Taylor*, 44 F. App'x 852, 853 (9th Cir. 2002) (mem.) (same); *United States v. Kehoe*, 310 F.3d 579, 591 (8th Cir. 2002) (same); *United States v. Jinadu*, 98 F.3d 239, 245 (6th Cir. 1996) (same); *Berrisford v. Wood*, 826 F.2d 747, 751 (8th Cir. 1987) (same); *United States v. Lemonakis*, 485 F.2d 941, 949 (D.C. Cir. 1973) (same).  In short, because Gupta adopted the Czech Surrender Record, it is Gupta's own statement, and neither hearsay nor the Confrontation Clause is implicated.

III.    **The Court Should Admit Evidence of Gupta's Solicitation of the Murder of Individuals Other Than the Victim, Narcotics and Weapons Trafficking, and International Money Laundering and Credit Card Fraud as Direct Evidence of the Charged Crimes or Under Federal Rule of Evidence 404(b)**

The Government intends to offer, as direct evidence or, in the alternative pursuant to Federal Rule of Evidence 404(b),[16] the following:

1.  Evidence that Gupta and Yadav targeted the Victim as a part of a larger plot to carry out murders, including killings of members of the Sikh separatist movement, such as the Victim and Hardeep Singh Nijjar, and engaged in the planning of additional murders in Canada and in Nepal or Pakistan.

2.  Evidence that from at least in or about 2013, until his arrest in or about June 2023, Gupta trafficked narcotics and firearms, in furtherance of which he communicated with the CS and Yadav, met with the CS in the United States, and agreed to meet with the CS in London and Prague.

3.  Evidence that in or about 2017, Gupta engaged in international money laundering and credit card fraud, and asked the CS to assist him with international money laundering.

The Government will offer evidence of the above in several forms.  *First*, the CS is expected testify about, among other things, the CS's prior relationship with Gupta and the foundation for that relationship: criminal activity.  Specifically, the CS will testify about the CS's interactions with Gupta, both in person and on the phone (through voice and text messages), including that:  (i) before Gupta asked the CS for assistance in killing the Victim in May 2023, the

---

[16] The Government notified the defense of its intent to offer this evidence as direct proof or, in the alternative, under Rule 404(b), on September 8, 2025.

CS had previously met with Gupta in New York City to negotiate a narcotics and weapons trafficking deal, and had planned to meet with Gupta in Sri Lanka and London to negotiate other trafficking deals; (ii) Gupta had previously identified himself as an international money launderer and asked for the CS's assistance in moving money internationally, which is relevant in this case because Gupta arranged an international payment for the murder-for-hire plot in the United States; and (iii) at the same time that he was working to secure the murder-for-hire of the Victim in this case, Gupta also pursued a weapons and drug trafficking deal with the CS and Yadav. *Second*, both the CS and the UC will testify that Gupta circulated the Nijjar Murder Video and spoke of additional targets in Canada. *Third*, during the testimony of the CS and the UC, the Government will offer corroborating text messages and recorded audio and video conversations between Gupta and the CS, and between Gupta and the UC. *Finally*, the Government will offer communications from the Gupta Cellphones between Gupta and Yadav that capture their discussions about targeting Nijjar, their efforts to kill another individual in Nepal or Pakistan, and Yadav's ability to supply weapons for sale to the CS.

Evidence of Gupta's background with the CS, and of his participation with Yadav in the commission of other murders and weapons trafficking, should be admitted as direct evidence of the charged crimes. This evidence is inextricably intertwined with the charged offenses and is essential to the story of the crime. In the alternative, this evidence and the evidence regarding Gupta's international money laundering and credit card fraud should be admitted under Rule 404(b) as evidence of Gupta's motive, intent, knowledge, plan, opportunity, and lack of mistake.

### A.    Applicable Law

All relevant evidence is admissible, unless otherwise precluded by the Federal Rules of Evidence. Fed. R. Evid. 401, 402. Relevant evidence "need only tend to prove the government's case," and includes "evidence that adds context and dimension to the government's proof of the

charges." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Thus, background evidence is relevant and admissible, pursuant to Rule 401, where it tends "to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* Evidence is also admissible if it relates to conduct that: (i) "arose out of the same transaction or series of transactions as the charged offense"; (ii) "is inextricably intertwined with the evidence regarding the charged offense"; or (iii) "is necessary to complete the story of the crime on trial." *United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012). "Evidence fitting within one of these three categories is considered direct evidence and Rule 404 is not applicable." *United States v. Fiumano*, No. 14 Cr. 518 (JFK), 2016 WL 1629356, at *3 (S.D.N.Y. Apr. 25, 2016).

Under Federal Rule of Evidence 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. As the Second Circuit has observed, "*all* evidence incriminating a defendant is, in one sense of the term, 'prejudicial' to him: that is, it does harm to him" and in "that sense, the more pertinent evidence is, the more prejudicial it is," but "[w]hat 'prejudice' as used in Rule 403 means is that the admission is, as the rule itself literally requires, 'unfair' rather than 'harmful.'" *United States v. Jimenez*, 789 F.2d 167, 171 (2d Cir. 1986).

Federal Rule of Evidence 404(b) provides that evidence of a crime, wrong, or other act, while inadmissible to prove propensity, may be admitted for another purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." The Second Circuit "follows the inclusionary approach, which admits all other act evidence that does not serve the sole purpose of showing the defendant's bad character and that is

neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011). Accordingly, evidence is admissible under Rule 404(b) so long as "(1) it is introduced for a proper purpose, (2) it is relevant to the charged offense, (3) its prejudicial effect does not substantially outweigh its probative value, and (4) it is admitted with a limiting instruction if requested." *United States v. Rutkoske*, 506 F.3d 170, 176–77 (2d Cir. 2007).

While all evidence, including evidence offered pursuant to Rule 404(b), is subject to the Rule 403 balancing test, the Second Circuit has long made clear that "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *United States v. Roldan-Zapata*, 916 F.2, 795, 804 (2d Cir. 1990); *see also United States v. Williams*, 205 F.3d 23, 33–34 (2d Cir. 2000); *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006).

### B. The Court Should Admit Evidence of Gupta's Solicitation of the Murder of Individuals Other Than the Victim in This Case

#### 1. Relevant Facts

As discussed above and in the Indictment, Gupta took direction from Yadav to carry out murder. Beginning in May 2023, when Yadav instructed Gupta to "[s]ave my name as Aman," Yadav told Gupta over WhatsApp that there were multiple "targets," including one in New York (the Victim) and another in California, and by reference to addresses, at least one target in Nepal or Pakistan. Gupta made similar representations to the UC, describing the murder of the Victim as one of multiple "jobs," that is, murders. For example, on June 9, 2023, Gupta told the CS that if the UC could successfully kill the Victim, the UC would have "more bigger job, more, more job every month, every month 2-3 job." (Indictment ¶ 27). Similarly, on June 19, 2023, Gupta told the UC that "we have so many targets," implying that Gupta and his co-conspirators were planning the murders of multiple individuals. (*Id.* ¶ 30).

On June 12, 2023, after weeks of discussing a New York based target (the Victim), Gupta referenced an additional "big target" in Canada in discussions with the CS. (*Id.* ¶ 28). Days later, on June 18, 2023, Nijjar was assassinated outside of a Sikh temple in Canada. (*Id.* ¶ 29). Hours after Nijjar's murder, Yadav sent Gupta the Nijjar Murder Video. In response, Gupta expressed his desire to "go to the field," that is, to participate, himself, in the murders. (*Id.*). Yadav reminded Gupta of the importance of "secrecy" and advised that it was best that Gupta "not get involved in action." (*Id.*).

Shortly after receiving the Nijjar Murder Video, Gupta sent the video to the CS and UC and later explained that Nijjar's murder was part of the same plot as the plot to kill the Victim by describing Nijjar as a "target," "#4, #3" on the list. (*Id.* ¶ 30). Gupta told the CS that "we" — referring to Gupta, Yadav, and their co-conspirators — had not given the UC the Nijjar "job" so it had been completed by "some other guy" in Canada. (*Id.* ¶ 30). Gupta separately told the UC that Nijjar had been the Canadian target that Gupta had previously mentioned to the UC as a potential Canadian "job." (*Id.*). Gupta added that, in the wake of the Nijjar murder, there was no longer a "need to wait" to execute the Victim. (*Id.*). Demonstrating his awareness of the relationship between the Victim and Nijjar, Gupta advised the UC that the UC should expect the Victim to "be more cautious, because in Canada, his colleague is down." (*Id.*).

In the days after Nijjar's murder, Yadav gave Gupta information about the Victim's location, which Gupta relayed to the UC. (*Id.* ¶ 32). For example, Yadav told Gupta that the Victim was expected either at his home or his office, and that Gupta should tell the UC "to be ready for both the locations." (*Id.* ¶ 33). Yadav also provided the Victim's phone numbers. (*Id.* ¶ 34). At the end of June, Gupta traveled to Prague to meet with the CS and finalize a narcotics and firearms deal. Upon his arrival in the Czech Republic, Gupta was arrested by the Czech police.

Gupta and Yadav's WhatsApp communications reveal that in mid-May 2023 — around the same time that they began organizing the murder of the Victim — Gupta and Yadav targeted another individual in Nepal or Pakistan. In so doing, Gupta and Yadav followed the same pattern they later followed when targeting the Victim, Nijjar, and others in Canada. As reflected in their WhatsApp messages, Gupta established contact with hitmen, closely coordinated with Yadav while exchanging information about the Nepal/Pakistan target and the timing of the murder, and worked with Yadav to negotiate payment for the hitmen. For example, on May 8, 2024, Gupta messaged Yadav that the hitmen had "already arrived [in Nepal] and looking for" the intended victim. In the following days, Yadav requested updates and told Gupta to offer additional funds to the hitmen to encourage them to get the job done the next day because it was urgent — just as Yadav would later press Gupta to kill the Victim. Yadav provided the target's locations in Nepal to Gupta to pass on to the hitmen, whom Gupta described as "soldiers," and instructed Gupta that "if they have really captured the target.. they should kill him. Else we won't get another chance."

## 2. Discussion

Evidence of Gupta's solicitation of other murders is admissible as direct evidence because it is central to the story of the crimes and inextricably intertwined with the proof at trial. Gupta's discussions of the murder of Nijjar, other Canadian targets, and the Nepal/Pakistan target arose out of the same series of transactions — and indeed, the same communications — as the plan to kill the Victim. And that body of evidence explains, among other things, the relationship between Gupta and Yadav, their motivations for killing the Victim, and "furnish[es] an explanation of the understanding or intent with which certain acts were performed." *Gonzalez*, 110 F.3d at 941. Put simply, the same evidence that proves Gupta, Yadav, and their co-conspirators planned to kill the Victim — principally, the communications between Gupta and Yadav, Gupta and the CS, and

Gupta and the UC — will also show that Gupta, Yadav, and their co-conspirators worked to kill other Sikh separatists in Canada, including Nijjar, and to kill the target in Nepal or Pakistan.

The evidence of Gupta's participation in other murder plots is therefore necessary to show the scope of the charged offense and "complete the story of the crime on trial." *United States v. Gohari*, 227 F. Supp. 3d 313, 317 (S.D.N.Y. 2017). As discussed above, after Nijjar's murder, Gupta referred to Nijjar as target "#4 [or] #3" on a "list" of targets and confirmed that Nijjar was one of the additional Canadian targets that Gupta had discussed with the UC, expressly stating that "we" — meaning Gupta, Yadav, and their other co-conspirators — had given the job to another hitman. Further, Gupta made clear that completing the Victim's murder would lead to more jobs (meaning more killings), telling the UC that the murder of the Victim would result in "more bigger job[]s" being given to the UC. This evidence places the anticipated killing of the Victim in its true context: as one of a series of murders that the conspirators planned of Sikh dissidents like Nijjar. And because Gupta discussed the murder of Nijjar and the planned murder of others in Canada in the same communications where he discussed the murder of the Victim, the proof is inextricably intertwined. The same is true for the murder of the target in Nepal or Pakistan, which Gupta and Yadav discussed over WhatsApp in the same message thread, and at essentially the same time, as their discussions of the murders of the Victim and Nijjar.

Gupta participation in the plan to kill the target in Nepal or Pakistan is particularly probative as direct proof of his relationship with Yadav. *See United States v. Delligatti*, No. 15 Cr. 491 (KBF), 2018 WL 1033242, at *6 (S.D.N.Y. Feb. 23, 2018) ("[W]here potential evidence explains the development of the illegal relationship and explains the mutual trust that existed between the coconspirators, it will be plainly admissible."). Gupta and Yadav began messaging on WhatsApp on May 6, 2023. That same day, Yadav told Gupta that Yadav had a "target in New

York" and another in "California." On May 8, 2023, Gupta messaged Yadav that "Boys are there already arrived and looking for him," referring to the target in Nepal/Pakistan. This shows that Gupta and Yadav's relationship was, from the very beginning, about arranging murders — and that the Victim (presumably the "target in New York") and the target in Nepal/Pakistan were both within the scope of the plan. *See United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997) (affirming admission of uncharged murders against a defendant charged with murder and RICO violations, because the uncharged conduct was "proof of the existence of the RICO enterprise . . . which used such acts of violence in furtherance of its narcotics conspiracy"); *United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) ("When the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself."). The timing of the Nepal/Pakistan-related conduct is also probative as it shows that the Victim was but one in many targets that Gupta and Yadav intended to murder. *See United States v. Mundle*, No. 15 Cr. 315 (NSR), 2016 WL 1071035, at *2 (S.D.N.Y. Mar. 17, 2016) (events in the "days leading up to, and the day after" the charged conduct were direct evidence and inextricably intertwined because it provided crucial context and occurred close in time to the charged conduct).

Alternatively, evidence of the Gupta's solicitation of other murders is admissible under Rule 404(b) to prove his motive, knowledge, intent, plan, opportunity, and absence of mistake.

*First*, evidence of Gupta's participation in the plan to kill Nijjar is proof of Yadav and Gupta's motive for targeting the Victim — *i.e.*, to suppress Nijjar and the Victim's Sikh separatist activities. This motive dovetails with the proof, described above, that Yadav was an employee of the Government of India. And this motive helps explain why Gupta was concerned enough about, in his words, "political things," that he instructed that the UC should not kill the Victim around the time of the Indian Prime Minister's visit to the United States. (Indictment ¶ 24).

*Second*, evidence of Gupta's targeting of the individual in Nepal/Pakistan is proof of Gupta's knowledge and intent in committing the charged murder-for-hire of the Victim. While some similarity is necessary, "[e]vidence of other acts need not be identical to the charged conduct to show knowledge or intent pursuant to Rule 404(b), so long as the evidence is relevant in that it provides a reasonable basis for inferring knowledge or intent." *United States v. Cadet*, 664 F.3d 27, 32–33 (2d Cir. 2011). Here, the murder-for-hire plots were nearly identical, occurred nearly contemporaneously, and followed similar patterns of planning, payment, and motive. Gupta and Yadav's discussions of the Nepal/Pakistan killing took place in mid-May 2023, just days before Gupta contacted the CS to solicit the Victim's murder. That Gupta coordinated another murder-for-hire plot at the same time as the charged offense is strong evidence that Gupta had the requisite knowledge and intent in this case.

*Third*, evidence of Gupta's participation in the plan to kill the target in Nepal/Pakistan is proof of Gupta and Yadav's *modus operandi* in conducting lethal targeting operations. It illustrates how Yadav directed Gupta, who contracted local "soldiers" (*i.e.*, hitmen) to carry out the murder. Specifically, Gupta received information about the Nepal/Pakistan target's location from Yadav; Gupta passed that information to the hitmen; Gupta negotiated payment in consultation with Yadav; and Gupta passed updates from the hitmen to Yadav. Gupta and Yadav's method of targeting to the Nepal/Pakistan target is strikingly similar to their method of targeting the Victim. *See United States v. Mills*, 895 F.2d 897, 907 (2d Cir. 1990) ("Rule 404(b) permits evidence of similar acts to prove a 'signature crime,' *i.e.*, a *modus operandi* where the crimes are 'so nearly identical in method as to ear-mark them as the handiwork of the accused.'").

*Finally*, evidence of all the additional murder plots — in Canada and in Nepal/Pakistan — are admissible under Rule 404(b) as evidence of Gupta's absence of mistake in entering into an

agreement to kill the Victim and well as his opportunity to arrange murder-for-hire deals. *See, e.g.*, *United States v. Rosario*, 2014 WL 5870708, at *4 (S.D.N.Y. Nov. 13, 2014) (evidence of prior firearms possession "would be admissible [in an armed robbery case] to prove [the defendant's] ability to obtain firearms, the absence of a mistake in [the defendant's] possession of firearms, or to rebut a 'mere presence' defense").

Evidence of Gupta's solicitation of other murders is not substantially more prejudicial than probative. These additional killings do not involve conduct "any more sensational or disturbing" than the murder-for-hire of the Victim of which Gupta is accused. *Roldan-Zapata*, 916 F.2d at 804. And this evidence, consisting of communications in which Gupta participated, is certainly not *unfairly* prejudicial. *See United States v. Amato*, No. 03 Cr. 1382 (NGG), 2006 WL 1495497, at *7 (E.D.N.Y. May 26, 2006) (other-act evidence involving murders was not unduly prejudicial when defendant was charged with racketeering act of murder). Moreover, any prejudicial effect can be minimized with a limiting instruction. *See United States v. Mercado*, 573 F.3d 138, 142 (2d Cir. 2009) (upholding Rule 403 determination where challenged evidence was "not especially worse or shocking than the transactions charged" and where the district court "gave several careful instructions to the jury regarding what inferences it could draw from the admitted evidence").

### C. The Court Should Admit Evidence of Gupta's Participation in Drug and Weapons Trafficking Between 2013 and June 2023

The evidence at trial will establish that between in or about 2013 and his arrest in June 2023, Gupta engaged in the international trafficking of narcotics and weapons, including through attempted transactions with the CS. This evidence is admissible as direct evidence or, in the alternative, pursuant to Rule 404(b), to explain Gupta's relationships with the CS and Yadav and to show Gupta's financial motivation for participating in the charged crimes.

### 1. Relevant Facts

Gupta was introduced to the CS, who was posing as an international narcotics trafficker, in or about 2013. Gupta told the CS that he was an international narcotics trafficker and money launderer. Since their introduction in or about 2013, Gupta and the CS negotiated narcotics and weapons deals on several occasions. For example, early in their relationship, Gupta and the CS agreed to meet in Sri Lanka to negotiate a deal to ship heroin to the United States. Though the Sri Lanka trip did not transpire, in or about June 2017, Gupta traveled to Manhattan and met with the CS to negotiate a narcotics deal. During that meeting, Gupta told the CS that he had contacts in Afghanistan who could supply the CS with heroin. From in or about 2021 to in or about 2022, Gupta offered to sell the CS heroin and assault rifles, machineguns, explosives, and other heavy weaponry, and Gupta sent the CS photographs of the weapons. Throughout the charged conspiracy period, even as they discussed the murder-for-hire of the Victim, Gupta and the CS also negotiated a drug and weapons deal. Gupta flew to Prague, where he was arrested, in part to meet the CS and finalize this deal.

Gupta turned to Yadav to supply the weapons that Gupta planned to sell to the CS in exchange for narcotics. In a series of WhatsApp messages on June 22, 2023, Yadav promised to supply Gupta with firearms, such as assault rifles and pistols, and to arrange for the clearance of an airplane to transport the weapons from India. Yadav told Gupta, however, that Yadav's assistance would depend on how well the "task at hand" was executed, meaning the Victim's murder. Days later, in a June 26, 2023 message, Gupta asked Yadav to check about the "toys," meaning firearms. Yadav again reiterated that Yadav anticipated he would be able to obtain the weapons for Gupta once the work (meaning the Victim's murder) was completed.

## 2.    Discussion

Evidence of Gupta's narcotics and weapons trafficking is direct proof of the charged crimes. It explains Gupta's relationship with the CS — and in particular, *why* Gupta contacted the CS to arrange the Victim's murder — and is thus essential to the story of the crime. The foundation of Gupta's relationship with the CS was criminal. Gupta believed the CS was an international drug trafficker, and by the time that Gupta asked the CS in May 2023 to help arrange the Victim's murder, Gupta and the CS had met in person and known each other for years. Gupta's long relationship of trust with the CS was why Gupta felt comfortable asking the CS to arrange a murder. *See United States v. Francisco*, 642 F. App'x 40, 46 (2d Cir. 2016) (evidence properly admitted to explain the "mutual trust" between the defendant and the cooperating witnesses); *Delligatti*, 2018 WL 1033242, at *6 (same). For similar reasons, evidence of Gupta's weapons trafficking is also direct proof of his relationship with Yadav. It illuminates one aspect of their transactional relationship: if Gupta accomplished the murder of the Victim, then Yadav would supply Gupta would weapons to sell the CS. Because much of the proof of Gupta's narcotics and weapons trafficking is contained within his communications with the CS and Yadav arranging the Victim's murder, the evidence is inextricably intertwined and is necessary to complete the story of the crime. *See United States v. Kemp*, No. 21-1684-CR, 2023 WL 405763, at *6 (2d Cir. Jan. 26, 2023) (district court did not abuse discretion by admitting evidence of shootings predating charged murder to provide context and to show that the charged murder was not an isolated incident but the culmination of a turf war).

In the alternative, evidence of Gupta's narcotics and weapons trafficking should be admitted pursuant to Rule 404(b) as proof of his motive, intent, and lack of mistake. As described above, evidence of Gupta's narcotics and weaponing trafficking activity with the CS is also critical to explaining their relationship of trust. *See United States v. Pipola*, 83 F.3d 556, 566 (2d Cir.

1996) (evidence is admissible under Rule 404(b) "to explain how a criminal relationship developed" and "help the jury understand the basis for the co-conspirators' relationship of mutual trust"). As to motive, Gupta's narcotics and weapons transactions with the CS reveals his financial motivation for arranging the Victim's murder. Specifically, Yadav made clear that his provision of firearms for Gupta to sell to the CS (in exchange for cocaine) was contingent on Gupta successfully arranging the Victim's murder. Without this evidence, the key question of why Gupta would participate in the murder-for-hire scheme would remain unanswered for the jury.[17] As to intent and lack of mistake, evidence of Gupta's narcotics and weapons relationship with the CS tends to prove that Gupta truly intended for the Victim to be killed, because Gupta chose to contact the CS, whom Gupta believed was a narcotics trafficker with violent criminal associates in New York who could be hired to commit a murder.

### D. The Court Should Admit Evidence of Gupta's Participation in International Money Laundering and Credit Card Fraud in 2017

The evidence at trial will establish that in or about 2017, Gupta engaged in international money laundering, including credit card fraud, and asked the CS to assist him with international money laundering. This evidence is admissible under Rule 404(b) as proof of Gupta's relationship with the CS and to show Gupta's opportunity, knowledge, intent, and lack of mistake in arranging the $15,000 advance payment to the UC in this case.

#### 1. Relevant Facts

In or about May and June 2017, Gupta and the CS discussed meeting in person to negotiate a narcotics deal. During one of those calls, Gupta asked the CS if the CS could arrange for someone

---

[17] Although Gupta began working with Yadav in exchange for Yadav's assistance in resolving an Indian criminal case, by May 12, 2023, Yadav had already notified Gupta that his criminal case was "taken care of." (Indictment ¶ 12). This leaves open the question of why Gupta continued to participate in the murder-for-hire of the Victim.

to collect $25,000 on his behalf from Cuba and deliver the cash when they met in person either in London or New York. Gupta suggested that the CS arrange for three or four boys ("Money Couriers") to travel to Cuba to collect about $7,000 to $8,000 each. Gupta explained that he would pay the Money Couriers, and he did not expect the Money Couriers to have an issue with the authorities because they did not need to declare the $8,000. Gupta also stated that in January 2017, he had traveled to Cuba and collected $10,000 without issue and without declaring the funds.

As discussed above in the context of Gupta's drug and weapons trafficking activities, in June 2017, Gupta met with the CS in Manhattan to discuss a drug transaction. During that meeting, Gupta told the CS that "money," meaning credit card fraud and the laundering of those proceeds, was Gupta's primary business. Gupta explained that he had smuggled $20 million in credit cards from Cuba to Los Angeles by taping the cards to his ankles. Gupta also told the CS that he had moved $50 million from Ecuador to Panama. In subsequent text messages, Gupta asked the CS if the CS could help arrange a $30,000 to $40,000 payment in Romania on Gupta's behalf, and Gupta in turn would make the payment in New York.

### 2. Discussion

Evidence of Gupta's participation in international money laundering, including by smuggling $20 million in credit cards, is admissible because it tends to prove Gupta's opportunity, knowledge, intent, and lack of mistake in committing the charged money laundering offense. It explains how Gupta was able to arrange for the $15,000 advance payment to the UC in Manhattan despite being based in India. It shows that Gupta had the connections — and through them, the opportunity — to transfer large amounts of money across international borders on short notice and without detection. *See United States v. Flom*, 763 F. App'x 27, 30 (2d Cir. 2019) (affirming admission of uncharged money-laundering scheme to prove defendant's knowledge in money laundering offense). And it shows Gupta's knowledge, intent, and lack of mistake because Gupta's

prior attempts to have the CS assist him with his financial crimes make it less probable that Gupta thought that sending $15,000 in cash to the UC was for some innocuous purpose. *Cf. United States v. Osarenkhoe*, 439 F. App'x 66, 68 (2d Cir. 2011) (defendant's tax returns, which listed false dependents, properly admitted as proof of the defendant's intent and absence of mistake in the charged scheme to fraudulently obtain adoption subsidy payments).

Moreover, evidence of Gupta asking the CS to help him smuggle cash, and admitting to the CS about other instances of credit card fraud and smuggling bulk cash, is admissible as proof of Gupta's relationship with the CS. It explains why Gupta trusted the CS enough to send $15,000 to the CS's associate (the UC) before the murder of the Victim was complete. *See Pipola*, 83 F.3d at 566 (evidence admissible under Rule 404(b) "to explain how a criminal relationship developed" and "help the jury understand the basis for the co-conspirators' relationship of mutual trust").

## IV.  The Court Should Take Certain Measures to Protect the UC and CS

The Government requests that the Court take three measures to protect the UC and a single measure to protect the CS, both of whom are expected to testify about their respective roles in the investigation.[18] As to the UC, the Government requests that the Court (i) allow the Government to withhold the name of the UC from the defense, and (ii) close the courtroom for the testimony of the UC.[19] As to both the UC and the CS, the Government requests that (iii) the UC and CS be permitted to testify pseudonymously.

_____

[18] The Government requested the defense position on these protective measures but has not yet received a response.

[19] Although the Government is not requesting to seal the Courtroom for the testimony of the CS, the Government does request that any courtroom sketch artists be precluded from drawing the face of the CS, consistent with the CS's pseudonymous testimony. *See, e.g.*, *United States v. Maxwell*, 20 Cr. 330 (AJN) (S.D.N.Y. Nov. 18, 2021) (Doc. No. 471) ("[C]ourtroom sketch artists whether in the courtroom or overflow rooms may not draw exact likenesses of the Protected Witnesses.");

*(continued on next page)*

## A.    Relevant Facts

As more fully described in Exhibit X,[20] the UC is an active NYPD undercover officer who has been working undercover for approximately 15 years.  The UC is currently involved in at least six active and ongoing investigations, with another investigation planned to start soon.  Among the UC's active investigations is an investigation into ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████     The UC estimates that, over the course of the next year, the UC will be involved in approximately ten investigations in some capacity.

The CS is a long-term DEA source who has rendered assistance in numerous drug and gun trafficking investigations, including prior investigations of Gupta.  The CS's work is ongoing.

The need for protective measures in this case is compelling.  The threat to witnesses — including the UC and the CS — is not illusory.  As described in the Indictment, Gupta worked with an employee of a foreign government and others to orchestrate an international murder-for-hire plot.  The nature of the charges, standing alone, invites the risk of violence against Government witnesses, their relatives, and associates.  *See, e.g.*, *United States v. Santos*, 541 F.3d 63, 72 (2d Cir. 2008) ("Because narcotics conspiracies are illicit ventures, disputes are frequently

---

*United States v. Raniere*, 18 Cr. 204 (May 6, 2019 Text Order) ("Sketch artists will be allowed in the courtroom and overflow room with their supplies. They may, however, not draw exact likenesses of jurors or witnesses other than co-defendants should they testify.").

[20] For the same reasons the Government seeks these safety measures, the Government also respectfully requests permission to redact from the public filing portions of this motion and the supporting NYPD declaration that may reveal the UC's identity.

settled by force or the threat of force."); *United States v. Taylor*, 707 F. Supp. 696, 703 (S.D.N.Y. 1989) (denying defense request for witness list and noting that "[e]specially in narcotics cases . . . the dangers of witness intimidation, subornation of perjury or actual injury to witnesses are great"). Indeed, during the course of the charged conduct, Gupta and his co-conspirators demonstrated their willingness to use extreme violence, including by referencing the successful murder of Nijjar. (Indictment ¶¶ 29–30). Gupta even advocated for the indiscriminate killing of witnesses. For example, in urging the UC to execute the Victim expeditiously, Gupta told the UC that "[i]f he is not alone, [if] there are two guys with him in the meeting or something . . . put everyone down, put everyone down." (Indictment ¶ 30).

### B. The UC Should Be Permitted to Testify with the Courtroom Closed

The Government requests that the Court allow the UC to testify with the courtroom closed, except to the parties and Gupta's immediate family.[21] This protective measure — along with allowing the Government to withhold the true identity of the UC, and allowing both the UC and CS to testify under pseudonyms, *see infra* — is necessary to protect the lives of the UC and CS, their physical safety, and the integrity of ongoing as well as future investigations.

#### 1. Applicable Law

While the Sixth Amendment guarantees every person accused in a criminal prosecution the right to a "public" trial, the closure of a criminal trial courtroom may constitutionally occur under limited circumstances. *Waller v. Georgia*, 467 U.S. 39, 43 (1984); *see also Presley v. Georgia*, 558 U.S. 209, 212–15 (2010). The Supreme Court set forth the standards for courtroom closure in a four-factor test:

---

[21] The Government is in the process of seeking authorization from the Deputy Attorney General, pursuant to 28 C.F.R. § 50.9, to seek court closure for the testimony of the UC.

(1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced,

(2) the closure must be no broader than necessary to protect that interest,

(3) the trial court must consider reasonable alternatives to closing the proceeding, and

(4) it must make findings adequate to support the closure.

*Waller*, 467 U.S. at 43; *see also United States v. Gupta*, 699 F.3d 682, 687 (2d Cir. 2012) ("[I]f a court intends to exclude the public from a criminal proceeding, it *must* first analyze the *Waller* factors and make specific findings with regard to those factors.").

In evaluating the first *Waller* factor in the context of a state criminal prosecution, the Second Circuit stated:

> It may be doubted whether trial judges can make meaningful distinctions between "compelling" and "overriding" interests or can distinguish between whether such interests are "likely to be prejudiced" or whether there is a "substantial probability of" prejudice. We believe the sensible course is for the trial judge to recognize that open trials are strongly favored, to require persuasive evidence of serious risk to an important interest in ordering any closure, and to realize that the more extensive is the closure requested, the greater must be the gravity of the required interest and the likelihood of risk to that interest.

*Ayala v. Speckard*, 131 F.3d 62, 70 (2d Cir. 1997).[22]

As a general matter, prosecutors have an interest in protecting the safety of witnesses, in particular those whose lives have been threatened. *See Ip v. Henderson*, 710 F. Supp. 915, 918

---

[22] The public also has a First Amendment right to open access to public trials. *See, e.g., Press-Enter. Co. v. Superior Ct. of Cal.*, 464 U.S. 504, 505–07 (1984). The Supreme Court has indicated, however, that the *Waller* test also satisfies the requirements of the First Amendment, as "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." *Waller*, 467 U.S. at 46; *see also Presley*, 558 U.S. at 213 ("[T]here is no legitimate reason, at least in the context of juror selection proceedings, to give one who asserts a First Amendment privilege greater rights to insist on public proceedings than the accused has.").

(S.D.N.Y. 1989). The Second Circuit has repeatedly held that prosecutors have an overriding interest in protecting the safety and efficacy of undercover officers. *See Smith v. Hollins*, 448 F.3d 533, 539 (2d Cir. 2006); *Brown v. Artuz*, 283 F.3d 492, 501-02 (2d Cir. 2002) (the "safety of a police officer working undercover surely constitutes an overriding interest"); *Gonzalez v. Quinones*, 211 F.3d 735, 738 (2d Cir. 2000) (courts "may properly order courtrooms closed during the testimony of undercover police officers, in order to protect both the officers' safety and their future effectiveness"); *see also Bowden v. Keane*, 237 F3d 125, 132–33 (2d Cir. 2001) (affirming denial of habeas relief where undercover officer testified in closed courtroom after articulating the basis for his fear of public testimony).

### 2.    Discussion

Measured against the governing constitutional standard, the appropriateness of closing the courtroom for the testimony of the UC is clear. There can be no question that the Government has a strong interest in protecting the safety of the UC — indeed, protecting the lives of the UC and the UC's ability to effectively continue the UC's ongoing undercover work "is an extremely substantial interest" and that "this interest would be seriously prejudiced by requiring the officer to testify in an open courtroom." *Ayala*, 131 F.3d at 72.

For all the reasons described above, the risk that anyone in the courtroom might recognize the UC and reveal the UC's identity to others creates unacceptable risks. Indeed, the Second Circuit has emphasized that there is "no requirement that the prosecution must prove that particular individuals likely to attend the trial will disclose the officer's identity." *Id.* The risk to both the UC and the UC's work are especially pronounced here where the UC continues to conduct undercover operations in several ongoing investigations, ███████████████████████████
███████████████████████

The Government understands that when undercover NYPD officers — including the UC — testify in New York State Supreme Court, courtrooms are often closed to address similar risks to testifying UCs in state investigations. Courts in this District have also closed the courtroom under such circumstances. *See e.g.*, *United States v. Eusebio*, 22 Cr. 522 (GHW); *United States v. Mial*, 21 Cr. 499 (PAE); *United States v. Esteves*, 20 Cr. 686 (JGK); *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 490 (S.D.N.Y. 2018); *United States v. Urena*, 8 F. Supp. 3d 568, 572 (S.D.N.Y. 2014); *United States v. Felton*, 17 Cr. 21 (WHP) (S.D.N.Y. Jan. 23, 2019) (Doc. No. 357); *United States v. Sharpe*, 15 Cr. 288 (RMB); *United States v. Allen*, 15 Cr. 95 (AJN).

While the requested closure will unquestionably deprive the public of the opportunity to see the witness, Gupta will suffer no deprivation whatsoever, as he will be able to observe the UC throughout the entirety of the testimony, including for any cross-examination. The Government recognizes that it must accept the risk that Gupta will describe the UC to others, but "the right to a public trial does not require the further risk that the officer's identity will become known through observation by members of the public who might enter the courtroom and see the officer testifying," *Ayala*, 131 F.3d 72. In addition, as the transcript of the proceeding would be made available to the public shortly after the testimony is given, and a live audio feed from another courtroom could also be provided, the deprivation to the public pales in comparison to the Government's interest in shielding the identity of the UC from the public in order to protect the UC, the UC's family, and the ongoing efforts of law enforcement.

Although open public hearings and trials serve many important salutary values, the adverse effect of the requested limited closure is minimal and in no way prejudices Gupta. The same cannot be said of alternative means that would serve the purpose of protecting the UC, such as having the UC testify either in disguise or behind a screen. Indeed, the Second Circuit in *Ayala*

addressed these alternatives and found that the alternatives themselves pose "substantial risks to a fair trial for the defendant," including an impact on the fact-finder's ability "to observe the witness's demeanor and assess credibility." *Ayala*, 131 F.3d 71–72; *see also Alimehmeti*, 284 F. Supp. 3d at 487–89.  Accordingly, the appropriate way to protect the Government's substantial interests, while minimizing any prejudice to Gupta and the public, is to allow the closure of the courtroom while the UC testifies.  Based on the facts of the instant case, the proposed courtroom closure is "no broader than necessary" to protect the UC's safety and the integrity of ongoing investigations.  *Urena*, 8 F. Supp. 3d at 571; *see also Alimehmeti*, 284 F. Supp. 3d at 487.  The Government is unaware of any reasonable alternative that will protect these vital interests.

Should the Government's request be granted, the Government would work to provide additional accommodations in the interests of transparency, which would further minimize any prejudice to Gupta or the public.  *First*, the Government would make the daily transcript of the UC's testimony available to the public through the court reporter's office.  *Second*, the Government would agree to permit Gupta's immediate family to be present for the testimony of the UC.[23]  *Third*, the Government would request the Court make a live audio feed of the UC's

---

[23] There is some authority in the Second Circuit indicating that a higher showing must be made to exclude a defendant's family from a criminal proceeding than members of the general public.  *See, e.g.*, *Yung v. Walker*, 468 F.3d 169, 175 (2d Cir. 2006) ("*Waller*'s . . . mandate that the closure be no broader than required to protect the overriding interest at stake necessarily applies . . . to the portion of the public to be excluded.  Thus, *Waller* prevents a court from denying a family member's request to be exempted from a courtroom closure order unless the court is convinced that the exclusion of that particular relative is necessary to protect the overriding interest at stake.").  While the Government is not currently aware of any criminal activity by Gupta's family, should the Government learn new information suggesting that his members of his family may be involved with criminal activity, the Government will move to exclude those individuals from the courtroom.

testimony available in another courtroom where, to the extent technologically possible, exhibits and recordings played during the UC's testimony will be made available.[24]

### C.    The Government Should be Permitted to Withhold the True Name of the UC

The Government requests that it be permitted to withhold the true name of the UC, and that the defense be precluded from eliciting any personally identifiable information at trial about the UC, as revealing the true identity of the UC will create serious risks to the safety of the UC and the UC's family.   Such disclosure will also threaten the viability of ongoing criminal investigations.   Moreover, based on the below-described diligence that will be performed by the Government, maintaining the confidentiality of the UC's true name will in no way prejudice the defense.   The Government therefore respectfully requests that the Court issue an order that the Government shall not be required to disclose the UC's true name, and that the defense cannot elicit personally identifiable information about the UC at trial.

The law enforcement privilege protects, among other things, "information pertaining to law enforcement techniques and procedures," "information that would undermine the confidentiality of sources," "information that would endanger witness and law enforcement personnel," and "information that would seriously impair the ability of a law enforcement agency to conduct future investigations." *In re City of New York*, 607 F.3d 923, 948 (2d Cir. 2010).  Once a court has determined that the law enforcement privilege applies, there is a "strong presumption against lifting the privilege." *Id.* at 944.  A criminal defendant can overcome that presumption by showing "an authentic and sufficient need and no adequate alternative means to obtain the

---

[24] In a case where Judge Engelmayer granted a request for court closure, he permitted one member of the press to attend the otherwise closed session "so as to assure press exposure to visual observations . . . that only a person physically present in the court can make," provided the member of the press pool would respect the Government's "vital interest" in protecting the UCs' identity. *Alimehmeti*, 284 F. Supp. 3d at 487.

information." *United States v. Johnson*, No. 10 Cr. 184, 2011 WL 7782624, at *7 (E.D.N.Y. Oct. 24, 2011). But "demonstrating a 'compelling need' does not automatically entitle a litigant to privileged information. Rather, disclosure is required only if that compelling need outweighs the public interest in non-disclosure." *City of New York*, 607 F.3d at 945 (granting writ of mandamus compelling district court to deny a motion to compel the City of New York to produce undercover police reports).

A criminal defendant does not have an absolute right to the true identity of a Government witness at trial. *See United States v. Machado-Erazo*, 951 F. Supp. 2d 148, 153 (D.D.C. 2013) ("[t]he right to a witness's identity . . . is not absolute"). Rather, the defendant must be given an opportunity "to place the prosecution's witness in their proper setting and to test the weight of their testimony and their credibility before the jury." *Alford v. United States*, 282 U.S. 687, 692 (1931). Thus, the accused's right to the identity of a witness is not absolute and should yield where threats to the witness are "actual and not the result of conjecture." *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969); *see also United States v. Cavallaro*, 553 F.2d 300, 304 (2d Cir. 1977) ("[W]here the government voices a legitimate concern for a witness' safety, the trial court must balance the potential danger to the witness against the need of the defense for the information.").

Attached as Exhibit X is a declaration from NYPD Chief of Detectives Joseph Kenny ("Kenny Decl."), which sets forth numerous specific reasons why the UC's true name should remain confidential in this case.

*First*, disclosure of the true identity of the UC would pose grave risks to the safety of the UC and his family. As described in the Kenny Declaration, undercover officers put themselves in extreme risk every day. ██████████████████████████████████████
████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ Were the UC to be recognized by the targets of the UC's current or past investigations, or those targets' criminal associates, the UC's safety and life would be in grave danger. Many of those individuals have criminal histories that include firearms offenses as well as significant violence, including violence specifically directed at individuals believed to be working with law enforcement. Those individuals may seek to injure or kill the UC and have the means to do so.

*Second,* disclosure of the UC's true identity would compromise the UC's ongoing investigations. ███████████████████████████████████████

███████    ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ Disclosing the UC's true identity (which inevitably would lead to discovery of the UC's addresses, telephone numbers, email addresses, and family members), would risk outing the UC and potentially ending these ongoing law enforcement operations and significantly reduce the effectiveness of DETF.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████

Thus, the significant government interest in protecting ongoing investigations, ensuring the safety of the UC, who risks life and limb every day, and enabling the UC to continue the important work the UC does for public safety necessitates protecting the UC's true identity. *See, e.g.*, *Cotto v. Fischer*, No. 09 Civ. 9813, 2012 WL 5500575 (SAS) (MHD), at *31–36 (S.D.N.Y. Aug. 23, 2012) (noting the safety threats and dangers posed to undercovers and the need to protect their real identities), *report and recommendation adopted*, 2012 WL 5499890 (S.D.N.Y. Nov. 12, 2012); *Washington v. Walsh*, No. 08 Civ. 6237 (DAB), 2010 WL 423056, at *7 (S.D.N.Y. Feb. 5, 2010) (approving of withholding the true identities of undercover officers where "[b]oth were still pursuing undercover work in close proximity to the buy-and-bust operation that led to [the defendant's] arrest; both had been threatened during their respective careers and were aware of threats to fellow officers; both participated in cases with 'lost subjects' who were never arrested and still at large; and both regularly took precautions to keep their true identities a secret"); *United States v. Naseer*, No. 10 Cr. 19 (RJD), 2015 WL 13843166, at *3 (E.D.N.Y. Jan. 26, 2015) ("When these national security and safety concerns are balanced against the defendant's ability to conduct meaningful cross-examination, the scale tips in the favor of maintaining secrecy of the witnesses' names."); *United States v. Ramos-Cruz*, 667 F.3d 487, 501 (4th Cir. 2012) (affirming district court's decision to allow two Government witnesses to testify without revealing their true names because "the government disclosed to the defense details of these two witnesses before the trial" and "the defendants were able to effectively cross-examine the witnesses without threatening their safety."). Indeed, even setting aside the danger of intentional disclosure of the UC's true identity, there are such serious concerns regarding inadvertent disclosure that prosecutors in the United States Attorney's Office are typically not informed of the true identities of undercover officers.

Non-disclosure of the UC's true identity is especially appropriate here, where the true name of the UC has no specific relevance to the case or to the UC's credibility or knowledge as a percipient witness. *See, e.g.*, *Urena*, 8 F. Supp. 3d at 573 (finding that disclosure of the undercover officer's true name was immaterial to any issue of guilt or innocence, explaining that "nothing about [the undercover officer's] real name goes to his credibility or knowledge regarding the subject of his testimony. The limitation imposed on the defense is therefore negligible."). In addition to disclosing any *Giglio* information identified by the Government, the Government will also produce notes from its witness preparation sessions. The Government has already produced the UC's text messages with Gupta and with the case agents, as well as recorded conversations between the UC and Gupta.

In *United States v. Eusebio*, Judge Woods authorized the Government to not disclose the true names of two undercover officers to the defense. 22 Cr. 522 (GHW) (S.D.N.Y. Oct. 31, 2024) (Doc. No. 575). Judge Woods recognized that the "Government's interests in maintaining the continued effectiveness and safety of undercover officers, including the Undercover Officers, is an extremely substantial interest, which would be seriously prejudiced by requiring disclosure of the Undercover Officers' true names," and that "the safety of the Undercover Officers and the integrity of their work would be jeopardized if their true identities were disclosed in advance [of] their trial testimony." *Id.* To permit the defense to run database queries, Judge Woods ordered that the NYPD disclose the true names of the undercover officers to a walled-off investigator at the U.S. Attorney's Office, through whom defense counsel could "request that a particular query be conducted by the Investigator." *Id.* If ordered by the Court, the Government is prepared to follow a similar procedure in this case.

Other courts have also authorized the non-disclosure of an undercover officer's identity in appropriate circumstances. In *United States v. Roopnarine*, the district court "permitted the government's undercover witness to testify without disclosing his real name" to the defendant, despite the defendant's request for the information. 718 F. App'x 797, 809 (11th Cir. 2017). The Eleventh Circuit affirmed, explaining, in part, that the defendant was not prejudiced because "[p]rejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them." *Id.* Because there was no allegation that the lack of obtaining the UC's identity prevented the defendant from "effectively plac[ing] a witness in the proper setting" before the jury," the Eleventh Circuit found "no harm." *Id.* To the contrary, the Eleventh Circuit stated that even without the identity information, "the record reflect[ed] a thorough cross-examination." *Id.*

Similarly, in *Washington v. Walsh*, Judge Batts approved Magistrate Judge Katz's report and recommendation holding that the denial of even limited, *in camera* disclosures of the true names of undercover officers to defense counsel only was appropriate where the prosecution demonstrated compelling safety interests. 2010 WL 423056, at *1. Judge Katz pointed out that under *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), the defendant's "claim that withholding the detectives' names theoretically deprived him of an opportunity to uncover information that would be useful in cross-examination, [was] beyond the scope of the Confrontation Clause" because, as the Supreme Court explained, "'[t]he ability to question adverse witnesses . . . does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony.'" *Walsh*, 2010 WL 423056, at *9 (quoting *Ritchie*, 480 U.S. at 52–53). The same is true here, where the overriding safety and operational concerns with respect to the UC, combined with the Government's search for and provision of any impeachment

material, disciplinary files, and civilian complaints, greatly outweighs the defense's need to search for theoretically useful impeachment material.

Also analogous is *United States v. Donovan*, No. 20 Cr. 374 (PKC) (E.D.N.Y. 2021). In *Donovan*, Judge Chen initially ordered the Government "to provide defense counsel with names of the relevant undercover officers, which defense counsel may share only with their investigator, who, in turn, shall not reveal this information to anyone." *Id.* (Dec. 21, 2021 Minute Entry). The Government moved for reconsideration on the basis that "disclosure of the UCs' true identities would jeopardize ongoing investigations and pose a serious risk of danger to the UCs and their families." *Id.* (Doc. No. 91 at 1). The Government attached a declaration of the NYPD Chief of Detectives in support of its motion for reconsideration in *Donovan* (as the Government has done here). *Id.* (Doc. No. 91-1). After reviewing the Government's motion and supporting declaration, Judge Chen reconsidered her previous order and permitted the Government "not to disclose the UCs' names, given that the Government ha[d] already provided a detailed *Giglio* disclosure to the defense, and because of the significant safety issues articulated in the Government's motion and supporting declaration." *Id.* (Dec. 21, 2021 Minute Entry).

The Government is in the process of conducting its routine *Giglio* checks on the UC and will make appropriate disclosures in accordance with pre-trial deadlines. An investigator from the United States Attorney's Office will also conduct both law enforcement and open-source searches of the UC's real name, as well as additional database queries requested by the defense if the Government's motion for non-disclosure is granted. Therefore, the defense should have no genuine need for the UC's true name in preparation for cross-examination. On balance, the Government's interest in protecting the lives of the UC and the UC's family, as well as in preserving the integrity of ongoing investigations, far outweighs the interest of the defense in

learning the true name of the UC, or in eliciting information about the UC's true identity, where this information has little, if any, relevance to the UC's testimony.

### D. The UC and CS Should Be Permitted to Testify Using Pseudonyms

The Government seeks an order allowing the UC and CS to testify using pseudonyms and without disclosing other personally identifiable information in public, to mitigate risks to their safety and the safety of their family and associates in the United States and other countries.

Courts in this District have routinely allowed Government witnesses, including confidential sources, to testify at trial without publicly disclosing their true names. *See, e.g.*, *United States v. Roldan Cardenas*, 21 Cr. 359 (LAK) (S.D.N.Y. May 6, 2024) (Doc. No. 185 at 2) (allowing a confidential source to testify under pseudonym); *United States v. Orense Azocar*, 21 Cr. 379 (VSB) (S.D.N.Y. Nov. 14, 2023) (Doc. No. 40 at 48) (confirming the court's endorsement of the Government's sealed application on consent to allow confidential source to testify under pseudonym); *United States v. Balouchzehi*, 21 Cr. 658 (JMF) (S.D.N.Y. 2023) (Doc. Nos. 71, 84 at 12-15) (allowing a confidential source and two undercover officers to testify under pseudonym); *United States v. Sosa-Zarzuela*, 21 Cr. 41 (PAC), 2022 WL 16722329, at *1–2 (S.D.N.Y. Nov. 4, 2022) (allowing undercover officer and cooperating witness to testify under pseudonym); *United States v. Fuentes Ramirez*, No. 15 Cr. 379 (PKC) (S.D.N.Y. Feb. 12, 2021) (Doc. No. 251) (allowing law enforcement witness to testify under pseudonym at trial); *United States v. Campo Flores*, 15 Cr. 765 (PAC) (S.D.N.Y. Dec. 6, 2016) (Doc. No. 135) (allowing three confidential sources and a cooperating witness to testify under pseudonym at trial); *United States v. Akasha*, No. 14 Cr. 716 (VM) (S.D.N.Y. Oct. 23, 2018) (Doc. No. 135) (authorizing confidential sources to testify under pseudonyms).

As described more fully above and in Exhibit X, the risk of the UC being recognized in the course of the UC's undercover work, leading to violent harm and potentially death, is a grave

concern. Public disclosure of the UC and CS's names would heighten this risk by allowing Gupta, Yadav, their associates, and anyone else who is aware of this prosecution to research, locate, and retaliate against the CS, the UC, or their families. These risks are heightened by the availability of nearly everyone's personal information on the Internet, and are particularly grave in this case given that Yadav is a fugitive. As discussed above, the UC continues to routinely be exposed to very real threats as the UC continues to work undercover. The CS is also an active confidential source, and the CS faces similar threats should the CS's true name be exposed.

The Government currently intends to have the UC and CS testify using the names they employed during the investigation, as those names will appear in trial exhibits (including text messages between the CS, the UC, and Gupta). The jury will be unaware that the UC and CS are using pseudonyms, and will be left with the impression that the witnesses are testifying under their true names. Accordingly, there will be no prejudice to Gupta from this use of pseudonyms at trial.

## **CONCLUSION**

For the reasons set forth above, the Government's motions *in limine* should be granted.


Dated: New York, New York
      September 22, 2025

                                     Respectfully submitted,

                                     JAY CLAYTON
                                     United States Attorney

By:                                      
                                     Alexander Li / Ashley C. Nicolas /
                                     Camille L. Fletcher
                                     Assistant United States Attorneys
                                     (212) 637-2265 /-2467 /-2383

**Exhibits to the Government's Motions *in Limine***

| Ex. | Description |
|---|---|
| A | Google Custodial Certificate for onlybutt095@gmail.com and vikas0yadav@gmail.com |
| B | Google Subscriber Information for onlybutt095@gmail.com |
| C | March 14, 2023 Email from onlybutt095@gmail.com re "Photo From Amanat" |
| D | August 2, 2022 Email from onlybutt095@gmail.com Attaching Yadav 2021-2022 Form 16 |
| E | August 26, 2022 Email to onlybutt095@gmail Attaching Yadav 2021-2022 Income Tax Return |
| F | July 13, 2023 Email from onlybutt095@gmail Attaching Yadav 2022-2023 Form 16 |
| G | Google Subscriber Information for vikas0yadav@gmail.com |
| H | April 7, 2016 Email to vikas0yadav@gmail.com Attaching Photo of Yadav |
| I | April 7, 2016 Email to vikas0yadav@gmail.com Attaching Photo of Yadav |
| J | June 5, 2016 Email from vikas0yadav@gmail.com Attaching Yadav Passport |
| K | June 12, 2012 Email to vikas0yadav@gmail.com Attaching RAW Recruitment Invitation |
| L | June 5, 2017 Email from vikas0yadav@gmail.com Attaching Yadav Photo, ID, and Paystubs |
| M | July 25, 2023 Email to vikas0yadav@gmail.com Attaching Yadav 2022-23 Income Tax Return |
| N | March 12, 2020 Email from vikas0yadav@gmail.com Attaching Yadav Curriculum Vitae |
| O | October 29, 2013 Email from vikas0yadav@gmail.com Attaching Employment Verification Letter |
| P | October 30, 2013 Email from vikas0yadav@gmail.com Attaching Quarters Assignment Order |
| Q | November 3, 2016 Email from vikas0yadav@gmail.com re "seniority issue of senior field officers" |
| R | October 1, 2020 Email to vikas0yadav@gmail.com Attaching Yadav 2019-2020 Income Tax Return |
| S | November 15, 2021 Email to vikas0yadav@gmail.com Attaching Yadav 2020-2021 Income Tax Return |
| T | Sample Form No. 16 from Government of India Website |
| U | Czech Record of Surrender of Gupta Cellphones |
| U-T | English Translation of Czech Record of Surrender of Gupta Cellphones |
| V | Czech Certification of Official Records on Form C |
| W | Mutual Legal Assistance Treaty Between the U.S. and the Czech Republic |
| X | Declaration of NYPD Chief of Detectives Joseph Kenny |