UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

NIKHIL GUPTA,
a/k/a "Nick,"

*Defendant.*

**DECLARATION OF JOSEPH KENNY IN SUPPORT OF THE GOVERNMENT'S MOTION**

**S2 23 Cr. 289**

STATE OF NEW YORK )
) ss.
COUNTY OF NEW YORK )

JOSEPH KENNY, being duly sworn, deposes and says:

1. I am Chief of Detectives for the New York City Police Department (the "NYPD"), and I have served in this capacity since September 2023. I joined the NYPD in 1992 as a Police Officer. I was promoted to the rank of Sergeant in 1997, the rank of Lieutenant in 2000, the rank of Captain in 2005, the rank of Deputy Inspector in 2011, the rank of Inspector in 2014, the rank of Deputy Chief in 2016, and the rank of Assistant Chief in 2023, and now have been the Chief of Detectives since September 2023. As the Chief of Detectives, I oversee the entirety of the Detective Bureau. The Detective Bureau is responsible for the prevention, detection, and investigation of crime throughout the City of New York. As part of my duties as Chief of Detectives, I oversee investigations related to all crimes, including investigations related to narcotics. I also work in conjunction with many federal agencies such as the ATF, DEA, and FBI as many of our investigations involve joint task forces.

2. In my 33 years of service as a law enforcement officer, I have supervised numerous investigations regarding undercover police operations and narcotics. Prior to my current role, I

served as Commanding Officer of the Citywide Investigations Division, where I supervised all borough narcotics units and undercover officers. Furthermore, I served as a supervisor in the Firearm Suppression Section, where I supervised undercover operations involving the purchase of illegal firearms. In my current position, I am apprised of all threats against members of the NYPD and am familiar with the operations and security concerns listed below.

3. In addressing these matters, I draw on my background not only as the NYPD Chief of Detectives, but also my over 27 years in law enforcement and specifically my experience in the Detective Bureau working with and supervising undercover officers.

4. I submit this in support of the Government's application to withhold the name of the NYPD Undercover Officer No. 240 (the "UC"), involved in this case. I am familiar with the facts and circumstances stated herein. This affidavit is based on my personal knowledge, as well as my conversations with other employees of the NYPD and my review of records maintained by the NYPD in the ordinary course of business, which I believe to be true and correct.

5. The term "police officer" is used in this affidavit to refer to persons serving in the job with the title "police officer," and in the promotional series of job titles for police officers: police sergeant, detective, police lieutenant, police captain, policy deputy inspector, police inspector, police deputy chief, police assistant chief, and police chief and chief of department.

6. I am informed that defense counsel in the above-captioned case is expected to request disclosure of the full name of the UC for purposes of the defense to, among other things, run Google searches of the UC's name. I am also informed that the NYPD and the Government are in the process of complying with their *Giglio* obligations by running *Giglio* checks of the UC; the NPYD has identified a substantiated civilian complaint review board ("CCRB") report for the UC which will be disclosed in a redacted form. To this point, neither the NYPD and nor the

Government has uncovered any additional information disclosable pursuant to *Giglio*. It is my opinion that the disclosure of the full name of the UC would constitute a danger to the life and safety of the UC, the UC's family, and jeopardize the integrity of active, ongoing investigations.

7. The dangers of police work are readily apparent. In light of these dangers, police officers are armed. As part of their duties, police officers frequently interact with dangerous suspects, many of whom have lengthy criminal histories and are sometimes violent and/or armed. A police officer's duties necessarily place him or her in an adversarial relationship with such individuals. Officers arrest, investigate, interrogate, execute search warrants, and testify against those dangerous subjects.

8. Given these dangers, maintaining the confidentiality of officers' personal information is of critical importance. Protecting the identity of undercover officers is even more paramount.

**<u>Dangers of Undercover Work and the Efforts of the NYPD to Protect Undercover Officers</u>**

9. Police undercover work is particularly dangerous. Such undercover work is generally undertaken to further an ongoing investigation. Most NYPD officers who work undercover are assigned to the Detective Bureau; the Narcotics Division and Vice Enforcement Division, which are subdivisions of the Detective Bureau; the Violent Crime Squad; the Intelligence Bureau; or the Counterterrorism Bureau. Others, like the UC, are assigned to federal task forces such as the New York Drug Enforcement Task Force ("DETF").

10. Police officers working undercover investigate the most serious and violent criminal activities that include organized crime, narcotics and weapons trafficking, terrorist plots, gang violence, and murder. While working undercover, these officers, typically wearing no protective gear or equipment, and isolated from fellow officers, interact closely with persons

engaged in dangerous criminal activities. For those reasons, undercover officers are subject to a far greater level of danger than the typical uniformed officer.

11. Releasing the names of undercover officers will have a chilling effect on reducing violent crime and narcotics trafficking and on recruiting talented individuals who are willing to risk their safety and their family's safety in order to stop the scourge of violence and the distribution of deadly narcotics on our city streets. In recruiting and training officers to perform undercover police duties, we assure them that their identities will be kept secret.

12. The NYPD protects the identities of undercovers, even from other members of the NYPD. Undercover officers do not participate in large group departmental training programs or promotion exercises. Instead, they train at locations unknown to anyone but their immediate supervisor, and they never attend Department ceremonies, promotions, or events. Their names are not commingled in NYPD databases containing the personal identifying information of other employees. Every year, the City's Office of Payroll Administration prepares a list of active-duty employees of the City of New York, which contains employees' names, salaries, and job titles. I am informed that undercover officers' names are excluded from this list.

13. The cost to the public would be enormous if the NYPD undercover program was threatened because the identities of undercovers could no longer be protected. Our undercover officers have prevented acts of terrorism, saved victims of human trafficking, and prevented thousands of additional victims of gun violence by removing gun traffickers from our streets. By not protecting the identity of undercover officers, the Court would compromise the NYPD's ability to address the ongoing threats to the safety of New Yorkers. Here the risk to the ability of DETF to work effectively is even more pronounced — [redacted] If the UC was unable to continue working undercover, the effectiveness of

DETF would be significantly diminished, particularly in cases like this case where quick access to an experienced undercover officer was critical to DETF's ability to prevent a violent crime.

14. Undercover officers operate in an environment where they are at a tactical disadvantage. They often work alone and, depending on the particular facts and circumstances of an investigation, may have no police back-up in the immediate vicinity to come to their aid. They are outnumbered by the people who are involved in the criminal activity and who are also frequently armed. As a result, undercover officers in the field are often in grave danger and are extremely vulnerable should they be discovered and, if suspected of being undercover, could more easily be lured into a dangerous situation than an officer working in uniform. There have been numerous instances of undercover officers being assaulted, threatened at gunpoint during operations, or questioned as to whether they are police officers, without the benefit of such protections afforded to officers who are not conducting undercover investigations. For example, in 2003, undercover Detectives James Nemorin and Rodney Andrews were murdered during an undercover firearm trafficking investigation by the subjects of that investigation.

15. There have been numerous incidents in which undercover officers have been threatened after their identity as a police officer was revealed. For example, a federal agency informed the NYPD that a photo of an undercover officer was being circulated amongst drug dealers with the intention of targeting violence against the officer. A different undercover officer was threatened after a federal inmate relayed a message to a fellow gang member that he wanted a "hit put out" on the undercover officer who was involved in his arrest. A third undercover officer, while riding the subway, encountered two perpetrators who were arrested in relation to the officer's undercover operations. They stated to him, "We know you are a cop. You tried to set us up. We should kill you now." The undercover pretended he did not know what the individuals were talking

about and tried to walk past them. Nonetheless, the perpetrators assaulted the undercover in front of a crowd, striking the undercover in the head and body causing physical injuries.

**The UC's Investigations and Operations**

16. The UC is an NYPD undercover officer assigned to DETF and has extensive experience conducting undercover operations into drug trafficking organizations. The UC is [redacted]

17. The UC has been working in an undercover capacity for approximately fifteen years. [redacted]

[redacted]

20. Releasing the UC's identity in this matter, even if only to defense counsel, jeopardizes the integrity of the active investigations with which the UC is currently involved.

**Risks Associated with the Defendant**

21. In this case, as alleged in the Indictment, which is attached hereto as Exhibit A and incorporated by reference herein, the UC posed as a New York City-based hitman while coordinating with NIKHIL GUPTA, the defendant, to set-up the murder of a United States citizen in New York City. In the course of the investigation, the UC spoke with GUPTA, including by recorded video and audio chat as well as by text message, to share details about the murder plot. On one occasion, the UC met, in-person in mid-town Manhattan, with a third-party money courier associated with GUPTA who paid the UC $15,000 in advance of the murder.

22. As described above, the UC has done extensive work in the area in which the murder-for-hire payment occurred as well as in lower Manhattan, where the trial will take place. It is also routine for the UC to appear on video calls during narcotics-transactions related to his work in unrelated investigations. Further, as described above, the UC has received prior threats and been target for violence in connection with his work as a UC. The likelihood that the UC and the UC's family would be placed in danger should the UC be identified during this case is not speculative or illusory.

23. In addition, there is a reasonable basis to assume there are risks to the UC's personal safety based on the nature of this defendant. GUPTA, a native of India who was extradited to the United States after having been arrested in the Czech Republic, is a sophisticated international criminal who has previously engaged in attempts to complete complex gun and drug deals. In this case, the defendant attempted to coordinate a murder-for-hire in New York while he was in New Delhi, India. As alleged, the defendant did so through connections with the Indian government specifically his co-codefendant VIKAS YADAV, a member of the Indian intelligence agency, RAW. The defendant has demonstrated a fluency with technology and ability to coordinate violence with the backing of significantly well-resourced actors.

24. The nature of the allegations in this case as well as the nature and characteristics of the defendant and his co-conspirators, including the evidence of their access to firearms and ability to operate covertly and carry out violence, all increase the likelihood of danger to the UC should the UC's full name be disclosed. The UC will have legitimate safety concerns—for themself and their family—if the UC's identity were to be disclosed to defense counsel in this case.

**Threats to Police Officers, Retired Officers, and Their Families**

25. Threats to the safety of NYPD officers and their families are not hypothetical; they are documented and tracked. As a result of the ongoing dangers of police work combined with the many threats directed towards the lives of officers and sometimes their families as well, the Department maintains the Threat Assessment and Protection Unit ("TAPU"), which is part of the Intelligence Bureau, whose purview includes investigating threats against police officers.

26. In 2024, there were a total of 486 Cases received. Of the 486 threat cases, 311 involved direct threats to NYPD officers or general threats to Police Officers where the subject has mentioned or directly stated that he or she was going to retaliate and/or harm a police officer because of their interactions with police officers. The remaining 175 cases were threats against appointed or elected officials.

27. In 2023, there were a total of 533 threat cases received. Of the 533 threat cases, 346 involved direct threats to NYPD officers or general threats to Police Officers where the subject has mentioned or directly stated that he or she was going to retaliate and/or harm a police officer because of their interactions with police officers. The remaining 187 cases were threats against appointed or elected officials.

28. In 2022, there were a total of 483 threat cases received. Of the 483 cases, 370 involved direct threats to NYPD officers or general threats to Police Officers where the subject has mentioned or directly stated that he or she was going to retaliate and/or harm a police officer because of their interactions with police officers. The remaining 113 cases were threats against appointed or elected officials. Additionally, TAPU had 2 cases in 2022 specifically involving two narcotics undercovers and a separate case involving a DBBS Violent Crimes Squad undercover. The case involving the two narcotics undercovers was deemed a credible threat, and as a result of

that threat, it was determined that the narcotics undercover officers could no longer operate in an undercover capacity due to concerns for their safety.

29. In, 2021, there were a total of 391 threat cases received. Of the 391 cases, 147 involved direct threats to NYPD officers in which the subject mentioned or directly stated that he or she was going to retaliate and/or harm a police officer because of their interactions with police officers. An additional 198 cases included general threats against police officers. The remaining 55 cases were threats against appointed or elected officials. Additionally, TAPU had one case in 2021 specifically involving a narcotics undercover. It was deemed a credible threat, and as a result of that threat, it was determined that the undercover officer could no longer operate in an undercover capacity due to concerns for his safety.

30. In 2020, there were a total of 608 threat cases received. Of those, 179 involved direct threats to NYPD officers in which the subject mentioned or directly stated that he or she was going to retaliate and/or harm a police officer. An additional 309 cases included general threats against police officers. The remaining 120 cases were threats against appointed or elected officials.

31. In 2019, there were a total of 335 threat cases received. Of those cases, 116 involved direct threats to NYPD officers in which the subject mentioned or directly stated that he or she was going to retaliate and/or harm a police officer because of their interactions with police officers. An additional 159 cases included general threats against police officers. The remaining 60 cases were threats against appointed or elected officials.

32. Furthermore, in February 2018, a resident of Brooklyn, New York, Victor Kingsley, was arrested on charges of using a weapon of mass destruction, after attempting to send an explosive device to a member of the NYPD. Kingsley found the officer's home address through

an internet search, as well as various other legal processes, including civil litigation, but the address results were off by a few numbers. As a result, the bomb failed to reach the officer, and instead was delivered to and killed a neighbor when he opened the package. Upon execution of a search warrant following Kingsley's arrest, other explosive devices were found in various stages of construction, as well as documents demonstrating other NYPD officers may have been targets.

33. Additionally, after the home address and personal information of a precinct commander who policed the Occupy Wall Street protests were revealed, his family received death threats by telephone. Another police captain involved in policing these protests received threats that she would be assaulted when she arrived at her home after protesters chanted her home address.

34. In another case, a police captain was recognized by an individual whom he had arrested in the past. The individual violently assaulted the captain, after claiming that he knew where the captain lived and knew that the captain had a new baby at home.

35. In another case, a detective investigating a homicide received a voice message at his residence from the suspect, indicating that the suspect knew his home address and threatened to kill him if the detective did not stop investigating him.

36. Another police captain, who had been heavily involved in investigations of organized crime during his career, and who was concerned about retaliation by individuals against whom he had testified, was approached by a suspicious individual at his post-retirement place of business, who asked questions about the captain's pension.

37. In September of 2020, the wife of a NYPD lieutenant was hanging decorations in front of her home. A man approached her and stated, "I know your husband is a police officer. I am going to let all the cop haters know where you live." The lieutenant then encountered the male

a short distance from his residence and the male told the lieutenant, "I know you're a fucking cop, I know where you live, and I'm going to let all the cop haters and cop killers know where you live."

38. In July of 2021, an off-duty detective was doing laundry in the vicinity of his residence. A perpetrator he had previously arrested for armed robbery was observed in the same location by the detective. The perpetrator approached the detective and placed a phone call so the detective could hear him. In an irate manner, the perpetrator stated into the phone that he now knew where the detective who arrested him lived.

39. Incidents of doxing are also on the rise against members of the NYPD. Doxing is the posting of a person's personal address and contact information on the internet. Numerous NYPD members have become victim to these types of actions. In 2019, five instances were reported. In 2020, 11 cases of doxing of NYPD officers and employees were reported, including the doxing of former Police Commissioner Dermot Shea. In some doxing cases, there have been social media comments advocating for violence against these officers at their residences. In other cases, protesters showed up at police officers' residences and chanted threats with amplified devices and shined lights in their windows all night.

**Deaths, Near-Deaths, and Injuries of Officers, Both in New York City and Around the Country, Shows the Heightened Dangers of Police Work in the Current Threat Environment**

40. In New York City alone, there have been far too many examples of the readily apparent dangers of police work, particularly in light of the current threat environment in which officers operate. Police Officers Wenjian Liu and Raphael Ramos were shot and killed in Brooklyn in December of 2014. In 2015, there were two more deaths: Police Officer Brian Moore was shot while questioning an individual, and Police Officer Randolph Holder was shot and killed while

pursuing an armed subject. In November of 2016, NYPD Sergeant Paul Tuozzolo was shot and killed by an individual who was evading the police. On July 5, 2017, Police Officer Miosotis Familia was ambushed and killed in the line of duty while in her police vehicle in the Bronx. On February 12, 2019, Detective Brian Simonsen was shot and killed while attempting to apprehend an armed individual during a robbery of a store. On September 29, 2019, Police Officer Brian Mulkeen was shot and killed during a violent struggle with a perpetrator in the Bronx. On January 21, 2022, Police Officers Jason Rivera and Wilbert Mora were shot and later died after responding to a domestic dispute in Harlem. On February 4, 2023, Police Officer Adeed Fayaz, who was off duty at the time, was shot during an attempted robbery in Brooklyn and died three days later. On March 25, 2024, Detective Jonathan Diller was shot and killed during a traffic stop by a subject who had an extensive criminal record. Many other police officers have been injured, some seriously, in the line of duty.

41. While the number of NYPD officers killed in the line of duty is higher than in most other cities, this problem is not exclusive to New York City. For example, in April 2017, an Assistant Chief Deputy Constable in Texas, a 30-year veteran, was shot and killed. In July 2016, 20 officers were shot in Dallas and Baton Rouge, eight of whom died as a result of those shootings. In November 2016, two officers in Des Moines, Iowa were killed in an ambush-style attack. On May 2, 2017, in Chicago, Illinois, there was an attempted murder of two officers who were shot and wounded while conducting an investigation.

42. In addition, dangerous suspects, many of whom have lengthy criminal histories, who are sometimes violent and/or armed, violently assault police officers. Police officers' duties necessarily place them in adversarial relationships with such individuals. As a result of these assaults, police officers may suffer serious injuries. For example, on August 15, 2016, Akram

Joudeh, a 32-year-old Jordanian citizen pending deportation from the United States, attacked an NYPD officer in Manhattan with an 11-inch meat cleaver after he found a parking boot on his car. Several NYPD officers, as well as Joudeh, were taken to the hospital following this attack.

43. The FBI collects and publishes annual data from law enforcement agencies around the country in its Uniform Crime Report which includes a section "Law Enforcement Officers Killed and Assaulted." This data shows that between January 1, 2021 and December 6, 2021, 69 police officers were feloniously killed in the line of duty. This was up from 43 officers feloniously killed in the line of duty in 2020. Additionally, in 2017, 46 law enforcement officers were killed, and 60,211 were assaulted; in 2018, 55 law enforcement officers were killed, and 58,886 were assaulted; and in 2019, 48 law enforcement officers were killed, and 56,034 were assaulted.[1]

**Conclusion**

44. In summary, the far too many examples of attacks on police in recent years demonstrate the dangerous conditions in which officers operate simply by being police officers, being present within the community in which they work, and responding to calls for help from those communities they have sworn to protect. A release of the full name of the UC to defense counsel could place the UC in an extremely dangerous situation and may make the UC and the UC's family potential targets of violence, in addition to endangering ongoing investigations into

[1] FBI, *UCR Publications*, https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/ucr/publications#LEOKA (last accessed June 8, 2024) (indicating Law Enforcement Officers Killed and Assaulted (LEOKA)).

violent criminals in New York City and elsewhere. Simply stated, the release of the UC's identity presents too great of a risk and it should be withheld.

Dated: New York, New York
September 19, 2025

JOSEPH KENNY
CHIEF OF DETECTIVES
NEW YORK CITY POLICE DEPARTMENT