UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__10/3/2025_

---

UNITED STATES OF AMERICA,

             - against -

NIKHIL GUPTA,

                  Defendant.

---

**23 CR 289 (VM)**

**DECISION AND ORDER**

---

**VICTOR MARRERO, United States District Judge.**

Pending before the Court is the motion of defendant Nikhil Gupta ("Gupta" or "Defendant") pursuant to Federal Rule of Criminal Procedure ("Rule") 12(b) to suppress certain statements and evidence in connection with Gupta's arrest in the Czech Republic on the conduct underlying the instant action, and to dismiss Count Three of the Second Superseding Indictment ("S2 Indictment"), which charges Gupta with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). (See "Def. Mot.," Dkt. No. 65.) The Court held an evidentiary hearing regarding Gupta's post-arrest statements and the evidence acquired therefrom. (See Dkt. Minute Entry on Aug. 12, 2025.) For the reasons explained further below, the Court finds that (1) there was no joint venture between authorities of the Czech Republic and the United States, (2) Gupta's statements to Czech law enforcement officers were made voluntarily, (3) Gupta waived his rights knowingly and voluntarily during his interrogation

with United States law enforcement officers, and (4) Gupta does not have standing to challenge Count Three under the rule of specialty. Accordingly, Gupta's motion is **DENIED** in its entirety.

## I.    BACKGROUND

### A.    FACTUAL BACKGROUND

The S2 Indictment alleges that Gupta and co-defendant Vikash Yadav ("Yadav"),[1] both Indian nationals based in India, worked in tandem with other persons to orchestrate the assassination of a Sikh political activist (the "Victim") on American soil. (See "S2 Indictment," Dkt. No. 28 ¶¶ 1-3.) The Victim, a U.S. citizen of Indian origin who resides in New York City, is a vocal critic of the Indian Government and a leader of the Sikh separatist movement. (See id. ¶ 1.)

The alleged murder scheme began in India in early May 2023 when Yadav recruited Gupta to plot the Victim's assassination, which would take place in New York City. (See id. ¶¶ 2, 10.) In exchange, Yadav promised to help obtain dismissal of criminal charges against Gupta regarding unrelated conduct that were pending in India. (See id.) Gupta

---

[1] The Government alleges that Yadav, who is also known as "Amanat," was employed by the Cabinet Secretariat of the Government of India, which houses India's foreign intelligence service, the Research and Analysis Wing ("RAW"). (See S2 Indictment ¶ 2.) Although there is a warrant for Yadav's arrest, (see Dkt. No. 29), Yadav has not been apprehended or extradited in connection with this criminal action.

allegedly agreed to this arrangement and the other criminal charges against Gupta were promptly dismissed. (See id. ¶¶ 10-12.) A few weeks later, Gupta contacted a criminal associate – who, unbeknownst to Gupta, was a confidential source ("CS") working with U.S. law enforcement authorities – for assistance in contracting a hitman to murder the Victim in New York City. (See id. ¶ 4.) The CS introduced Gupta to a purported hitman, who was actually an undercover U.S. law enforcement officer (the "UC"). (See id.) Yadav, through dealings brokered by Gupta, agreed to pay the UC $100,000 to murder the Victim. (See id.) Yadav and Gupta, who were both based in India at the time, subsequently arranged for an associate to deliver $15,000 in cash to the UC in New York City on or around June 9, 2023, as an advance payment for the murder. (See id. ¶¶ 4, 22.)

On June 13, 2023, a grand jury returned Indictment 23 Cr. 289, which charged Gupta with murder-for-hire conspiracy in violation of 18 U.S.C. § 1958 (Count One), and murder-for-hire in violation of 18 U.S.C. §§ 1958 and 2 (Count Two). (See "Indictment," Dkt. No. 3.) Based on the Indictment, the Court issued an arrest warrant for Gupta. (See Dkt. No. 5.)

On June 19, 2023, the United States requested that the Czech Republic execute a provisional arrest warrant for the purpose of Gupta's extradition pursuant to the extradition

treaty between the United States and the Czech Republic (the "Extradition Treaty"), as Gupta would be traveling to Prague to meet with the CS at the end of the month. (See Def. Mot., Ex. 1.) The provisional arrest warrant included the murder-for-hire allegations and sought, pursuant to the Extradition Treaty, that Czech authorities seize and eventually surrender "all articles, instruments, objects of value, documents and other evidence relating to the offenses charged that are found in the possession of [Gupta] at the time of his arrest." (Id. §§ 2-4.)

United States Drug Enforcement Administration ("DEA") Special Agent Mark Franks ("SA Franks") and Task Force Officer Jose Sandobal ("TFO Sandobal," and together with SA Franks, the "DEA Case Agents") were responsible for the investigation into Gupta. (See Suppression Hearing Transcript (Aug. 12, 2025) [hereafter "Transcript" or "Tr."] 8:20-9:1.) DEA Country Attaché Kyle Brannon ("CA Brannon") and Special Agent Jose Catalano ("SA Catalano," and together with CA Brannon, the "Country Attachés") served as the logistical points of contact between the DEA Case Agents and Czech law enforcement. (See id. at 14:21-16:11.) On June 29, 2023, the Country Attachés and the DEA Case Agents met with Czech law enforcement officers at the Czech police headquarters in Prague to coordinate Gupta's arrest at the Prague airport

upon his arrival the following day. (See id. at 14:14-20.) During the meeting, the Czech law enforcement officers made clear that (1) Czech law enforcement would be solely responsible for Gupta's arrest, (2) the DEA Case Agents were not permitted to enter the airport during the arrest operation, and (3) the DEA Case Agents would be able to speak to Gupta only once he was removed from the airport and being transported to the local jail. (See id. at 16:24-17:22.) At some point during the meeting, DEA personnel indicated that they would like Gupta's belongings, including any cellphones, to be seized by Czech law enforcement. (See id. at 18:1-6.) One of the Country Attachés also remarked that "if [the phones] were unlocked, even better." (Id. at 18:11-20.)

On June 30, 2023, Gupta was arrested by Czech law enforcement upon his arrival at the Prague airport. (See id. at 9:2-10:2, 43:8-9.) While Gupta was in the airport, Czech law enforcement officers conducted a short post-arrest interview and asked Gupta to turn over his cellphones and any corresponding passcodes. (See id. at 73:23-74:19.) At the time of his arrest, Gupta had three cellphones in his possession: two iPhones that were passcode protected, and a Samsung Vivo, which was not. (See id. at 10:17-22; Def. Mot., Ex. 15B at 2-4.) Gupta provided all three phones, and the passcodes to the iPhones, to the Czech law enforcement

officers. (See Tr. 10:17-11:8.) Gupta was subsequently escorted by Czech police from the airport into a van, where the DEA Case Agents were waiting for him to be brought in. (See id. at 43:12-25; Gov't Suppression Hr'g Ex. 108.) The DEA Case Agents questioned Gupta during the van ride from the airport to the local jail, which lasted ten to fifteen minutes. (See Tr. 66:17-23.) The parties dispute, however, whether the DEA Case Agents read Gupta his rights from the Advice of Rights form and received a valid oral waiver from Gupta before his substantive questioning. (See "Gupta Decl.," Dkt. No 67 ¶ 21; Tr. 57:8-59:10.) Upon arrival at the local jail, Gupta refused to sign the Advice of Rights form. (See Tr. 67:10-68:4; Gov't Suppression Hr'g Exs. 101, 108.)

On August 23, 2023, United States authorities, by diplomatic note, requested Gupta's extradition. (See Def. Mot., Ex. 22.) On November 29, 2023, while the extradition proceedings were pending, a grand jury returned the First Superseding Indictment ("S1 Indictment"), which added factual details about the murder-for-hire plot but maintained the same two charges against Gupta. (See "S1 Indictment," Dkt. No. 9.) On June 6, 2024, the Czech Ministry of Justice informed the U.S. Department of Justice that it had granted Gupta's extradition to the United States. (See "Gov't Opp'n,"

Dkt. No. 75, Ex. B.) Gupta was extradited to the United States on June 14, 2024. (See Gov't Opp'n at 11.)

On October 17, 2024, a grand jury returned the S2 Indictment, which added the money laundering conspiracy charge (Count Three) based on Gupta's alleged participation in transmitting $15,000 from India to the purported hitman in the United States as an advance payment for the murder. (See S2 Indictment ¶¶ 40-42.) The S2 Indictment also added Yadav as a co-defendant for all three counts. (See id. ¶¶ 36-42.)

At a conference on January 17, 2025, the Government informed the Court that it would seek a waiver of the rule of specialty from the Czech Republic on Count Three, which was charged post-extradition.[2] (See Dkt. Minute Entry on Jan. 17, 2025; "Jan. 2025 Conference Tr.," Dkt. No. 59 at 8:18-9:11.) On February 25, 2025, the Government informed the Court that it would proceed to trial on Count Three because the Czech Republic had advised the U.S. Department of Justice that a waiver of the rule of specialty was unnecessary, as the money laundering conspiracy charge was based on the same alleged

---

[2] As explained further below in Section II.C, the rule of specialty limits a defendant's prosecution to the crimes for which he was extradited. Thus, a district court's personal jurisdiction is limited to charges that have been "'specially brought to the attention' of the foreign government that has delivered a defendant pursuant to extradition." United States v. Levy, 947 F.2d 1032, 1034 (2d Cir. 1991) (quoting Fiocconi v. Attorney General, 462 F.2d 475, 478 (2d Cir. 1972)).

facts that had been submitted in the extradition proceedings. (See Dkt. No. 40.)

B. THE PENDING MOTION

On June 23, 2025, Gupta filed his Rule 12(b) motion, along with an accompanying memorandum of law, (see "Def. Mem.," Dkt. No. 66), a declaration by Gupta, (see Gupta Decl.), and other supporting exhibits. (See "Heller Decl.," Dkt. No. 68 (summarizing exhibits).) Gupta's motion advanced three general arguments: (1) Gupta's post-arrest statements to Czech law enforcement officers, which provided his cellphone passcodes, should be suppressed because Gupta was not apprised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), even though the phone passcodes were obtained at the direction of U.S. law enforcement authorities, (2) Gupta's post-arrest statements to the DEA Case Agents should be suppressed because Gupta was not given Miranda warnings and did not waive his rights prior to substantive questioning by the DEA Case Agents, and (3) Count Three of the S2 Indictment, which was added post-extradition, should be dismissed because it violates the Extradition Treaty and the rule of specialty. (See generally Def. Mem.) Gupta also requested an evidentiary hearing to address contested issues of fact regarding Gupta's arrest and interrogation in the Czech Republic. (See Def. Mem. at 28.)

On July 21, 2025, the Government filed its opposition to Gupta's Rule 12 motion. (See generally Gov't Opp'n.) In opposing Gupta's requested relief, the Government acknowledged that a hearing was necessary on the narrow issue of Gupta's post-arrest statements to the DEA Case Agents because Gupta and the DEA Case Agents had conflicting accounts of whether the DEA Case Agents had apprised Gupta of his rights and obtained an oral waiver before conducting the interrogation. (See id. at 27-28.)

On July 31, 2025, the Court scheduled an evidentiary hearing to determine whether Gupta's post-arrest statements to the DEA Case Agents should be suppressed. (See Dkt. No. 77.) On August 5, 2025, Gupta requested that the Court expand the scope of the hearing in light of the Government's recent discovery productions to address whether there was a joint venture between the United States and the Czech Republic, and whether Gupta's interrogation by Czech police violated his rights under the Fifth Amendment of the United States Constitution. (See "Def. MTS Reply," Dkt. No. 80.[3]) The Government opposed Gupta's request to expand the scope of the

---

[3] Because Gupta's request to expand the scope of the hearing was effectively a reply brief in support of Gupta's motion to suppress, Gupta represented to the Court that he would limit his reply brief – which was due on August 8, 2025 - to arguments in support of his motion to dismiss Count Three of the S2 Indictment. (See Def. MTS Reply at 1.)

hearing, arguing that there were no disputes of material fact as to the additional topics and that Gupta had waived a voluntariness challenge because he had failed to raise the issue in this opening brief. (See Dkt. No. 84.) After careful consideration, the Court granted Gupta's request to expand the scope of the hearing, (see Dkt. No. 86), and allowed the Government to file a sur-reply on the issue of voluntariness. (See Dkt. No. 89.) The Government subsequently filed its voluntariness sur-reply, (see "Gov't Sur-Reply," Dkt. No. 92), and Gupta filed a reply in support of his motion to dismiss Count Three. (See "Def. MTD Reply," Dkt. No. 90.)

The Court held the suppression hearing on August 12, 2025.[4] (See Dkt. Minute Entry on Aug. 12, 2025.) The Government called TFO Sandobal as its only witness. On direct examination, TFO Sandobal described his meetings with Czech

---

[4] The morning of the suppression hearing, Gupta filed a motion to compel discovery, arguing that all materials referencing the Country Attachés and their involvement in Gupta's arrest and extradition should be produced because the Country Attachés are members of the prosecution team. (See Dkt. No. 95.) Gupta claimed that he would be severely prejudiced if he was deprived access to those requested materials at the suppression hearing. (See id.) At the start of the hearing, the Court informed the parties that it had received Gupta's motion to compel and asked the parties whether the hearing could continue as scheduled in light of the prejudice alleged in Gupta's motion. (See Tr. 3:12-4:3.) The parties confirmed that they were ready to proceed with the suppression hearing despite the motion to compel. (See id. at 4:5-5:18.) At the Court's direction, the Government filed an opposition to Gupta's motion to compel on August 19, 2025, (see Dkt. No. 99), and Gupta filed a reply on August 22, 2025. (See Dkt. No. 100.) On August 27, 2025, the Court denied Gupta's motion to compel, finding that the Country Attachés are not members of the prosecution team. (See Dkt. No. 103.)

law enforcement officers to coordinate Gupta's arrest, the updates that he received from Czech police during and immediately after Gupta's arrest, and his questioning of Gupta in the van as Czech police transported Gupta to the local jail. (See Tr. 7:13-76:10.) TFO Sandobal's testimony was also subject to cross examination by defense counsel. (See id. at 76:22-122:6.) Although the Government made SA Franks available to Gupta for the suppression hearing, Gupta declined to call SA Franks as a witness. (See id. at 139:15-140:18.) Gupta declined to call any other witnesses and did not testify himself.

On August 26, 2025, the parties submitted their respective post-hearing submissions. (See "Gov't Post-Hearing Mem.," Dkt. No. 101; "Def. Post-Hearing Mem.," Dkt. No. 102.)

## II.  DISCUSSION

### A.  STATEMENTS TO CZECH LAW ENFORCEMENT

Gupta argues that Czech law enforcement agents arrested and interrogated him at the direction of, and in coordination with, the United States. Because Czech officers did not read Gupta his Miranda rights or a functional equivalent, Gupta seeks to suppress the iPhone passcodes that he provided to Czech police, which Gupta claims were allegedly obtained in violation of the Fifth Amendment of the United States Constitution. (See Def. Mem. at 17-21.) Gupta also seeks to

suppress the evidence from the passcode-protected iPhones as
fruits of the poisonous tree. (See id. at 21-23.) See United
States v. Santana, No. 22 Cr. 368, 2023 WL 4636369, at *9
(S.D.N.Y. July 20, 2023) ("Under the fruit of the poisonous
tree doctrine, evidence obtained from or as a consequence of
lawless official acts must be excluded." (citation omitted)).

Generally, statements taken abroad by foreign police
pertaining to criminal prosecutions conducted in the Unites
States in the absence of Miranda warnings are admissible in
those proceedings as long as the statements were voluntary.
See United States v. Yousef, 327 F.3d 56, 145 (2d Cir. 2003);
see also United States v. Bin Laden, 160 F. Supp. 2d 670, 679
n.12 (S.D.N.Y. 2001) ("[T]he Miranda warning/waiver framework
applies to the evaluation of overseas interrogation conducted
by American law enforcement agents only."). But under the
"joint venture" doctrine, unwarned statements made to foreign
police "must be suppressed whenever United States law
enforcement agents actively participate in questioning
conducted by foreign authorities," either through direct
questioning or by using foreign officers as instruments to
circumvent U.S. constitutional requirements. Yousef, 327 F.3d
at 145-46.

Here, there is no evidence that Czech law enforcement
advised Gupta of his rights under Miranda. Accordingly,

Gupta's statements to Czech law enforcement officers must be suppressed if (1) there was a joint venture between Czech Republic and United States law enforcement agents encompassing Gupta's assertions, or (2) the statements were made involuntarily. The Court addresses each theory in turn.[5]

1. Joint Venture

The joint venture doctrine "is based on the assumption that _Miranda_ must apply to any portion of an overseas interrogation that is, in fact or form, conducted by U.S. law enforcement." _United States v. Bin Laden_, 132 F. Supp. 2d 168, 187 (S.D.N.Y. 2001); see also _United States v. Abu Ali_, 528 F.3d 210, 227 (4th Cir. 2008) ("United States law enforcement officials may not intentionally evade the requirements of _Miranda_ by purposefully delegating interrogation duties to foreign law enforcement officers."). Accordingly, a joint venture may be found in two narrow circumstances: (1) where "the relationship between American

---

[5] The Government argues that Gupta has waived a voluntariness challenge because he failed to meaningfully address voluntariness in his opening brief. (See Gov't Opp'n at 16 n.12.) Courts "generally do not consider issues raised in a reply brief for the first time because if [a party] raises a new argument in a reply brief [the opposing party] may not have an adequate opportunity to respond to it." _United States v. Pepin_, 514 F.3d 193, 203 n.13 (2d Cir. 2008) (citation omitted). "However, the Second Circuit has made it abundantly clear that a district court has discretion to consider a belatedly-raised argument." _American Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co._, 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009) (citing _Ruggiero v. Warner-Lambert Co._, 424 F.3d 249, 252 (2d Cir. 2005)). Because the Government has been given an opportunity to file a sur-reply on the voluntariness issue, (see Gov't Sur-Reply), the Court will consider Gupta's voluntariness arguments. See _Sacchi v. Verizon Online LLC_, No. 14 Civ. 423, 2015 WL 1729796, at *1 n.1 (S.D.N.Y. Apr. 14, 2015).

and foreign authorities . . . amount[s] to a joint willful attempt to evade the strictures of Miranda," or (2) "a situation in which United States police officers simply used foreign police officials as instruments in conducting investigation and interviews." United States v. Bary, 978 F. Supp. 2d 356, 367 (S.D.N.Y. 2013) (citations omitted).

However, the existence of routine international cooperation "does not mandate the conclusion that the assistance rendered by foreign officials thereby makes them agents of the United States and thus subject to our Constitution and jurisprudence." United States v. Molina-Chacon, 627 F. Supp. 1253, 1260 (E.D.N.Y. 1986). To impose Miranda's "strictures regardless of whether U.S. law enforcement officers have any practical authority over or responsibility for the interrogations and investigative measures undertaken by foreign officials" ignores that "Miranda is a prophylaxis designed to regulate and deter the coercive conduct of domestic law enforcement officers. It is not meant to police independent foreign investigative activities that U.S. law enforcement officers do not direct and cannot control." United States v. Straker, 800 F.3d 570, 617 (D.C. Cir. 2017); see also United States v. Lira, 515 F.2d 68, 71 (2d Cir. 1975) ("The DEA can hardly be expected to monitor the conduct of representatives of each foreign

14

government to assure that a request for extradition or expulsion is carried out in accordance with American constitutional standards."). Thus, the Second Circuit has made clear that "evidence that the United States may have solicited the assistance of a foreign government in the arrest of a fugitive within its borders is insufficient as a matter of law to constitute United States participation under the joint venture doctrine." Yousef, 327 F.3d at 146; see also United States v. Hashmi, No. 06 Cr. 442, 2009 WL 2496272, at *5 (S.D.N.Y. Aug. 7, 2009) ("[O]rdinary requests for extradition are alone insufficient evidence of a joint venture.").

Gupta argues that the following facts are sufficient to establish the existence of a joint venture in this action: (1) Czech law enforcement had no investigation into Gupta before his arrest, (2) DEA personnel had several in-person meetings with Czech law enforcement prior to Gupta's arrest, (3) Czech law enforcement officers provided real time updates to DEA personnel during Gupta's arrest and interrogation in the Prague airport, (4) Czech law enforcement seized Gupta's cellphones and obtained his passcodes at the request of the DEA, and (5) Czech law enforcement agents helped the DEA by taking a longer route from the airport to the local jail, which allowed for a longer interrogation by the DEA Case

Agents, and by producing extractions of Gupta's cellphones before United States law enforcement authorities submitted an official request pursuant to the Mutual Legal Assistance Treaty ("MLAT").[6] (See Def. Mem. at 17-20.) But as explained further below, the Court finds that the circumstances surrounding Gupta's arrest do not support the existence of a joint venture.

At the outset, the Czech officers were not instruments of United States law enforcement officers merely because Czech Republic police officers did not maintain an independent investigation into Gupta. See United States v. Zhukov, 537 F. Supp. 3d 431, 436 (E.D.N.Y. 2021) ("[A] joint venture does not arise from the U.S. requesting investigative actions and arrest overseas, even where the recipient nation maintains no investigation of its own."); see also United States v. Getto, 729 F.3d 221, 230 (2d Cir. 2013) ("It is not enough that the foreign government undertook its investigation pursuant to an American MLAT request" to find that the foreign law enforcement officers were virtual agents of the United States).

Further, "[i]f the government can show that the United States and foreign law enforcement went no further than

---

[6] The Government has indicated that it will not offer the pre-MLAT extractions at trial. (See Gov't Opp'n at 8 n.8.)

providing assistance and sharing information, a joint venture has been disproven." Bary, 978 F. Supp. 2d at 367. Here, TFO Sandobal testified at the Court's hearing that there were two meetings between DEA personnel and Czech law enforcement on June 29, 2023, the day before Gupta's arrest. (See Tr. 19:19-25.) The first meeting, which took place at Czech police headquarters, lasted an hour and was attended by the DEA Case Agents, the Country Attachés, and a few Czech law enforcement officers. (See id. at 16:12-17:22.) During the meeting, the parties discussed the logistics of Gupta's arrest at the airport and his subsequent transport to the local jail. (See id.) Although the DEA Case Agents asked to participate in the arrest, Czech law enforcement denied the request and made clear that Czech law enforcement agents would be solely responsible for Gupta's arrest and that the DEA Case Agents were not permitted to enter the airport during the arrest operation. (See id.) Moreover, Czech law enforcement told the DEA Case Agents that they would be able to speak to Gupta only once he was being transported to the local jail. (See id.) At some point during the meeting, DEA personnel indicated that they would like Gupta's belongings, including any cellphones, to be seized by Czech law enforcement. (See id. at 18:1-6.) DEA personnel also indicated that they hoped that Gupta would be cooperative and allow them to take a look at

his phones, with one of the Country Attachés remarking that "if [the phones] were unlocked, even better." (Id. at 18:11-20.) Later that evening, the Country Attachés and DEA Case Agents met with a few Czech officers for dinner, which TFO Sandobal described as a social gathering rather than a meeting with Czech police. (See id. at 14:5-13.) The parties did not discuss the investigation during the dinner because they were in a public restaurant. (See id. at 20:14-21:7.)

On the day of the arrest, the DEA Case Agents, the Country Attachés, and Czech police met for thirty minutes to confirm that Gupta was on the flight manifest and was expected to arrive in Prague later that day. (See id. at 21:8-16, 22:22-23:2.) After the meeting, the DEA Case Agents traveled with the Czech arrest team to the Prague airport. (See id. at 9:2-24, 23:12-25.) Once at the airport, the Czech officers went inside to prepare for the arrest operation, while as instructed and agreed the DEA Case Agents waited in the van. (See id. at 31:5-16.) The lead Czech law enforcement officer provided updates to the DEA Case Agents via text message, including that Gupta's flight had landed, that Gupta was waiting for his luggage at the carousel, and that Gupta had been arrested. (See Gov't Suppression Hr'g Ex. 111 at 5-7.) The DEA Case Agents did not provide any directions to the

Czech officer in response to those messages, nor was any requested. (See id.)

Based on TFO Sandobal's testimony, the Court concludes that the meetings and correspondence between the DEA and Czech police merely reflects that the law enforcement agencies shared information and assisted one another in executing Gupta's arrest. Such cooperation is not sufficient to support a reasonable finding that Czech law enforcement officers' cooperative actions regarding Gupta's arrest gave rise to a joint venture with United States police officials. See Molina-Chacon, 627 F. Supp. at 1263 ("The role of the United States in helping to plan the arrest of [the defendant] does not impose the requirements of Miranda on the 'interrogation' by Bermudian officials."); Zhukov, 537 F. Supp. 3d at 436 (no joint venture where U.S. law enforcement officers had briefings with Bulgarian police officers and agents of U.S. law enforcement authorities had dinner with a Bulgarian officer the night before the defendant's arrest because those facts did not show that the U.S. directed the Bulgarian's questioning of the defendant).

"In the Second Circuit in particular, the joint-venture analysis focuses less on the overall level of cooperation between the two nations, and more on the U.S. agents' efforts

to direct the specific questioning at issue." Zhukov, 537 F. Supp. 3d at 436.

The parties dispute whether the DEA effectively directed Czech law enforcement officers to seize Gupta's cellphones and request the corresponding passcodes during the airport interrogation. For the reasons explained further below, the Court finds that the Government has met its burden to show that the DEA's comments about Gupta's cellphones – which were made during the meeting on June 29, 2023 - do not reflect a joint venture between the United States and the Czech Republic. See Bary, 978 F. Supp. 2d at 367 (noting that the Government's burden to disprove a joint venture "is not a heavy one").

As a general matter, foreign law enforcement officers may lawfully seize a defendant's electronic devices pursuant to an arrest warrant for extradition. See United States v. Chang, No. 18 Cr. 681, 2024 WL 1308775, at *3 (E.D.N.Y. Mar. 27, 2024) (seizure of the defendant's cellphone by South African law enforcement was proper, noting that the United States's provisional warrant for the defendant's arrest and extradition sought the seizure of all articles and instruments in the defendant's possession at the time of arrest). And here, the United States's provisional arrest warrant requested that Czech law enforcement seize, and

eventually surrender, "all articles, instruments, objects of value, documents and other evidence relating to the offenses charged that are found in the possession of [Gupta] at the time of his arrest." (Def. Mot., Ex. 1 § 4.) Given that the provisional arrest warrant alleged that Gupta was regularly communicating with a confidential source and undercover agent by phone, video call, and chat, (see id. at § 3), it is unsurprising that Czech law enforcement agents sought to recover any cellphones in Gupta's possession at the time of his arrest, as well as the corresponding passcodes to ensure that the contents could be accessed.

Turning to the interrogation, the Government emphasizes that no one from the DEA was present during Gupta's interrogation by Czech police. (See Tr. 9:14-10:16, 23:12-25; Gov't Opp'n at 20; Gov't Post-Hearing Mem. at 5.) Although the absence of DEA personnel weighs in favor of finding that U.S. law enforcement officers were not directing the questioning at issue, it is not determinative.[7] See Bary, 978

---

[7] Even if DEA personnel had been present during Gupta's interrogation by Czech police, such would be insufficient to show a joint venture between the United States and the Czech Republic. See United States v. Harun, 232 F. Supp. 3d 282, 287 (E.D.N.Y. 2017) (recognizing that the "'mere presence at an interrogation' or indirect involvement of United States law enforcement agents will not give rise to a joint venture" (citation omitted)); see also Pfeifer v. United States Bureau of Prisons, 615 F.2d 873, 877 (9th Cir. 1980) (concluding that the mere presence of U.S. agents during an interrogation conducted by foreign officers did not constitute the substantial participation required for a joint venture).

F. Supp. 2d at 367. A joint venture may be proven if the interrogation "is, in fact or form, conducted by U.S. law enforcement." Bin Laden, 132 F. Supp. 2d at 187; Yousef, 327 F.3d at 146 ("[T]he joint venture doctrine may also apply where United States officials, although asking no questions directly, use foreign officials as their interrogation agents in order to circumvent the requirements of Miranda."). Indeed, Gupta argues that the DEA effectively directed the Czech officers' questioning because the DEA expressed an interest in Gupta's cellphones and passcodes in a joint meeting the day before Gupta's arrest. (See Def. Mem. at 17, 19; Def. Post-Hearing Mem. at 5.)

Regarding the purported directive, TFO Sandobal testified that no one from the DEA requested that Czech law enforcement obtain Gupta's cellphone passcodes. (See Tr. 11:17-22, 30:11-25.) TFO Sandobal understood the DEA's passing comments about Gupta's cellphones to mean "[t]hat as part of an investigation, if someone is cooperative and they willingly cooperate to unlock their phones and provide their passcode, that would be best for our investigation." (Id. at 18:22-24, 19:4-9.) Moreover, TFO Sandobal testified that the Czech officers did not saying anything in response to the DEA's cellphone comments and that there was no further

discussion about Gupta's cellphones after that meeting. (See id. at 19:10-18, 21:2-4, 23:5-11, 24:13-18.)

At the suppression hearing, the Government did not offer any evidence, either through a live witness or affidavit, from any Czech officers that would corroborate TFO Sandobal's testimony that the DEA's comments about Gupta's cellphones were not a request for Czech law enforcement agents to obtain Gupta's cellphone passcodes. See Zhukov, 537 F. Supp. 3d at 437 (no joint venture where the U.S. agents and a Bulgarian officer all denied that the United States had directed the Bulgarian officer's questioning of the defendant). But even if Czech law enforcement asked Gupta for his passcodes in light of the DEA's comments, such would not amount to giving rise to a joint venture. That U.S. agents provided foreign officers with suggested questions is insufficient to establish a joint venture where the foreign officers retained control over the interrogation. See e.g., Abu Ali, 528 F.3d at 228 (no joint venture where "FBI supplied a list of questions" to Saudi officials to be asked at interrogation because Saudi officials retained ultimate control over the interrogation, noting that the Saudis rejected many, but not all, of the proposed questions and denied the U.S. agents' request to be present in the interrogation room).

Here, the evidence supports a finding that Czech law enforcement officers retained control over Gupta's initial interrogation at the Prague airport. During the meeting on June 29, 2023 - the same meeting during which the DEA made comments about Gupta's cellphones - Czech law enforcement officers rejected the DEA Case Agents' request to participate in the arrest and made clear that (1) Czech law enforcement agents would be solely responsible for Gupta's arrest, (2) the DEA Case Agents were not permitted to enter the airport during Gupta's arrest, and (3) the DEA Case Agents would be able to speak to Gupta only once he was removed from the airport and being transported to the local jail. (See Tr. 16:24-17:22.)

Additionally, other actions taken by Czech law enforcement officers support the conclusion that Czech officers were making decisions on their own initiative throughout Gupta's arrest and extradition operations. For example, the lead Czech law enforcement officer sent the DEA Case Agents several unsolicited photographs via text message while executing the arrest plan. (See Gov't Suppression Hr'g Ex. 111 at 5-18.) Those photographs showed Gupta in the airport, Gupta in handcuffs once he was arrested, the biographical pages of Gupta's passports, and basic device information for Gupta's phones. (See Tr. 33:8-34:10, 36:4-

38:3, 42:9-17; Gov't Suppression Hr'g Ex. 111 at 5-18.) The messages also included a video of Gupta verbally providing his passcode to a Czech officer while simultaneously unlocking the phone. (See Tr. 38:6-17; Gov't Suppression Hr'g Ex. 112.) As TFO Sandobal testified, no one from the DEA asked Czech law enforcement officials to send the photographs or the video, nor was anyone from the DEA present when the photographs and video were taken. (See Tr. 35:1-36:3, 38:4-17, 42:18-23.) Likewise, TFO Sandobal testified that no one from the DEA asked Czech law enforcement officers to take another lap around the local jail to give the DEA Case Agents more time with Gupta in the van. (See id. at 66:19-25.)

Nor is there other conduct that suggests that United States law enforcement authorities asked the Czech Republic to obtain Gupta's cellphones and passcodes to intentionally bypass United States constitutional safeguards. See Getto, 729 F.3d at 232-33. For example, even though the Czech Republic took the initiative to provide pre-MLAT "courtesy extractions" of the Samsung Vivo and iPhone 14, the Government still requested the three physical phones, as well as their contents, through a MLAT application. (See Def. Mot., Ex. 15B at 2.) Further, the Government did not rely on the courtesy extractions in its warrant request to search Gupta's three cellphones. (See Def. Mot., Ex. 16 ¶ 9(d) n.3.) And as

explained further below, the DEA Case Agents apprised Gupta of his _Miranda_ rights and received a valid oral waiver before questioning Gupta about his role in the murder-for-hire scheme.

Considering TFO Sandobal's testimony, the provisional arrest warrant's request that Czech law enforcement collect items in Gupta's possession at the time of arrest, the initiatives taken by Czech law enforcement agents, and law enforcement officers' general interest in a defendant's electronic devices and their contents, the DEA's comments about Gupta's cellphones did not constitute a directive to Czech law enforcement authorities, let alone an attempt by U.S. law enforcement officers to evade the requirements of _Miranda_. _See_ _Zhukov_, 537 F. Supp. 3d at 433, 435-37; _Molina-Chacon_, 627 F. Supp. at 1262-63; _Yousef_, 327 F.3d at 145-46.

2.  Voluntariness

Regardless of the existence of a joint venture, the Court must suppress Gupta's statements to Czech law enforcement officials if Gupta's statements were made involuntarily. _See_ _United States v. Welch_, 455 F.2d 211, 213 (2d Cir. 1972). The "due process voluntariness test" is "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." _Dickerson v. United States_, 530 U.S. 428, 434 (2000) (citation omitted). However, "the mere fact

that a suspect has made an unwarned admission does not warrant a presumption of compulsion" "absent deliberately coercive or improper tactics in obtaining the initial statement." Oregon v. Elstad, 470 U.S. 298, 314 (1985); see also Berghuis v. Thompkins, 560 U.S. 370, 387 (2010) ("The Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion." (citation omitted)).

In evaluating voluntariness, courts consider "the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991). Courts have excluded statements as involuntary where the statements were obtained through violence or a credible threat of violence, see Arizona v. Fulminante, 499 U.S. 279, 287-88 (1991), where the defendant was deprived of basic needs or subjected to a lengthy interrogation under coercive conditions, see Brooks v. Florida, 389 U.S. 413, 414-15 (1967), or where law enforcement exploited the defendant's medical or mental vulnerabilities to extract a confession. See Mincey v. Arizona, 437 U.S. 385, 398-401 (1978).

Here, considering the totality of the circumstances, the Court concludes that the evidence does not support a finding that Gupta's post-arrest statements to Czech law enforcement

agents were involuntary. See e.g., United States v. Kaba, 999
F.2d 47, 49-51 (2d Cir. 1993). By Gupta's own account, he was
strip-searched in a small windowless room in the Prague
airport and subsequently detained by six or seven Czech
officers for approximately thirty minutes. (See Gupta Decl.
¶¶ 2, 4, 6, 13.) Further, Gupta asserts that the Czech
officers questioned him exclusively in English even though he
is not always comfortable speaking or understanding English,
and that he felt as though he had no choice but to provide
his passcodes to the Czech officers. (See id. ¶¶ 7-8, 24.)

But as explained further below, TFO Sandobal's testimony
and other evidence presented during the suppression hearing
reflects that Gupta has good command of the English language.
Further, the custodial circumstances that Gupta describes,
which spanned only thirty minutes, are not sufficiently
severe to render Gupta's statements involuntary. See In re
Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d
177, 213-14 (2d Cir. 2008); Abu Ali, 528 F.3d at 234. There
is no indication that Czech police engaged in any coercive
tactics, used physical violence, or employed other deliberate
means to break Gupta's will. See Elstad, 470 U.S. at 312;
Yousef, 327 F.3d at 126. And based on a video and photograph
taken by Czech police, Gupta's demeanor reflects that he was
relatively calm following his arrest by the Czech police

officers. (See Gov't Suppression Hr'g Exs. 102, 112.) See In re Terrorist Bombings, 552 F.3d at 213-14. Although the DEA Case Agents were not present for Gupta's arrest in the airport, TFO Sandobal similarly recounted that Gupta appeared "very relaxed" and "cooperative" when the Czech officers brought him to the van. (Tr. 45:5-9.) Thus, the totality of the circumstances reflect that Gupta voluntarily provided his passcodes to Czech law enforcement. See Kaba, 999 F.2d at 49-51; In re Terrorist Bombings, 552 F.3d at 213-14.

    3.   Fruit From the Poisonous Tree

    Gupta argues that the contents of his passcode-protected iPhones should be excluded as fruits from the poisonous tree under the Fourth Amendment of the United States Constitution. (See Def. Mem. at 21-23.) Because there was no joint venture between the United States law enforcement authorities and the Czech Republic, and Gupta provided his passcodes voluntarily, the contents of the iPhones are not subject to exclusion. "[I]nformation furnished [to] American officials by foreign police need not be excluded simply because the procedures followed in securing it did not fully comply with our nation's constitutional requirements." United States v. Cotroni, 527 F.2d 708, 711 (2d Cir. 1975); see also United States v. Marcos, No. 87 Cr. 598, 1990 WL 29368, at *3 (S.D.N.Y. Mar. 9, 1990) ("[E]vidence furnished to United States law

enforcement officials by a foreign government is not subject to exclusion even if the evidence produced was gathered in violation of United States constitutional guarantees."); Molina-Chacon, 627 F. Supp. at 1260 (that foreign search or seizure was prompted by a United States request for assistance is insufficient justification to apply the Fourth Amendment). Accordingly, the Court will not suppress the contents of the passcode-protected iPhones.

B.  STATEMENTS TO THE DEA CASE AGENTS

Gupta argues that his statements to the DEA Case Agents must be suppressed because: (1) the DEA Case Agents did not advise Gupta of his rights before they began interrogating him, in violation of Miranda, and (2) Gupta refused to sign the Advice of Rights form, reflecting that he did not knowingly and voluntarily waive his rights. (See Def. Mem. at 23-28.) For the reasons explained further below, the Court finds that Gupta was apprised of his rights and subsequently waived those rights knowingly and voluntarily before any substantive questioning by the DEA Case Agents. Thus, the Court will not suppress Gupta's statements to the DEA Case Agents.

1.  Advice of Rights

"In order for an accused's statement to be admissible at trial, police must have given the accused a Miranda warning."

Berghuis, 560 U.S. at 388. This principle extends to U.S. law enforcement officers conducting an interrogation overseas. See United States v. Restrepo, No. 01 Cr. 1113, 2002 WL 10455, at *6 (S.D.N.Y. Jan. 3, 2002). If a "defendant [was] not advised of his Miranda rights prior to making his custodial statement, an irrebuttable presumption of compulsion arises and the [Government] cannot show that the suspect waived his rights voluntarily." United States v. Gaines, 295 F.3d 293, 298 (2d Cir. 2002).

In his declaration, Gupta maintains that the DEA Case Agents did not inform him of his rights, including his right to remain silent or his right to an attorney, before they began questioning him. (See Gupta Decl. ¶ 21.) At the suppression hearing, TFO Sandobal testified to a different version of events. According to TFO Sandobal, the DEA Case Agents introduced themselves by name when Gupta entered the van and informed him that they were with U.S. law enforcement authorities, and specifically, the DEA. (See Tr. 49:11-51:20; Gov't Suppression Hr'g Exs. 103, 104.) Gupta told the DEA Case Agents that he was ready to talk to them, but the DEA Case Agents informed Gupta that they needed to read him his rights before they could speak to him further. (See Tr. 52:1-17, 59:4-10.) SA Franks then read Gupta every right on the Advice of Rights form, which apprised Gupta, among other

things, that he had "the right to remain silent," that anything he said "could be used against [him] in court," that he had "the right to talk to a la[w]yer," and that if he decided "to answer questions now without a lawyer present," he had "the right to stop answering at any time." (Id. at 57:8-58:3; Gov't Suppression Hr'g Ex. 101.) Gupta was provided his glasses and a copy of the Advice of the Rights form so that he could follow along, which he did. (See Tr. 54:21-55:24.) TFO Sandobal also told Gupta that he could ask for clarification if he did not understand anything from the Advice of Rights form. (See id. at 58:12-24.) In response, Gupta acknowledged that he understood his rights and reiterated that he was willing to talk to the DEA Case Agents. (See id. at 58:25-59:10.) Based on Gupta's oral waiver, the DEA Case Agents proceeded to question Gupta for approximately ten to fifteen minutes. (See id. at 66:17-18.)

According to TFO Sandobal, the DEA Case Agents did not ask Gupta to sign the Advice of Rights form at the time of the oral waiver because the van was in motion and the signatures could have gotten smeared. (See id. at 59:11-19.) Once the van was stopped at the local jail, the DEA Case Agents asked Gupta to sign the Advice of Rights form. (See id. at 67:1-68:20.) Although Gupta printed his name, he asked the DEA Case Agents if he could make a phone call before

signing. The DEA Case Agents told Gupta that they were unaware of the procedures for making a phone call in a foreign country, but one of the Czech officers informed Gupta that he could make a phone call at a later time. (See id. at 68:5-16.) It is undisputed that Gupta subsequently refused to sign the Advice of Rights form, which SA Franks noted on the form and in the DEA post-arrest report. (See id. at 68:3-22; Gov't Suppression Hr'g Exs. 101, 108.)

Gupta insists that TFO Sandobal's testimony is inconsistent and contradicted by objective evidence. (See Def. Post-Hearing Mem. at 7-9.) First, Gupta emphasizes that the van was so poorly lit that SA Franks could not have read the Advice of Rights form aloud. (See id. at 7-8; see also Tr. 111:17-115:1.) In support this argument, Gupta relies on a photograph taken during the van ride, which shows Gupta's bright cellphone screen and a dark surrounding environment. (See Gov't Suppression Hr'g Ex. 105.) TFO Sandobal acknowledged that the van's windows were tinted but affirmed that it was a sunny day and that the sunlight outside provided "[p]lenty of light" in the van for SA Franks to read the Advice of Rights form. (Tr. 70:15-24, 123:11-18.) Although the Government did not introduce evidence to establish when the sun set on June 30, 2023, the Court finds it plausible that there was substantial sunlight when Gupta was placed in

the van shortly after 7:30 pm. (See Gov't Suppression Hr'g Ex. 111 at 10; Tr. 34:18-35:21, 43:12-25.)

TFO Sandobal further explained that the background of the photograph appeared dark only because the photograph's exposure was centered on Gupta's brightly lit cellphone screen, which was being shown to the DEA Case Agents to provide Amanat's contact information. (See id. at 122:12-123:5.) TFO Sandobal also testified that neither Gupta nor SA Franks had difficulty writing on the Advice of Rights form at the end of the van ride – with Gupta printing his name in the correct place and SA Franks noting on the signature line that Gupta had refused to sign – without any additional lighting, supporting the conclusion that the Advice of Rights form was readable inside the van. (See id. at 111:13-112:6, 124:1-12; see also Gov't Suppression Hr'g Ex. 101.) Thus, the Court finds TFO Sandobal's testimony credible that SA Franks could, and did, read Gupta the Advice of Rights form.

Second, Gupta claims that TFO Sandobal's testimony is inconsistent because TFO Sandobal initially testified that SA Franks read the Advice of Rights form "straight through," but on cross examination testified that SA Franks paused after each statement to confirm Gupta's understanding. (Def. Post-Hearing Mem. at 8; Tr. 115:6-116:22.) This discrepancy does not detract from TFO Sandobal's testimony that SA Franks read

34

Gupta the entire Advice of Rights form, including the final lines which stated, "I have read this statement of my rights, and I understand what my rights are. At this time, I'm willing to answer questions without[] a lawyer present." (Tr. 58:7-11.) In response, Gupta stated that he understood his rights and that he was willing to answer questions. (See id. at 58:25-59:5.) Thus, "[w]hatever minor inconsistencies [Gupta has] claimed, they do not impair the officer['s] credible recounting of the events at issue." United States v. Ortega, No. 15 Cr. 320, 2015 WL 6143758, at *5 (S.D.N.Y. Oct. 19, 2015). Based on TFO Sandobal's testimony, the Court concludes that SA Franks read Gupta all of the rights from the Advice of Rights form and that Gupta confirmed that he understood those rights.

Although Gupta disputes TFO Sandobal's version of events through his declaration, (see Gupta Decl. ¶¶ 21, 24), Gupta did not testify at the suppression hearing. "[I]n practice, the self-serving affidavit of the moving defendant is usually disregarded if [h]e declines to testify at the hearing." United States v. Wang, No. 23 Cr. 118, 2024 WL 1717998, at *4 (S.D.N.Y. Apr. 22, 2024) (citation omitted). Moreover, the Court will accord "greater weight" to TFO Sandobal's testimony because it was given under oath, subject to cross examination, corroborated by other evidence in the record,

and found credible by the Court. <u>United States v. Cherry</u>, 541 F. Supp. 3d 407, 422-23 (S.D.N.Y. 2021) (citation omitted); <u>see also</u> <u>United States v. Taylor</u>, No. 11 Cr. 310, 2011 WL 4357350, at *4 n.12 (S.D.N.Y. Sept. 19, 2011) (officers' testimony was "entitled to more weight" than the defendant's declaration because the testimony "was subject to cross-examination and is found by this Court to be credible"); <u>United States v. Frank</u>, 8 F. Supp. 2d 284, 291 n.2 (S.D.N.Y. 1998) (crediting officers' testimony that defendant was read his <u>Miranda</u> rights over defendant's affidavit because the affidavit was not subject to cross-examination and the testifying officers were credible). Accordingly, the Court finds that the DEA Case Agents advised Gupta of his rights before substantively questioning him.

2.   Waiver of Rights

Gupta argues that even if he was given proper <u>Miranda</u> warnings, he did not knowingly and voluntarily waive his rights. Specifically, Gupta claims that his refusal to sign the Advice of Rights form shows that he did not consent to being questioned without an attorney present. (<u>See</u> Def. Mem. at 24-25.) It is undisputed that Gupta refused to sign the Advice of Rights form at the end of the van ride. (<u>See</u> Tr. 67:13-68:4; Gov't Suppression Hr'g Exs. 101, 108.)

Gupta's refusal to sign the Advice of Rights form does not, however, preclude the admissibility of his statements. Rather, the relevant inquiry is whether Gupta orally waived his rights knowingly and voluntarily. See Berghuis, 560 U.S. at 382-83; see also Gaines, 295 F.3d at 298 (declining to suppress defendant's statements where defendant did not sign a waiver of rights form because the officer testified that the defendant was read his rights and verbally acknowledged that he understood those rights); United States v. Munoz, 748 F. Supp. 167, 171 (S.D.N.Y. 1990) (finding oral waiver of rights was effective, noting that "[d]efendant's refusal to sign the waiver of rights form does not automatically render the subsequent questioning improper"); United States v. Parris, No. 13 Cr. 17, 2014 WL 2745332, at *13-14 (S.D.N.Y. June 17, 2014) (denying motion to suppress post-arrest statements where two FBI agents advised the defendant of his Miranda rights using an advice of rights form because the defendant orally stated that he understood his rights even though he refused to sign the form).

Regarding voluntariness, there is no evidence to suggest that Gupta's statements to the DEA Case Agents were the result of intimidation, coercion, or deception. Rather, Gupta's contentions focus on whether he understood his Miranda rights and the implications of waiving those rights. Gupta claims

that he could not have knowingly waived his rights because (1) English is not his first language, (2) he did not have any familiarity with American law enforcement, (3) he was not given much time to review the Advice of Rights form, and (4) he did not have his glasses, meaning that he could not have read the Advice of Rights form. (See Def. Mem. at 25-26; Gupta Decl. ¶ 24.)

First, it is undisputed that the DEA Case Agents questioned Gupta in English and that the Advice of Rights form was also in English. (See Tr. 52:21-53:8; Gov't Suppression Hr'g Ex. 101.) Although Gupta is not a native English-speaker, the Court credits TFO Sandobal's testimony that Gupta speaks and understands English very well. (See Tr. 52:21-53:16.) Moreover, Gupta gave responsive answers to post-arrest questioning by both the DEA Case Agents and Czech law enforcement officers, corroborating TFO Sandobal's testimony regarding Gupta's sufficient English comprehension. (See Gov't Suppression Hr'g Exs. 108, 112; see also Def. Mot., Ex. 15B at 8 (Czech interrogation report listing Gupta's languages as English and Hindi).) See Campaneria v. Reid, 891 F.2d 1014, 1020 (2d Cir. 1989) (limited proficiency in English "did not prevent [the defendant] from making a knowing and intelligent waiver of his constitutional rights" where the defendant "spoke in broken English with an accent and

occasionally lapsed into Spanish"); United States v. Ghafoor,
897 F. Supp. 90, 91 (S.D.N.Y. 1995) (finding defendant spoke
and understood English sufficiently well to knowingly and
voluntarily waive his Miranda rights because defendant gave
responsive answers and asked relevant questions during his
interrogation by U.S. law enforcement officers, which was all
in English). Further, at the time of arrest, Gupta's personal
property included several books and magazines – such an issue
of The Economist titled "How Strong is India's
Economy?" – that were all in English. (See Tr. 75:1-76:8;
Gov't Suppression Hr'g Ex. 106.) Although Gupta participates
in judicial proceedings before this Court with the assistance
of a Hindi interpreter, such is not the standard to evaluate
whether Gupta knowingly waived his rights. See Kaba, 999 F.2d
at 49-51; Ghafoor, 897 F. Supp. at 91.

Second, that Gupta was unfamiliar with American law
enforcement is insufficient to show that his waiver was made
unknowingly or involuntarily. (See Def. Mem. at 25.) Gupta's
reliance on United States v. Anderson, 929 F.2d 96 (2d Cir.
1991) is misplaced. In Anderson, the defendant's confession
was involuntary where a DEA agent repeatedly told the
defendant that he would not receive any credit for his
cooperation if he requested an attorney, which was untrue.
See Anderson, 929 F.2d at 97-102. The Second Circuit rejected

the Government's argument that the defendant's extensive criminal background was sufficient to prove voluntariness, as there was no indication that the defendant knew the rules about cooperation and the resulting benefits in federal court. See id. at 99. But here, there is no evidence to suggest that the DEA Case Agents made any statements like those in Anderson, or any other statements that could be considered coercive, that would render Gupta's statements involuntary.

Third, SA Franks adequately apprised Gupta of his Miranda rights by reading him the Advice of Rights form. TFO Sandobal testified that there was no indication that Gupta was confused by anything from the Advice of Rights form or that Gupta was having trouble due to a language barrier. (See Tr. 52:21-53:16, 60:5-15.) After SA Franks read the Advice of Rights form aloud, Gupta confirmed that he understood his rights and that he was willing to answer questions by the DEA Case Agents. (See id. at 58:4-59:10.) Such representations, which the Court finds credible based on TFO Sandobal's testimony, are sufficient to establish a knowing and intelligible waiver. See Gaines, 295 F.3d at 298-99; Ghafoor, 897 F. Supp. at 91.

Lastly, Gupta's claim about his glasses is not credible. (See Gupta Decl. ¶ 24.) As a general matter, a defendant is

not required to personally read his <u>Miranda</u> rights to make a knowing and intelligent waiver; it is sufficient for an officer to verbally apprise the defendant of his rights. <u>See</u> <u>Kaba</u>, 999 F.2d at 49-51. But as TFO Sandobal testified, Gupta requested his glasses to review the Advice of Rights form at the beginning of the van ride, and with Gupta's verbal assistance, Czech officers promptly retrieved the glasses from Gupta's luggage in the van. (<u>See</u> Tr. 55:2-24.) Once Gupta had his glasses on, SA Franks proceeded to read through the Advice of Rights form, with Gupta following along on his own copy. (<u>See</u> <u>id.</u>) Because Gupta's declaration was not subject to cross examination, the Court credits TFO Sandobal's testimony that Gupta was provided his glasses at the beginning of the van ride.

Thus, for the numerous reasons discussed above, the Court will not suppress Gupta's post-arrest statements to the DEA Case Agents.

C.   <u>DISMISSAL OF COUNT THREE</u>

Gupta argues that Count Three of the S2 Indictment violates the rule of specialty – a doctrine that limits a defendant's prosecution to the crimes for which he was extradited - and thus Count Three must be dismissed for lack of jurisdiction. (<u>See</u> Def. Mem. at 29-33.) The parties do not dispute that the Czech Republic authorized Gupta's

extradition based on the murder-for-hire allegations (Counts I and II) in the Indictment and S1 Indictment. (See Gov't Opp'n, Ex. B.) Once Gupta was in the United States, however, the Government charged Gupta with Count Three of the S2 Indictment, which alleges that Gupta participated in a money laundering conspiracy by helping transmit money from India to the purported hitman in the United States. (See S2 Indictment ¶¶ 40-42.) Gupta argues that by adding Count Three, the Government improperly expanded the scope of the charges against him in violation of the Extradition Treaty and the rule of specialty because the Czech Republic did not consent to Gupta's prosecution on Count Three. (See Def. Mem. at 29-30.) In response, the Government argues that (1) Gupta does not have standing to invoke the rule of specialty, which protects the rights of the extraditing sovereign and not those of the individual being extradited, and (2) Gupta's rule of specialty claim fails on the merits in light of correspondence from the Czech Republic. (See Gov't Opp'n at 28-34.)

Under the rule of specialty, "an extradited defendant 'can only be tried for one of the offences described in the treaty under which he is extradited, and for the offence with which he is charged in the proceedings for his extradition.'" United States v. Barinas, 865 F.3d 99, 104 (2d Cir. 2017) (quoting United States v. Rauscher, 119 U.S. 407, 430 (1886))

(alterations omitted). "[T]he principle of speciality generally requires a country seeking extradition to adhere to any limitations placed on prosecution by the surrendering country," United States v. Baez, 349 F.3d 90, 92 (2d Cir. 2003), and "[a] country that consents to extradite a person has the right to enforce such limitations." Barinas, 865 F.3d at 104. Thus, the rule of specialty limits a district court's personal jurisdiction "to charges 'specially brought to the attention' of the foreign government that has delivered a defendant pursuant to extradition." Levy, 947 F.2d at 1034 (quoting Fiocconi, 462 F.2d at 478).

However, "treaties establish rights and obligations between States-parties[,] and generally not between states and individuals," even though "individuals may benefit because of a treaty's existence." See United States v. Guzman Loera, 24 F.4th 144, 151 (2d Cir. 2022) (citation omitted). "[T]he principle of specialty has been viewed as a privilege of the asylum state, designed to protect its dignity and interests, rather than a right accruing to the accused." Shapiro v. Ferrandina, 478 F.2d 894, 906 (2d Cir. 1973). Thus, an extradited defendant has standing to invoke the rule of specialty in only three narrow circumstances: (1) the treaty explicitly creates a private right of action, (2) there is clear evidence that the state-parties intended for the treaty

to create privately enforceable rights, or (3) the surrendering state has formally protested or objected to the defendant's prosecution on the charges at issue. See Barinas, 865 F.3d at 105; United States v. Suarez, 791 F.3d 363, 367 (2d Cir. 2015); United States v. Garavito-Garcia, 827 F.3d 242, 246-47 (2d Cir. 2016).

The Extradition Treaty incorporates the rule of specialty but does not explicitly create a private right of action. (See "Extradition Treaty," Def. Mot., Ex. 28, Articles II and XIc; see also Def. Mem. at 33 (conceding that the Extradition Treaty does not provide a private right of action).) Nonetheless, Gupta insists that he has standing to invoke the rule of specialty on Count Three because (1) the Czech Republic objected to Gupta's prosecution on Count Three in a letter dated April 10, 2025 (the "April 2025 Letter"), and (2) the record reflects that the Czech Republic "would object" to Gupta's prosecution on Count Three. (See Def. Mem. at 31-32 (quoting Barinas, 865 F.3d at 105); Def. MTD Reply at 7-9.)

First, Gupta's claim that the Czech Republic has already objected to his prosecution on Count Three misrepresents the record. (See Def. Mem. at 33; see also "Apr. 2025 Letter," Def. Mot., Ex. 26.) An individual defendant has standing to invoke the rule of specialty if the surrendering government

44

"first makes an official protest." Suarez, 791 F.3d at 367;
see also United States v. Alvarez-Machain, 504 U.S. 655, 659
(1992) ("[L]etters from the Mexican Government to the United
States Government served as an official protest of the Treaty
violation."); United States ex rel. Lujan v. Gengler, 510
F.2d 62, 67 n.8 (2d Cir. 1975) ("[T]o support this claim[,]
[defendant] would have to prove that the Uruguayan government
registered an official protest with the United States
Department of State.").

The Czech Republic's April 2025 Letter was in response
to a letter from Gupta dated February 18, 2025, where Gupta
asked the Czech Republic to reject the Government's request
for a waiver of the rule of specialty on Count Three. (See
Apr. 2025 Letter; see also "Feb. 2025 Letter," Def. Mot., Ex.
25.) In the April 2025 Letter, the Czech Republic informed
Gupta that it had not received a waiver application from the
United States and thus there were no proceedings pending that
would allow the Czech Republic to grant additional consent to
Gupta's prosecution. (See Apr. 2025 Letter.) The April 2025
Letter cannot plausibly be construed to mean that the Czech
Republic objected to Gupta's prosecution on Count Three.
Rather, the April 2025 Letter merely stated that Gupta's
objection to the Government's waiver application was
premature given that the Czech Republic had not received an

application. (See id.) Nor can the April 2025 Letter be construed as an "official protest" by the Czech Republic, as the letter was addressed to only Gupta's counsel and not to a relevant branch of the United States government. See Alvarez-Machain, 504 U.S. at 659; Gengler, 510 F.2d at 67 n.8. Thus, the Court finds that the Czech Republic has not officially protested Gupta's prosecution on Count Three.

Second, Gupta's reliance on the "would object" language in Barinas is unpersuasive. (See Def. Mem. at 31-33; Def. MTD Reply at 7-8.) In Barinas, the Second Circuit explained that the rule of specialty affords an extraditee a "remedy only if the surrendering government would object," as the underlying treaty violation is an affront to the surrendering government, not the extraditee. Barinas, 865 F.3d at 105 (quoting Fiocconi, 462 F.2d at 479-80 n.8). Accordingly, "[a]n extraditee lacks standing to complain of noncompliance with an extradition treaty unless the treaty [contains] language indicating that the intent of the treaty drafters' was that such benefits could be vindicated through private enforcement." Id. (quoting Garavito-Garcia, 827 F.3d at 247). Applying those legal principles, the Second Circuit concluded that the defendant did not have standing to invoke the rule of specialty because the treaty did not create a private right of action, either explicitly or implicitly, and the Dominican

Republic had not objected to the defendant's prosecution. See
id. In light of the holding in Barinas, the Court rejects
Gupta's suggestion that an extraditee may establish standing
by merely identifying a potential violation of the treaty and
claiming that the surrendering sovereign would similarly
protest. Rather, where the sovereign has not objected, an
individual being extradited must show that the treaty
purposefully created rights that could be vindicated through
enforcement by an individual, not just a sovereign. See
Barinas, 865 F.3d at 105; Suarez, 791 F.3d at 367; Garavito-
Garcia, 827 F.3d at 246-47.

Foreign nationals may enforce treaty provisions "that
d[o] not explicitly provide for judicial enforcement of their
guarantees" where there is clear evidence that the treaty
drafters intended "to confer rights that could be vindicated
in a manner sought by the affected individuals." Mora v. New
York, 524 F.3d 183, 203 (2d Cir. 2008). Clear evidence of
intent may be shown through diplomatic notes and other case-
specific extradition documents that "implicate the same
international legal rights as treaties." Suarez, 791 F.3d at
367. Moreover, "[t]he treaty's history, the negotiations, and
the practical construction adopted by the parties' may also
be relevant." Societe Nationale Industrielle Aerospatiale v.

United States Dist. Ct. for S. Dist. of Iowa, 482 U.S. 522, 534 (1987) (citation omitted).

There is no indication that the Extradition Treaty creates privately enforceable rights. For example, Article 15 allows the relevant agencies of both sovereigns to coordinate and resolve issues regarding the implementation of the Extradition Treaty, but makes no mention of private enforcement. (See Extradition Treaty, Article 15.) See United States v. Zelaya-Romero, No. 15 Cr. 174, 2018 WL 1033235, at *4 (S.D.N.Y. Feb. 21, 2018) (extradited defendant did not have standing where treaty was silent on private enforcement). Further, Gupta does not identify any relevant negotiations, diplomatic notes, or past practices that may shed light on how the state-parties' have previously interpreted or enforced the Extradition Treaty. See Kolovrat v. Oregon, 366 U.S. 187, 194-95 (1961); Rauscher, 119 U.S. at 411, 415-20.

Moreover, recent correspondence from the Czech Republic supports the Government's position that Count Three does not exceed the scope of the previous grant of extradition. In a letter dated July 7, 2025 (the "July 2025 Letter"), the Czech Republic informed the United States that "[i]f there are no new facts and the new charge is based upon the same facts (acts) for which the extradition was granted, it is not

necessary to seek . . . [a] waiver of the rule of specialty[.]" ("July 2025 Letter," Gov't Opp'n, Ex. A.) Here, the money laundering conspiracy allegations in Count Three are based on the same conduct alleged during the extradition proceedings: that Gupta helped transmit the advance of $15,000, which was delivered to the UC through a money courier on June 9, 2023, in Manhattan, New York. (Compare S2 Indictment ¶¶ 15, 17, 20-22, 41-42, with Def. Mot., Ex. 1 § 3; Def. Mot., Ex. 21 (SA Franks Affidavit) ¶¶ 6-8.) And through the February 2025 Letter, the Czech Republic knew that Gupta had been charged with money laundering conspiracy post-extradition. (See Feb. 2025 Letter.) Thus, the Czech Republic was well aware of Count Three and the alleged underlying conduct before it issued its guidance letter to the United States on July 7, 2025. See Levy, 947 F.2d at 1034.

Ultimately, the Extradition Treaty does not create any privately enforceable rights, either explicitly or implicitly, and the Czech Republic does not consider additional charges based on the same underlying facts to exceed the scope of extradition. As a result, Gupta has no basis to invoke the rule of specialty.

Gupta argues that even if he does not have standing to invoke the rule of specialty, the specialty protections provided by 18 U.S.C. § 3192 ("Section 3192") apply to him.

(<u>See</u> Def. Mem. at 33-34.) Gupta's position is unpersuasive. Section 3192 is the "congressional recognition of the principle that a person who has been extradited should not be tried for an offense which the foreign country would consider to be outside the limits of its act of extradition." <u>Fiocconi</u>, 462 F.2d at 482; <u>see</u> <u>also</u> 18 U.S.C. § 3192. But as explained above, the Czech Republic would not consider Count Three to exceed its grant of extradition because Count Three is based on the same alleged facts as the murder-for-hire counts. (<u>See</u> July 2025 Letter.) Thus, Section 3192 does not limit Gupta's prosecution on Count Three.

Finally, Gupta asks the Court to defer its ruling on Count Three until Gupta can further develop the record on this issue. (<u>See</u> Def. MTD Reply at 9.) Although the Court will deny Gupta's motion to dismiss Count Three without prejudice, the Court declines to defer its ruling because, as discussed above, there is ample evidence that the Czech Republic has not - and will not - object to Gupta's prosecution on Count Three. (<u>See</u> July 2025 Letter; Feb. 2025 Letter; Def. Mot., Ex. 21 (SA Franks Affidavit); Def. Mot., Ex. 1 § 3.)

Accordingly, Gupta's motion to dismiss Count Three of the S2 Indictment is **DENIED** based on Gupta's lack of standing to invoke the rule of specialty. However, the motion to

dismiss Count Three may be renewed in the unlikely event that the Czech Republic formally objects to Gupta's prosecution on Count Three. See United States v. Amirov, No. 22 Cr. 438, 2025 WL 660197, at *3 (S.D.N.Y. Feb. 28, 2025); United States v. Bankman-Fried, 680 F. Supp. 3d 289, 300 (S.D.N.Y. 2023).

### III. ORDER

For the reasons explained above, it is hereby

**ORDERED** that the motion (Dkt. No. 65) of defendant Nikhil Gupta to suppress certain statements and evidence and to dismiss Count Three of the Second Superseding Indictment pursuant to Federal Rule of Criminal Procedure 12(b) is **DENIED**. The Clerk of Court is respectfully directed to close Dkt. No. 65.


**SO ORDERED.**

Dated:     3 October 2025
           New York, New York

                                         _____
                                            Victor Marrero
                                               U.S.D.J.