UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

NIKHIL GUPTA,
     a/k/a "Nick,"

*Defendant*.

S2 23 Cr. 289 (VM)

## THE GOVERNMENT'S OPPOSITION TO DEFENDANT NIKHIL GUPTA'S MOTIONS *IN LIMINE*

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Alexander Li
Ashley C. Nicolas
Camille L. Fletcher
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT .......................................................................................... 1

ARGUMENT ....................................................................................................................... 1

I.    Evidence of Gupta's Solicitation of Other Murders, Narcotics and Weapons Trafficking, and Financial Crimes Is Admissible as Direct Evidence or Under Rule 404(b) ................................................... 1

    A.    Evidence of Gupta's Solicitation of Other Murders, and Narcotics and Weapons Trafficking, Is Admissible ....................................... 2

    B.    Evidence of Gupta's Other Financial Crimes Is Admissible ................................................................................................... 7

    C.    The Evidence Is Not Substantially More Prejudicial Than Probative .............................................................................................. 8

II.    Professor Kaul's Testimony Is Relevant and Admissible ............................................ 9

    A.    Professor Kaul's Opinions ............................................................................... 9

    B.    Applicable Law ............................................................................................... 10

    C.    Discussion ....................................................................................................... 11

III.    The Google Exhibits Are Authentic ......................................................................... 14

    A.    Applicable Law ............................................................................................... 15

    B.    Discussion ....................................................................................................... 17

IV.    The Nijjar Murder Video Is Not Unfairly Prejudicial ............................................. 25

CONCLUSION .................................................................................................................. 27

## **TABLE OF AUTHORITIES**

**Cases**

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). ............................................. 10

*Rogers v. United States*, 340 U.S. 367 (1951) ............................................................. 22

*United States v. Abdullah*, No. 20 Cr. 677 (AT), 2024 WL 4519860 (S.D.N.Y. Oct. 16, 2024) .......................................................................................... 19, 23, 24

*United States v. Abu Ghayth*, No. 98 Cr. 1023 (LAK), 2014 WL 978629 (S.D.N.Y. Feb. 28, 2014). .......................................................................... 11

*United States v. Amirov*, 2025 WL 660197 (S.D.N.Y. Feb. 28, 2025) ........................ 14

*United States v. Ayelotan*, 917 F.3d 394 (5th Cir. 2019) ............................................ 19

*United States v. Barber*, 937 F.3d 965 (7th Cir. 2019) ............................................... 25

*United States v. Brown*, No. 16 Cr. 559 (DLC), 2017 WL 2493140 (S.D.N.Y. June 9, 2017). .......................................................................................... 25

*United States v. Browne*, 834 F.3d 403 (3d Cir. 2016) ..................................... 20, 23, 24

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) ................................................. 2

*United States v. Carter*, No. 21 Cr. 681 (NSR), 2024 WL 268248 (S.D.N.Y. Jan. 24, 2024) ................................................................................................... 16

*United States v. El Gammal*, 831 F. App'x 539 (2d Cir. 2020). ................................. 17

*United States v. Ellis*, 461 F.2d 962 (2d Cir. 1972) ................................................... 22

*United States v. Encarnacion-Lafontaine*, 639 F. App'x 710 (2d Cir. 2016) ....................... 21, 24

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) ............................................. 10

*United States v. Gagliardi*, 506 F.3d 140 (2d Cir. 2007) ................................. 15, 17, 23

*United States v. Garg*, No. 21 Cr. 45 (JCC), 2024 WL 1050994 (W.D. Wash. Mar. 11, 2024) ................................................................................... 23, 24

*United States v. Gohari*, 227 F. Supp. 3d 313 (S.D.N.Y. 2017). ................................. 2

*United States v. Gonzalez*, 144 F.4th 396 (2d Cir. 2025) ........................................... 16

*United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014) ............................................. 19

*United States v. Hernandez*, No. 19 Cr. 97 (VM), 2020 WL 3257937 (S.D.N.Y. June 16, 2020) ........................................................................................ 24

*United States v. Hunt*, 534 F. Supp. 3d 233 (E.D.N.Y. 2021) ...................................... 23

*United States v. Ivanova*, 19 F. Supp. 3d 511 (S.D.N.Y. May 2, 2014) ........................ 8

*United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013). .................................................. 11

*United States v. Kidd*, No. 18 Cr. 872 (VM) (S.D.N.Y. July 8–9, 2019) (Doc. Nos. 70, 72) ........................................................................................................ 16

*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993). .................................................. 11

*United States v. Lombardozzi*, 491 F.3d 61 (2d Cir. 2007). ................................... 11, 13

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990) ........................... 16, 17, 20, 23

*United States v. Mundle*, No. 15 Cr. 315 (NSR), 2016 WL 1071035 (S.D.N.Y. Mar. 17, 2016) ...................................................................................................... 2

*United States v. Osborne*, 739 F. App'x 11 (2d Cir. 2018) ........................................ 25

*United States v. Perez*, 61 F.4th 623 (8th Cir. 2023) .................................................. 24

*United States v. Pluta*, 176 F.3d 43 (2d Cir. 1999) ..................................................... 17

*United States v. Quintana*, 763 F. App'x 422 (6th Cir. 2019) .................................... 25

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990). ................................... 8

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) ................................................ 25

*United States v. Spila*, 136 F.4th 1296 (11th Cir. 2025) ............................................ 18

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004) ........................................ 15

*United States v. Vayner*, 769 F.3d 125 (2d Cir. 2014) ..................................... 16, 17, 23

*United States v. Weber*, 574 F. Supp. 3d 791 (D. Mont. 2021) .................................. 23

*United States v. Weber*, No. 21 Cr. 28 (DLC), Doc. No. 124 (D. Mt. July 11, 2022) .......................................................................................................... 23

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007). ............................................ 10

**Rules**

Fed. R. Evid. 104 ........................................................................................................ 16

Fed. R. Evid. 901 .................................................................................................... 16

Fed. R. Evid. 902 ............................................................................................... 17, 18

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to defendant Nikhil Gupta's motions *in limine* to preclude: (1) evidence of Gupta's narcotics and weapons trafficking, financial crimes, and solicitations to murder individuals other than the Victim;[1] (2) expert testimony by Professor Nitasha Kaul; (3) evidence from the Google accounts onlybutt095@gmail.com and vikas0yadav@gmail.com (the "Google Accounts"); and (4) the Nijjar Murder Video. ("Def. MIL," Dkt. 108). For the following reasons, Gupta's motions should be denied.

## ARGUMENT

### I. Evidence of Gupta's Solicitation of Other Murders, Narcotics and Weapons Trafficking, and Financial Crimes Is Admissible as Direct Evidence or Under Rule 404(b)

In its motions *in limine*, the Government moved to admit evidence of Gupta's (i) solicitation of the murder of individuals other than the Victim and (ii) narcotics and weapons trafficking as direct evidence or, in the alternative, under Federal Rule of Evidence 404(b). (Gov't MIL at 25–34). The Government also moved to admit (iii) Gupta's participation in additional financial crimes under Rule 404(b). (*Id.* at 34–36). Gupta now moves to preclude the same evidence. (Def. MIL at 3–9). For the reasons set forth below and in the Government's motions, the Court should admit this evidence.

---

[1] Capitalized terms have the same meaning as in the Government's motions *in limine*, ("Gov't MIL," Dkt. 109), and the Government incorporates by reference the facts set forth therein, (*id.* at 1–8, 22–23, 25–27, 32, 34–35). Letter exhibits (*e.g.*, "Ex. A") are exhibits to the Government's motions, (Dkt. 109-1 to 109-25). Number exhibits (*e.g.*, "Ex. 1") are exhibits to Gupta's motions, (Dkt. 110-1 to 110-2).

**A.** **Evidence of Gupta's Solicitation of Other Murders, and Narcotics and Weapons Trafficking, Is Admissible**

The evidence of Gupta's participation in firearms and narcotics trafficking, as well as his participation in the planning of the murder of Hardeep Singh Nijjar and other Canadian targets, is "inextricably intertwined with the evidence regarding the charged conduct," *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000),[2] such that it cannot be excised without removing crucial context from events close in time to the charged conduct and, thus, is admissible as direct evidence of the charged crimes. *See United States v. Mundle*, No. 15 Cr. 315 (NSR), 2016 WL 1071035, at *3 (S.D.N.Y. Mar. 17, 2016) ("[C]ourts routinely admit evidence of this nature to give coherence to the basic sequence of events."). A few examples of this evidence are instructive. Below are: (1) part of a recorded call between Gupta and the UC on June 19, 2023; (2) part of a recorded call between Gupta and the CS on the same date; and (3) certain WhatsApp messages between Gupta and Yadav on June 22 and 26, 2023. These examples illustrate how evidence of Gupta's murder, firearms, and drug-related conduct is necessary to "complete the story of the crime on trial." *United States v. Gohari*, 227 F. Supp. 3d 313, 317 (S.D.N.Y. 2017).

*First*, shortly after Gupta sent the UC the Nijjar Murder Video on June 19, 2023, the UC and Gupta spoke. Here is a portion of their call:

| UC | Hello. |
|---|---|
| GUPTA | Hey, amigo, my friend, how are you? |
| UC | My, my friend, my friend. I saw the [Nijjar Murder Video]. You, you scare me. What's, what's that? I don't, I don't, I don't know who that is. |
| GUPTA | Uh, this is the one job, uh, in Canada. Canada. We have three job. So, one, somebody did. So, I was wondering if you did that, but we found who did that. |

---

[2] Unless otherwise specified, all case quotations omit internal quotation marks, citations, and prior alterations.

| UC | I wish I... I wish I could do that. But you don't send me the person. |
|---|---|
| GUPTA | No, no, no. That is different person. But this was also the target. But this was at the number four. Number three. No, not to worry. We have so many target. We have so many target. But the good news is this, good news is this now, no need to wait. As I told you that we have to wait a few days. |
| UC | Yes. |
| GUPTA | So, we got the go ahead. Any time — At earliest we can do that. We have no restrictions. |
| UC | I, yes, we sit the — Right, right now I am, I am in my house. I, every day somebody stay with him. Every day. Follow him. Uh... |
| GUPTA | Wonderful. Wonderful. |
| UC | No, no, no sleep until the, until the job is done. Uh, 1, 1, 1 person go, I go home and like that, you see? So, everybody, uh, every day, all the 24/7 with him, you know, like — |
| GUPTA | Wonderful, wonderful, my brother. |
| UC | Yes. |
| GUPTA | Wonderful, wonderful. And, uh, but now, no need to wait. When you get the chance, opportunity, hit the target. |

Later in the same conversation, Gupta urged the UC to finish the "job" and promised the UC so much work that Gupta joked the UC would beg for a break. Gupta also promised that after the UC killed the Victim, Gupta would visit the UC in the United States and bring a "nice present." The call, which lasted approximately three minutes, thus addressed: (i) plans to kill the Victim; (ii) the Nijjar Murder Video and Nijjar's murder; (iii) additional contemplated Canadian targets; and (iv) the prospect of a continuing criminal relationship between the UC and Gupta that would include the UC's compensation with a "nice present" in the United States. This call also evidences Gupta's intent to murder the Victim, and Gupta's knowledge that his discussions with his co-conspirators and the UC were about murdering the Victim.

*Second*, the same day, Gupta spoke with the CS about the Nijjar Murder Video. A portion of their call is below:

| GUPTA | Yeah. Yeah. This is, this is the, uh, guy, uh, I sent you the video. |
|-------|-------|
| CS | Ok. |
| GUPTA | Not the [UC] because we didn't give to [the UC] this, uh, job. So some other guy did this job. |
| CS | Oh, right. |
| GUPTA | In, uh, in Canada. Yeah, in Canada. But we have many job. We have four or five, uh, job. And, uh, now, no problem. We got the go ahead. Good to go. Anytime. Even today, tomorrow, as early as possible. Uh, [the UC] has to finish this job brother. |

The call continued:

| GUPTA | Just tell him, tell him to finish this, finish this quickly. |
|-------|-------|
| CS | Yeah. Yeah. I do. |
| GUPTA | See [the UC] will get his money. You will, you will meet this [UI] guys, you will get the toys. Your friends will be happy. They will, uh, as I told you that your, your production, your production also will not be any problem.[3] |
| CS | Right. |
| GUPTA | I give you the [UI], fucking don't worry about the clearance and the custom anything, brother. They are really big. They're really huge, very big. |
| CS | Oh, okay. |
| GUPTA | Your, your, your plane will come. They will give your production. Same plane will put the toys and you will take. |
| CS | Oh, okay. Sound good? Sound good, my friend. |
| GUPTA | Yeah. But everything depends upon this first job trial. This is trial. They're, they're checking us. They're testing us. That how strong we are. |

---

[3] The CS is expected to testify that "toys" referred to weapons and "production" referred to narcotics.

On the same call, Gupta and the CS discussed meeting in person:

| GUPTA | But Czech, Czech is right now good. Right now. Czech is good because, uh, time is very, uh, less. |
| CS | Oh, okay. My friend. Yeah. But the, the problem is because — |
| GUPTA | Because we have four, four job to done. Four job for [the UC] to take care. This is the only first job. And this four job we have to finish in this month. |
| CS | Mm-hmm. Yep. |
| GUPTA | The 29th. 30th. We have to finish, uh, more three job after this. |
| CS | Oh, okay. All right. Yeah. But, uh, yeah, my production will be the next week in, in, over there. |
| GUPTA | No problem. No problem. |
| CS | In Czech Republic. And I need to be there. And for, for do the, for the talk with the customer. The people over there, man. |
| GUPTA | Ok. Ok. No problem. |
| CS | Yeah. I need your help with that. I don't know. How much do you need over there for my production? |
| GUPTA | Okay. |
| CS | And I need, be sure, but, uh, you will have news for me about the toys, my friend. |
| GUPTA | Toys. Don't worry. Toys. Don't worry. Don't think anything about the toys. |
| CS | Mm-hmm. |
| GUPTA | You will have the toys. Yes. |

After a short back and forth, Gupta told the CS that he (Gupta) would handle the logistics for the firearms shipment: "I will load your toys, no problem. No checking, nothing. Your plane will come. We will put all the toys, what you want in your airplane." This call, which lasted approximately fifteen minutes, thus addressed: (i) plans to kill the Victim; (ii) the Nijjar Murder Video and Nijjar's murder; (iii) additional contemplated Canadian targets; and (iv) meeting in the

Czech Republic to discuss gun and drug trafficking, contingent on the completion of the Victim's murder.

*Third*, on June 22, 2023 — three days after Gupta's foregoing calls with the UC and CS — Gupta discussed the weapons with Yadav over WhatsApp.  Yadav promised to supply Gupta with firearms, such as assault rifles and pistols, and to arrange for the clearance of an airplane to transport the weapons from India.  Yadav told Gupta, however, that Yadav's assistance would depend on how well the "task at hand" was executed, meaning the Victim's murder.  A few days later, on June 26, 2023, Gupta asked Yadav on WhatsApp to check on the "toys" (meaning weapons).  Yadav again reiterated that he would be able to obtain the weapons for Gupta once the "work" (meaning the Victim's murder) was completed.  This conversation closes the loop:  Yadav told Gupta that Gupta would have airplane clearance and "toys" as soon as Gupta had the Victim murdered — just as Gupta told the CS that Gupta would provide the CS with firearms and airplane clearance as soon as the UC completed the murder.

Simply put, there is no separation between the charged crimes and Gupta's contemporaneous discussions about other murders[4] and narcotics and weapons trafficking.  It is intertwined as part of ongoing criminal activity between Gupta, Yadav, the UC, and the CS.  Gupta made this point himself when he told the CS that his ability to facilitate firearms and narcotics deals "depends upon this first job trial" — the Victim's murder — which, as Gupta explained to the UC and the CS, would be the first of many "jobs."  Yadav did the same when he told Gupta that Gupta would not receive the "toys" until the "task at hand" was complete.  Indeed, as shown

---

[4] Like Gupta's targeting of Nijjar, Gupta's targeting of the individual in Nepal or Pakistan is interwoven in his communications with Yadav and admissible as direct evidence.  (Gov't MIL at 27–29).  The facts of the Nepal/Pakistan plot are also so strikingly similar to the plot to murder the Victim as to constitute a *modus operandi* under Rule 404(b).  (Gov't MIL at 30).

in the above excerpts, the communications are so intertwined that there would be no practical way to isolate communications about the murder of the Victim without removing admissible evidence, omitting necessary context, and introducing confusion.

For the same reasons that this evidence is admissible as direct evidence, this evidence is also admissible under Rule 404(b) as evidence of Gupta's intent, motive, planning, preparation, and lack of accident.

*       *       *

In addition to evidence contemporaneous with the charged crimes, like the communications described above, the Government expects that early in the CS's testimony, the CS will testify that the CS knew Gupta as a drug and gun trafficker with whom the CS had previously negotiated gun and drug deals (which were not completed). The CS is expected to testify that the CS had represented himself to Gupta as a drug dealer with business in, among other places, the United States. Significantly, the CS will testify that in June 2017, Gupta met with the CS in Manhattan (the "Manhattan Meeting") to discuss a drug deal (and, as discussed below, financial crimes). This testimony about Gupta's prior drug and firearms dealings with the CS — which the Government expects to be brief — is necessary to explain why Gupta contacted the CS for assistance in carrying out a murder in New York. The answer is simple: the CS and Gupta had a pre-existing relationship that grew out of Gupta's efforts to commit crimes (including those with ties to New York), establishing a relationship of trust such that Gupta believed he could rely on the CS to carry out serious crimes in New York. This evidence is also admissible under Rule 404(b) as evidence of Gupta's opportunity, intent, preparation, and lack of accident.

### B.       Evidence of Gupta's Other Financial Crimes Is Admissible

As discussed in the Government's motions *in limine*, the CS is expected to testify that in or about 2017 — including at the Manhattan Meeting — Gupta invited the CS to participate in

Gupta's ongoing international money laundering. (Gov't MIL at 34–35). Gupta argues this evidence bears "no resemblance to the crimes on trial," (Def. MIL at 8), but that ignores the money laundering conspiracy with which Gupta is charged. While in India, Gupta arranged for the international transfer of $15,000 to the UC as a partial payment for the Victim's murder. Evidence that Gupta, by his own admission, had previously engaged in large international money movements is admissible for the non-propensity purpose of showing Gupta's opportunity, intent, and lack of mistake when he arranged the money transfer in this case, and to explain why Gupta trusted the CS enough to send $15,000 before the murder was complete. *See United States v. Ivanova*, 19 F. Supp. 3d 511, 517 (S.D.N.Y. May 2, 2014) (Marrero, J.) (proof of defendant's own fraudulent marriage was admissible under Rule 404(b) to show her knowledge of how to submit the necessary fraudulent paperwork for others in a marriage fraud case).

### C.     The Evidence Is Not Substantially More Prejudicial Than Probative

None of this evidence is substantially more prejudicial than probative. As discussed in greater detail below in the context of the Nijjar Murder Video, (*see infra* Point IV), there is nothing "unfairly" prejudicial about presenting evidence of Gupta's solicitation of other murders, or his narcotics and weapons trafficking, when it was Gupta himself who linked those activities to the charged crimes. It was Gupta who circulated the Nijjar Murder Video to the UC and CS; Gupta who told the UC that Nijjar was "number three" or "number four" on the list; and Gupta who told the CS that their ongoing weapons and narcotics deal was contingent on the "first job trial" — *i.e.*, the Victim's murder. Nor would it be unfairly prejudicial to present evidence of Gupta's prior financial crimes, which certainly are not "more sensational" or "more disturbing" than the charged crimes. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Indeed, the CS's testimony about Gupta's prior financial crimes will likely be overshadowed even by the recorded

evidence of Gupta's money laundering in this case, which include a video call with Gupta during the $15,000 payment to the UC.

## II.     Professor Kaul's Testimony Is Relevant and Admissible

Gupta seeks to preclude the expert testimony of Professor Kaul, a professor of Politics, International Relations, and Critical Interdisciplinary Studies, and the director of the Center for the Study of Democracy at the University of Westminster's School of Social Sciences in London, United Kingdom.  (Def. MIL at 10–15).  The Government intends to call Professor Kaul to testify about the GOI's public condemnation of the Victim, Nijjar, and the Sikh separatist organization they led (the "Group"), and about the structure, methods, and mission of the GOI's foreign intelligence service, RAW.  This testimony is highly probative of *why* Yadav enlisted Gupta to murder the Victim, and it provides important and helpful context for the jury in understanding the evidence in the case.  Because this probative value is not substantially outweighed by any unfair prejudice, Gupta's motion to preclude Professor Kaul's testimony should be denied.

### A.     Professor Kaul's Opinions

As described in greater detail in the Government's expert notice, (Ex. 1), Professor Kaul will offer two principal opinions.

First, Professor Kaul will testify that the Group, and its leaders Nijjar and the Victim, "have been publicly condemned by the [GOI] for their Sikh separatist activities."  (Ex. 1 at 1).  Professor Kaul will explain the relationship of the Victim and Nijjar to the Group, some of the Group's Sikh separatist activities, and GOI's response to those activities, which included (a) banning the Group for "engaging in anti-India conduct, including promoting secessionism, inciting violence, and threatening the sovereignty and territorial integrity of India," and (b) naming 20 Sikhs around the world, including the Victim and Nijjar, to a list that was publicized by Indian media as a list of

"enemies of the state." (*Id.*). Put simply, Professor Kaul will testify that the GOI views the Group and its members as an "existential threat." (*Id.*).

Second, Professor Kaul will testify that RAW "is an Indian intelligence agency whose mission includes, among other things, the suppression of Sikh separatists." (*Id.* at 2). Professor Kaul will describe aspects of RAW's organizational structure (including that it is a part of the GOI's Cabinet Secretariat and headquartered at the CGO Complex in New Delhi, India), mission (including the suppression of Sikh separatists), and methods (including its use of criminal proxies to conduct operations in neighboring countries like Nepal and Pakistan, and more recently, in Western countries). (*Id.*).

### B.    Applicable Law

Federal Rule of Evidence 702 provides that a witness "who is qualified as an expert" may offer an opinion if "the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is based on reliable facts and methods that the expert has reliably applied to the case. District courts play a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). Expert evidence, like all evidence, must also satisfy Rule 401's requirement of relevance and Rule 403's balancing test.

The Second Circuit has routinely "approved the use of expert testimony to provide juries with background on criminal organizations." *United States v. Farhane*, 634 F.3d 127, 159 (2d Cir. 2011). Expert testimony is admissible, for example, to "help explain the operation, structure, membership, and terminology of organized crime families." *United States v. Locascio*, 6 F.3d

924, 936 (2d Cir. 1993).  This evidence can help the jury understand "the particular roles played by organized crime family members, thereby giving the jury insight that it might not otherwise have."  *United States v. Lombardozzi*, 491 F.3d 61, 78 (2d Cir. 2007).  It can be "probative of the intent element of the charged conspiracies" by helping the jury consider whether the defendant "intended to obtain support from [a criminal organization], and/or identified with [its] goals."  *United States v. Kadir*, 718 F.3d 115, 122 (2d Cir. 2013).  And it can help the jury "understand[] the nature of the conspiracy that the defendant allegedly joined, the identity of the conspiracy's other participants, and the extent, if any, to which the defendant's words and actions" furthered the conspiracy's goals.  *United States v. Abu Ghayth*, No. 98 Cr. 1023 (LAK), 2014 WL 978629, at *1 (S.D.N.Y. Feb. 28, 2014).

### C.    Discussion

Gupta argues that Professor Kaul's testimony should be precluded because it is not relevant and is unfairly prejudicial.[5]  (Def. MIL at 11–15).  Gupta is wrong.

#### 1.    Professor Kaul's Testimony Is Relevant

Professor Kaul's testimony is relevant for at least three reasons.

*First*, Professor Kaul's testimony will help the jury understand why Yadav enlisted Gupta to kill the Victim.  Yadav worked for the GOI, and the GOI had condemned the Victim for his Sikh separatist activities, including by specifically naming the Victim (and Nijjar) on a list publicized by Indian media as a list of "enemies of the state."  That explains why Yadav targeted the Victim.  Gupta suggests that Yadav's motive is irrelevant because Gupta's own alleged motive

---

[5] Gupta also suggests that Professor Kaul may serve as a "conduit" for hearsay evidence from two Google accounts.  (Def. MIL at 12).  This concern is unfounded.  First, as explained in the Government's motions *in limine*, the Google exhibits at issue are either not hearsay or fall under an exception to hearsay.  (Gov't MIL at 5–18).  Second, the Government will not ask Professor Kaul about anything the Court deems inadmissible.

was to secure dismissal of his criminal case. (Def. MIL at 11). As an initial matter, a person can have multiple motives, and there is evidence that Gupta understood and supported Yadav's goals. For example, after receiving the Nijjar Murder Video from Yadav, Gupta messaged Yadav, "Only the disappointment that not by me." Yadav responded, "Same here, bhai ji," and Gupta replied, "Please support me and let me go to the field." This exchange suggests that Gupta and Yadav shared a common understanding of why they were targeting Nijjar — so much so that Gupta was "disappoint[ed]" that he had not killed Nijjar himself. Regardless, even if Gupta and Yadav had different reasons for participating in the murder-for-hire plot, that does not make Yadav's motive irrelevant. To find Gupta guilty of conspiracy to commit murder-for-hire, the jury must find that at least *two* people entered into that agreement. Yadav's motive to kill the Victim makes it more probable that Yadav was one of them.

*Second*, Professor Kaul's testimony will help the jury understand Gupta's words and actions in the case. For example, after sending the Nijjar Murder Video to the CS, Gupta told the CS that the Victim would "be more cautious, because in Canada, his colleague is down."[6] Professor Kaul's testimony helps the jury understand why Gupta referred to Nijjar as the Victim's "colleague" (because they were both leaders of the Group) and why Gupta expected the Victim to become more "cautious" after Nijjar's death (because the Victim and Nijjar had both been publicly condemned by the GOI). Professor Kaul's testimony similarly helps the jury understand why Gupta instructed that the UC should not kill the Victim around the time of the Indian Prime Minister's visit to the United States (because that timing might provoke protests or cast the GOI

---

[6] In its motions *in limine*, the Government inadvertently indicated that Gupta made this statement to the UC (rather than to the CS). (Gov't MIL at 26). The Indictment is correct. (Indictment ¶ 30).

in a negative light). Without Professor Kaul's testimony, the jury will be left to speculate about why Gupta and his co-conspirators would care about the Indian Prime Minister's visit.

*Third*, Professor Kaul's testimony will help the jury understand Yadav's role within the GOI and in the charged crimes. The Government has moved to admit circumstantial evidence of Yadav's affiliation with the GOI, including tax records bearing Yadav's name and the employer "Cabinet Sectriate [sic]" at the "CGO Complex." (Gov't MIL at 6–8). Understanding that RAW is India's foreign intelligence service, that RAW is a component of the Cabinet Secretariat, and that RAW is headquartered at the CGO Complex, will enable the jury to infer that Yadav worked for RAW. Similarly, understanding that RAW's mission includes the suppression of Sikh separatists and that RAW's methods include the use of criminal proxies to conduct operations will help the jury appreciate why Yadav targeted the Victim through Gupta. Without Professor Kaul to "help explain the operation, structure, membership, and terminology" of RAW and Yadav's "role in the crimes charged," *Lombardozzi*, 491 F.3d at 78, the jury will not understand what it means for Yadav to serve in the "Cabinet Secretariat" or at the "CGO Complex," or why Yadav would enlist Gupta to try to murder the Victim overseas.

### 2. Professor Kaul Testimony Is Not Substantially More Prejudicial Than Probative

There is no unfair prejudice from Professor Kaul's testimony, which is tightly bound to the facts of this case. Gupta argues that Professor Kaul's testimony will "air inflammatory political disputes related to sovereignty and secession," (Def. MIL at 14), but Professor Kaul's testimony is not about the merits of "political disputes" or "secession" generally. It is about the GOI's interest in the Victim, Nijjar, and the Group specifically — the targets of the murder-for-hire plot. Similarly, Gupta's concern that Professor Kaul's testimony will inflame the jury by focusing on "ethnoreligious" tensions, (*id.*), is misplaced. While Professor Kaul's testimony will include a

modicum of historical background about the Sikh separatist movement to explain why the GOI views the Group as an "existential threat," (Ex. 1 at 1), this portion of Professor Kaul's direct examination will be limited to the minimum needed to explain her opinions.

Contrary to Gupta's argument, (Def. MIL at 15), Judge McMahon's decision in *United States v. Amirov*, 2025 WL 660197 (S.D.N.Y. Feb. 28, 2025), does not support exclusion of Professor Kaul's testimony. In *Amirov*, Judge McMahon *permitted* the Government's expert to testify, "in the most general terms, about the fact that (1) for the past forty-five years, the [Government of Iran] has pursued opponents of the regime and its policies, both inside and outside of Iran; (2) [Government of Iran] agencies, including specifically the IRGC (an entity likely unknown to the average lay juror), are involved in these efforts, which are designed to silence dissent against the regime and its policies, including, *inter alia*, dissent over Iran's treatment of women; and (3) the regime has on occasion used tactics ranging from media smear campaigns to kidnapping and rendition to execution in order to silence those it views as enemies of the regime." *Id.* at *6. This testimony is analogous to Professor Kaul's proposed testimony about the GOI's targeting of Sikh dissidents abroad, particularly through RAW, and using criminal proxies as a method. Though Judge McMahon precluded the expert in *Amirov* from testifying about the Government of Iran's prior efforts to capture or kill the victim in that case, the Government intended to call the victim herself to testify about those prior plots, resulting in "a significant danger of [the expert] unnecessarily lending credibility to a key Government fact witness." *Id.* The Government does not intend to call the Victim as a witness in this trial, and so there is no danger of improper bolstering or cumulative testimony.

## III. The Google Exhibits Are Authentic

As set forth in the Government's motions *in limine*, the Government will offer at trial subscriber records and limited email content from the Google Accounts. Specifically, the

Government seeks to offer five exhibits from the Google account onlybutt095@gmail.com, (Exs. B–F), and seven exhibits from the Google account vikas0yadav@gmail.com, (Exs. G–M) (collectively, the "Google Exhibits"). Gupta argues that there is insufficient evidence to authenticate the ownership and contents of the Google Accounts because the certification of a Google records custodian (or equivalent trial testimony) cannot establish that Yadav was the owner of the Google Accounts. (Def. MIL at 15–22). But as Gupta concedes, the Google certification, (Ex. A), *can* (and does) establish that the Google Exhibits were "stored and saved on the Google platform." (Def. MIL at 17). Further digital forensic evidence, described below, shows that the owner of the Google Accounts was Gupta's co-conspirator "Amanat." Because sufficient evidence supports a finding that the Google Exhibits are what the Government claims them to be — *i.e.*, subscriber records and emails attributable to "Amanat" — they are authentic under Federal Rules of Evidence 901, 902(11), and 902(13).[7] The rest of Gupta's argument goes to the weight of the Google Exhibits, not their admissibility, and he is free to make his arguments to the jury.

### A.     Applicable Law

Rule 901(a) provides that to authenticate an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." "The bar for authentication of evidence is not particularly high," and "the standard for authentication is one of 'reasonable likelihood' and is 'minimal.'" *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004)). "Rule 901's requirements are satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity." *Tin Yat Chin*, 371 F.3d at 38. "The ultimate determination as to

---

[7] Gupta also argues that the Google Exhibits contain inadmissible hearsay. (Def. MIL at 20–22). The Government addressed hearsay in its motions *in limine* and incorporates that analysis here. (Gov't MIL at 5–18).

whether the evidence is, in fact, what its proponent claims is thereafter a matter for the jury." *United States v. Vayner*, 769 F.3d 125, 130 (2d Cir. 2014).

Proof of authentication "may be direct or circumstantial," and may include evidence "that would not necessarily be admissible at trial." *United States v. Maldonado-Rivera*, 922 F.2d 934, 957 (2d Cir. 1990) (citing Fed. R. Evid. 104(a)). "Indeed, a document may be authenticated by distinctive characteristics of the document itself, such as its 'appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.'" *United States v. Gonzalez*, 144 F.4th 396, 406 (2d Cir. 2025) (quoting Fed. R. Evid. 901(b)(4)).

Rule 902 provides that certain evidence is "self-authenticating," meaning it "require[s] no extrinsic evidence of authenticity in order to be admitted." As relevant here, Rule 902(11) provides that records satisfying "the requirements of Rule 803(6)(A)–(C)," the business-records exception to the hearsay rule, as shown by "a certification of the custodian or another qualified person," are self-authenticating. *See, e.g.*, *United States v. Carter*, No. 21 Cr. 681 (NSR), 2024 WL 268248, at *3–4 (S.D.N.Y. Jan. 24, 2024) (authenticating Apple subscriber records and Facebook communications, posts, and subscriber records under Rule 902(11)). In addition, Rule 902(13) provides that records "generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11)," are also self-authenticating. *See, e.g.*, *United States v. Kidd*, No. 18 Cr. 872 (VM) (S.D.N.Y. July 8–9, 2019) (Doc. Nos. 70 at 26, 72 at 78) (authenticating Google and Pinger records pursuant to Rule 902(13)). "A document which is of a type that could be self-authenticating but which does not meet all the requirements of Rule 902 may nonetheless be

authenticated by any means appropriate under Rule 901." *United States v. Pluta*, 176 F.3d 43, 49–50 (2d Cir. 1999).

"Authentication is essentially a question of conditional relevancy." *United States v. El Gammal*, 831 F. App'x 539, 542 (2d Cir. 2020). Accordingly, when the proponent of an Internet webpage asserts that it is relevant because it was authored by a particular person, the proponent must offer a sufficient basis for "a reasonable juror [to] conclude that the page in question was not just any Internet page, but in fact [the person's]." *Vayner*, 769 F.3d at 133. "[T]he prosecution need only provide a rational basis from which the jury could infer that the document did, in fact, belong to [the asserted person]." *Maldonado-Rivera*, 922 F.2d at 957; *see also Vayner*, 769 F.3d at 133 ("[T]he type and quantum of evidence necessary to authenticate a web page will always depend on context.").

### B.      Discussion

The Government will offer the Google Exhibits as subscriber records and emails attributable to Gupta's co-conspirator "Amanat." To establish that the Google Exhibits are authentic Google records, the Government relies on the Google custodial certification, (Ex. A), which establishes that the Google Exhibits were (1) made and kept in the regular course of business and (2) generated by Google's electronic process or system that produces an accurate result. *See* Fed. R. Evid. 902(11), (13). To establish that the Google Exhibits are attributable to "Amanat," the Government relies on the below-described evidence linking the Google Accounts to "Amanat," including the Google user's possession of the same phone number, codename, and true name used by "Amanat" in his extensive WhatsApp messages with Gupta. *See* Fed. R. Evid. 901. Taken together, this evidence easily clears the "minimal" bar of authentication. *Gagliardi*, 506 F.3d at 151.

### 1. The Google Certification Establishes That the Google Exhibits Are Authentic Google Records

The Google custodial certification, (Ex. A), tracks the language of Rule 902(11) and (13). It certifies that the search warrant return for the Google Accounts — from which the Google Exhibits are drawn — "is a record made and retained by Google" and that "Google servers record this data automatically at the time, or reasonably soon after, it is entered or transmitted by the user, and this data is kept in the course of this regularly conducted activity and was made by regularly conducted activity as a regular practice of Google." (Ex. A at 3); *see* Fed. R. Evid. 902(11). The certification further states that the search warrant return "is a true duplicate of original records that were generated by Google's electronic process or system that produces an accurate result" and that "[t]he accuracy of Google's electronic process and system is regularly verified by Google." (Ex. A at 3); *see* Fed. R. Evid. 902(13). The certification thus establishes that the Google Exhibits are authentic records of Google.

Put concretely in the context of trial: The Google custodial certification establishes that the subscriber records for the Google Accounts, (Exs. B, G), contain information that was in fact recorded by Google, such as the IP addresses from which the subscriber accessed the account, and the names and phone numbers provided by the subscriber. The Google certification further establishes that the emails contained within the Google Accounts, (Exs. C–F, H–M), were in fact transmitted to and from the email addresses, on the dates and times, and containing the text and attachments recorded by Google. The Google certification thus authenticates the Google Exhibits in the sense permitted by Rules 902(11) and (13) — as authentic records of Google. *See United States v. Spila*, 136 F.4th 1296, 1308 (11th Cir. 2025) ("As the Fifth Circuit has explained, self-authenticating documents contain two 'statements' for admissibility purposes: the first is the 'email provider's statement that one user wrote and sent a message to another user at the recorded

time'; the second is the content of the emails. The self-authentication provision does not absolve the proponent of the email *content* from the burden to prove that the statements it contains are admissible. It instead relieves them of the burden to lay the foundation supporting the authenticity of the record." (quoting *United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019)); *see also United States v. Hassan*, 742 F.3d 104, 133–34 (4th Cir. 2014) (affirming authentication of Google and Facebook records under Rule 902(11)).

Gupta does not seem to dispute that the Google custodial certification establishes that the Google Exhibits are authentic records of Google. Gupta suggests, in passing, that the certification does not prove that certain attachments to the emails, such as photographs of Yadav's person and tax records (*e.g.*, Exs. D–F, H–J, L–M), were "unaltered" or "legitimate." (Def. MIL at 20). It is not clear what Gupta means by this, but if the thought is that the photographs might have been manipulated, the Google certification *does* address that concern. Because the emails at issue were recorded by Google "automatically at the time, or reasonably soon after, [they were] entered or transmitted by the user," and because the emails are "true duplicate[s] of original records that were generated by Google's electronic process or system," the Google certification establishes that the emails — and their attachments — have not been altered since they were originally sent or received. (Ex. A). Indeed, Gupta quotes *United States v. Abdullah*, for the principle that "Google and Meta certifications could be used to establish that the 'records [were] indeed Google and Meta records of accounts, communications, location data, etc., *that were not subject to manipulation or inadvertent distortion*.'" (Def. MIL at 18 (emphasis added) (quoting *Abdullah*, No. 20 Cr. 677 (AT), 2024 WL 4519860, at *2 (S.D.N.Y. Oct. 16, 2024)). At a minimum, the Google certification provides a sufficient basis under Rule 901 to find that the Google Exhibits were not manipulated after they were recorded by Google. *See United States v. Browne*, 834 F.3d 403, 411 (3d Cir.

2016) (suggesting that "the timestamps on the Facebook chats" and "the fact that the chats took place between particular Facebook accounts" could be authenticated through certification). Gupta is free to present any admissible contrary evidence or argument to the jury.

### 2. Additional Evidence Establishes that the Google Exhibits Are Attributable to "Amanat" and Yadav

Because the Government will offer the Google Exhibits as Google records attributable to Gupta's co-conspirator "Amanat," the Government must provide a "rational basis" for that attribution. *Maldonado-Rivera*, 922 F.2d at 957. There is ample basis. As described in greater detail in the Government's motions *in limine*, Gupta's cellphone contains extensive WhatsApp messages between Gupta and someone saved on Gupta's phone as "Amanat," in which the two planned the murder of the Victim. (Gov't MIL at 4.) In his WhatsApp messages to Gupta, "Amanat" wrote: "This is Vikas... Save my name as Aman." Gupta saved the Amanat Phone Number on his phone under the name "Amanat." Each of these three pieces of identifying information — the Amanat Phone Number, the codename "Amanat," and the true name "Vikas" — ties to the Google Accounts:

- **The Amanat Phone Number**: The user of onlybutt095@gmail.com provided Google with the Amanat Phone Number as his recovery phone number.[8] (Ex. B).

- **The Amanat Codename**: The user of onlybutt095@gmail.com sent an email on March 14, 2023 — mere weeks before Gupta and "Amanat" began messaging on WhatsApp on May 6, 2023 — with the subject line "Photo from Amanat." (Ex. C).

- **Yadav's True Name**: On August 2, 2022, the user of onlybutt095@gmail.com emailed tax records to the Accountant and, in the email, identified himself as "Vikash

---

[8] The Government expects that a Google witness will testify that in December 2021, and again in December 2022, Google verified this recovery phone number by requiring it to transmit a passcode supplied by Google to a phone number provided by Google. In July 2023 — after Gupta's June 30, 2023 arrest in this case — Google attempted to verify the Amanat Phone Number as the recovery phone number for onlybutt095@gmail.com for a third time, but that verification request expired without confirmation. This shows that the user of onlybutt095@gmail.com not only knew the Amanat Phone Number, but also actively used it — until after Gupta's arrest.

yadav" with the email address vikas0yadav@gmail.com, (Ex. D); on August 26, 2022, the Accountant emailed completed tax returns for "Vikash Yadav" to onlybutt095@gmail.com and vikas0yadav@gmail.com, (Ex. E) — *i.e.*, both Google Accounts. Similarly, on July 13, 2023, the user of onlybutt095@gmail.com emailed tax records to the Accountant, (Ex. F), and on July 25, 2023, the Accountant emailed completed tax returns for "Vikash Yadav" to vikas0yadav@gmail.com, (Ex. M). Other evidence in vikas0yadav@gmail.com, including subscriber records, IDs, and photographs of a man in military uniform with the nameplate "Vikas Yadav," show that the user of vikas0yadav@gmail.com used the names "Vikas Yadav" and "Vikash Yadav." (Exs. G–J, L).

- **Common IP Addresses**: In addition to the tax-related emails tying onlybutt095@gmail.com and vikas0yadav@gmail.com, both accounts were accessed using the IP addresses 103.92.41.180 and 103.92.41.28. (Exs. B, G).

The evidence thus shows that the user of onlybutt095@gmail.com used the same phone number (the Amanat Phone Number), codename ("Amanat"), and true name ("Vikas") as the co-conspirator who communicated with Gupta on WhatsApp. The evidence also shows that the same person used both onlybutt095@gmail.com and vikas0yadav@gmail.com. This is precisely the kind of attribution evidence that the Second Circuit has upheld as sufficient to authenticate the authorship of an online account under Rule 901. *See United States v. Encarnacion-Lafontaine*, 639 F. App'x 710, 713 (2d Cir. 2016) (Facebook messages properly authenticated as messages by the defendant where (1) IP addresses used to send the messages were linked to computers near defendant's apartment, (2) patterns of access to the Facebook accounts indicated control by the same person, (3) Facebook accounts were used to contact other individuals connected to the defendant, (4) the defendant had a motive to make the threats at issue, and (5) a limited number of people, including the defendant, had information contained in the messages).

Gupta argues that the relevance of the Google Exhibits "hinges on the government's contention that the Google Accounts purportedly *belonged* to Mr. Yadav." (Def. MIL at 17). That is not quite right. The Google Exhibits are relevant, in the first instance, because they are attributable to the "Amanat" who worked with Gupta to plan the murder-for-hire plot. To prove

each of the two conspiracy counts, the Government must establish that at least two conspirators entered into an agreement. The Government does not need to prove, however, the identity of the co-conspirators. *Rogers v. United States*, 340 U.S. 367, 375 (1951) ("[T]he identity of the other members of the conspiracy is not needed, inasmuch as one person can be convicted of conspiring with persons whose names are unknown."). The Google Exhibits make it more probable that there was a co-conspirator to the charged offenses, and are therefore relevant regardless of the true identity of that co-conspirator.

To be sure, the Government will argue at trial that the Google Exhibits contain substantial circumstantial evidence that "Amanat" was in fact Yadav, and that Yadav was a GOI employee. This, in turn, is relevant to establish Yadav's motive and intent in enlisting Gupta to orchestrate the Victim's murder, and to explain why Gupta and Yadav took certain actions in this case, such as their transmittal of the Nijjar Murder Video and Gupta's instruction that the UC should not kill the Victim around the time of the Indian Prime Minister's visit to the United States. Though not exactly an issue of authentication — because the Government is offering the Google Exhibits, in the first instance, as Google records attributable to "Amanat" — there is certainly sufficient evidence for a juror to infer that the Google Accounts "*belonged* to Mr. Yadav," (Def. MIL at 17). Just as a co-conspirator's driver's license, found inside a vehicle seen at a bank robbery, was powerful "circumstantial evidence" that the co-conspirator "was the owner of the address book and the coat in which the . . . the license were found," *United States v. Ellis*, 461 F.2d 962, 970 (2d Cir. 1972), so too are Yadav's IDs, tax records, and photographs, found inside email accounts tied to the "Amanat" alias and phone number used in the charged crimes here, powerful circumstantial proof that Yadav is "Amanat." Gupta is free to challenge these inferences before the jury, (*see*

Def. MIL at 20), but there can be no serious dispute that there is a "rational basis," *Maldonado-Rivera*, 922 F.2d at 957, for the jury to infer that the Google Accounts belonged to Yadav.

In the end, whether the Government must authenticate the Google Exhibits as records of "Amanat" or of Yadav, the evidence here clears the "minimal" bar of authentication. *Gagliardi*, 506 F.3d at 151. Gupta principally cites cases in which the courts held that the certification or testimony of a records custodian, standing alone, cannot establish the authorship of an online account.[9] (Def. MIL at 16–18); *see Browne*, 834 F.3d at 410 (custodial certification insufficient because the custodian could "attest[] only that the communications took place as alleged between the named Facebook accounts," and not that the defendant "authored the Facebook messages at issue"); *United States v. Hunt*, 534 F. Supp. 3d 233, 253–58 (E.D.N.Y. 2021) (similar); *Abdullah*, 2024 WL 4519860, at *1–3 (similar); *United States v. Garg*, No. 21 Cr. 45 (JCC), 2024 WL 1050994, at *3 (W.D. Wash. Mar. 11, 2024) (similar); *cf. Vayner*, 769 F.3d at 132 (social media profile could not be authenticated as the defendant's profile on the sole basis that his name and photograph were published on the webpage). None of these cases suggests that a custodial certification is *irrelevant* to authenticating evidence from an online account. Indeed, each of these cases (other than *Vayner*, in which no custodial certification or testimony was offered) recognizes that a custodial certification may help establish authenticity under Rule 901. *See, e.g.*, *Hunt*, 534 F. Supp. 3d at 255 (although "the Government may not rely *solely* on certifications to authenticate

---

[9] Gupta also cites an out-of-circuit district court case, *United States v. Weber*, 574 F. Supp. 3d 791, 794–95 (D. Mont. 2021), in which the court held that the contents of certain online accounts could not be authenticated solely using certifications under Rules 902(11) and 902(13), because the contents were neither business records nor the product of automatic electronic processes. (Def. MIL at 20). At trial in *Weber*, the Government called records custodians and the contents of the online accounts were admitted on the basis of their testimony, presumably under Rule 901. *See, e.g.*, *Weber*, No. 21 Cr. 28 (DLC), Doc. No. 124 at 172–77 (D. Mt. July 11, 2022) (admitting Google emails and location data). Because the Government is not relying solely on Rules 902(11) and 902(13) to authenticate the Google Exhibits by certification in this case, *Weber* is inapposite.

and admit the *content* of messages or videos on Defendant's social media accounts[,] such certifications remain one of the many ways the Government may demonstrate authenticity under Rule 901(a)"); *see also Browne*, 834 F.3d at 414–15; *Abdullah*, 2024 WL 4519860, at *2; *Garg*, 2024 WL 1050994, at *3.  The point of the cases is simply that if "the relevance of the . . . records hinges on the fact of authorship," the proponent must supply enough proof to support a finding, under Rule 901, that the author of the content is who the proponent claims.  *Browne*, 834 F.3d at 410.

That proof exists here.  Contrary to Gupta's argument, the Government is not seeking to authenticate either the "ownership of the [Amanat] Google Accounts" or the "content of the records obtained from the [Amanat] Google Accounts" through the Google custodial certification alone.  (Def. MIL at 19 (emphasis omitted)).  Instead, as set forth above, the Government seeks to authenticate the Google Exhibits, pursuant to Rules 901, 902(11), and 902(13), through the combination of the custodial certification and the digital forensic evidence establishing that the Google Exhibits are attributable to "Amanat" and Yadav.  As this Court has explained, "evidence may be authenticated by its distinctive content — content that is not generally known or available to others."  *United States v. Hernandez*, No. 19 Cr. 97 (VM), 2020 WL 3257937, at *15 (S.D.N.Y. June 16, 2020) (observing that the user of the Kik account at issue had sent a video of the defendant masturbating, and contrasting "[t]he account in *Vayner*," which "could not be authenticated based on distinctive content because the details the account contained were known to persons other than the defendant").  Consistent with this Court's reasoning in *Hernandez* and the Second Circuit's reasoning in *Encarnacion-Lafontaine*, 639 F. App'x at 713, other courts of appeals have upheld the authentication of online accounts on proof of attribution similar to the proof here.  *See, e.g.*, *United States v. Perez*, 61 F.4th 623, 626–27 (8th Cir. 2023) (name, home address, date of birth,

phone number, known alias, IP addresses, and personal photographs of user); *United States v. Quintana*, 763 F. App'x 422, 427 (6th Cir. 2019) (name, email address containing name and moniker, relevant locations and dates, and photograph of user); *United States v. Barber*, 937 F.3d 965, 970 (7th Cir. 2019) ("This court has relied on evidence such as the presence of a nickname, date of birth, address, email address, and photos on someone's Facebook page as circumstantial evidence that a page might belong to that person.").

## IV. The Nijjar Murder Video Is Not Unfairly Prejudicial

Gupta moves to preclude the Nijjar Murder Video, (Ex. 2), as substantially more prejudicial than probative, (Def. MIL at 22–25). Gupta's motion should be denied.[10] Although Rule 403 requires the Court to exclude evidence that is substantially more prejudicial than probative, "[p]robative evidence is not inadmissible solely because it has a tendency to upset or disturb the trier of fact." *United States v. Salameh*, 152 F.3d 88, 123 (2d Cir. 1998) (affirming admission of photographs of World Trade Center bombing victims); *United States v. Osborne*, 739 F. App'x 11, 18 (2d Cir. 2018) (affirming admission of crime scene and autopsy photos). "The Second Circuit has declined to find probative evidence which is properly used at trial unduly prejudicial under Rule 403 where it did not involve conduct more inflammatory than the charged crime." *United States v. Brown*, No. 16 Cr. 559 (DLC), 2017 WL 2493140, at *2 (S.D.N.Y. June 9, 2017).

As shown in the video, (Ex. 2), the Nijjar Murder Video is approximately seven seconds long and was recorded by someone standing steps away from Nijjar's vehicle. For approximately two seconds, the video shows Nijjar's body (from the chest up) slumped over in the driver's seat of his vehicle. There are visible blood stains on Nijjar's white shirt near his shoulder and neck.

---

[10] The Government does not object to Gupta's request for a limiting instruction, (Def. MIL at 25), tailored to the Court's ruling on the admissibility of the Nijjar Murder Video as direct evidence or under Rule 404(b), (*see supra* Point I).

His head and face are not visible. As described more fully in the Government's motions *in limine*, (Gov't MIL at 3, 26), Yadav first sent the Nijjar Murder Video to Gupta, who then sent it to the UC and the CS, all in the immediate wake of Nijjar's murder. In a call with the UC, Gupta placed the video in context, explaining that Nijjar was "also a target" and "number three" or "number four" of a group of "so many targets" that "we" — that is, Gupta and his co-conspirators — had compiled. Similarly, in a call with the CS, Gupta again referenced Nijjar's murder when he explained that "we" — Gupta and his co-conspirators — didn't give the Canada "job" to the UC and instead tasked "some other guy." Gupta continued by urging the CS to push the UC to carry out the Victim's execution quickly while warning that the Victim would now be more cautious because "his colleague" — Nijjar — was "down."

The Nijjar Murder Video is thus highly probative of the existence of a conspiracy to murder the Victim, as well as Gupta's intent to carry out the murder. That Yadav sent the Nijjar Murder Video to Gupta in the immediate aftermath of Nijjar's death, and in the midst of Yadav and Gupta's WhatsApp messages planning the murder of the Victim, is compelling proof that Gupta and Yadav (and others) had an agreement to arrange the murder-for-hire of the Victim. It is also compelling proof that both Gupta and Yadav intended to murder the Victim, because it shows that someone Gupta described as another "target" was in fact killed.

There is no "unfair" prejudice from admission of the Nijjar Murder Video. There is nothing unfair about playing a video that Gupta himself received and circulated, where Gupta himself claimed that the victim depicted in the video was "number three" or "number four" on the conspirators' list, and where Gupta is charged with trying to arrange a related murder on the same list. The Nijjar Murder Video is no more inflammatory than the charges in this case, which allege that Gupta planned to assassinate a U.S. citizen, in exchange for, in part, weapons and the dismissal

of a criminal case. The Nijjar Murder Video does not capture the murder itself; is not excessively gory or sensational; and is just seven seconds long. There is nothing unfairly prejudicial about a brief video clip showing the aftermath of a related murder discussed by the defendant and his co-conspirators in a murder-for-hire case. On this record, there is no risk that unfair prejudice will substantially outweigh the probative value of the Nijjar Murder Video.

## **CONCLUSION**

For the foregoing reasons, Gupta's motions *in limine* should be denied.


Dated: New York, New York
         October 6, 2025

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney


                          By: _____
                                        Alexander Li / Ashley C. Nicolas /
                                        Camille L. Fletcher
                                        Assistant United States Attorneys
                                        (212) 637-2265 /-2467 /-2383