**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

NIKHIL GUPTA,

               Defendant.

No. 23 Cr. 289 (VM)


**DEFENDANT NIKHIL GUPTA'S MEMORANDUM OF LAW IN**
**OPPOSITION TO THE GOVERNMENT'S MOTIONS <u>*IN LIMINE*</u>**

Nola B. Heller
Matthew Laroche
Peter Farag
Isabel C. Pitaro
Elyse J. Hain
MILBANK LLP
55 Hudson Yards
New York, New York 10001
(212) 530-5000

*Counsel for Defendant Nikhil Gupta*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ............................................................................................................3

I.    **EVIDENCE OF ALLEGED UNCHARGED CONDUCT IS NOT ADMISSIBLE AS DIRECT EVIDENCE OR UNDER RULE 404(b)** .....................3

    A.    Evidence Regarding Alleged Involvement in ███████████ ███ Is Inadmissible ........................................................... 3

    B.    Allegations of ███████████████████████ Are Inadmissible ...... 6

    C.    Allegations of ████████████████ Are Inadmissible ....................... 8

II.    **EVIDENCE FROM THE GOOGLE ACCOUNTS IS INADMISSIBLE AND MUST BE EXCLUDED** ...................................................................13

    A.    The Google Custodial Certification Cannot Be Used to Authenticate the Ownership or Content of the Google Accounts ................................................. 14

    B.    Each Remaining Category of Exhibits Has Not Been Authenticated and Is Otherwise Inadmissible, Requiring Its Exclusion.............................................. 15

III.    **THE GOVERNMENT SHOULD NOT BE PERMITTED TO WITHHOLD THE TRUE NAME OF THE UC AS IT WOULD IMPERMISSIBLY BURDEN MR. GUPTA'S CONSTITUTIONAL RIGHTS**................................................................................................28

    A.    The Confrontation Clause Protects a Defendant's Right to Investigate Adverse Witnesses ............................................................................... 29

    B.    The Court Should Require the Government to Disclose the UC's Identity on an AEO Basis................................................................................. 30

IV.    **THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM ADMITTING THE CZECH CELLPHONE SURRENDER RECORD BECAUSE IT IS INADMISSIBLE HEARSAY** .......................................................33

CONCLUSION .......................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alford v. United States*,
282 U.S. 687 (1931)..................................................................................29, 30, 31

*In re Axos Bank Litig.*,
2024 WL 4195299 (S.D. Cal. Sept. 13, 2024)..........................................36

*Broadspring, Inc. v. Congoo, LLC*,
2014 WL 7392905 (S.D.N.Y. Dec. 29, 2014) ...........................................17

*Cotto v. Herbert*,
331 F.3d 217 (2d Cir. 2003)....................................................................30

*Davis v. Alaska*,
415 U.S. 308 (1974).................................................................................29

*Delaware v. Van Arsdall*,
475 U.S. 673 (1986).................................................................................29

*Devlin v. Noble Anesthesia Partners, PLLC*,
2023 WL 3961710 (N.D. Tex. June 12, 2023) .........................................21

*Guadalupe v. City of New York*,
2016 WL 3570545 (S.D.N.Y. June 24, 2016) ..........................................36

*Gupta v. Att'y Gen.*,
2014 WL 1116730 (S.D.N.Y. Mar. 20, 2014) ..........................................20

*Haw. Foodservice All., LLC v. Meadow Gold Dairies Haw., LLC*,
2024 WL 3759693 (D. Haw. Aug. 12, 2024) ...........................................17

*Huddleston v. United States*,
485 U.S. 681 (1988)...................................................................................4

*Lakah v. UBS AG*,
996 F. Supp. 2d 250 (S.D.N.Y. 2014)......................................................26

*United States v. Donovan*,
No. 20 Cr. 374 (PKC) (E.D.N.Y. Dec. 21, 2021), Dkt. No. 91 ...............32

*United States v. Eusebio*,
22 Cr. 522 (GHW) (S.D.N.Y. Oct. 29, 2024), Dkt. No. 568 ...............32, 33

*Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*,
   262 F. Supp. 2d 251 (S.D.N.Y. 2003) ..................................................................34

*SEC v. World Info. Tech., Inc.*,
   250 F.R.D. 149 (S.D.N.Y. 2008) ........................................................................21

*Smith v. Illinois*,
   390 U.S. 129 (1968)......................................................................................29, 30

*Spencer v. City of New York*,
   2011 WL 13257640 (S.D.N.Y. July 18, 2011) ..................................................22

*Tompkins-Wells v. Shelby Cnty. Head Start*,
   2015 WL 1345254 (W.D. Tenn. Mar. 23, 2015) ................................................17

*United States v. Abdullah*,
   2024 WL 4519860 (S.D.N.Y. Oct. 16, 2024) ....................................................14

*United States v. Arrington*,
   618 F.2d 1119 (5th Cir. 1980) ..........................................................................25

*United States v. Bannister*,
   2023 WL 2596890 (S.D.N.Y. Mar. 22, 2023) ..................................................30

*United States v. Boles*,
   914 F.3d 95 (2d Cir. 2019)................................................................................18

*United States v. Browne*,
   834 F.3d 403 (3d Cir. 2016)..............................................................14, 15, 16

*United States v. Chavez*,
   951 F.3d 349 (6th Cir. 2020) ............................................................................18

*United States v. Childs*,
   539 F.3d 552 (6th Cir. 2008) ............................................................................23

*United States v. Cicale*,
   691 F.2d 95 (2d Cir. 1982)................................................................................22

*United States v. Curley*,
   639 F.3d 50 (2d Cir. 2011)..................................................................................4

*United States v. Delligatti*,
   2018 WL 1033242 (S.D.N.Y. Feb. 23, 2018)..................................................4, 5

*United States v. DiMaria*,
   727 F.2d 265 (2d Cir. 1984)..............................................................................22

*United States v. Edwards*,
2019 WL 5196614 (D. Kan. Oct. 15, 2019) ...................................14

*United States v. Ellis*,
461 F.2d 962 (2d Cir. 1972)..............................................................19

*United States v. Flom*,
256 F. Supp. 3d 253 (E.D.N.Y. 2017) ...............................................7

*United States v. Flom*,
763 F. App'x 27 (2d Cir. 2019) ..........................................................7

*United States v. Fox*,
2025 WL 2076664 (E.D.N.Y. July 23, 2025)...........................22, 26

*United States v. Francisco*,
642 F. App'x 40 (2d Cir. 2016) ...........................................................5

*United States v. Galanis*,
429 F. Supp. 1215 (D. Conn. 1977)..................................................36

*United States v. Garrity*,
2018 WL 2676891 (D. Conn. June 4, 2018) .....................................34

*United States v. Goldberg*,
756 F.2d 949 (2d Cir. 1985)................................................................8

*United States v. Gordon*,
1991 WL 108723 (6th Cir. June 20, 1991) .......................................23

*United States v. Graham*,
2019 WL 2366724 (S.D.N.Y. May 31, 2019) .....................................7

*United States v. Guo*,
2024 WL 1939221 (S.D.N.Y. May 2, 2024) ...............................26, 27

*United States v. Harwood*,
998 F.2d 91 (2d Cir. 1993)...............................................17, 20, 24

*United States v. Hyatt*,
565 F.2d 229 (2d Cir. 1977)..............................................................20

*United States v. Joshi*,
896 F.2d 1303 (11th Cir. 1990) ........................................................35

*United States v. Kahale*,
789 F. Supp. 2d 359 (E.D.N.Y. 2009) ................................................4

*United States v. Kostopoulos*,
119 F. App'x. 308 (2d Cir. 2004) ....................................................18

*United States v. LaFlam*,
369 F.3d 153 (2d Cir. 2004)................................................................4

*United States v. Marcus*,
2007 WL 330388 (E.D.N.Y. Jan. 31, 2007) ...................................32

*United States v. Marti*,
421 F.2d 1263 (2d Cir. 1970)......................................................30, 32

*United States v. McCallum*,
584 F.3d 471 (2d Cir. 2009)........................................................4, 13

*United States v. Mejia*,
948 F. Supp. 2d 311 (S.D.N.Y. 2013) .............................................28

*United States v. Mejias*,
552 F.2d 435 (2d Cir. 1977)..............................................................25

*United States v. Miller*,
116 F.3d 641 (2d Cir. 1997)..............................................................10

*United States v. Orellana-Blanco*,
294 F.3d 1143 (9th Cir. 2002) .....................................................34, 35

*United States v. Padilla*,
374 F.2d 996 (2d Cir. 1967).............................................................23

*United States v. Pipola*,
83 F.3d 556 (2d Cir. 1996)..................................................................7

*United States v. Prevezon Holdings, Ltd.*,
319 F.R.D. 459 (S.D.N.Y. 2017) .....................................................28

*United States v. Reese*,
933 F. Supp. 2d 579 (S.D.N.Y. 2013)..............................................11

*United States v. Reindeau*,
947 F.2d 32 (2d Cir. 1991)................................................................30

*United States v. Roopnarine*,
718 F. App'x 797 (11th Cir. 2017) ..................................................33

*United States v. Rosario*,
2014 WL 5870708 (S.D.N.Y. Nov. 13, 2014) ...............................9, 12

*United States v. Rowinsky*,
  2013 WL 5607064 (S.D. Fla. Oct. 14, 2013).........................................................17

*United States v. Saint Prix*,
  672 F.2d 1077 (2d Cir. 1982)..........................................................................20

*United States v. Sampson*,
  385 F.3d 183 (2d Cir. 2004)............................................................................11

*United States v. Snow*,
  517 F.2d 441 (9th Cir. 1975) ....................................................................18, 19

*United States v. Stein*,
  521 F. Supp. 2d 266 (S.D.N.Y. 2007)................................................................7

*United States v. Triplett*,
  1988 WL 82817 (9th Cir. 1988) .....................................................................25

*United States v. Urena*,
  8 F. Supp. 3d 568 (S.D.N.Y. 2014) ................................................................32

*Washington v. Walsh*,
  2010 WL 423056 (S.D.N.Y. Feb. 5, 2010).....................................................33

*Zeeman v. United States*,
  275 F. Supp. 235 (S.D.N.Y. 1967) .............................................................25, 26

## Other Authorities

Fed. R. Evid. 403 ............................................................................ *passim*

Fed. R. Evid. 404 ............................................................................ *passim*

Fed. R. Evid. 801 ....................................................................................22, 25

Fed. R. Evid. 807 ........................................................................24, 26, 27, 28

Fed. R. Evid. 901 ............................................................................ *passim*

U.S. Const. amend. XI ...........................................................................29

# PRELIMINARY STATEMENT[1]

The government's motions *in limine* ("Gov. Mot.") (Dkt. 109) seek to expand the scope of Mr. Gupta's upcoming trial far beyond the charged offenses, introduce unreliable and unauthenticated evidence, and curtail Mr. Gupta's constitutional rights. They should be denied.[2]

*First*, the government seeks to admit evidence relating to a broad swath of uncharged criminal conduct—some of which is over a decade old—that falls in three categories: Mr. Gupta's alleged involvement in (i) ███████████████████, (ii) █████████████████ ███████, and (iii) ██████████████████. The proposed evidence, which will be introduced primarily via the testimony of a confidential source ("CS") with questionable motives, is not direct evidence of the discrete 2023 murder-for-hire scheme charged in the Indictment or admissible under Rule 404(b). The government claims that the evidence is necessary to explain Mr. Gupta's relationship with the CS and the "story" of the crime on trial. Not so. The crime on trial is not difficult to understand—it involves alleged discussions that took place over two months in 2023 about an alleged single attempt on one person's life ("Individual-1"). There is no need to transform this simple fact pattern into a sprawling examination of more than ██████ of unrelated and uncharged criminal conduct. To do so would confuse and distract the jury, causing it to impermissibly conclude that Mr. Gupta has a propensity to commit crimes. This evidence is far more prejudicial than it is probative, and the government should not be permitted to introduce it. *See* Dkt. 108 at 3-9 ("Defense Motions" or "Def. Mot.") (moving to exclude the same evidence).

---

[1] Pursuant to the Court's Individual Practices, the defense respectfully requests leave to file a brief exceeding 8,750 words to address the points raised in the government's motion, which was 17,752 words. This memorandum is 11,883 words. The government does not object to this request.

[2] The defense is filing the unredacted version of this motion under seal, as it did for its own motions *in limine*, because the redacted information is sensitive and may not be deemed admissible.

*Second*, documents from two Google accounts allegedly tied to co-defendant Vikash Yadav are inadmissible. The government cannot authenticate the ownership or content of the accounts under Rule 901 of the Federal Rules of Evidence. Nor has the government overcome the multiple layers of hearsay embedded in these documents. Admitting these materials would ask the jury to accept at face value unauthenticated records of unknown origin, obtained from accounts of unproven ownership, to establish contested facts central to the government's theory.

*Third*, the government seeks to withhold the identity of the undercover agent ("UC") from the defense, close the courtroom during his testimony, and permit both the UC and the CS to testify pseudonymously. While the defense does not object to the requests regarding closure of the courtroom and the use of pseudonyms, the request to withhold the UC's identity should be denied. Without the UC's name, Mr. Gupta cannot conduct a meaningful investigation into the credibility, bias, or reliability of one of the government's key witnesses. The government also has not shown a particularized risk that could justify such a measure, particularly when disclosure can be safeguarded by providing the UC's name on an Attorney's-Eyes-Only ("AEO") basis.

*Finally*, the Czech Surrender Record, which the government intends to rely on to establish Mr. Gupta's alleged ownership of cellphones seized abroad, is being offered for its truth and, accordingly, is inadmissible hearsay. The government has offered no evidence authenticating the signature on the document that allegedly belongs to Mr. Gupta, no proof of the circumstances of its execution, and no showing that Mr. Gupta intended to adopt the statement as his own. To the contrary, the conditions of Mr. Gupta's arrest, detention, and interrogation in the Czech Republic underscore the absence of any reliable measure of adoption.

For these reasons, as outlined below, the Court should deny the government's motions.

**ARGUMENT**

I.    **EVIDENCE OF ALLEGED UNCHARGED CONDUCT IS NOT ADMISSIBLE AS DIRECT EVIDENCE OR UNDER RULE 404(b)**

      A.    **Evidence Regarding Alleged Involvement in** ███████████████ **████████████ Is Inadmissible**

The government seeks to introduce evidence of Mr. Gupta's alleged statements about prior potential ███████████████████████████████████ because they purportedly illustrate the relationship of mutual trust between Mr. Gupta and both the CS and Yadav, and because they allegedly reveal Mr. Gupta's financial motivation for allegedly participating in the charged crimes.  Gov. Mot. at 33-34.  None of these justifications vindicate admitting this prejudicial and irrelevant evidence.

The government's proposed evidence takes two forms:  the CS's testimony about his discussions with Mr. Gupta about ██████████████████████████, and ████████████████████ between Mr. Gupta and Yadav, in which Yadav allegedly promised to ███████████████████████████████.  None of these alleged transactions ever actually occurred.  *Id*. at 32.

The government also argues that the ████████████ is alternatively admissible under Rule 404(b) to prove Mr. Gupta's motive, intent, and lack of mistake in committing the charged crimes.  *Id*. at 33.  Both arguments fail.

**The government's** ████████ **allegations are not direct evidence of the charged offenses.**  The government argues that it must offer proof of Mr. Gupta's oral and written discussions about prior alleged ████████████████████ because those discussions explain why Mr. Gupta trusted the CS and Yadav enough to engage in criminal activity with them. *Id*. at 33.  But the government may not dredge up old, unrelated, confusing, and prejudicial conversations that never resulted in criminal activity to make this point.

The government's purported evidence carries scant indicia of reliability, such that its prejudicial nature substantially outweighs any probative value it might have. The CS's self-serving and uncorroborated testimony regarding his oral discussions with Mr. Gupta about subjects unrelated to the crimes on trial will do little to convince the jury of anything, much less a relationship of trust and confidence. Mr. Gupta's WhatsApp communications with Yadav will not be corroborated by live testimony and they are also vague and open to multiple interpretations. Braggadocio does not equate to reliable evidence. *See United States v. LaFlam*, 369 F.3d 153, 157 (2d Cir. 2004) ("[Similar] act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." (citing *Huddleston v. United States*, 485 U.S. 681, 689 (1988)). This sort of prejudicial and confusing evidence must be excluded under Rule 403. *See United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009).

Additionally, the purported evidence would needlessly expand the scope of the trial to cover ▓▓▓▓▓▓ of the CS's interactions with Mr. Gupta—a confusing detour that will result in numerous needless mini-trials about the meaning of interactions between the two men and whether anything they discussed actually happened. *See United States v. Curley*, 639 F.3d 50, 59 (2d Cir. 2011) ("[D]istrict court[s] may exclude older acts if they have become too attenuated to be relevant." (citations omitted)); *United States v. Kahale*, 789 F. Supp. 2d 359, 385-86 (E.D.N.Y. 2009) (holding that uncharged conduct creating mini-trials and propensity risks is inadmissible under Rule 403), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012).

The government's cited caselaw fails to support its arguments. In *United States v. Delligatti*, 2018 WL 1033242, at *7 (S.D.N.Y. Feb. 23, 2018), the court admitted evidence of the defendant's prior involvement in a prostitution business with a cooperating witness because that shared enterprise "explain[ed] the development of the illegal relationship . . . and explain[ed] the

mutual trust that existed between the coconspirators," but in that case, the cooperating witness had actually participated in the criminal activity as a co-conspirator. Here, by contrast, no █████ ████████████ ever occurred. The CS will only be able to testify about a handful of sporadic conversations over a ███████████ relating to conduct that never came to fruition. The WhatsApp messages between Yadav and Mr. Gupta are even less probative, because no live witness will be able to interpret how they support a relationship of trust and confidence.

Likewise, the government's reliance on *United States v. Francisco*, 642 F. App'x 40, 46 (2d Cir. 2016) is inapposite. Gov. Mot. at 33. The district court in *Francisco* allowed evidence of drug-related uncharged conduct because it demonstrated the defendant's relationship with cooperating witnesses that related to the charged drug-related murders. *Francisco*, 642 F. App'x at 45-46. By contrast, Mr. Gupta's alleged discussions about ████████████████ with the CS do not relate in any way to the crimes on trial, and the WhatsApp conversations with Yadav have only a tenuous connection, based on a subjective reading of several texts exchanged between the two men. These thin reeds are not enough to support the introduction of evidence that could substantially prejudice the jury against Mr. Gupta.

**The evidence is inadmissible under Rule 404(b).** In the alternative, the government makes a tortured argument that this evidence demonstrates Mr. Gupta's motive to commit the charged crimes, because Mr. Gupta was planning ████████████████████ ████████████ Mr. Gupta once he arranged the charged murder-for-hire. Gov. Mot. at 33-34. This allegation is unsupported by the evidence—the government has no way to prove that Mr. Gupta planned to ███████████ to the CS, nor (as argued above) can it prove that the ████████████ had anything to do with the alleged murder-for-hire. And of course, no one provided any actual █████ to anyone in this case. The lack of evidence regarding Mr. Gupta's

motive is a big problem for the government, as the government itself admits. *Id*. at 34 & n.17. But the Court should not allow the government to solve this problem by shoehorning inadmissible propensity evidence into trial under Rule 404(b).

The government also appears to argue that Mr. Gupta's alleged discussions with the CS regarding ████████████████████ are somehow proof that Mr. Gupta intended to commit the murder-for-hire. *Id*. at 34. But it does not follow that someone who might be able to help ████████████████ would also know how to commit a murder. These are different crimes, and Mr. Gupta's potential involvement in one does not necessarily indicate he would have had the knowledge of how to commit the other.

### B. Allegations of ██████████████████████████ Are Inadmissible

The government seeks to admit under Rule 404(b) certain statements Mr. Gupta made to the CS ████████████████████████ about his alleged involvement in ███████████████████. According to the government, the CS will testify that in ████, Mr. Gupta made the following series of alleged statements: (i) he asked ██ ████████████████████; (ii) he suggested that ████████████████████████; (iii) he stated that ██████████████████████; (iv) he boasted of ██████████████████████████; (v) he claimed to have ████ ████████████████; and (vi) he asked the CS ████████████████████ ████. *Id.* at 35.

*First*, the government argues these communications are admissible under Rule 404(b) to show Mr. Gupta's "opportunity, knowledge, intent, and lack of mistake" in arranging the alleged $15,000 advance payment to the UC for the charged murder-for-hire. *Id*. at 34. These arguments are tenuous at best. The government must show a "clear connection between the prior act evidence

and a disputed issue at trial." *United States v. Graham*, 2019 WL 2366724, at *5 (S.D.N.Y. May 31, 2019) (internal citations omitted), *aff'd*, 51 F.4th 67 (2d Cir. 2022); *see also United States v. Stein*, 521 F. Supp. 2d 266, 268 (S.D.N.Y. 2007). It has failed to do so here. The CS's uncorroborated and self-serving account of offhand statements that Mr. Gupta made ███████ ███ does not establish *anything* regarding the charged crimes, much less that Mr. Gupta possessed the requisite knowledge or intent to commit them. Mr. Gupta's alleged prior involvement in ████████████ that bear no resemblance to the murder-for-hire scheme is irrelevant to this case.

The government cites *United States v. Flom*, 763 F. App'x 27, 30 (2d Cir. 2019) in support of its arguments, but in *Flom* the district court admitted testimony regarding a money laundering scheme because the defendant modeled the charged offense "in the same manner," as a prior uncharged scheme and because the charged offense involved the defendant "playing the same role," and "using the same account as he did in the previous [uncharged] scheme." *United States v. Flom*, 256 F. Supp. 3d 253, 256-57 (E.D.N.Y. 2017); Gov. Mot. at 35. Here, by contrast, the government does not contend that Mr. Gupta used any method he allegedly described ███████ ██████████████████████████████████████████████, to facilitate the alleged $15,000 payment. Gov. Mot. at 35. The government's allegations of prior participation in other crimes ███████████ are insufficiently similar to warrant admission under this standard.

*Second*, the government asserts that these statements explain Mr. Gupta's "relationship" with the CS, relying on *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996). *See* Gov. Mot. at 36. But in *Pipola*, the court admitted evidence because it showed how genuine co-conspirators developed an illegal relationship of trust through past criminal conduct that made the charged conspiracy more plausible. *Id.* No such criminal conduct ever occurred here. The CS was

cooperating with the government from the start and, as a government agent, could not be Mr. Gupta's co-conspirator. *See United States v. Goldberg*, 756 F.2d 949, 958 (2d Cir. 1985). Whatever trust the government claims existed was not the product of joint criminal conduct because no criminal relationship arose out of the alleged discussions. Rather, Mr. Gupta's statements simply evidence his tendency to share details (whether actual or fabricated) about his prior activities. As with the evidence regarding █████████████████████, introducing this testimony would be distracting, dilatory, and prejudicial. It should be excluded under Rule 403.

### C.    Allegations of ████████████████████ Are Inadmissible

The government asserts that testimony regarding alleged ███████████████████████ ████████████████████ is admissible as direct evidence because it "is necessary to show the scope of the charged offense" and is probative of Mr. Gupta's relationship with Yadav. Gov. Mot. at 28. The government identifies two categories of alleged conduct. First, it points to communications in which Mr. Gupta allegedly ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ *Id.* at 26. Second, the government points to communications from Mr. Gupta's phones in which he and Yadav allegedly ████████████ ███████████████████████████████████. Alternatively, the government argues the alleged ████████████ are admissible under Rule 404(b) to show Mr. Gupta's motive, knowledge, intent, plan, opportunity, and absence of mistake. *Id.* at 29. These arguments fail.

**The government's ████████████ allegations are not direct evidence of the charged offenses.** The charged crime is a discrete murder-for-hire plot concerning Individual-1. Alleged communications related to ████████████████████████████ are distinct, uncharged schemes with different targets and contexts. The Indictment specifically charges Mr. Gupta with

"conspir[ing] . . . to carry out a plot directed from India to hire hitmen to assassinate [Individual-1] in the United States . . . and arrange[ ] for the delivery of a $15,000 advance cash payment for the murder in Manhattan, New York." S2 Indictment ¶ 37; *see United States v. Rosario*, 2014 WL 5870708, at *4 (S.D.N.Y. Nov. 13, 2014) (holding allegation of a second robbery inadmissible as direct evidence and irrelevant to the charged conspiracy to rob a "specific pharmacy" located in Manhattan). Moreover, the purported communications between Mr. Gupta and Yadav that the government claims relate to these allegations are vague, and the government will not present any witness at trial who can contextualize these communications.

The government relies on only a handful of ambiguous communications to support its claim that Mr. Gupta ██████████████████. Gov. Mot. at 26. It first cites a conversation in which Mr. Gupta allegedly told the UC that ████████████████████. That statement is far from conclusive. The government reads into it an admission of involvement that could just as easily have been a grammatical mistake from a non-native English speaker. The government also highlights a later exchange, after Yadav sent Mr. Gupta a video of Mr. Nijjar after his demise. In response, Mr. Gupta allegedly stated that ███████████████ Gov. Mot. at 26; S2 Indictment ¶¶ 29-30. Rather than showing participation, this message suggests the exact opposite: that Mr. Gupta allegedly █████████████████████████████████████████ ████████████████████████████. Far from completing the story of the crime on trial, these communications will distract and confuse the jury. The minimal probative value of these communications is insufficient to overcome the prejudice Mr. Gupta would suffer as a result of their admission.

The government also argues that proof of these discussions is admissible because it is probative of Mr. Gupta's relationship with Yadav. Gov. Mot. at 28. That argument dramatically

fails the balancing test that the Court must apply under Rule 403. Evidence of discussions of ███ ███████████ is about as prejudicial as uncharged evidence gets. Its probative value—as incremental proof of the relationship between Mr. Gupta and another defendant not on trial— cannot outweigh the prejudice Mr. Gupta would suffer by its admission. The cases the government cites in support do not suffice. For example, in *United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997), the Second Circuit held that evidence of uncharged murders could be admitted in a murder and RICO case as proof of the charged enterprise. But here, the charged crime is not a RICO enterprise (which is by its very nature a criminal syndicate that commits multiple crimes), or a conspiracy to commit multiple crimes—it is a conspiracy to commit a *single* murder-for-hire. Evidence of oblique comments regarding ███████████████████████████ is not proof of the existence of the charged conspiracy.

Nor does the government's argument that the evidence is "inextricably intertwined" with the crimes on trial pass the balancing test. Gov. Mot. at 27. The jury does not need to hear about Mr. Gupta's alleged discussions of ████████████ to understand the crimes on trial. Rather, they will be severely prejudiced by hearing this inadmissible propensity evidence.

**The evidence is inadmissible under Rule 404(b).** The government separately claims the alleged ████████ prove motive, knowledge, intent, plan, opportunity, and absence of mistake. Gov. Mot. at 29. These theories do not withstand scrutiny.

*First*, the government argues that the ████████████ reveal Mr. Gupta's motive for targeting Individual-1, "*i.e.*, to suppress Nijjar and [Individual-1's] Sikh separatist activities." Gov. Mot. at 29. The Indictment alleges that Mr. Gupta's motivation was to dismiss a pending criminal case against him in India. S2 Indictment ¶¶ 10, 12. And in its motions, the government separately alleges that Mr. Gupta's motivation was financial—███████████████████████████

██████. Gov. Mot. at 34. As with the ████████████████████, the government's desperate search for a motive in this case does not justify the admission of highly prejudicial and irrelevant evidence under Rule 404(b).

*Second*, the government argues Mr. Gupta's alleged ████████████████████████ ██████ is proof of his knowledge of and intent to commit the charged offenses because ██████ ████████████████████ Govt. Mot. at 30. Not so. The government has not tied—and will not be able to tie—these alleged plots to the charged offenses. The government has no evidence supporting that these were ████████████████ other than pointing to ambiguous messages that could have multiple meanings. Even assuming these messages were about a ███████████, the government cannot ████████████████████████████████████████████████ ██████. The government's conclusory arguments are devoid of any details sufficient to allow anyone to conclude that ████████████ was similar to the charged offenses. The only alleged similarity is that ████████████████████, which is precisely the type of propensity evidence that Rule 404(b) prohibits. *See United States v. Sampson*, 385 F.3d 183, 192 & n.7 (2d Cir. 2004) ("For the evidence relating to Sampson's involvement in the 2000 offenses to be probative of whether he committed the 1998 offenses, a juror would have to reason that the events in 2000 showed that Sampson was a drug dealer. . . . This sort of propensity reasoning is plainly barred by Federal Rule of Evidence 404(b).")

*Third*, the government claims this alleged ████████████████████ is proof of Mr. Gupta and Yadav's *modus operandi* in ████████████████████████ Gov. Mot. at 30. This argument fails. To establish *modus operandi*, the government must show that the charged and uncharged conduct share unusual characteristics or a distinctive signature, not just broad similarities. *See United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (rejecting

admission where prior acts and the charged offense lacked a signature or unique scheme.)  The alleged ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████.  By contrast, the charged offense, as alleged by the government, is a discrete murder-for-hire scheme aimed at a known individual, carried out through a particular payment structure, and tied to a specific motive alleged in the Indictment.  The only similarity between the alleged ██████████ and the charged offense is that ████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████ does not show *modus operandi*.

*Finally*, the government argues that ████████████████████████████████████ is admissible as evidence of Mr. Gupta's absence of mistake in entering into the charged murder-for-hire conspiracy.  Gov. Mot. at 30-31.  However, nothing in the alleged ██████████ has any bearing on whether Mr. Gupta might have acted by mistake in the charged scheme.  The government offers no coherent theory of how ████████████████████████████████████████████ ██████ negates mistake or accident here.  The government's reliance on *Rosario* is misplaced. 2014 WL 5870708, at *4.  There, the court considered whether prior firearm possession could be admitted under Rule 404(b) to show that the defendant's possession in the charged offense was not a mistake.  The court denied the government's motion once the defendant conceded that possession was not in dispute.  *Id.*  That reasoning has no application here.  A defendant cannot "mistakenly" agree to pay $15,000 to arrange a killing.  Either the agreement exists, or it does not. There is no middle ground in which mistake is a live issue for the jury.  The government should be precluded from introducing highly prejudicial evidence of ██████████████████████.

Finally, any marginal probative value of the alleged ████████ is substantially outweighed by its prejudicial effect and must be precluded under Rule 403. *See McCallum*, 584 F.3d at 475. The introduction of this evidence will create an unacceptable danger that the jury may convict Mr. Gupta not for the discrete plot charged, but for allegedly being ████████ ████████████████████. The ████████████ is particularly inflammatory and unfairly prejudicial because ████████████████████████████████████.

For the foregoing reasons, Mr. Gupta respectfully requests that the Court preclude the government from introducing evidence of uncharged conduct as it is neither direct evidence of the crimes at issue nor admissible under Rule 404(b).

## II. EVIDENCE FROM THE GOOGLE ACCOUNTS IS INADMISSIBLE AND MUST BE EXCLUDED

The government intends to offer five categories of documents from two Google accounts allegedly belonging to Yadav ("Account-1" and "Account-2," and collectively, the "Google Accounts" or "Accounts"): (1) Google subscriber records; (2) photographs purportedly depicting Yadav and his alleged identification documents; (3) an email from Account-1 with the subject "Photo from Amanat"; (4) an email sent to Account-2 with a so-called "invitation" to apply to join RAW; and (5) pay stubs and tax records allegedly belonging to Yadav. Gov. Mot. at 11.[3] Notwithstanding the limited admissibility of the first category of documents—the Google subscriber records—the government has no basis for proffering any of the remaining documents from the Google Accounts. Neither the ownership of the Accounts nor their content has been properly authenticated, and the documents are otherwise inadmissible hearsay, irrelevant, and unfairly prejudicial. Accordingly, the proffered evidence must be excluded.

---

[3] "Account-1" refers to the Google account ending in -095@gmail.com. "Account-2" refers to the Google account ending in -dav@gmail.com.

**A.     The Google Custodial Certification Cannot Be Used to Authenticate the Ownership or Content of the Google Accounts**

As the defense explained in its motions, the Google custodial certification cannot be used to authenticate the ownership or content of all the documents from the Google Accounts. The only documents properly self-authenticated by the Google custodial certification are the first category of documents, the Google subscriber records (Gov. Mot. Exs. B, G), which show machine-generated information, such as metadata, that is admissible for the limited purpose of showing "that the accounts exist (or did exist) and are associated with particular IP addresses, or metadata showing the times and dates of online activity." *United States v. Abdullah*, 2024 WL 4519860, at *3 (S.D.N.Y. Oct. 16, 2024). But a custodial certification cannot, as the government seems to suggest, wholesale authenticate the evidence taken from these Accounts, such as photos, emails, and tax records. This is especially true where, as here, the purported relevance of many of the records "hinges on the fact of authorship" or ownership. *United States v. Browne*, 834 F.3d 403, 410 (3d Cir. 2016)*; Abdullah,* 2024 WL 4519860, at *2.

Instead, the government must independently authenticate the content and ownership of the Google Accounts via extrinsic evidence, in addition to proving the admissibility of the content as non-hearsay or exceptions to the hearsay rule. *See* Fed. R. Evid. 901(a); *Browne*, 834 F.3d at 441-42 (requiring both authentication of Facebook chat communications as well as an applicable exception to hearsay rule if evidence was offered to prove the truth of the matter asserted); *United States v. Edwards*, 2019 WL 5196614, at *11 (D. Kan. Oct. 15, 2019) (to prove substantive content of email or other online communication, "the government must independently authenticate the email's or content's author under Federal Rule of Evidence 901 and provide a hearsay exclusion or exception for admitting the particular communication"). The government has failed to do so.

**B. Each Remaining Category of Exhibits Has Not Been Authenticated and Is Otherwise Inadmissible, Requiring Its Exclusion**

    1.    *There Is No Basis to Admit Purported Photographs of and IDs Allegedly Belonging to Yadav*

The government contends that photographs from the Google Accounts that purportedly depict Yadav and various identification cards that allegedly belong to him (Gov. Mot. Exs. H, I, J, L) are admissible because they are not being offered for the truth of the matter, but rather "as circumstantial proof that Yadav was the user of the Google [A]ccounts from which these documents were obtained, and, by extension, the 'Amanat'" who allegedly worked with Mr. Gupta to orchestrate the murder-for-hire plot. Gov. Mot. at 13. The government's argument fails for several reasons.

*First*, the government fails to show how any of the photos that were found in Account-2 can be linked to an individual named "Amanat" or to Account-1. Exhibits H and I were sent by a third, unrelated email address to Account-2, with no indication that they were being sent to an "Amanat." Similarly, Exhibits J and L were sent by Account-2 to different email addresses, again with no indication that the sender bore any connection to an individual named "Amanat." Further, none of the photos were sent by or to Account-1. Thus, to the extent the government seeks to establish that Yadav controlled Account-1 or is "Amanat" through these photos, it cannot do so.

*Second*, the photographs are insufficient to establish that Account-2 belonged to Yadav. Only two of the photographs, Exhibits J and L, were *sent* by Account-2, whereas the remaining two photographs were *received* by Account-2 from a third, unrelated email address without any commentary on who they depict or why they were sent. That provides no basis to conclude that these are even photographs or identification cards depicting Yadav. Indeed, these four exhibits that purport to depict Yadav are a far cry from the kind of extrinsic evidence that courts typically accept to authenticate the ownership of accounts under Rule 901. In *Browne*, for example, the

Third Circuit found that a Facebook chatlog was sufficiently authenticated by extrinsic evidence where the government provided testimony from four witnesses who participated in the Facebook chats at issue, three of whom testified that they personally chatted with the at-issue Facebook account and identified the person responsible for running the account. 834 F.3d at 413. The defendant in *Browne* also "made significant concessions that served to link him to the Facebook conversations." *Id.*

Here, by contrast, the government will offer no witnesses who will have interacted with any of the Google Accounts, and Yadav will not testify at trial. Four exhibits of questionable reliability, containing low-resolution images purportedly representing Yadav and his identification documents can hardly suffice to authenticate Account-2. Moreover, other documents from Account-2 undercut the argument that the account belonged to Yadav. Account-2 contains at least six other emails—sent without text in the body of the email or, often, a subject line—attaching photographs and identification cards of other individuals and with other names. *See* Opp. Exs. A-F (identification card emails).[4] One email, for example, sent by Account-2 to another account, attaches two identification cards belonging to a "███████████" as well as a headshot of a man. *See* Opp. Ex. A. Another email, again sent by Account-2 to another account, attaches identification cards belonging to a "███████████" as well as a headshot of a woman. *See* Opp. Ex. B. Additional emails sent by Account-2 include identification cards belonging to individuals named "███████████," "███████████," "█████████," and "███████████." *See* Opp. Exs. C-F. By the government's logic, it is just as likely that Account-2 belongs to any of these individuals.

*Third*, while the government claims to offer these documents only as circumstantial

---

[4] Citations to "Opp. Ex. __" are to the exhibits to the Declaration of Nola B. Heller filed in connection with the defense's opposition to the government's Motions *in Limine*.

evidence to show that Yadav owned the Accounts (Gov. Mot. at 13-14), it is in fact offering these photographs for the truth of the matter asserted—to establish that the individual depicted in each exhibit is actually Yadav and that he sent and received the emails in the Accounts. *Broadspring, Inc. v. Congoo, LLC*, 2014 WL 7392905, at *2-3 (S.D.N.Y. Dec. 29, 2014) (documents are offered for their truth when their significance "depends on the documents . . . being taken as true," rather than solely for the limited purpose of proving the documents were made); *see also United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993). The Exhibits include unauthenticated, low-quality photographs of an individual bearing a nametag that reads "Vikas Yadav." *See* Gov. Mot. Exs. H, I. But no witness at trial will identify Yadav in the photographs and so these pictures are plainly being offered for the truth of the nametag on them. In fact, Exhibit H was included in the Indictment and captioned as "a photograph of YADAV in military fatigues." S2 Indictment ¶ 9.

Because no hearsay exception applies, these photos must be excluded. *See, e.g.*, *United States v. Rowinsky*, 2013 WL 5607064, at *7 (S.D. Fla. Oct. 14, 2013) ("[T]he names written on the images now—before trial begins—are out-of-court statements that the Government intends to offer for the truth of the matters asserted, thus making them hearsay."); *Haw. Foodservice All., LLC v. Meadow Gold Dairies Haw., LLC*, 2024 WL 3759693, at *9 (D. Haw. Aug. 12, 2024) ("The Court agrees that a photograph of a price is, essentially, an out-of-court assertion of what price the seller would accept for the item in question. Standing alone, such a photograph would be hearsay if offered for the truth of the asserted price depicted."); *Tompkins-Wells v. Shelby Cnty. Head Start*, 2015 WL 1345254, at *12 (W.D. Tenn. Mar. 23, 2015) (declining to consider exhibit containing a page printed from the internet and two photographs because exhibit was "not properly authenticated and contain[ed] inadmissible hearsay").

The cases cited by the government are inapposite. *See* Gov. Mot. at 13. While the Sixth

Circuit in *Chavez* remarked that "the *name* 'Papo' can't assert a proposition because, *by itself*, it's *just* a name," the court then held that the defendant's signature on the cover sheet of a health care application was indeed a statement, and therefore hearsay, because it *asserts* "I am Ledinson Chavez and I am responsible for these documents." *United States v. Chavez*, 951 F.3d 349, 359, 361 (6th Cir. 2020) (emphasis added). The same holds true here. Each name found in Exhibits H, I, J, and L is not "just a name," "by itself." *See id.* These names are found on *unauthenticated* photographs, that could have been manipulated, depicting individuals and identification cards, and are attached to emails from or to unidentified senders. These names *assert* that the persons depicted in the photographs and identification card photographs are all Yadav. If these photographs did not assert that they were of Yadav, the government would have no reason to introduce them into the record. And it certainly would not attempt to rely on them as circumstantial evidence that the owner of Account-2 is Yadav.[5]

The government also relies on *United States v. Snow* to argue that the photographs and IDs that allegedly depict Yadav are circumstantial evidence of the ownership of Account-2. Gov. Mot. at 13 (citing *United States v. Snow*, 517 F.2d 441, 442-44 (9th Cir. 1975)). But the Second Circuit has been clear that where the relevance of evidence depends on its truth, as it does here, it is hearsay. *United States v. Kostopoulos*, 119 F. App'x 308, 311 (2d Cir. 2004) ("[T]he statements are hearsay because . . . the evidentiary link the government seeks to have the jury construct by the statements' introduction . . . '[cannot be] drawn . . . unless [the jury] [finds] the proffered statements to be true.'" (citations omitted)). *Snow* is also far different than this situation because

---

[5] Nor can *Boles* support the government's proposition that the word "INDIAN" in Exhibit I is not an assertion, as the *Boles* court never conclusively determined, and merely expressed "*some* doubt" as to, whether an inscription of a country's name was an assertion. *United States v. Boles*, 914 F.3d 95, 109 (2d Cir. 2019) (emphasis added).

the government in that case laid an extensive foundation that established that the evidence, a briefcase with a name affixed to it by tape, was trustworthy before seeking to admit it. 517 F.2d at 442. Specifically, the government established that the briefcase was found at a place the defendant often frequented, items found within the briefcase contained the defendant's fingerprints, the defendant had previously been seen with the briefcase, and there was a secure chain of custody over the evidence. *Id.* Here, the proposed exhibits are attachments to emails found in an account with an unknown owner and received from unknown senders, with no witness who can testify to their authenticity and that they have not been tampered with. *Cf. United States v. Ellis*, 461 F.2d 962, 970 (2d Cir. 1972) (as in *Snow*, *physical*, and therefore reliable, evidence— driver's license of a co-defendant found in an address book—was admissible as circumstantial evidence to show that co-defendant was the owner of the address book and the coat in which it was found).

As there is no hearsay exception for admitting these exhibits, they must be excluded.

2.      *The Government Should Not Be Permitted to Use the "Photo from Amanat" Email to Prove That Account-1 Was Operated by Someone Who Called Themself "Amanat"*

The government intends to use an email from Account-1 with the subject line "Photo from Amanat" to prove that Account-1 "was operated by someone who used the alias 'Amanat.'" Gov. Mot. at 14; *see also* Gov. Mot. Ex. C. But a single subject line, separate and apart from any firsthand testimony regarding the interpretation of that subject line, cannot prove ownership of an email account. A more reasonable interpretation of the same subject line is that Account-1, the sender of the email, was not speaking in the third person and is therefore not "Amanat." The email is written as though "Amanat" is a third party who sent the photo to Account-1, which was then passing it along to another recipient and noting who it had received the photo from. Had the sender

of the email been "Amanat," there would have been no reason for that person to also state in the subject line that Amanat had sent the photo. Thus, Exhibit C cannot adequately establish that someone named Amanat operated Account-1.

But even accepting the government's argument, the government is relying on the truth of the statement "Photo from Amanat" to prove that an individual who goes by "Amanat" had access to the account. Thus, Exhibit C is hearsay and should be excluded. *Harwood*, 998 F.2d at 97 (excluding on hearsay grounds a statement that was "irrelevant unless it was true"); *United States v. Hyatt*, 565 F.2d 229, 232 (2d Cir. 1977) ("If the statement in question is 'I am Jimmy,' the declarant is Jimmy, and the statement is hearsay."); *Gupta v. Att'y Gen.*, 2014 WL 1116730, at *6 n.1 (S.D.N.Y. Mar. 20, 2014) (an address on an envelope is hearsay if offered to prove the person lived in the United States).

The government's reliance on *United States v. Saint Prix* is misplaced for several reasons. Gov. Mot. at 14 (citing *United States v. Saint Prix*, 672 F.2d 1077, 1083-84 (2d Cir. 1982)). *First*, the evidence admitted in *Saint Prix* was a car-sales slip from a car dealership, *i.e.*, a business record that carries far greater indicia of reliability than an email from an unknown sender to an unknown recipient containing a photo sent by an unknown individual. *Id.* at 1083. *Second*, the inference the government seeks to draw from the email is significantly more attenuated than the inference permitted in *Saint Prix.* There, the court admitted the sales slip for the purpose of showing that someone using the defendant's name purchased the van, but the government claims that the subject line "Photo from Amanat" means that Account-1 is used by Amanat. Unlike a business receipt, the meaning of the email subject line, "Photo from Amanat," is inherently ambiguous because it is unclear whether Amanat is referring to a third-party on whose behalf Account-1 is sending the photo or if the Account-1 sender is referring to themself in the third-person as "Amanat."

The government should not be permitted to admit Exhibit K for similar reasons. *See* Gov. Mot. at 14-15. Exhibit K is an email from June 2012 (roughly eleven years before the at-issue conduct occurred) containing an attachment titled, "DIRECT RECRUITMENT OF SENIOR FIELD OFFICERS.docx," and was first sent by an unrelated email account to a group of seven individuals, none of whom include Account-1 or Account-2. Gov. Mot. Ex. K. The attachment itself was a letter that was addressed to "ALL OsC/207" and states that it "is being sent to all eligible officers of this unit through their email ID." *Id.* Appended to the letter is a job posting claiming to have an opening for the "Cabinet Secretariat" position with GOI, as well as a purported link to GOI's employment website. *Id.* This email and the attachment were then forwarded by one of the original recipients (an unrelated third-party email account) to Account-2, with no message in the email body. *Id.*

The government cannot authenticate the email, the third-party cover letter, or job posting because no witness with personal knowledge will testify as to their authenticity. Moreover, both the email and attachment are hearsay and must be excluded. *See, e.g.*, *SEC v. World Info. Tech., Inc.*, 250 F.R.D. 149, 152 (S.D.N.Y. 2008) (Marrero, J.), *aff'd in part sub nom. S.E.C. v. Sirianni*, 334 F. App'x 386 (2d Cir. 2009) (excluding emails as hearsay and irrelevant to issue in case); *Devlin v. Noble Anesthesia Partners, PLLC*, 2023 WL 3961710, at *4 (N.D. Tex. June 12, 2023) (excluding unauthenticated email with copy of job posting because of double hearsay issue).

The government makes the specious argument that Exhibit K is an "invitation" to Yadav to apply to RAW, and that it is not hearsay because "it is a verbal act with independent legal significance" where the purported significance lies in the fact that the invitation was allegedly sent to Yadav. Gov. Mot. at 14. But it is an unreasonable stretch to argue that this chain of

communications somehow constitutes an invitation to the user of Account-2, who was not copied on the initial email attaching the application, to apply to join RAW. The government's application of the independent legal significance doctrine is wrong.

The Second Circuit has remarked that the "verbal act doctrine applies only when the utterance is an operative fact which gives rise to legal consequences." *United States v. DiMaria*, 727 F.2d 265, 270 n.4 (2d Cir. 1984) (cleaned up); *see also United States v. Cicale*, 691 F.2d 95, 108 (2d Cir. 1982) (Ward, J. concurring) (stating that a verbal act is "a statement which, irrespective of its truth or falsity, has legal significance, or which, irrespective of its truth or falsity, explains the legal significance of an otherwise ambiguous act"). Further, the verbal act must affect legal rights. *See, e.g.*, Fed. R. Evid. 801(c) Adv. Comm. Notes ("The effect is to exclude from hearsay the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties."); *United States v. Fox*, 2025 WL 2076664, at *12 (E.D.N.Y. July 23, 2025) ("Neither [the SBA] applications nor the supporting documents 'affect the legal rights of the parties' involved."); *Spencer v. City of New York*, 2011 WL 13257640, at *1 (S.D.N.Y. July 18, 2011) ("Statements, such as contracts, that themselves affect the legal rights of the parties constitute 'verbal acts.'").

Here, there is no legal significance to any of the statements in Exhibit K. The email and attachment bear no relation to Mr. Gupta's charges, and there are no legal consequences stemming from the fact that a recipient of an invitation to apply to a job (who was likely a prospective applicant and not a recruiter), forwarded a largely blank email with an accompanying attachment to Account-2. The email contains no express statement that the sender is *inviting* Yadav to apply to RAW nor can the intention of the sender even be gleaned from this email. Moreover, the fact that Account-2 did not receive the email directly suggests that Account-2 does not belong to one

of the "eligible officer[s] of this unit" to whom the email was directed, and that Account-2 was not an intended recipient of the so-called invitation. Gov. Mot. Ex. K. An email like this involving a generic recruitment letter and job post cannot be said to affect the legal rights of either the sender or the recipient because no rights or obligations are imposed on either party. Nor is this more-than-a-decade-old email relevant to any of the issues in this case.

The cases cited by the government support Mr. Gupta's position. They demonstrate that (i) a "verbal act" must bear a direct or close relationship to the legal issues in the case, and (ii) a verbal act is only admissible if a witness with personal knowledge can testify about it. Neither requirement is met here. *See, e.g.*, *United States v. Padilla*, 374 F.2d 996, 997 (2d Cir. 1967) (statements made by a co-conspirator to an undercover agent to "rely on" the defendant for importing drugs were admissible as verbal acts where the defendant was charged with conspiracy to import drugs); *United States v. Childs*, 539 F.3d 552, 559 (6th Cir. 2008) (recipient of the verbal act testified at trial that the co-conspirator in a murder conspiracy asked the recipient "if she knew anyone who could kill someone for her"); *United States v. Gordon*, 1991 WL 108723, at *1, *3 (6th Cir. June 20, 1991) (witness testified that someone had invited him into the drug trade in a case involving conspiracy to distribute cocaine and use of a firearm in relation to the drug offense).

The government also argues in the alternative that it is not offering the invitation for the truth of the matter, but rather "to show that Yadav was invited in 2012 to join RAW and the GOI's Cabinet Secretariat—as circumstantial proof that Yadav was the type of employee who would receive such an invitation and that at the time of the charged crimes in 2023, Yadav worked there." Gov. Mot. at 15. But those assertions depend on the truth of contents of those documents. Because the government has offered no meritorious hearsay exceptions or exemptions that apply to both the email and its attachments, Exhibit K must be excluded.

4. *The Government Cannot Use Unauthenticated Financial Documents Allegedly Belonging to Yadav as Evidence that he Worked for GOI*

Lastly, the government contends that it is offering unauthenticated paystubs, Form 16 tax deduction statements, and income tax returns (collectively, the "Financial Statements") as circumstantial proof that Yadav was employed by GOI. Gov. Mot. at 15; *see* Gov. Mot. Exs. D, E, F, L, M. The government argues that even if the Court finds the Financial Statements are being offered for their truth, they should be admitted under Rule 807, the residual hearsay exception. Gov. Mot. at 16. These arguments fail.

a. The Financial Statements Are Being Introduced for the Truth of the Matters Asserted Therein

The government is seeking to use the Financial Statements for the truth of the statements contained within them—that is, that Yadav was employed by GOI. The Form 16 tax deduction statements *directly* assert that Yadav is employed by the "Cabinet Sectriate" [*sic*], a branch of GOI. Gov. Mot. Exs. D, F. The annual tax and income statements that the government seeks to offer list the "Cabinet Sectriate" [*sic*] as Yadav's tax "deductor" [*sic*] and assert that the "Central Reserve Police Force ('CRPF')" is a source of income for Yadav. Gov. Mot. Exs. E, M. The pay slip asserts that Yadav was stationed at "Arc Charbatia" as an "SFO" with his apparent payor being the "Directorate of Accounts Cabinet Secretariat (Main Wing)." Gov. Mot. Ex. L. The assertions in these documents are only relevant to the government's argument that Yadav worked for GOI if they are taken as true. *Harwood*, 998 F.2d at 95, 97.

The government's summary of Professor Nitasha Kaul's anticipated expert testimony illustrates how the government intends to use the Financial Statements for their truth. The government contends that Professor Kaul will establish that "RAW is headquartered at the Central Government Office ('CGO')." Gov. Mot. at 5 n.3. But to establish that Yadav also worked at the

CGO, the government must rely on Form 16 for its truth, *i.e.*, to demonstrate that Yadav was employed as listed on the form and that the address on the form is in fact his employer's address. Gov. Mot. Exs. D, F. The government's expert also intends to testify that RAW often recruits officers from India's CRPF. Gov. Mot. at 5 n.3. To establish that Yadav was a member of the CRPF, the government must rely on the annual tax statements and income tax returns for their truth—that the CRPF was a deductor of Yadav's income (and therefore his employer) and that he earned a salary from the CRPF. Gov. Mot. Exs. E, M.

The cases cited by the government for the proposition that courts admit "physical documents as circumstantial proof of identity or association" are inapposite. Gov. Mot. at 15. The relevance of the admitted documents in those cases was derived from where they were found and not from the truth of the statements in the documents. *See, e.g.*, *United States v. Mejias*, 552 F.2d 435, 446 (2d Cir. 1977) (business card that was found *on* the defendant admitted for the purposes of showing "a relationship between [the defendant] and [the person on the card]"); *United States v. Triplett*, 1988 WL 82817, at *5 (9th Cir. 1988) (documents bearing defendant's name that were found in a trailer were used to establish that defendant lived in the trailer, but not to establish the underlying contents of the document); *United States v. Arrington*, 618 F.2d 1119, 1122, 1126 (5th Cir. 1980) (utility bills found during a search admissible as circumstantial evidence that defendant resided in the house, but not to prove the truth of the contents of the bills). Unlike in *Mejias*, *Triplett*, and *Arrington*, the Financial Statements are not being used to merely establish a fact about Yadav based on where they were found. Rather, they are being offered for the truth of their internal statements—to establish that Yadav was employed by GOI.

Because the government is using these out-of-court statements for their truth, the Financial Statements are hearsay and must be excluded. *See* Fed. R. Evid. 801(c); *Zeeman v. United States*,

275 F. Supp. 235, 256 n.8 (S.D.N.Y. 1967) ("[S]tanding by itself, the [tax] return is . . . hearsay);

*Fox*, 2025 WL 2076664, at *13 (limiting the government's use of certain tax records and photo

IDs to "the non-hearsay purpose of showing falsity").

> b.   <u>The Government's Proposed Use of the Financial Statements Is Not Permitted Under Rule 807</u>

The Financial Statements are not admissible under the residual exception to the rule against

hearsay, which is to be used "very rarely, and only in exceptional situations." *Lakah v. UBS AG*,

996 F. Supp. 2d 250, 257 (S.D.N.Y. 2014) (citation omitted). Hearsay evidence is admissible

under Rule 807 only when "(1) the statement is supported by sufficient guarantees of

trustworthiness" and "(2) it is more probative on the point for which it is offered than any other

evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807. In

assessing trustworthiness, courts evaluate (1) "the circumstances surrounding the discovery of the

records," (2) "the appearance of the records, including their internal consistency," and (3) "the

contents of the records." *United States v. Guo*, 2024 WL 1939221, at *5 (S.D.N.Y. May 2, 2024).

The Financial Statements fail the trustworthiness prong of the residual exception. *First*,

the circumstances surrounding the discovery of the Financial Statements suggest that they are not

trustworthy. Despite the government's claim that Account-2 belongs to Yadav, the owner of

Account-2 has not been established, and the government will have no testimony at trial sufficient

to establish the owner of that account. Gov. Mot. at 15. Moreover, many of the Financial

Statements were transmitted to or from a "███████████" who uses alternatively a Yahoo and

a Gmail account. Gov. Mot. Exs. D, E, F, M. The transmission emails contain no email signature

indicating who ████████████ is and no suggestion that ██████ is an accountant or otherwise

responsible for preparing tax statements. Accordingly, the circumstances surrounding the transmission of the Financial Statements provide no indicia of trustworthiness.

*Second*, the appearance of the Financial Statements is not "so 'distinctive' as to support [their] trustworthiness." *Guo*, 2024 WL 1939221, at *6. While Exhibits D and F (Form 16) contain digital signatures, the forms make clear that the signatures have not been verified. Furthermore, even though the exhibits are marked with symbols that appear to be attributable to certain departments within GOI, these alone are not enough to establish their trustworthiness. *See id.* (excluding bank documents that bore the bank's insignia). This is especially true given that the documents were obtained from the Google Accounts rather than directly from GOI or from public records, calling into question where the symbols came from.

The government argues that the consistency and duration of the Financial Statements establish their trustworthiness (Gov. Mot. at 16-17), but their consistency and duration are extremely limited. The government offers one document, Exhibit L, from 2017, that is different in kind from the other Financial Statements that the government seeks to admit, which were created years after Exhibit L. The other Financial Statements span a two-year period and contain two statements from each year. The limited duration of the Financial Statements is not sufficiently consistent to adequately establish that the statements are trustworthy.

*Finally*, the content of the Financial Statements lacks trustworthiness. In *Guo*, the court held that certain bank records were not sufficiently trustworthy to be admitted under Rule 807 where there was no "information as to how the Bank Records 'were prepared or maintained.'" 2024 WL 1939221, at *5. Like in *Guo*, the government has not provided any evidence as to how the Financial Statements at issue were prepared and maintained or any evidence of their authenticity. *Id.* ("Without insight into 'the exact circumstances by which the spreadsheet was

prepared,' it cannot fulfill the residual hearsay exception's trustworthiness requirement." (citation omitted)). The Court cannot know whether the documents could have been "modified," thereby "alter[ing] the nature of the [Financial Statements]." *Id.* The Financial Statements thus bear the ordinary "faulty narration" risk of hearsay evidence. *United States v. Mejia*, 948 F. Supp. 2d 311, 316 (S.D.N.Y. 2013) (citation omitted).

The government's reliance on Exhibits N through S—other documents purporting to show Yadav's employer and financial circumstances—to corroborate the trustworthiness of the Financial Statements is unavailing. Gov. Mot. at 17 n.13. These exhibits are not from independent sources but instead were found in the same unauthenticated Google Account, Account-2, in which the Financial Statements were found. Like the Financial Statements, none of the exhibits have been authenticated and all the exhibits were transmitted between unknown individuals. As these exhibits suffer from the same trustworthiness problems as the Financial Statements, they do not corroborate the trustworthiness of the Financial Statements. *Cf. United States v. Prevezon Holdings, Ltd.*, 319 F.R.D. 459, 467-68 (S.D.N.Y. 2017) (admitting evidence under Rule 807 where there was sufficient corroborating evidence, including evidence from independent sources).

Additionally, while the government seeks to corroborate Exhibits D and F (the Form 16s), with a blank Form 16 (Gov. Mot. Ex. T), the blank Form 16 cannot corroborate the underlying content of Exhibits D and F that the government seeks to admit for its truth. Gov. Mot. at 17. Given the lack of indicia of trustworthiness in the Financial Statements, the Court should not admit them under Rule 807.

## III. THE GOVERNMENT SHOULD NOT BE PERMITTED TO WITHHOLD THE TRUE NAME OF THE UC AS IT WOULD IMPERMISSIBLY BURDEN MR. GUPTA'S CONSTITUTIONAL RIGHTS

The government seeks to (i) withhold the name of the UC from Mr. Gupta *and* his defense counsel, (ii) close the courtroom for the testimony of the UC, and (iii) have the UC and CS testify

pseudonymously. Gov. Mot. at 36. The defense does not object to closing the courtroom for the UC's testimony or to the UC and CS testifying using pseudonyms (provided that, as the government states in its motion, the jury will be unaware that they are testifying under pseudonyms). However, the defense objects to the government's efforts to prevent even Mr. Gupta's counsel from learning the UC's name. The government has not met its burden to justify such a restriction on Mr. Gupta's Confrontation Clause right to a fulsome cross-examination of and an independent investigation into a key adverse witness.

## A. The Confrontation Clause Protects a Defendant's Right to Investigate Adverse Witnesses

"Cross-examination of a witness is a matter of right" guaranteed to an accused person in a criminal prosecution. *Alford v. United States*, 282 U.S. 687, 691 (1931); *see also* U.S. Const. amend. XI. This right is violated when a defendant is "prohibited from engaging in otherwise appropriate cross-examination designed . . . 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)).

The Confrontation Clause guarantees a defendant the right to investigate an adverse witness using his identifying information, including his full name. *Smith v. Illinois*, 390 U.S. 129, 131 (1968) ("The witness' name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself.").[6] Additional constitutionally protected "permissible purposes" of cross-examination are to demonstrate bias and "impeach the witness's

---

[6] To be clear the defense does not intend to question the UC about his full name or address or in any way disclose that information publicly, including at trial. But *Smith* protects a defendant's right to conduct an out-of-court investigation into a witness in preparation for cross-examination, including by using that witness's full name for investigatory purposes.

recollection, ability to observe, and general credibility." *Alford*, 282 U.S. at 691; *Cotto v. Herbert*, 331 F.3d 217, 249 (2d Cir. 2003) (citing *United States v. Reindeau*, 947 F.2d 32, 36 (2d Cir. 1991)). The Second Circuit has explained that there are "two central interests" safeguarded under *Smith* and *Alford*, both of which relate to the disclosure of a witness' identifying information. *United States v. Marti*, 421 F.2d 1263, 1266 (2d Cir. 1970). These include the ability to "(1) obtain[] information needed for in-court and out-of-court investigation of the witness; and (2) enable[] defense counsel to elicit information that might be relevant to the jury's deliberations as to the credibility or knowledgeability of the witness." *United States v. Bannister*, 2023 WL 2596890, at *3 (S.D.N.Y. Mar. 22, 2023) (citation omitted); *see also Marti*, 421 F.2d at 1266.

## B. The Court Should Require the Government to Disclose the UC's Identity on an AEO Basis

The government has failed to meet its burden to identify any particularized harm to the UC that would necessitate withholding identifying information from defense counsel on an AEO basis. While the government has proffered general concerns for the UC's safety, these concerns are untethered from any specific issues relevant to Mr. Gupta. *See* Gov. Mot. at 44-46. The government also offers no reason why providing the UC's name to defense counsel (two of whom are former Assistant U.S. Attorneys from the same office prosecuting Mr. Gupta) would present any risk to the UC. *See generally id.* at 43-49. Defense counsel, and any investigators working on defense counsel's behalf, would not object to signing a supplemental protective order specifically related to safeguarding the UC's identity.

The defense appreciates the safety concerns articulated in the government's motion, *see id.* at 44-46, *see also* Gov. Mot. Ex. X, and, because it recognizes the legitimacy of those concerns, is not objecting to the government's requests to have the UC testify in a closed courtroom using a pseudonym. These measures are more than sufficient to address the concerns asserted by the

government.  But the government's request that, in addition to these significant measures, the UC's name be withheld from even defense counsel, goes too far.  While the government has articulated a number of risks the UC ████████████████████████████████████████ ████████████████████████████████████████████████, it does not articulate a single particularized risk the UC might face if *Mr. Gupta's defense counsel* were to receive his true name on an AEO basis.[7]  *See* Gov. Mot. at 43-49; Gov. Mot. Ex. X.

The UC's name is highly relevant to the defense's ability to conduct the out-of-court examination necessary to assess his credibility and reliability, and there is no other sufficient way for the defense to obtain the information that it seeks.  *See Alford*, 282 U.S. at 692 ("Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them.").  For example, the government's declaration in support of its motion identifies ████████████ ████████████.  *See* Gov. Mot. Ex. X. ¶ 6.  The defense has not yet received any details regarding ████████████████ beyond this brief mention in an exhibit to the government's motion, but it must investigate ████████████████, including by speaking with witnesses and accessing any related reporting and files.  The defense, of course, will not be able to identify and speak with witnesses if it does not even know the UC's true name.

The government's proposal of having an investigator from the U.S. Attorney's Office conduct database queries regarding the UC for defense counsel would not solve that problem.  *See* Gov. Mot. at 49.  Moreover, trial is quickly approaching, and the proposal contains no guarantee that these searches will be done in the timeframe required for effective cross-examination.  This

_____

[7] The declaration submitted by the government identifies safety issues it believes are specific to Mr. Gupta.  Each of these risks can be addressed by providing the UC's true name on an AEO basis to Mr. Gupta's counsel, subject to any protective orders or safeguards deemed necessary.

proposal is also no substitute for the defense's ability to hire a private investigator to conduct the kind of in-depth background investigation required for an effective cross-examination (especially where, as here, ███████████████████████████████).

Several courts in this circuit have required the disclosure of personal identifying information of witnesses to at *least* defense counsel for the purposes of an out-of-court investigation. *See e.g.*, *Marti*, 421 F.2d at 1266 (acknowledging little risk of prejudice after prosecution offered to communicate witness' address privately to defense counsel to enable the defense to investigate the witness out of court); *United States v. Marcus*, 2007 WL 330388, at *2 (E.D.N.Y. Jan. 31, 2007) (limiting scope of cross-examination on the witnesses' home address and employment only after ordering the government to disclose the witnesses' names to the defendant for the purposes of his out-of-court investigation). The government has already produced a considerable portion of its discovery to the defense on an AEO basis. As such, disclosing the UC's identifying information to defense counsel on that same basis would appropriately balance Mr. Gupta's rights against the safety concerns articulated in Exhibit X to the government's motion.

The government cites several cases that it argues are analogous, but the defense in those cases either did not oppose the government's non-disclosure of the UC's identity or articulate a legitimate need for the information. *See* Gov. Mot. at 46-49; *United States v. Urena*, 8 F. Supp. 3d 568, 573 (S.D.N.Y. 2014) (the defendant failed to demonstrate the materiality of the UC's real name and in fact appeared to concede that the name was immaterial to defendant's guilt or innocence); Minute Entry, *United States v. Donovan*, No. 20 Cr. 374 (PKC) (E.D.N.Y. Dec. 21, 2021), Dkt. No. 91 (the record reflects no statements from the defense regarding why provision of the UC's name was necessary); Order, *United States v. Eusebio*, 22 Cr. 522 (GHW) (S.D.N.Y. Oct. 29, 2024), Dkt. No. 568 (noting that "Mr. Eusebio preserves his objection to the process

[outlined]" but that "neither he nor any other Defendant provided comments regarding the Government's proposed procedures"); *United States v. Roopnarine*, 718 F. App'x 797, 809 (11th Cir. 2017) (counsel did not "argue or assert an objection based on some claimed prejudice as a result of withholding the witness's identity").

Another case that the government cites supports Mr. Gupta's position. *See* Gov. Mot. at 48. In *Washington v. Walsh*, 2010 WL 423056, at *4 (S.D.N.Y. Feb. 5, 2010), the court restricted defense counsel's access to a witness's name because counsel already had access to information sufficient to conduct a pre-trial impeachment investigation, including the officers' shield numbers. *Id.* Here, however, Mr. Gupta and his counsel have no knowledge of any identifying material concerning the UC that would enable the same kind of pre-trial inquiry.

## IV. THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM ADMITTING THE CZECH CELLPHONE SURRENDER RECORD BECAUSE IT IS INADMISSIBLE HEARSAY

The government seeks to admit a Czech document (Gov. Mot. Ex. W) into evidence under the U.S.-Czech Mutual Legal Assistance Treaty ("MLAT") and as an adoptive admission. Gov. Mot. at 18. The government claims that after Mr. Gupta was arrested in the Czech Republic, Mr. Gupta acknowledged in writing that Czech law enforcement officers seized three cellphones belonging to him. *Id.* at 18-19. The government asserts that this document, which it calls the "Czech Surrender Record," was signed by Mr. Gupta, Mr. Gupta's Czech attorney, an interpreter, and a Czech officer. *Id.* at 19; *see also* Gov. Mot. Ex. U. This document does not constitute an adoptive admission for two reasons.

*First*, the government claims that the Czech Surrender Record is Mr. Gupta's adoptive admission primarily because he purportedly signed the document. Gov. Mot. at 18-19. But the government offers no proof of the circumstances or context that would support that this is in fact Mr. Gupta's signature as required under Federal Rule of Evidence 901. *See, e.g.*, *United States v.*

*Garrity*, 2018 WL 2676891, at *1 (D. Conn. June 4, 2018) (outlining a non-exhaustive list of ways to authenticate a signature under Rule 901, such as by comparing signatures among "specimens of [the alleged signatory's] writing which have been authenticated" (internal citation omitted)).

*Second*, the government has not established that Mr. Gupta intended to adopt the statements in the document. *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 262 (S.D.N.Y. 2003) (noting that in order for a statement to be adopted, the facts and circumstances must represent that the party's use of the statement represents the party's "intended assertion of the truth and information contained therein" (cleaned up)). The government will not call any witness to testify concerning the circumstances of Mr. Gupta's alleged signature on the document. At the suppression hearing, the evidence showed that on the day of his arrest in the Czech Republic, Mr. Gupta arrived in a foreign country where he was arrested, interrogated, put into a van, interrogated again, and then taken to a holding cell. *See* Tr. of Aug. 12, 2025 Suppression Hr'g at 39:14-41:11; 82:3-8; 100:20-101:23; 105:13-20; 129:15-24 . The government claims—without submitting any evidence or testimony to attest to this fact—that Mr. Gupta was then purportedly provided with a Czech attorney and a translator and signed the Czech Surrender Record. Gov. Mot. at 19. But the government can offer no context for what happened before or after he signed this document.

Mr. Gupta's alleged signature also does not make "adoption plain" where the evidence is uncontroverted that Mr. Gupta does not speak the Czech language and the government has not offered any proof surrounding the circumstances of the signature's execution. *See, e.g.*, *United States v. Orellana-Blanco*, 294 F.3d 1143, 1148-49 (9th Cir. 2002) (declining to admit immigration form signed by Spanish speaking defendant because the translator was not present for portions of the interview and "couldn't testify to what went on when [the translator] wasn't there"). In fact,

the translator who allegedly translated the Czech Surrender Record for Mr. Gupta before he allegedly signed it does not speak Hindi, Mr. Gupta's native language. A public web page for the Czech Republic Chamber of Court Interpreters and Translators lists Ms. Badieová, the purported translator, as speaking only Czech and English, not Hindi, making it clear that, at best, she translated the Czech Surrender Record into English for Mr. Gupta.[8]

This is supported by other documents the government produced in discovery that relate to various other interrogations and proceedings in the Czech Republic. One document that is dated July 1, 2023, lists an individual named Rashid Zahid as a Hindi interpreter and notes that he had to be specifically appointed for Mr. Gupta's case since there was no Hindi interpreter already officially affiliated with the court. *See* Opp. Ex. G-T. This document shows that only one day after Mr. Gupta allegedly signed the Czech Surrender Record, the Czechs recognized the limits of Mr. Gupta's English and took the significant steps necessary to retain an interpreter who could communicate in his native language. Indeed, Mr. Zahid was present as a Hindi interpreter again at a later interrogation on October 5, 2023. *See* Opp. Ex. H-T. Notably, Ms. Badieová was also at that same interrogation but serving as an *English* interpreter for others present.[9] *Id.*

Mr. Gupta cannot be deemed to have adopted a statement that he could not fully comprehend because it was not even translated to him in his native language. *See Orellana-Blanco*, 294 F.3d at 1148-49; *see also United States v. Joshi*, 896 F.2d 1303, 1311 (11th Cir. 1990) ("When a statement is offered as an adoptive admission . . . there must be sufficient foundational

---

[8] *See* Czech Republic Chamber of Court Interpreters and Translators, *Mgr. Heather Badieová*, https://www.kstcr.cz/en/members/heather-badieova/ (last accessed Oct. 6, 2025).

[9] Ms. Badieová was presumably interpreting for the large number of United States representatives present, who included the three AUSAs prosecuting this case and, from the DEA, Special Agent Mark Franks and Task Force Officer Jose Sandobal. *Id.*

facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement.") (citations omitted). Without any evidence tying the signature on the Czech Surrender Record to Mr. Gupta, or any evidence that he understood the statements in the record and intended to adopt them, the record cannot be considered an adoptive admission, making any truth the record purports to represent inadmissible hearsay that should not be admitted. *See United States v. Galanis*, 429 F. Supp. 1215, 1227 (D. Conn. 1977) (noting that certification of a foreign document is a separate inquiry from authentication); *Guadalupe v. City of New York*, 2016 WL 3570545, at *3 (S.D.N.Y. June 24, 2016) ("Authentication means only that there is evidence adequate to support a finding that a document 'is what the proponent claims it is.'") (citing Fed. R. Evid. 901(a)); *In re Axos Bank Litig.*, 2024 WL 4195299, at *2 (S.D. Cal. Sept. 13, 2024) (finding that a party seeking authentication of a writing may present "evidence of the contents of the contract in question and the circumstances surrounding the contract's execution" (cleaned up)).

## CONCLUSION

For the foregoing reasons, the government's motions *in limine* should be denied.

Dated:    October 6, 2025

Respectfully submitted,

_____

Nola B. Heller
Matthew Laroche
Peter Farag
Isabel C. Pitaro
Elyse J. Hain
MILBANK LLP
55 Hudson Yards
New York, New York 10001
212-530-5000

*Counsel for Defendant Nikhil Gupta*