```
P8CDGup1
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                         23 Cr. 289 (VM)

NIKHIL GUPTA,
    also known as Nick,

                Defendant.

                              Hearing

------------------------------x

                              New York, N.Y.
                              August 12, 2025
                              9:00 a.m.

Before:

                  HON. VICTOR MARRERO,

                              District Judge

                    APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  ASHLEY NICOLAS
      ALEXANDER LI
      CAMILLE L. FLETCHER
      Assistant United States Attorneys

MILBANK LLP
    Attorneys for Defendant
BY:  MATTHEW LAROCHE
      NOLA HELLER
      PETER FARAG
      ISABEL PITARO
      ELYSE HAIN

P8CDGup1

1    APPEARANCES Continued;

2

3    Also Present:      David Santiago, paralegal, Milbank LLP
                        Samantha Roberts, paralegal, U.S. Attorney's
4                           Office
                        Nita Shah, Interpreter (Hindi)
5                       Umesh Passi, Interpreter (Hindi)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P8CDGup1

1             (Case called)

2             THE COURT:  Counsel, please enter your appearances for

3    the record.

4             MR. LI:  Good morning, your Honor.  Alexander Li,

5    Ashley Nicolas, and Camille Fletcher for the government.  We're

6    joined at counsel table by our paralegal specialist, Samantha

7    Roberts.

8             MR. LAROCHE:  Good morning, your Honor.  Matt LaRoche,

9    Nola Heller, Isabel Pitaro, Peter Farag, and Elyse Hain on

10   behalf of Mr. Gupta.

11            THE COURT:  All right.  Thank you.

12            The Court scheduled this proceeding in connection with

13   a defense motion for suppression of certain materials that the

14   government obtained in connection with the arrest of the

15   defendant.  I received this morning a letter dated August 11,

16   2025, from the defendant's counsel.  In this letter, the

17   defense indicates that there is certain discovery that it

18   believes is relevant and should be turned over to the defense

19   for examination, and that failure to do so would be prejudicial

20   to the defense in producing its response, and, if necessary,

21   calling the witnesses that the defense believes are critical to

22   the preparation of its case.

23            Let me first ask the government whether it received

24   this letter of August 11, whether it has reviewed the letter,

25   and is prepared to discuss the matter here today, or whether,

P8CDGup1

 1   in light of the urgency and lateness of this letter, at this

 2   point it might be more prudent to examine the whether we're

 3   ready to proceed at this hearing this morning.

 4           Mr. Li.

 5           MR. LI:  Thank you, your Honor.  I'm happy to address

 6   those issues.

 7           Your Honor, we received a preview of this letter at

 8   about 11:00 p.m. last night.  The defense indicated they

 9   intended to file it.  They filed it a few hours later, I think

10   around 2:00 or so in the morning.  We reviewed the filed letter

11   this morning.  We are prepared to address the issues.  We are

12   familiar with the issues, and we believe the law is very clear

13   that the relevant individuals, Special Agents Catalano and

14   Brannon, are not members of the prosecution team.  We're happy

15   to explain why to the Court.

16           With respect to proceeding today, we conferred with

17   the defense early this morning.  I think the parties are

18   prepared to proceed with the suppression hearing today

19   regardless of the Court's ruling on this issue.  If I'm

20   mistaken, I'm sure the defense will correct me, but certainly

21   the government is ready to proceed with the suppression hearing

22   today.

23           THE COURT:  All right.  Thank you.

24           MR. LAROCHE:  That's correct, your Honor.  I think the

25   defense agrees the most prudent way to proceed today, given

P8CDGup1

1    that there are some open issues that should be considered and

2    discussed with this letter, is to proceed with the witnesses as

3    is, and to the extent the Court orders the government to

4    produced additional materials, we would of course reserve our

5    right to request that your Honor either allow us to either

6    present those as evidence or call another witness to the extent

7    the new production justified it.

8            Just a note on timing, your Honor.  We drafted that

9    letter yesterday afternoon, because we were notified yesterday

10   afternoon from our perspective for the first time that these

11   two individuals were not considered to be part of the

12   prosecution team.  That was a surprise to us.  And, again, we

13   don't have to get into the substance of that today, but that's

14   why we worked as quickly as we could to get the letter out last

15   night.

16           But Mr. Li is correct, we're happy to proceed today on

17   this record, and to the extent your Honor order further

18   productions, we would of course reserve our rights.

19           THE COURT:  All right.  Thank you.

20           Is the government ready to proceed?

21           MR. LI:  The government is ready to proceed.

22           THE COURT:  All right.  Do you want to call your

23   witnesses at this point?

24           MR. LI:  Yes, your Honor.  The government calls Task

25   Force Officer Jose Sandobal.

P8CDGup1

```
 1              (Witness sworn)

 2              THE COURT:  You may be seated.

 3              Speak into the microphone.  Get as close as possible.

 4              Before we proceed, let me note for the record that the

 5    defendant is apparently following this proceeding with the

 6    assistance of interpretation.  It is the practice of this Court

 7    to identify on the record the name of the interpreter and

 8    confirm that the interpreter is either on the staff of the

 9    Court or is a certified interpreter.

10              INTERPRETER SHAH:  This is Nita Shah.  I'm certified.

11              THE COURT:  I'm sorry?  Your name?

12              INTERPRETER SHAH:  Nita Shah.

13              THE COURT:  You're an interpreter?

14              INTERPRETER SHAH:  Yes, your Honor.

15              THE COURT:  What language?

16              INTERPRETER SHAH:  Hindi.

17              INTERPRETER PASSI:  Umesh Passi, certified

18    interpreter.  Good morning, your Honor.

19              THE COURT:  Thank you.

20              Through the interpreters, I would like to confirm if

21    the defendant in fact is following this proceeding and will be

22    able to understand it fully with the assistance of this

23    interpretation.

24              THE DEFENDANT:  Yes, I can.  Yes, I can understand.

25              THE COURT:  Thank you.
```

P8CDGup1                              Sandobal - Direct

```
 1                Mr. Li.
 2                MR. LI:  Thank you, your Honor.  Apologies if I missed
 3     it, but do the interpreters confirm whether they were either
 4     certified or under oath?
 5                INTERPRETER SHAH:  Certified, your Honor.
 6                INTERPRETER PASSI:  Yes, sir.  Certified.
 7                MR. LI:  Thank you, your Honor.
 8      JOSE SANDOBAL,
 9          called as a witness by the government,
10          having been duly sworn, testified as follows:
11     DIRECT EXAMINATION
12     BY MR. LI:
13     Q.  Good morning, sir.  What is your name?
14     A.  Good morning.  Jose Sandobal.
15     Q.  Are you currently employed?
16     A.  Yes.
17     Q.  Where do you work?
18     A.  New York City Police Department.
19     Q.  Is that also known as NYPD?
20     A.  Yes.
21     Q.  What is your title there?
22     A.  Detective.
23     Q.  How long have you worked at the NYPD?
24     A.  I started my 22nd year in July.
25     Q.  Do you also have a relationship with the Drug Enforcement
```

P8CDGup1                          Sandobal - Direct

1    Administration or DEA?

2    A.    Yes.

3    Q.    What's your title at the DEA?

4    A.    Task force officer.

5    Q.    How long have you been a task force officer with the DEA?

6    A.    For about nine years.

7    Q.    In your approximately 21 years of law enforcement

8    experience, approximately how many times have you conducted a

9    substantive interview of a person under arrest?

10   A.    Over 100.

11   Q.    Are you familiar with Miranda warnings?

12   A.    Yes.

13   Q.    Approximately how many times have you delivered Miranda

14   warnings?

15   A.    About the same.

16   Q.    Do you typically deliver Miranda warnings before

17   interviewing someone who is under arrest about the facts of an

18   investigation?

19   A.    Yes.

20   Q.    In your capacity as a task force officer at the DEA, did

21   you participate in an investigation of Nikhil Gupta?

22   A.    Yes.

23   Q.    What was your role in that investigation?

24   A.    I was one of two lead case officers.

25   Q.    And who was the other lead case officer?

P8CDGup1                         Sandobal - Direct

1    A.   DEA Special Agent Mark Franks.

2    Q.   Let me turn your attention to June 30, 2023.  What city and

3    country were you in that day?

4    A.   I was in Prague, in the Czech Republic.

5    Q.   Did there come a time that day that you went to the Prague

6    airport?

7    A.   Yes.

8    Q.   Why did you go there?

9    A.   For the arrest of Mr. Nikhil Gupta.

10   Q.   Were you participating in that arrest?

11   A.   No.

12   Q.   What was your job?

13   A.   To remain in the van.

14   Q.   And who was going to conduct the arrest of Nikhil Gupta?

15   A.   The Czech Republic police officers.

16   Q.   Did anyone else go with you in the van to the Prague

17   airport?

18   A.   Yes.

19   Q.   Anyone else from the DEA?

20   A.   Yes.

21   Q.   And who?

22   A.   Special Agent Mark Franks.

23   Q.   Anyone else from the DEA?

24   A.   No.

25   Q.   Did the Czech Police in fact arrest the defendant at the

P8CDGup1                          Sandobal - Direct

1   Prague airport on June 30, 2023?

2   A.  Yes.

3   Q.  And were you physically present inside the airport when the

4   defendant was arrested by the Czech Police?

5   A.  No.

6   Q.  Was Special Agent Franks physically inside the airport when

7   the defendant was arrested by the Czech Police?

8   A.  No.

9   Q.  Where were you?

10  A.  I was in the van with Special Agent Franks.

11  Q.  And where was that van?

12  A.  It was outside the main entrance to the airport.

13  Q.  Why were you in a van outside the airport?

14  A.  We were instructed to wait in the van.

15  Q.  Who instructed you to do that?

16  A.  The Czech Republic police.

17  Q.  After they arrested the defendant, did the Czech Police

18  tell you whether they had obtained any of the defendant's cell

19  phones?

20  A.  Yes.

21  Q.  What did they tell you?

22  A.  That they seized three cell phones.

23  Q.  Did they tell you anything about the defendant's passcodes?

24  A.  Yes.

25  Q.  What did they tell you?

P8CDGup1                          Sandobal - Direct

1    A.   That he voluntarily provided them with the passcodes of the

2    phones.

3    Q.   That he had voluntarily provided the Czech Police?

4    A.   Yes.

5    Q.   Did the Czech Police say anything about whether the

6    defendant had consented to the search of any of his cell

7    phones?

8    A.   Yes.

9    Q.   What did they say about that?

10   A.   They consented to a search of the phones.

11   Q.   Did the Czech Police specify which phone or phones the

12   defendant had consented to search?

13   A.   No.

14   Q.   Did the Czech Police say that the defendant had refused

15   consent to search any of his phones?

16   A.   No.

17   Q.   Had you asked the Czech Police to ask the defendant for his

18   passcodes?

19   A.   No.

20   Q.   To your knowledge, had anyone from the DEA requested that

21   the Czech Police ask the defendant for his passcodes?

22   A.   No.

23   Q.   After the defendant's arrest by the Czech Police, did you

24   interview the defendant?

25   A.   Yes.

P8CDGup1                          Sandobal - Direct

1    Q.  Where did you conduct that interview?

2    A.  In the van traveling from the airport to the jail.

3    Q.  What jail?

4    A.  The Prague jail in Prague.

5    Q.  Did the Czech Police actively participate in your interview

6    of the defendant in the van?

7    A.  No.

8    Q.  Did anyone else actively participate in that interview?

9    A.  Yes.

10   Q.  Who?

11   A.  Special Agent Mark Franks.

12   Q.  Before asking the defendant any questions about this case,

13   did you and Special Agent Franks advise him of his rights under

14   U.S. law?

15   A.  Yes.

16   Q.  Did he agree to waive those rights?

17   A.  Yes.

18   Q.  Did he agree to speak with you?

19   A.  Yes.

20   Q.  After he waived his rights, did the defendant point you to

21   anything on one of his cell phones?

22   A.  Yes.

23   Q.  What did he point you to?

24   A.  To a name and a phone number.

25   Q.  What was the name?

P8CDGup1                        Sandobal - Direct

1    A.   Amanat.

2    Q.   Based on your discussion with the defendant in the van, did

3    you have an understanding of who Amanat was?

4    A.   Yes.

5    Q.   And what was your understanding based on what the defendant

6    told you?

7    A.   Mr. Amanat had hired Mr. Nikhil Gupta to carry out a murder

8    for hire in New York City.

9    Q.   And you said that the defendant pointed you to a contact

10   for Amanat.  Specifically, what kind of information did the

11   defendant point you to?

12   A.   The name and the phone number associated with it.

13   Q.   And in what form did he point that information out to you?

14   A.   On one of his physical phones.

15   Q.   All right.  So, we'll turn back to the events of June 30 in

16   a few minutes.  Before I do, let me ask you some questions

17   about your interactions with the Czech Police.

18          Before the day of the arrest, that is, June 30, 2023,

19   did you participate in any meetings with the Czech Police?

20   A.   Yes.

21   Q.   Where did those meetings take place?

22   A.   Prague.

23   Q.   Where in Prague?

24   A.   In the police headquarters.

25   Q.   How many meetings did you have with the Czech Police at the

P8CDGup1                        Sandobal - Direct

1    Czech Police headquarters?

2    A.  At least two.

3    Q.  You recall at least two?

4    A.  One, but at least two.

5    Q.  Okay.  And in addition to those one or two meetings at the

6    Czech Police headquarters, do you recall any other meetings,

7    for example, at a restaurant?

8    A.  Yes.

9    Q.  And can you describe those other meetings?

10   A.  The one meeting I remember is going to their headquarters,

11   and the second meeting that I'm referring to is when we sat

12   down to eat.  It wasn't really a meeting.  It was a social

13   gathering.

14   Q.  Okay.  So let's turn to the meeting you have in mind at

15   Czech Police headquarters.  When did that take place?

16   A.  The day before the arrest.

17   Q.  Who was present?

18   A.  Myself, Special Agent Franks, the country attache, DEA

19   Special Agent Kyle Catalano -- excuse me, Kyle Brannon, Special

20   Agent Joe Catalano, and Czech police officers.

21   Q.  All right.  So let's break that down a little bit.  So, you

22   mentioned someone named Kyle Brannon.

23        Who is that?

24   A.  That is one of the country attaches.

25   Q.  So when you listed the country attache, are you thinking of

P8CDGup1                        Sandobal - Direct

1    a different person or were you thinking of Kyle Brannon?

2    A.   Kyle Brannon.

3    Q.   You also mentioned someone named Joe Catalano.

4              Who is Joe Catalano?

5    A.   He is the assistant country attache.

6    Q.   Are both Kyle Brannon and Joe Catalano special agents with

7    the DEA?

8    A.   Yes.

9    Q.   You referred to something called a country attache.   What

10   is your understanding of the country attache's role in

11   connection with this investigation?

12   A.   They were the liaison between the DEA and the Czech

13   Republic police officers.

14   Q.   And what role, if any, did Special Agents Brannon and

15   Catalano have in coordinating the arrest of the defendant?

16   A.   They just coordinated the needs that we needed in order to

17   affect the arrest of Mr. Nikhil Gupta with the Czech Police.

18   Q.   So, to be clear, they coordinated with the Czech Police?

19   A.   Yes.

20   Q.   Other than coordinating with Czech authorities regarding

21   the arrest, did they also coordinate with the Czech Police

22   regarding other things you needed from the Czech Police?

23   A.   Yes.

24   Q.   Did that include mutual legal assistance requests?

25   A.   Yes.

P8CDGup1                          Sandobal - Direct

1    Q.  Did that include extradition?

2    A.  Yes.

3    Q.  Other than coordinating with the Czech authorities

4    regarding the defendant's arrest, legal assistance questions,

5    and extradition did Special Agent Brannon have any involvement

6    in your investigation of this case?

7    A.  No.

8    Q.  Other than coordinating with Czech authorities, did Special

9    Agent Catalano have any involvement in your investigation of

10   this case?

11   A.  No.

12   Q.  Who were the Czech police officers at the meeting?

13   A.  The one name I can remember is Petr, and the other names I

14   do not know.

15   Q.  Do you recall how many Czech police officers were at this

16   meeting?

17   A.  I would say about three to four.

18   Q.  And you said you recall one name specifically, Petr.  Do

19   you have an understanding of Petr's role within the Czech

20   Police?

21   A.  I believe he was the supervisor.

22   Q.  How long was the meeting?

23   A.  Less than an hour.

24   Q.  Generally speaking, what were the topics discussed at the

25   meeting?

P8CDGup1                        Sandobal - Direct

1    A.  The arrest, that we had an arrest warrant for Mr. Nikhil

2    Gupta discussing the confirmation that he was going to be

3    flying to Prague, and on the day of the flight, that he was, in

4    fact, on the plane itself as it was making its way.

5    Q.  Did you discuss how -- what roles, if any, you and Special

6    Agent Franks would play in the arrest?

7    A.  We asked if we could participate in the arrest, and we were

8    told that we couldn't, but -- we could accompany them to the

9    airport, but we couldn't go inside the airport.

10   Q.  Just because -- you were told you could not go inside the

11   airport?

12   A.  We could not go inside the airport.

13   Q.  Who told you that?

14   A.  The Czech Police.

15   Q.  Did you discuss with the Czech Police whether you could

16   conduct an interview of the defendant?

17   A.  Yes.

18   Q.  And what, in substance, was that discussion?

19   A.  We could, but it had to be during the timeframe of

20   transport, during transport from the airport to the local jail.

21   Q.  And who told you that?

22   A.  The local police.

23   Q.  Was there any discussion during this meeting about the

24   defendant's phones?

25   A.  Yes.

P8CDGup1                          Sandobal - Direct

1    Q.  Can you describe in substance what you recall about the

2    defendant's phones being discussed at this meeting?

3    A.  If he had any property like cell phones or anything like

4    that, we would like for it to be seized.

5    Q.  Seized by who?

6    A.  By the Czech Police.

7    Q.  Do you recall any discussion about the defendant consenting

8    to search his phones?

9    A.  We hoped that he would be cooperative to allow us to take a

10   look at his phones.

11   Q.  Do you recall any discussion about the defendant's phones

12   being unlocked or his passcode?

13   A.  The only discussion was made just abruptly of seizing the

14   phones, if they were unlocked, even better.

15   Q.  So that remark you just described that someone said, "if

16   it's unlocked, even better," who said that?

17   A.  It had to be done by one of the DEA agents.  I don't

18   remember who.

19   Q.  Was it you?

20   A.  No.

21   Q.  What did you understand that statement to mean?

22   A.  That as part of an investigation, if someone is cooperative

23   and they willingly cooperate to unlock their phones and provide

24   their passcode, that would be best for our investigation.

25   Q.  Did you understand that statement to mean that the DEA

P8CDGup1                          Sandobal - Direct

1  wanted the Czech Police to ask the defendant for his passcode?

2              MR. LAROCHE:  Objection, leading.

3              THE COURT:  Rephrase the question.

4  Q.  What, if anything, did you understand about the nature of

5  that remark?

6              MR. LAROCHE:  Objection, asked and answered.

7              THE COURT:  Overruled.

8  A.  I understood that to mean it was just a general topic, not

9  directly asking the Czech to do a specific thing.

10 Q.  Did the Czech Police say anything in response to that

11 remark?

12 A.  No.

13 Q.  Do you recall any other discussion at this meeting at Czech

14 headquarters about the defendant's cell phones?

15 A.  No.

16 Q.  Do you recall any other discussion at this meeting about

17 the defendant's cell phones passcode?

18 A.  No.

19 Q.  When was this first meeting?

20 A.  June 29, 2023.

21 Q.  So the day before the arrest?

22 A.  Yes.

23 Q.  So you said you also participated in a dinner with the

24 Czech Police.  When did that happen?

25 A.  The day before the arrest, June 29.

1   Q.  Was it the same evening as the meeting you described?

2   A.  Yes.

3   Q.  Who attended the dinner?

4   A.  Myself, Special Agent Mark Franks, some of the Czech

5   Police, excuse me, and country attaches Kyle and Joe.

6   Q.  That's Special Agents Kyle Brannon and Joe Catalano?

7   A.  Yes.

8   Q.  Do you recall any of the Czech Police who were present at

9   the meeting?

10  A.  One is Petr.

11  Q.  Do you recall how many members of the Czech Police were

12  present at the dinner?

13  A.  At least two.

14  Q.  What did you discuss at this dinner?

15  A.  It was just a social gathering.

16  Q.  At this dinner, did you discuss the case?

17  A.  No.

18  Q.  Where was the dinner?

19  A.  It was in a Georgian restaurant.

20  Q.  You said a Georgian restaurant?

21  A.  Yes.

22  Q.  And where was the Georgian restaurant?

23  A.  In Prague.

24  Q.  Why didn't you discuss the case at the dinner?

25  A.  We were in a public place, and I myself didn't know some of

1   the people that were there.

2   Q.  Was there any discussion about the defendant's cell phones

3   at this dinner?

4   A.  No.

5   Q.  Was there any discussion about the arrest plan at this

6   dinner?

7   A.  No.

8   Q.  So let's turn to the day of the arrest, June 30, 2023.  Did

9   there come a time that day when you went back to the Czech

10  Police headquarters?

11  A.  Yes.

12  Q.  When did that happen?

13  A.  Late in the afternoon.

14  Q.  And what was the purpose of going to the Czech Police

15  headquarters?

16  A.  To meet up with the arrest team.

17  Q.  Who was present at this interaction at the Czech Police

18  headquarters?

19  A.  Myself, Special Agent Mark Franks, Special Agent Kyle,

20  Special Agent Joe, and the Czech Police.

21  Q.  So just to be clear, going forward, when you refer to

22  Special Agent Kyle, are you referring to Special Agent Kyle

23  Brannon?

24  A.  Yes.

25  Q.  And when you refer to Special Agent Joe, are you referring

P8CDGup1                              Sandobal - Direct

1    to Special Agent Joe Catalano?

2    A.   Correct.

3    Q.   Who were the members of the Czech Police at this dinner --

4    excuse me, at this meeting on the day of the arrest?

5    A.   The one I remember is Petr.  I do not know the name of the

6    others.

7    Q.   Were there members of the Czech arrest team at this

8    meeting?

9    A.   Yes.

10   Q.   And approximately how many people were on the arrest team?

11   A.   There were at least three to four.

12   Q.   Were you on the arrest team?

13   A.   No.

14   Q.   Was Special Agent Franks on the arrest team?

15   A.   No.

16   Q.   Was Petr on the arrest team?

17   A.   No.

18   Q.   Was Special Agent Catalano on the arrest team?

19   A.   No.

20   Q.   Was Special Agent Brannon on the arrest team?

21   A.   No.

22   Q.   Approximately how long was this meeting?

23   A.   Fairly brief, less than 30 minutes.

24   Q.   Generally speaking, what did you discuss with the members

25   of the arrest team at the Czech Police headquarters?

P8CDGup1                          Sandobal - Direct

1   A.  Confirmation that Mr. Nikhil Gupta was on the manifest and
2   that he was, in fact, on the plane on the way to Prague.
3   Q.  Do you recall any other topics being discussed?
4   A.  No.
5   Q.  Do you recall any discussion about the defendant's cell
6   phones?
7   A.  No.
8   Q.  At this meeting, this meeting being the meeting on the day
9   of the arrest at the Czech Police headquarters, do you recall
10  any discussion about the defendant's cell phones passcode?
11  A.  No.
12  Q.  So after this meeting, on the day of the arrest, where, if
13  anywhere, did you go?
14  A.  We -- the Czech Police drove a van with myself, Special
15  Agent Mark Franks to the airport in Prague.
16  Q.  And when you say the Czech Police drove this van, who were
17  you referring to?
18  A.  The Czech police officers that were part of the arrest
19  team.
20  Q.  Is that the three to four Czech officers you referred to
21  earlier?
22  A.  Correct.
23  Q.  Other than you and Special Agent Franks, were there any
24  other members of the DEA in the van?
25  A.  No.

P8CDGup1                          Sandobal - Direct

1  Q.  During the van run, did you talk to the Czech officers?

2  A.  No.

3  Q.  Why not?

4  A.  They were just joking amongst themselves in their native

5  language.

6  Q.  Do you know what that native language is?

7  A.  No.

8  Q.  Whatever that language is, do you speak it?

9  A.  No.

10  Q.  Did any of the Czech police officers in the van speak

11  English?

12  A.  At least one of them.

13  Q.  During the van ride, do you recall any discussion about the

14  defendant's cell phones?

15  A.  No.

16  Q.  During the van ride, do you remember any discussion about

17  the defendant's cell phones passcodes?

18  A.  No.

19  Q.  Do you recall any other in-person meetings with the Czech

20  Police prior to the defendant's arrest that we haven't talked

21  about?

22  A.  No.

23  Q.  Other than these in-person meetings we've just discussed,

24  did you communicate electronically with the Czech Police in

25  connection with the defendant's arrest?

P8CDGup1                         Sandobal - Direct

1   A.  Yes.

2   Q.  How did you do that?

3   A.  In the group chat.

4   Q.  What platform did you use for this group chat?

5   A.  WhatsApp.

6   Q.  Who was in this WhatsApp group chat?

7   A.  Myself, Special Agent Mark Franks, Special Agent Catalano,

8   Special Agent Brannon, and the Czech Police, Petr being one of

9   them.

10          MR. LI:  All right.  Ms. Roberts, can we please pull

11  up Government Exhibit 111 for identification?

12  Q.  Officer Sandobal, do you recognize Government Exhibit 111?

13  A.  Yes.

14  Q.  What is it?

15  A.  This is the group chat.

16  Q.  Are there multiple pages to Government Exhibit 111?

17  A.  Yes.

18  Q.  And have you reviewed the entirety of those pages in

19  preparation for your testimony today?

20  A.  Yes.

21  Q.  Does Government Exhibit 111 consist of true and accurate

22  screen shots of the WhatsApp conversation that you were part

23  of?

24  A.  Yes.

25          MR. LI:  The government offers Government Exhibit 111.

1      MR. LAROCHE:  No objection, your Honor.

2      THE COURT:  Admitted, without objection.

3      (Government Exhibit 111 received in evidence)

4      MR. LI:  Your Honor, may we publish?

5      THE COURT:  Yes.

6  Q.  All right.  Officer Sandobal, we're now looking at page one

7  of Government Exhibit 111.  First of all, do you recognize the

8  phone whose screen shots this appears on?

9  A.  Yes.

10  Q.  Whose phone is it?

11  A.  Mine.

12  Q.  At the top, do you see where it says "Op Nick" at the

13  header?

14  A.  Yes.

15  Q.  What, if anything, does the "Op Nick" mean to you?

16  A.  That's the operation name, Op Nick.  That was Mr. Nikhil

17  Gupta's nickname.

18  Q.  And in the placement up there, is Op Nick the name of the

19  WhatsApp group?

20  A.  Yes.

21  Q.  Do you see in the center of the screenshot underneath

22  June 28, 2023, it says, "DEA-Czech SA Joe added you?"

23  A.  Yes.

24  Q.  Who is SA Joe?

25  A.  Special Agent Catalano.

P8CDGup1                          Sandobal - Direct

1    Q.   And just remind us again, what was his role?

2    A.   He is the assistant country attache.

3    Q.   Do you see where it says, group created 6/28/23 by number

4    ending in 164?

5    A.   Yes.

6    Q.   Do you know who was using the number ending in 164?

7    A.   No.

8              MR. LI:   All right.  Ms. Roberts, let's turn to page

9    two, please.

10   Q.   All right.  Officer Sandobal do you see a message from Kyle

11   on June 28, 2023, at what's listed as 11:23 a.m., saying,

12   "Thanks, David.  Great news?"

13   A.   Yes.

14   Q.   Who is Kyle?

15   A.   That is the country attache.

16   Q.   That is Kyle Brannon?

17   A.   Yes.

18   Q.   In his message, Special Agent Brannon refers to "David."

19   Do you know who David is?

20   A.   No.

21   Q.   Could you read the message that Special Agent Brannon

22   responded to?

23   A.   "We have just received your request for the provisional

24   arrest from Czech MOJ with translation."

25   Q.   Do you have an understanding of what that message means?

P8CDGup1                          Sandobal - Direct

1    A.  The Czechs have received the provisional arrest approval.

2    Q.  And what is CZ MOJ?

3    A.  I believe it's Czech Ministry of Justice.

4    Q.  By the way, what time zone are these messages?

5    A.  Eastern Time, New York time.

6    Q.  What's the difference between the time in New York and the

7    time in Prague in the month in June?

8    A.  Prague is six hours ahead.

9    Q.  So is it accurate that the message at 11:23 a.m. here in

10   New York is 5:23 p.m. in Prague?

11   A.  Yes.

12          MR. LI:  All right.  Let's go to page three, please,

13   Ms. Roberts.

14   Q.  So Officer Sandobal, turn your attention to the message at

15   the bottom.  It's dated June 30, 2023, at 5:31 a.m. New York

16   time, or 11:31 Prague time, from Kazar, Petr.  Do you see that

17   message?

18   A.  Yes.

19   Q.  First of all, who is Kazar, Petr?

20   A.  Czech Republic supervisor.

21   Q.  Is that the same Petr you described being present at your

22   meetings at the Czech headquarters?

23   A.  Yes.

24   Q.  Could you please read Petr's message?

25   A.  "Joe, can you come to our place at 1:00 p.m.?  We'll give

P8CDGup1                          Sandobal - Direct

1   you the details."

2   Q.  What is the understanding of the message there?

3   A.  They wanted Joe, Special Agent Joe Catalano, to meet them

4   at their headquarters.

5   Q.  Did you attend a meeting that day at 1:00 p.m. with Petr

6   and Special Agent Catalano?

7   A.  No.

8   Q.  Do you know if that meeting took place?

9   A.  No.

10  Q.  All right.  We'll pick back up with the group chat in just

11  a few minutes.

12          Let me ask you this:  At any point in the group chat

13  did anyone from the DEA ask the Czech Police to get the

14  defendant's cell phones passcodes?

15  A.  No.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

P8CBGUP2                        Sandobal - Direct

1           MR. LI:  Let's take that down, Ms. Roberts.

2   Q.  Officer Sandobal, setting aside the group chat and the

3   three meetings we discussed, did you have any direct one-on-one

4   communications with the Czech police in connection with the

5   defendant's arrest?

6   A.  No.

7   Q.  Why not?

8   A.  Because we had to go through the country attache.

9   Q.  That's Kyle and Joe?

10  A.  Correct.

11  Q.  Did you ever ask Special Agents Kyle Brannon or Joe

12  Catalano to have the Czech police get the defendant's pass

13  codes?

14  A.  No.

15  Q.  To your knowledge did Special Agent Brannon or Catalano

16  ever ask the Czech police to ask the defendant for his cell

17  phone pass codes?

18  A.  No.

19  Q.  At any time did you ever ask the Czech police directly or

20  indirectly to ask the defendant for his cell phone pass codes?

21  A.  No.

22  Q.  To your knowledge at any time did anyone from the DEA ever

23  ask the Czech police directly or indirectly to ask the

24  defendant for his cell phone pass codes?

25  A.  No.

P8CBGUP2                        Sandobal - Direct

1   Q.  Let's turn now to the defendant's arrest.

2           Approximately what time did you arrive at the Czech

3   airport -- excuse me.  At the Prague airport on June 30, 2023?

4   A.  Late afternoon.

5   Q.  What happened when you got to the airport?

6   A.  The Czech police officer left the van and walked into the

7   airport.  Myself and Special Agent Mark Franks remained inside

8   the van as instructed.

9   Q.  Where was the van parked?

10  A.  Right opposite the main entrance to the airport.

11  Q.  Is that the public entrance to the airport?

12  A.  Yes.

13  Q.  Did you stay in the van?

14  A.  Yes.

15  Q.  Did Special Agent Franks stay in the van?

16  A.  Yes.

17  Q.  While waiting for the van, did there come a time when

18  Special Agent Franks said he needed to use the restroom?

19  A.  Yes.

20  Q.  Do you recall him going inside the airport to use the

21  restroom?

22  A.  No.

23  Q.  Do you recall Special Agent Franks leaving the van for more

24  than five minutes?

25  A.  No.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P8CBGUP2                          Sandobal - Direct

1    Q.   Think you would remember if he did?

2    A.   100 percent.

3    Q.   At any point on June 30, 2023, did you ever enter the Czech

4    airport in Prague?

5    A.   No.

6    Q.   While you were waiting in the van, did you receive updates

7    from the Czech police?

8    A.   Yes.

9    Q.   How did you receive those updates?

10   A.   On the group chat.

11   Q.   To the best of your memory, did you receive updates from

12   the Czech police in any other way at that time?

13   A.   No.

14           MR. LI:   Ms. Roberts, can we pull up Government

15   Exhibit 111 back up again.   It's in evidence.   We can publish

16   and go to page four, please.

17   Q.   I'm showing you page four of the screenshots of your group

18   chat, and the date here is June 30, 2023.

19           Do you see a message from Petr at 12:10 p.m. New York

20   time, or 6:10 Prague time saying the plan is now landing?

21   A.   Yes.

22   Q.   What's your understanding of Petr's message there?

23   A.   That the plane is landing in the Prague airport.

24   Q.   What plane?

25   A.   The plane in which Mr. Nikhil Gupta was located.

P8CBGUP2                         Sandobal - Direct

1      MR. LI:  Go to page five, please.

2      Your Honor, if you bear with me.  I'm going to try to

3  use the technology to make this a little clearer.

4  Q.  We're still on June 30, 2023, and I've circled a photograph

5  in the center that appears to be forwarded from someone with

6  the name starting KAZA at 12:39 p.m. New York time or 6:39 p.m.

7  Prague time.

8      Do you see that?

9  A.  Yes.

10  Q.  Who is K-A-Z-A?

11  A.  Kazar Petr, the Czech Republic supervisors.

12  Q.  Is the name just cut off here?

13  A.  Yes.

14  Q.  Do you know who Petr forwarded this photograph from?

15  A.  No.

16      MR. LI:  Ms. Roberts, could we zoom in on that

17  photograph.

18  Q.  Officer Sandobal, what's shown in this photograph?

19  A.  This is a photograph of the general area inside the

20  airport, and you can see Mr. Nikhil Gupta in the general area

21  as well with his luggage.

22  Q.  Could you circle Mr. Gupta.

23      MR. LI:  Your Honor, may the record reflect that

24  witness has circled the man in the red shirt holding luggage in

25  the center of the photograph.

P8CBGUP2                          Sandobal - Direct

1           THE COURT:  Noted.

2           MR. LI:  Ms. Roberts, we can take that up down, and

3    let's go to page six, please.

4    Q.  Officer Sandobal, do you see a second photograph forwarded

5    from Kaza Petr at 12:39 p.m. New York time or 6:39 p.m. Prague

6    time in the center of the screenshot here?

7    A.  Yes.

8    Q.  And what's shown in that photograph?

9    A.  Same vicinity inside the airport Mr. Nikhil Gupta in the

10   same area.

11   Q.  In the next message which is timestamped at 12:41 p.m. New

12   York time or 6:41 p.m. Prague time, Special Agent Mark Franks

13   writes, Awesome.  Do you see that?

14   A.  Yes.

15   Q.  Where was Special Agent Franks when he wrote that?

16   A.  Sitting with me in the van.

17          MR. LI:  Ms. Roberts, let's go to page seven, please.

18   Q.  We'll still on June 30, 2023.

19          Officer Sandobal, could you please read the series of

20   text messages from Kazar Petr on this screenshot running from

21   12:49 p.m. to 1:11 p.m. New York time or 6:49 p.m. to 7:11 p.m.

22   Prague time?

23   A.  Still shopping perfume, with an emoji face.

24          He's at border control.

25          Still in line for the check.

P8CBGUP2                          Sandobal - Direct

1        We're waiting for him to take his luggage off the

2   belt.

3        Your man has been arrested.

4   Q.  Is that your man has just been arrested?

5   A.  Yes.

6   Q.  Who did you understand Petr to be referring to when he said

7   he's at border control?

8   A.  Nikhil Gupta.

9   Q.  And when he said, "Your man has just been arrested?"

10  A.  Nikhil Gupta.

11       MR. LI:  Ms. Roberts, let's go to page eight, please.

12  Ms. Roberts, could we please just flip through to page 17 and

13  just spend a few seconds on each page.

14       Thank you, Ms. Roberts.

15  Q.  Officer Sandobal, we just saw a series of photographs as

16  well as the first frame of what appears to be a video that were

17  sent by Kazar Petr on June 30, 2023, between 1:15 p.m. and 1:33

18  p.m. New York time or 7:15 p.m. to 7:33 p.m. Prague time.

19       Were you physically present at the lotions where these

20  photographs and video were taken?

21  A.  No.

22  Q.  To your knowledge was Special Agent Franks?

23  A.  No.

24  Q.  To your knowledge where were you when these photographs and

25  video were taken?

P8CBGUP2                          Sandobal - Direct

1    A.  Sitting in the van with Special Agent Franks.

2    Q.  Outside the airport?

3    A.  Yes.

4    Q.  Let's go through some of these photographs.

5            MR. LI:  Ms. Roberts, could we go to page 11, please.

6    Q.  Officer Sandobal, what's shown in the top photograph here?

7    A.  This is a photograph of Nikhil Gupta.

8    Q.  Is he restrained in any way?

9    A.  Yes.

10   Q.  How is he restrained?

11   A.  He's got handcuffs.

12   Q.  Do you see any other restraints?

13   A.  No.

14   Q.  Do you recognize the room that he's shown in?

15   A.  No.

16           MR. LI:  Ms. Roberts, let's go to page eight, please.

17   Q.  Officer Sandobal, what's shown in this center photograph?

18   A.  It's a passport of Mr. Nikhil Gupta.

19           MR. LI:  Ms. Roberts, let's go ahead and zoom in and

20   rotate that, please.  Thank you.

21   Q.  Whose name is on the passport?

22   A.  Nikhil Gupta.

23   Q.  What year was his passport issued?

24   A.  2023.

25   Q.  Do you see fingers holding the passport?

P8CBGUP2                          Sandobal - Direct

1    A.   Yes.

2    Q.   What are the fingers wearing?

3    A.   Blue latex gloves.

4              MR. LI:   Ms. Roberts, we can reorient back to

5    vertical, and let's go to page 12, please.

6              Thank you, Ms. Roberts.

7              Ms. Roberts, could we zoom in on the center

8    photograph, please.

9    Q.   Officer Sandobal, what's shown in this photograph?

10   A.   Another passport.

11   Q.   Whose name is on that passport?

12   A.   Nikhil Gupta.

13   Q.   What year was this passport issued?

14   A.   Looks like 1997.

15             MR. LI:   Ms. Roberts, let's go to page 13, please.

16             And, Ms. Roberts, co we zoom in on this image in the

17   center.

18   Q.   Officer Sandobal, what's shown in this photograph?

19   A.   Image of another passport.

20   Q.   Whose name is on this passport?

21   A.   Nikhil Gupta.

22   Q.   What year was this passport issued?

23   A.   2008.

24             MR. LI:   Ms. Roberts, let's go to page 14, please.

25   Q.   Officer Sandobal, what's shown in this photograph?

P8CBGUP2                          Sandobal - Direct

1    A.  Another passport.

2    Q.  Whose name is on it?

3    A.  Nikhil Gupta.

4    Q.  And what year was this passport issued?

5    A.  2014.

6         MR. LI:  Ms. Roberts, let's go to page 15, please.

7    Q.  Officer Sandobal, what are we looking at here?

8    A.  This is a still shot of a video clip.

9    Q.  Have you reviewed that video clip?

10   A.  Yes.

11   Q.  And generally speaking what does that video clip depict?

12   A.  It will show Mr. Nikhil Gupta entering and verbally saying

13   the pass code to one of his cell phones.

14   Q.  Were you present when this video was taken?

15   A.  No.

16   Q.  Was Special Agent Franks present when the video was taken?

17   A.  No.

18        MR. LI:  Ms. Roberts, let's take that down and put up

19   Government Exhibit 112, please, for identification.  I'm sorry.

20   Q.  Officer Sandobal, I'm showing you the first frame of

21   Government Exhibit 112.

22        Have you reviewed this video in preparation for your

23   testimony today?

24   A.  Yes.

25   Q.  Is this the video that you just described that was

```
P8CBGUP2                        Sandobal - Direct
```

1  circulated in the group chat?

2  A.  Yes.

3       MR. LI:  Your Honor, the government offers Government

4  Exhibit 112.

5       MR. LAROCHE:  No objection.

6       THE COURT:  Admitted without objection.

7       (Government's Exhibit 112 received in evidence)

8       MR. LI:  May we publish?

9       THE COURT:  Yes.

10      MR. LI:  Ms. Roberts, please play the video.

11      (Media played)

12      MR. LI:  So I'll just note that the video was about 20

13  seconds long.

14      Ms. Roberts, can we please turn to the first frame.

15  Q.  Officer Sandobal, in the video we just saw, who is holding

16  the cell phone?

17  A.  Nikhil Gupta.

18  Q.  At the dining of the video we heard the defendant speak the

19  digits 2-0-1-5-9-5, did you also see him entering those digits

20  on a phone?

21  A.  Yes.

22  Q.  What language was the defendant speaking in the video?

23  A.  English.

24  Q.  Did you hear someone talking to the defendant?

25  A.  Yes.

P8CBGUP2                      Sandobal - Direct

1   Q.  What language was that person speaking?

2   A.  English.

3   Q.  Did you hear anyone raise his or her voice in the video?

4   A.  No.

5   Q.  Did you hear any background noise in the video?

6   A.  Yes.

7   Q.  What kind of background noise did you hear?

8   A.  Typical airport background noise.

9   Q.  We're looking now at the first frame of the video in front

10  of you.

11          Do you see someone standing in the center of the frame

12  in front of the defendant?

13  A.  Yes.

14  Q.  Can you describe the clothing that person is wearing?

15  A.  Looks like dark color sneakers, light beige shorts, white

16  T-shirt.

17          MR. LI:  Ms. Roberts, let's play to nine seconds in,

18  please.

19          (Media played)

20          MR. LI:  I'm going to try to use some technology here.

21  Q.  Officer Sandobal, I circled what appear to be feet standing

22  in front of the defendant in the bottom left part of the frame.

23  Do you see that?

24  A.  Yes.

25  Q.  What kind of clothing is on that person's feet?

P8CBGUP2                          Sandobal - Direct

1    A.  Looks like gray sneakers.

2         MR. LI:  Ms. Roberts, let's continue to 13 seconds in.

3         (Media played)

4         MR. LI:  Thank you, Ms. Roberts.

5    Q.  So, Officer Sandobal, I've circled what appears to be a

6    person's leg standing behind the defendant in the top left part

7    of the screen. Do you see that?

8    A.  Yes.

9    Q.  Can you describe, if you can tell, what type of clothing

10   that person is wearing?

11   A.  Wearing shorts.

12        MR. LI:  Ms. Roberts, let's finish the video, please.

13        (Media played)

14   Q.  Officer Sandobal, was the defendant handcuffed in the video

15   we just saw?

16   A.  No.

17   Q.  Did you see any weapons in the video?

18   A.  No.

19   Q.  Did you hear anyone threaten the defendant in the video?

20   A.  No.

21   Q.  How was the room lighting in the video?

22   A.  Very light.

23        MR. LI:  Ms. Roberts, let's go back to Government

24   Exhibit 111.

25   Q.  Now, the group chat which is in evidence and we can

P8CBGUP2                          Sandobal - Direct

1    publish.

2              MR. LI:   And let's go to page 16, please.   Thank you,

3    Ms. Roberts.

4    Q.   Officer Sandobal, take a look at that photograph in the

5    center, please.

6              MR. LI:   And, Ms. Roberts, let's go to the next page,

7    please.

8    Q.   Now, that's page 17.

9              Officer Sandobal, we just looked at two photographs,

10   what do they appear to show?

11   A.   Appear to show the data on one of the phones.

12   Q.   When you say data from one of the phones, what do you mean

13   by that?

14   A.   Like the internal data, IMEI number, service provider,

15   network provider, stuff like that.

16   Q.   Fair to call that sort of basic device information?

17   A.   Yes.

18   Q.   Did you ask the Czech police to send you any of the

19   photographs of the video we just reviewed?

20   A.   No.

21   Q.   To your knowledge did anyone from the DEA ask the Czech

22   police to send the photographs in the video we just reviewed?

23   A.   No.

24             MR. LI:   Ms. Roberts, let's go to the last page,

25   please, page 18.

P8CBGUP2                        Sandobal - Direct

1    Q.  Officer Sandobal, did there come a time when you were

2    removed from the group chat?

3    A.  Yes.

4    Q.  And when was that?

5    A.  Excuse me.

6    Q.  When were you removed from the group chat?

7    A.  July 3, 2023.

8    Q.  And when was the defendant arrested?

9    A.  June 30, 2023.

10          MR. LI:  Ms. Roberts, we can take down Government

11    Exhibit 111.

12    Q.  Officer Sandobal, let's turn back to the day of the arrest

13    June 30, 2023.  I think you said that you and Special Agent

14    Franks were waiting outside the Prague airport in a van.

15          Did I get that right?

16    A.  Yes.

17    Q.  At some point did the Czech police return to the van?

18    A.  Yes.

19    Q.  Approximately how long elapsed between when they left the

20    van and when they came back to the van?

21    A.  About 30 minutes, less than an hour.

22    Q.  Anyone with them when they returned to the van?

23    A.  Yes.

24    Q.  Who was with them?

25    A.  Mr. Nikhil Gupta.

P8CBGUP2                          Sandobal - Direct

1    Q.  Was he restrained in any way?

2    A.  Yes.

3    Q.  How was he restrained?

4    A.  Front cuffed.

5    Q.  When you say front cuffed, what do you mean by that?

6    A.  The same way he was shown in the photo.

7    Q.  That's handcuffs on his hands?

8    A.  Yes.

9    Q.  Was he restrained in any other manner?

10   A.  No.

11        MR. LI:  Ms. Roberts, could we pull up Government

12   Exhibit 102, please, for identification.

13   Q.  Officer Sandobal, do you recognize Government Exhibit 102?

14   A.  Yes.

15   Q.  What is it?

16   A.  This is a photograph of Mr. Nikhil Gupta.

17   Q.  Is that one of the photographs that was circulated by Kazar

18   Petr on the group chat?

19   A.  Yes.

20   Q.  Does this photograph accurately reflect the defendant's

21   appearance as he entered the van?

22   A.  Yes.

23        MR. LI:  Your Honor, the government offers Government

24   Exhibit 102.

25        MR. LAROCHE:  No objection, your Honor.

P8CBGUP2                        Sandobal - Direct

1    THE COURT:  Admitted with no objection.

2         (Government's Exhibit 102 received in evidence)

3    THE COURT:  You may publish it.

4    MR. LI:  Thank you, your Honor.

5    Q.  Officer Sandobal, what was the defendant's demeanor as he

6    got to the van?

7    A.  Very cooperative and relaxed.

8    Q.  What do you mean by that?

9    A.  Very relaxed, like cooperative, nonconfrontational.

10   Q.  Do you recall his appearance as he physically got into the

11   van?

12   A.  Yes.

13   Q.  Can you describe it?

14   A.  When he came in, he was very well-dressed in a red long

15   sleeve, black pants and black dressed shoes.  And as he came to

16   the door, he was a bit surprised to see people in the van. We

17   greeted each other and he came inside.

18   Q.  And you said he appeared to be surprised to see people

19   inside the van.  Who was inside the van?

20   A.  Myself and Special Agent Franks.

21   Q.  As the defendant got into the van, did he appear

22   frightened?

23   A.  Nah.

24   Q.  Did you see any injuries on him?

25   A.  No.

P8CBGUP2                    Sandobal - Direct

1   Q.  What kind of clothing were the Czech police officers

2   wearing when they came back to van?

3   A.  Dark color clothing.

4   Q.  Were they in uniform or civilian clothing?

5   A.  Civilian clothing.

6   Q.  Whether they dressed the same way when they left the van?

7   A.  Yes.

8   Q.  Were the Czech police visibly displaying any weapons?

9   A.  No.

10  Q.  Were you armed in the van?

11  A.  No.

12  Q.  Why not?

13  A.  Because we're not authorized to be armed in a foreign

14  country.

15  Q.  Was Special Agent Franks armed in van?

16  A.  No.

17  Q.  At any point during the van ride did you see anyone with a

18  weapon?

19  A.  No.

20  Q.  At any point during the van ride did you see anyone harm

21  the defendant in any way?

22  A.  No.

23  Q.  At any point during the van ride, did you hear anyone

24  threaten the defendant in any way?

25  A.  No.

P8CBGUP2                          Sandobal - Direct

1    Q.   At any point during the van ride did the defendant claim to

2    you that he had been threatened or harmed?

3    A.   No.

4    Q.   What kind of van are we talking about here?

5    A.   One of those sprinter type vans with a high ceiling.

6    Q.   What do you mean by sprinter van?

7    A.   One of those vans that can hold anywhere between 9, 12

8    passengers, maybe 15.

9    Q.   Can you describe the seating layout inside the van?

10   A.   It had the driver/passenger, and at least three rows in the

11   back.

12   Q.   Three rows of seating?

13   A.   Yes.

14   Q.   Before the defendant entered the van, what row were you

15   seated in?

16   A.   I was sitting in the second row.

17   Q.   Was anyone with you?

18   A.   Yes.

19   Q.   Who?

20   A.   Special Agent Franks.

21   Q.   After the defendant came to the van, did you move?

22   A.   Yes.

23   Q.   Where did you go?

24   A.   I went to the back of the van, the last row on the left.

25   Q.   When the defendant came in, where did he sit?

P8CBGUP2                        Sandobal - Direct

1   A.  He sat on the right side of the van.

2   Q.  In which row?

3   A.  On the last row where I was sitting.

4   Q.  So he was sitting next to you to your right in the last row

5   of the van?

6   A.  Yes.

7   Q.  And where did Special Agent Franks sit after the defendant

8   got into the van?

9   A.  He was in the second row facing Mr. Nikhil Gupta.

10  Q.  So fair to say that you and Special Agent Franks were both

11  facing the defendant like the points of a triangle?

12  A.  Yes.

13  Q.  Where were the Czech officers sitting at this time?

14  A.  In the front, driver and the front seat.

15  Q.  So there was a Czech officer in the driver seat; is that

16  right?

17  A.  Yes.

18  Q.  And you said there was one in the passenger seat?

19  A.  Yes.

20  Q.  And were there any other Czech officers?

21  A.  At least one on the first seat.

22  Q.  In the first row?

23  A.  In the first row, yes.

24  Q.  Why did you position the defendant in this manner?

25  A.  We needed to speak to him.

P8CBGUP2                        Sandobal - Direct

1    Q.  When you say we needed to speak with him, who are you

2    talking about?

3    A.  Myself and Special Agent Franks.

4    Q.  After he got into the van, did you in fact speak with him?

5    A.  Yes.

6    Q.  Did Special Agent Franks also speak with the defendant?

7    A.  Yes.

8    Q.  Did any of the Czech officers in the van actively

9    participate in your conversation with the defendant?

10   A.  No.

11   Q.  What was the first thing that you recall happening during

12   your conversation with the defendant?

13   A.  We identified ourselves as being from America, specifically

14   from the DEA.  I then displayed my credentials from the DEA.  I

15   said my name is Jose Sandobal.  This is my partner Mark Franks.

16   He also displayed his credentials.

17            MR. LI:  Ms. Roberts, let's pull up Government Exhibit

18   103 for identification, please.

19   Q.  Officer Sandobal, do you recognize Government Exhibit 103?

20   A.  Yes.

21   Q.  What is it?

22   A.  These are my DEA credentials.

23   Q.  Is it a photograph of your DEA credentials?

24   A.  Yes.

25   Q.  Is that the same credentials that you showed the defendant

P8CBGUP2                          Sandobal - Direct

1    in the van?

2    A.  Yes.

3           MR. LI:  Your Honor, the government offers Government

4    Exhibit 103.

5           MR. LAROCHE:  No objection, your Honor.

6           THE COURT:  Admitted without negotiation.

7           (Government's Exhibit 103 received in evidence)

8           MR. LI:  May we publish?

9           THE COURT:  Yes.

10   BY MR. LI:

11   Q.  Officer Sandobal, I've circled some text in the top part of

12   the credentials, could you please read the circled text?

13   A.  Jose M. Sandobal.  Task Force Officer.

14   Q.  I've now circled some additional text in the top part of

15   the credentials, could you please read the circled text there?

16   A.  Drug Enforcement Administration United States Department Of

17   Justice.

18   Q.  Did Special Agent Franks also show his DEA credentials to

19   the defendant?

20   A.  Yes.

21           MR. LI:  Ms. Roberts, could we please pull up

22   Government Exhibit 104 for identification.

23   Q.  Officer Sandobal, do you recognize Government Exhibit 104?

24   A.  Yes.

25   Q.  What is it?

P8CBGUP2                           Sandobal - Direct

1   A.  This is DEA Special Agent Mark Franks' credentials.

2   Q.  Is it a photograph of those credentials?

3   A.  Yes.

4   Q.  Is that the same credentials that Special Agent Franks

5   showed the defendant inside the van?

6   A.  Yes.

7          MR. LI:  Your Honor, the government offers Government

8   Exhibit 104.

9          MR. LAROCHE:  No objection, your Honor.

10         THE COURT:  Admitted without objection.

11         (Government's Exhibit 104 received in evidence)

12         MR. LI:  May we publish?

13         THE COURT:  Yes.

14  Q.  Officer Sandobal, I've circled some text in the top part of

15  the credentials, could you please read it?

16  A.  Mark J. Franks, Special Agent.

17  Q.  I now circled some additional text in the top part of the

18  credentials, could you please read that additional text?

19  A.  Drug Enforcement Administration United States Department Of

20  Justice.

21  Q.  Officer Sandobal, how, if at all, did the defendant respond

22  after you and Special Agent Franks introduced yourself?

23  A.  Pleasure to meet you.  What do you want to know?  Take me

24  to America, but take me now. I'll tell you anything you want to

25  know.  You got to take me now.

P8CBGUP2                          Sandobal - Direct

1  Q.  What do you recall happening next in the conversation?

2  A.  We explain to him that we wanted to speak to him, but we

3  needed to read him his rights first.

4  Q.  Were you able to read him his rights right away?

5  A.  No, it took a few seconds.

6  Q.  Why is that?

7  A.  Because he kept interjecting. I tell you anything you want

8  to know, just take me now.

9  Q.  And how did you respond when he interjected?

10  A.  We just, listen, we do want to speak to you, but first

11  unfortunately we need to read this while Special Agent Franks

12  has the paper pointing to it.

13  Q.  When you say Special Agent Franks has a paper and he was

14  pointing to it, what paper are you referring to?

15  A.  His advice of rights, international rights.

16  Q.  Is that a physical form?

17  A.  Yes.

18  Q.  We'll come back to that in just a moment.

19        MR. LI:  And, Ms. Roberts, we can take down the

20  exhibit.

21  Q.  Before we get to the advice of rights, I want to ask you a

22  few questions about the language in which you communicated with

23  the defendant in the van.

24        During your conversation with the defendant in the

25  van, what language did the defendant speak?

P8CBGUP2                    Sandobal - Direct

1    A.  English.

2    Q.  What language did you speak with the defendant?

3    A.  English.

4    Q.  What language did Special Agent Franks speak with the

5    defendant?

6    A.  English.

7    Q.  Was your entire conversation with the defendant in English?

8    A.  Yes.

9    Q.  How fluent was the defendant's English?

10   A.  Very fluent.

11   Q.  Did you understand him?

12   A.  Yes.

13   Q.  Did he appear to understand you?

14   A.  Yes.

15   Q.  Did he appear to understand Special Agent Franks?

16   A.  Yes.

17          MR. LI:  Ms. Roberts, let's pull up Government Exhibit

18   101 for identification, please.

19   Q.  Officer Sandobal, do you recognize Government Exhibit 101?

20   A.  Yes.

21   Q.  What is it?

22   A.  This is the rights, this is the form containing the rights

23   that were read to Mr. Nikhil Gupta.

24   Q.  Is it a true and accurate copy of the advice of rights that

25   you and Special Agent Franks read in the van?

P8CBGUP2                        Sandobal - Direct

1    A.  Yes.

2              MR. LI:  Your Honor, the government offers Government

3    Exhibit 101.

4              MR. LAROCHE:  No objection, your Honor.

5              THE COURT:  Admitted without objection.

6              (Government's Exhibit 101 received in evidence)

7              MR. LI:  May we publish?

8              THE COURT:  Yes.

9    Q.  Officer Sandobal, did either you or Special Agent Franks

10   read the rights listed on this form to the defendant in the

11   van?

12   A.  Yes.

13   Q.  And who actually read the rights?

14   A.  Special Agent Franks.

15   Q.  Did you ask the defendant any questions about the case

16   before Special Agent Franks read the rights?

17   A.  No.

18   Q.  Did Special Agent Franks ask any questions about the case

19   before he read the rights?

20   A.  No.

21   Q.  You said that Special Agent Franks had a physical copy of

22   the form, did he also provide a physical copy of the form to

23   the defendant?

24   A.  Yes.

25   Q.  Did the defendant appear to read that form?

P8CBGUP2                        Sandobal - Direct

1    A.  Yes.

2    Q.  Did he need any assistance in reading the form?

3    A.  Yes.

4    Q.  Can you explain?

5    A.  He requested his reading glasses.

6    Q.  Did he get them?

7    A.  Yes.

8    Q.  How did that come about?

9    A.  The Czech police had his property, and he explained where

10   it was located.

11   Q.  When you say he explained where it was located, who are you

12   referring to?

13   A.  Mr. Nikhil Gupta explained.

14   Q.  And then what happened after he identified the location?

15   A.  His glasses were given to him.

16   Q.  By who?

17   A.  The Czech police passed it toward the back and it was given

18   to him.

19   Q.  Who gave it to him?

20   A.  Special Agent Franks.

21   Q.  After the defendant got his glasses, what did he do with

22   the glasses?

23   A.  He put the glasses on and was following along as Special

24   Agent Franks was reading the rights.

25   Q.  I want to turn now to the actual rights.

P8CBGUP2                        Sandobal - Direct

1           MR. LI:  And, Ms. Roberts, could we zoom in on the

2    form starting with the advice of rights and going through the

3    text after the consent section.  Thank you, Ms. Roberts.

4           Could we actually zoom out a little bit more so we

5    have a little bit of a margin underneath the consent.  Thank

6    you very much, Ms. Roberts.

7    Q.  I want to go through this form and I want to be careful to

8    understand exactly what parts you are sure Special Agent Franks

9    read, versus any parts where perhaps you're not sure.  Okay?

10   A.  Okay.

11   Q.  So starting with the very top.  The heading, Advice of

12   Rights for Suspects in Foreign Custody.

13          Do you recall whether Special Agent Franks read that

14   header?

15   A.  No.

16   Q.  The next paragraph reads, We are representatives of the

17   United States government.  Even though we are not in the United

18   States, United States laws provide you with certain rights in

19   your dealings with us.  Before we ask you any questions, you

20   must understand your rights.

21          Do you see that?

22   A.  Yes.

23   Q.  Do you recall whether Special Agent Franks read that

24   paragraph?

25   A.  No.

P8CBGUP2                    Sandobal - Direct

1   Q.  So at the time that Special Agent Franks did start reading

2   some portion of the form, had you and Special Agent Franks

3   already introduced yourselves as DEA officers?

4   A.  Yes.

5   Q.  Had you and Special Agent Franks already shown the

6   defendant your credentials?

7   A.  Yes.

8   Q.  Could you please read the parts of the form that you are

9   certain Special Agent Franks read in the van?

10  A.  Yes.  You have the right to remain silent.  Even if you

11  have already spoken to others, you do not have to speak to us

12  now.

13           Anything you say can be used against you in court.

14           You have the right to talk to a layer for advice

15  before we ask you any questions.

16           You have the right to have a lawyer with you during

17  your questioning.  If you cannot afford a lawyer, you have the

18  right to have one appointed for you before any questioning if

19  you wish.  Our ability to provide you with counsel at this

20  time; however, may be limited by the decisions of the local

21  authorities or the availability of an American trained

22  attorney.

23           If you decide to answer questions now without a lawyer

24  present, you have the right to stop answering at any time.  I

25  have read this statement of my rights, and I understand what my

P8CBGUP2                          Sandobal - Direct

1   rights are.

2              At this time, I am willing to answer questions without

3   a lawyer present.

4   Q.  To be clear, you are certain that Special Agent Franks read

5   each of the rights listed on this form; is that right?

6   A.  Yes.

7   Q.  And are you certain that he read the text below consent

8   stating, I have read this statement of my rights, and I

9   understand what my rights are.  At this time, I'm willing to

10  answer question withouts a lawyer present?

11  A.  Yes.

12  Q.  In addition to the rights you just read, did you or Special

13  Agent Franks say anything else to the defendant about his

14  rights?

15  A.  I went onto explain to Mr. Gupta, if he didn't understand

16  any of the rights, I was willing to break it further down to

17  him to where he could understand it.  He just replied, no, I

18  understand.  It's fine.

19  Q.  Did you say anything else to him about his rights?

20  A.  I further explained to him toward the bottom part where he

21  can stop answering questions at any time.  I explained as we

22  are asking him questions, he doesn't have to answer every

23  single question we're asking him.  If he doesn't like it, he

24  could skip and say next question.

25  Q.  After this last question on this form, at this time I am

P8CBGUP2                        Sandobal - Direct

1  willing to answer questions without a lawyer present, do you

2  recall if the defendant gave an answer?

3  A.  Yes.

4  Q.  What did he say?

5  A.  He said, yes, nodding his head as he did so.

6  Q.  And did you explicitly ask the defendant whether he was

7  willing to talk to you?

8  A.  Yes.

9  Q.  How did he respond?

10 A.  He said yes, what do you want to know.

11 Q.  Did you ask Special Agent Franks -- excuse me.  Did you or

12 Special Agent Franks ask the defendant to sign the form at this

13 time?

14 A.  No.

15 Q.  Why not?

16 A.  Because we were in a moving vehicle.

17 Q.  And what's the problem with that?

18 A.  The signature would have been -- or the writing would have

19 been all scribbled.

20 Q.  And just to be clear, when you said earlier that the

21 defendant said he was willing to talk to you, was that after

22 Special Agent Franks had read the rights?

23 A.  Yes.

24 Q.  After the defendant agreed to speak with you and Special

25 Agent Franks, did you ask the defendant questions about the

P8CBGUP2                          Sandobal - Direct

1    case?

2    A.   Yes.

3    Q.   Did he answer those questions?

4    A.   Yes.

5    Q.   During that conversation with the defendant, what was his

6    demeanor?

7    A.   Very cooperative.

8    Q.   What do you mean by that?

9    A.   He was willing to answer any questions we had, we're

10   inquiring, and at no point he said, I don't want to answer that

11   question.

12   Q.   Did he appear frightened during your conversation?

13   A.   No.

14   Q.   Did you have any trouble understanding each other?

15   A.   No.

16   Q.   Did you record your interview of the defendant in the van?

17   A.   No.

18   Q.   Why not?

19   A.   I was not aware of the rules and regulations in the Czech

20   Republic in terms of recording.

21   Q.   Now I'd like to just ask you a few questions about the

22   substance of your conversation with the defendant.

23        I think you said earlier that the name Amanat came up

24   in the conversation.  Did I get that right?

25   A.   Correct.

P8CBGUP2                          Sandobal - Direct

1   Q.  Just remind us, what is your understanding of Amanat's role

2   based on your conversation?

3   A.  Amanat enlisted Mr. Nikhil Gupta's assistance to carry out

4   a murder for hire in New York City.

5   Q.  And who told you that?

6   A.  Mr. Gupta.

7   Q.  Who first named Amanat in your conversation?

8   A.  Mr. Nikhil Gupta.

9   Q.  Were you aware of Amanat before your conversation with the

10  defendant?

11  A.  No.

12  Q.  Did either you or Special Agent Franks ask for contact

13  information for Amanat?

14  A.  Yes.

15  Q.  Can you describe what you asked and what the defendant's

16  response was?

17  A.  Do you have his number.  He said yes.  It's in my phone.

18  Do you mind if we get your phone?  He was like, yes.  They have

19  it.

20  Q.  Let's break that down a little bit.

21          So I think you said someone asked, do you have his

22  number.  Who asked that question?

23  A.  Myself and Special Agent Franks asked, do you have that

24  phone number.  He said yes.

25  Q.  And when you say he said yes, who you are referring to?

P8CBGUP2                          Sandobal - Direct

1    A.  Mr. Nikhil Gupta.

2    Q.  And what happened next during the questioning?

3    A.  We inquired if we could have that number.  He said, yeah,

4    sure.

5    Q.  Who said "Yes, sure?"

6    A.  Mr. Gupta.

7    Q.  What happened next?

8    A.  He then requested his phone, at which point he had three

9    phones, and he pointed towards the front.  No, not that one,

10   this one.

11   Q.  At that time, who had the three physical phones?

12   A.  The Czech police.

13   Q.  And how did the defendant identify which phone he had in

14   mind?

15   A.  By pointing.

16   Q.  After the defendant identified the specific phone, what

17   happened to that phone?

18   A.  It was passed to the back to Special Agent Franks and then

19   to Mr. Gupta.

20   Q.  Who passed it back?

21   A.  The Czech police.

22   Q.  What did Special Agent Franks do with the phone?

23   A.  Handed it to Mr. Gupta.

24   Q.  Do you recall Special Agent Franks saying anything at that

25   point about unlocking the phone or the passcode to the phone?

P8CBGUP2                          Sandobal - Direct

1   A.  No.

2   Q.  Did he ask whether the phone had a passcode?

3   A.  No.

4   Q.  He didn't ask the Czech police whether there was a passcode

5   to the phone?

6   A.  The Czech police had stated that he had provided the

7   passcode to his phone in and provided the okay to search his

8   phones.

9   Q.  What did the defendant do with the phone after he got it?

10  A.  When he got it, he was facing me, so now the back of the

11  phone is facing me.  And at one point as he has it, he looked

12  as though he unlock the screen because it lit up.  And at that

13  point, I asked him if he could put it down so I could see the

14  screen.

15         MR. LI:  Ms. Roberts, let's pull up Government Exhibit

16  105 for identification, please.

17  Q.  Officer Sandobal, do you recognize Government Exhibit 105?

18  A.  Yes.

19  Q.  What is it?

20  A.  It's a screenshot of one of the phones belonging to

21  Mr. Nikhil Gupta.

22  Q.  When you say a screenshot, do you mean a photograph?

23  A.  Yes.

24  Q.  Is this a photograph of the physical phone in the van?

25  A.  Yes.

P8CBGUP2                         Sandobal - Direct

1    Q.  Who took the photo?

2    A.  Special Agent Franks.

3    Q.  And where is the photo taken?

4    A.  Inside the van.

5    Q.  Is it an accurate copy of that photograph?

6    A.  Yes.

7            MR. LI:  Your Honor, the government offers Government

8    Exhibit 105.

9            MR. LAROCHE:  No objection, your Honor.

10           THE COURT:  Admitted without objection.

11           (Government's Exhibit 105 received in evidence)

12           MR. LI:  May we publish?

13           THE COURT:  Yes.

14   BY MR. LI:

15   Q.  Officer Sandobal, I've circled at the top of the phone what

16   appears to be the letters "A-M" being typed in.

17           Do you see that?

18   A.  Yes.

19   Q.  Who typed in the letters A-M?

20   A.  Speck Agent Franks.

21   Q.  Do you see a contact name A-M-A-N-A-T?

22   A.  Yes.

23   Q.  Do you see a phone number associated with that contact?

24   A.  Yes.

25   Q.  Is that the number starting in +212?

P8CBGUP2                      Sandobal - Direct

1   A.  Yes.

2   Q.  Can you circle that contact on your screen?

3          MR. LI:  Let the record reflect it is the second

4   contact that's pulled up on the screen under the heading

5   A-M-A-N-A-T.  We can take that down, Ms. Roberts.

6   Q.  Officer Sandobal, at any point during the van ride did

7   either you or Special Agent Franks order the defendant to open

8   his phone?

9   A.  No.

10  Q.  At any point during the van ride did any of the Czech

11  officers order the defendant to open his phone?

12  A.  No.

13  Q.  When you discussed the Amanat person with the defendant,

14  did he affirmatively offer information from his phone?

15  A.  Yes.

16  Q.  Did he identify which phone to get?

17  A.  Yes.

18  Q.  At any point during the van ride did the defendant express

19  any hesitation about opening his phone for you?

20  A.  No.

21  Q.  At any point during the van ride did the Czech -- excuse

22  me.

23          At any point during the van ride did the defendant say

24  that the Czech police had forced him to open his phones?

25  A.  No.

P8CBGUP2                          Sandobal - Direct

1   Q.  At any point during the van ride did the defendant say that

2   the Czech police had forced him to disclose his pass codes to

3   his phones?

4   A.  No.

5   Q.  While you and Special Agent Franks were interviewing the

6   defendant in the van, what were the Czech officers doing?

7   A.  They were just facing forward in front of the van.

8   Q.  Other than to locate the defendant's glasses and phone, did

9   the Czech officers ask the defendant any questions during the

10  van ride?

11  A.  No.

12  Q.  At any point during the van ride, did the defendant express

13  any concern about the Czech police?

14  A.  No.

15  Q.  At some point did the van arrive at the Czech jail?

16  A.  Yes.

17  Q.  Approximately how long was the van ride?

18  A.  About 10 to 15 minutes.

19  Q.  Before the van stopped at the jail, did you see the Czech

20  officers take any extra steps in connection with the route?

21  A.  Yes.

22  Q.  And what did you see?

23  A.  I noticed they did one extra lap around the jail.

24  Q.  Did you ask them to do that?

25  A.  No.

P8CBGUP2                        Sandobal - Direct

1   Q.  After the van stopped, did you ask the defendant to sign

2   the Advice of Rights form?

3   A.  Yes.

4   Q.  Did you give him the physical form?

5   A.  Yes.

6           MR. LI:  Ms. Roberts, can we please pull up Government

7   Exhibit 101 again, and let's focus now on the bottom part under

8   the heading Consent.  If we can zoom in on that portion,

9   please, Ms. Roberts.

10  Q.  So you said that you gave the defendant the physical form

11  after the van stopped at the jail, did he have his glasses?

12  A.  He put them on.

13  Q.  After he put on his glasses, what do you recall him doing?

14  A.  He just briefly was asking, where do I sign.  What do I do.

15  And I'm like print your name here and sign here.  He began

16  printing his name.

17          At which point he stated, I'm not signing.  I'll sign,

18  but after you let me make a phone call to my wife.

19  Q.  Okay.  Let's break that down a little bit.

20          I think you said that after he put on his glasses, he

21  asked a question, what was the question?

22  A.  The question was, Where do you want me to sign.

23  Q.  And what did you say in response?

24  A.  He needed to print on the first line where it says "name"

25  and to sign where it says "signature."

P8CBGUP2                          Sandobal - Direct

1   Q.  Did the defendant in fact write his name?

2   A.  Yes, he did.

3   Q.  Did he sign?

4   A.  No.

5   Q.  Can you explain why he was not going to sign the form?

6   A.  He said on several occasions, I'll sign the form.  I have

7   no problem signing it, but at first I need to make a phone

8   call.

9   Q.  Did he explain who he wanted to call?

10  A.  His wife.

11  Q.  And what did you tell him in response to his request to

12  make this phone call?

13  A.  That unfortunately we're in a foreign country.  We were

14  unaware of the procedures.  One of the Czech officers spoke

15  English, explain to him they'd allow him to make a phone call

16  later.

17  Q.  Was he allowed to make a phone call inside the van?

18  A.  No.

19  Q.  Did the defendant sign the form?

20  A.  No.

21  Q.  What did he do with the form?

22  A.  He just handed it back to us.

23  Q.  So we have now in front of you Government Exhibit 101.

24  We're looking at the bottom portion underneath heading Consent.

25          Do you see some handwritten letters next to the word

P8CBGUP2                           Sandobal - Direct

1   "name?"

2   A.  Yes.

3   Q.  Could you read what it says in handwriting?

4   A.  Nikhil Gupta, N-I-K-H-I-L, Gupta, G-U-P-T-A.

5   Q.  Who wrote that?

6   A.  Mr. Nikhil Gupta.

7   Q.  Do you see underneath that handwritten name someone wrote

8   the word "refused"?

9   A.  Yes.

10  Q.  Who wrote the word "refused"?

11  A.  Special Agent Franks.

12  Q.  What does the word "refused" mean to you in this context?

13  A.  The person refused to sign on that particular line.

14  Q.  To be clear, does it mean that the defendant refused to

15  speak with you or Special Agent Franks?

16  A.  No.

17  Q.  Do you see some handwritten text next to the word "date"?

18  A.  Yes.

19  Q.  And what's the date there?

20  A.  6/30/2023.

21  Q.  And who wrote that date?

22  A.  I believe I did.

23  Q.  And why do you think you did?

24  A.  It looks like my handwriting.

25  Q.  Are you certain one way or the other whether you wrote it?

P8CBGUP2                         Sandobal - Direct

1   A.  I'm not 100 percent sure.

2   Q.  Do you see a time listed in handwriting?

3   A.  Yes.

4   Q.  Can you read that time?

5   A.  It looks like 1949.

6   Q.  Who wrote that?

7   A.  Definitely not me.

8   Q.  Was it the defendant?

9   A.  No.

10  Q.  Was it Special Agent Franks?

11  A.  Possibly.

12  Q.  Do you know of anyone else it could have been other than

13  Special Agent Franks?

14  A.  No.

15  Q.  When you arrived at the Czech facility, was there still

16  daylight out?

17  A.  Yes.

18  Q.  Was it a sunny day?

19  A.  Yes.

20  Q.  Were the windows to the van clear or tinted?

21  A.  Tinted.

22  Q.  When you arrived at the Czech facility, was there enough

23  light in the car to read this form?

24  A.  Yes.

25  Q.  When you testified today about words you spoke and heard,

P8CBGUP2                        Sandobal - Direct

1    were you testifying to the exact words used or the substance of

2    those words?

3    A.   The substance.

4              MR. LI:  A few final questions, your Honor.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P8CDGup3                        Santobal - Direct

1    BY MR. LI:

2    Q.  Officer Sandobal, after you interviewed the defendant on

3    June 30, 2023, did you provide an update to the prosecutors on

4    this case?

5    A.  Yes.

6            MR. LI:  Ms. Roberts, let's pull up Government Exhibit

7    107 for identification.

8    Q.  Officer Sandobal, do you recognize Government Exhibit 107?

9    A.  Yes.

10   Q.  What is it?

11   A.  This is a screenshot of my message.

12   Q.  And who are these messages with?

13   A.  It's a group chat between myself, Special Agent Franks, and

14   the prosecutor.

15   Q.  Is it a true and accurate screenshot of some of the

16   messages with Mark Franks, yourself, and the prosecutors.

17   A.  Yes.

18           MR. LI:  Your Honor, the government offers Government

19   Exhibit 107.

20           MR. LAROCHE:  No objection, your Honor.

21           THE COURT:  Admitted, without objection.

22           (Government Exhibit 107 received in evidence)

23           MR. LI:  May we publish?

24           THE COURT:  Yes.

25   Q.  Officer Sandobal, do you know what time zone this message

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P8CDGup3                          Santobal - Direct

1   is in?

2   A.   Yes.

3   Q.   What time zone?

4   A.   Eastern Time, New York time.

5   Q.   Just as a reminder, Prague time I think you said is six

6   hours ahead?

7   A.   Yes.

8   Q.   Do you see a message that you sent on June 30, 2023,

9   sometime after 6:30 p.m., New York time, or 12:30 a.m. Prague

10  time?

11  A.   Yes.

12  Q.   And I've circled that message on your screen.  What did you

13  write in response to the question, "did we grab phones?"

14  A.   "Yes.  He gave the code to unlock them to the arrest team."

15  Q.   Who's the person you're referring to when you say, "he gave

16  the codes?"

17  A.   Mr. Nikhil Gupta.

18  Q.   What are "the codes" in your message?

19  A.   The password to his phone.

20  Q.   When you refer to "the arrest team" in your message, what

21  arrest team were you talking about?

22  A.   The Czech Republic police officers.

23  Q.   Now, did you know the defendant had provided his passcodes

24  to the Czech arrest team?

25  A.   We were told, and they had also recorded it.

P8CDGup3                          Santobal - Direct

1    Q.  When did they tell you that he had provided his passcodes?

2    A.  When they came back to the van.

3    Q.  Do you recall what it is they told you about the passcodes?

4    A.  Not exactly, but what I do remember is he consented to a

5    search of his phones and provided the codes.

6    Q.  Did the Czech Police tell you whether he had voluntarily

7    provided his passcodes?

8    A.  Yes.

9    Q.  What did they tell you?

10   A.  That he had voluntarily provided the codes to it.

11   Q.  Did the Czech Police tell you that they had forced the

12   defendant to provides those passcodes?

13   A.  No.

14   Q.  Did the Czech Police tell you that the defendant was

15   unwilling to provide his passcodes?

16   A.  No.

17   Q.  Do you have any reason to think the Czech Police forced him

18   to provide his passcodes?

19   A.  No.

20   Q.  Just one last exhibit.

21        MR. LI:  Ms. Roberts, can we please pull up Government

22   Exhibit 106 for identification?

23   Q.  Officer Sandobal, do you recognize Government Exhibit 106?

24   A.  Yes.

25   Q.  What is it?

P8CDGup3                                Santobal - Direct

1   A.   These are personal belongings Mr. Nikhil Gupta provided to

2   us during his extradition.

3   Q.   And who provided this personal property in connection with

4   his extradition?

5   A.   Czech Police.

6   Q.   Is this a true and accurate photograph of the property from

7   the defendant that you received in connection with his

8   extradition?

9   A.   Yes.

10           MR. LI:  Your Honor, the government offers Government

11  Exhibit 106.

12           MR. LAROCHE:  No objection.

13           THE COURT:  Admitted, without objection.

14           (Government Exhibit 106 received in evidence)

15           MR. LI:  May I publish, your Honor?

16           THE COURT:  Yes.

17           MR. LI:  Ms. Roberts, can you zoom in on the first

18  row, which is the books I believe?

19  Q.   Officer Sandobal, there appear to be three books here.

20  Please read the titles of the books and their authors.

21  A.   From left to right, Robin Sharma, The Monk Who Sold his

22  Ferrari; in the middle, The International Best Seller, Thinking

23  Fast and Slow, by Daniel Kahneman; and The Alchemist, by Paulo

24  Coelho.

25  Q.   What language do these books appear to be in?

P8CDGup3                        Sandobal - Cross

1   A.  English.

2              MR. LI:  Ms. Roberts, can we zoom in on the second

3   row, which appear to be the magazines?

4   Q.  So we're looking at what appear to be a stack of magazines.

5   What's the publication at the top of the stack?

6   A.  The Economist, How Strong is India's Economy?

7   Q.  What language does that magazine appear to be in?

8   A.  English.

9              MR. LI:  Your Honor, one moment.

10             Nothing further, your Honor.

11             THE COURT:  Let's take a 10-minute break.

12             MR. LAROCHE:  Yes, your Honor.

13             (Recess taken)

14             THE COURT:  Thank you.  Be seated.

15             Mr. LaRoche, are you conducting the cross?

16             MR. LAROCHE:  Yes.  Thank you, your Honor.  May I

17   proceed?

18             THE COURT:  You may proceed.

19             MR. LAROCHE:  Thank you, your Honor.

20   CROSS-EXAMINATION

21   BY MR. LAROCHE:

22   Q.  Good morning, Officer Sandobal.

23   A.  Good morning.

24   Q.  I represent Mr. Gupta.  I don't believe -- well, we

25   certainty haven't spoken about this case; is that correct?

P8CDGup3                          Sandobal - Cross

1    A.  Correct.

2    Q.  On direct, you were asked about your experience, and I

3    understand you've been an NYPD officer about 22 years; is that

4    right?

5    A.  I started my 22nd year in July.

6    Q.  And you're a detective now, correct?

7    A.  Yes.

8    Q.  And you have about nine years experience with the DEA,

9    correct?

10   A.  Yes.

11   Q.  You were asked how many post-arrest interviews you

12   conducted, and I believe you said about 100; is that right?

13   A.  Over 100.

14   Q.  Over 100; is that correct, sir?

15   A.  Yes.

16   Q.  And the next question they asked you was, approximately how

17   many times have you provided Miranda warnings during those

18   interview.

19          Do you recall that question?

20   A.  Yes.

21   Q.  And I believe your answer was, about the same.

22          Do you recall giving that answer?

23   A.  Yes.

24   Q.  I just want to make sure I understand that answer.  Are

25   there times you have not provided Miranda warnings in

P8CDGup3                          Sandobal - Cross

1    interviews in a post-arrest context?

2    A.   The only time I would not provide Miranda warnings is when

3    I'm asking pertinent pedigree information.

4    Q.   But have there been times in a post-arrest situation where

5    you have not provided Miranda warnings and then questioned an

6    individual?

7    A.   No.

8    Q.   How many -- so, this interview with Mr. Gupta happened in

9    June of 2023, correct?

10   A.   Correct.

11   Q.   Approximately how many post-arrest interviews did you

12   conduct between June 2023 and today?

13   A.   I don't have the exact number.

14   Q.   Is it more than 10?

15   A.   Yes.

16   Q.   More than 20?

17   A.   I don't have an exact number.

18   Q.   So more than 10 is a fair estimate at this point for you?

19   A.   Yes.

20   Q.   Okay.  Out of all those interviews, how many did you take

21   notes during?

22   A.   None.

23   Q.   You didn't take notes during any of those interviews?

24   A.   No.

25   Q.   Did anybody with you take notes during any of those

1    interviews?

2    A.  Not that I can remember.

3    Q.  So during all of the post-arrest interviews from June 2023

4    until today, not a single law enforcement officer, neither you

5    or anybody else, took a single note of those interviews?

6    A.  Not that I can remember.

7    Q.  You testified you are the case agent for Mr. Gupta's case;

8    is that fair?

9    A.  One of them.

10   Q.  And the other one is Special Agent Franks; is that right?

11   A.  Yes.

12   Q.  Now, that investigation into Mr. Gupta for murder for hire

13   started in May 2023; is that right?

14   A.  Yes.

15   Q.  And then he was arrested at the end of June 2023, correct?

16   A.  Yes.

17   Q.  And you said that obviously at the end of June 2023, you

18   were in the Czech Republic, correct?

19   A.  Yes.

20   Q.  And you were there because you knew Mr. Gupta would be

21   there, correct?

22   A.  Yes.

23   Q.  And the reason you knew that is because you got information

24   from a source that Mr. Gupta would be traveling to the Czech

25   Republic, correct?

P8CDGup3                    Sandobal - Cross

1   A.  Yes.

2   Q.  And the reason Mr. Gupta was told to travel to the Czech

3   Republic was purportedly to do a drugs and firearms

4   transaction, right?

5   A.  Mix of both.

6   Q.  Mix of both what?

7   A.  The murder-for-hire investigation we were conducting.

8   Q.  So your testimony is both, he was going there to talk about

9   murder for hire and then also separately to talk about a drugs

10  and firearms transaction?

11  A.  Correct.

12  Q.  Okay.  He's never been charged with a drugs or firearms

13  transaction, correct?

14            MR. LI:  Objection, scope.

15            THE COURT:  Sustained.

16  Q.  So you went to the Czech Republic in June 2023, correct?

17  A.  Yes.

18  Q.  To your knowledge, the DEA has no arrest power in the Czech

19  Republic, correct?

20  A.  No.

21  Q.  The DEA couldn't seize something in the Czech Republic?

22  A.  No.

23  Q.  They couldn't search someone in the Czech Republic?

24  A.  No.

25  Q.  So you needed the assistance of Czech law enforcement to

P8CDGup3                          Sandobal - Cross

1   arrest Mr. Gupta, correct?

2   A.  Yes.

3   Q.  You needed the assistance of Czech law enforcement to

4   search Mr. Gupta, correct?

5   A.  Yes.

6   Q.  You needed the assistance of Czech law enforcement to seize

7   anything from Mr. Gupta, correct?

8   A.  Yes.

9   Q.  That would include his cell phones, right?

10  A.  Yes.

11  Q.  You talked a lot about communications with Czech Republic

12  officers on direct.  I want to talk a little bit more about

13  that, but, first, as far as you know, at the time that you went

14  to the Czech Republic, the Czech Republic had no investigation

15  into Mr. Gupta, correct?

16  A.  No.

17  Q.  They weren't investigating him for murder for hire, right?

18  A.  No.

19  Q.  They weren't investigating him for any other crimes?

20  A.  No.

21  Q.  The Czechs had no reason to arrest him other than based on

22  the DEA's request, correct?

23  A.  Correct.

24  Q.  The Czechs had no reason to interrogate him other than the

25  DEA's request, correct?

P8CDGup3                         Sandobal - Cross

1                  MR. LI:  Objection.

2                  THE COURT:  Sustained.

3    Q.  The Czechs arrested Mr. Gupta because the DEA asked them

4    to, correct?

5    A.  Yes.

6    Q.  And the Czechs seized their phones because the DEA asked

7    them to seize the phones, correct?

8    A.  Yes.

9    Q.  And the Czech's interrogated Mr. Gupta because the DEA

10   asked them to do that, correct?

11                 MR. LI:  Objection.

12                 THE COURT:  Sustained.

13   Q.  You began coordinating with the Czech officers prior to Mr.

14   Gupta's arrest, correct?

15   A.  No.

16   Q.  Well, let me ask a different question.  When you learned

17   Mr. Gupta was going to be coming to the Czech Republic, you

18   contacted -- I believe you named two agents, Special Agent

19   Catalano, correct?  He was the country attache?

20   A.  Yes.

21   Q.  And there was another one, I believe also a country

22   attache, Special Agent Brannon, correct?

23   A.  Yes.

24   Q.  So when you learned that Mr. Gupta would be coming to the

25   Czech Republic, you reached out to them for assistance with the

P8CDGup3                           Sandobal - Cross

1   Czechs, correct?

2   A.   Yes.

3   Q.   And the reason you did that I think you said was because

4   they had to be the primary points of contact with the Czech

5   Republic, correct?

6   A.   Yes.

7   Q.   And so you weren't the direct interface with the Czech

8   Republic, correct?

9   A.   Correct.

10  Q.   So you provided background to them about the case, correct?

11  A.   No.

12  Q.   You provided no information to them whatsoever about the

13  case?

14  A.   No.

15  Q.   Do you have an understanding that they knew the purpose of

16  the arrest in the Czech Republic?

17  A.   They knew that we had an arrest warrant.

18  Q.   They knew nothing else about why they were seeking

19  Mr. Gupta?

20              MR. LI:   Objection, basis for knowledge.

21              THE COURT:   Sustained.

22  Q.   Okay.   So, Special Agent Franks also flew to the Czech

23  Republic with you, correct?

24  A.   Yes.

25  Q.   And Mr. Brannon and Mr. Catalano were also already in the

1   Czech Republic; is that right?

2   A.  Yes.

3   Q.  If we could pull up Government Exhibit 111.  That's the

4   WhatsApp chat.  And then just go to the first page, please.

5           Okay.  Do you recall being asked questions about this

6   chat during direct?

7   A.  Yes.

8   Q.  Okay.  The first message here is from Special Agent

9   Catalano, is that correct, SA Joe?

10  A.  Yes.

11  Q.  And he says, "awesome.  Thank you."  Do you see that?

12  A.  Yes.

13  Q.  You can't see anything he's responding to for that message,

14  correct?

15  A.  No.

16  Q.  There's nothing you can see before that, right?

17  A.  No.

18  Q.  That's because you weren't on this chat before you read it

19  on June 28; is that right?

20  A.  Correct.

21  Q.  And then I believe you were asked on the next page --

22          If you'd go to page two, please.  Thank you.

23          Kyle Brannon forwarded a message which I believe says,

24  "we have just received a request for the provisional arrest

25  from CZ MOJ with translation."  And it says, "thanks, David.

1 Great news."

2    Do you see that?

3 A. Yes.

4 Q. Is it your understanding that David was someone with the

5 Czech Republic?

6 A. I don't even know who David is.

7 Q. So you don't know one way or another?

8 A. No.

9 Q. Were you aware of any DEA agent or U.S. law enforcement

10 official named David who participated in the arrest?

11 A. No.

12 Q. Staying on the same chat, down below you were asked about

13 the message from Special Agent Catalano on June 29.

14    Thank you.  Now, it's at the top of the page.  Do you

15 see that?

16 A. Yes.

17 Q. He says, "no change.  All is still a go for tomorrow.

18 Sources arrive this evening, and we still anticipate Gupta to

19 arrive tomorrow evening on Turkish Airlines 1769."

20    Do you see that?

21 A. Yes.

22 Q. What do you understand this reference to the source to be?

23 A. DEA confidential source.

24 Q. All right.  So I believe you testified earlier you didn't

25 think he had any understanding of the underlying case; is that

P8CDGup3                          Sandobal - Cross

1   right?

2                MR. LI:  Objection.

3                THE COURT:  Overruled.

4   A.  No.

5   Q.  So let me make sure I understand your answer.  So I believe

6   you testified earlier you didn't believe Special Agent Catalano

7   had any understanding of the underlying case, correct?

8   A.  No.

9   Q.  But here he's referring top a confidential source, right?

10  A.  Yes.

11  Q.  And that's because you told him about the confidential

12  source, correct?

13  A.  Yes.

14  Q.  So he knew there was a confidential source involved in this

15  investigation, correct?

16  A.  Yes.

17  Q.  And he was providing that information to the Czech

18  Republic, correct?

19  A.  Yes.

20  Q.  Okay.  So we can take that down.

21                You were asked quite a bit on direct about a meeting

22  that happened with the Czech Republic on June 29.  Do you

23  recall those questions?

24  A.  Yes.

25  Q.  And I believe you testified that this meeting happened at

P8CDGup3                          Sandobal - Cross

1   the headquarters of the Czech officers; is that correct?

2   A.  Yes.

3   Q.  And is that the National Drug Headquarters?

4   A.  I believe so.

5   Q.  Is that what it's called?  Okay.  And that was a meeting in

6   person, correct?

7   A.  Yes.

8   Q.  And you were at the meeting, obviously, Special Agent

9   Franks was at the meeting, correct?

10  A.  Yes.

11  Q.  And both Special Agent Catalano and Special Agent Brannon

12  were at the meeting, correct?

13  A.  Yes.

14  Q.  And my understanding is Special Agent Catalano and Special

15  Agent Brannon had to be there, because they were the points of

16  contact with the Czechs, correct?

17  A.  Correct.

18  Q.  And there were also Czech officers at the meeting, correct?

19  A.  Correct.

20  Q.  How many Czech officers were there, as far as you know?

21  A.  As far as I can remember, three or four.

22  Q.  I believe two of them were supervisors; is that your

23  understanding?  Correct?

24  A.  At the very least.

25  Q.  At least two were supervisors?

P8CDGup3                          Sandobal - Cross

1   A.  Yes.

2   Q.  And the officers, I believe you referred to someone many

3   named Kazar?

4   A.  Petr, yes.

5   Q.  Petr.  I'm sorry.  We'll refer to him as Petr.

6            Do you remember the names of any other ones?

7   A.  No.

8   Q.  That meeting lasted an hour; is that right?

9   A.  Under an hour.

10  Q.  Under an hour?

11  A.  Yes.

12  Q.  More than a half hour?

13  A.  I would say definitely under an hour.

14  Q.  More than a half hour, less than an hour, somewhere around

15  there?

16  A.  Yes.

17  Q.  You didn't take notes at that meeting, correct?

18  A.  No.

19  Q.  Did Special Agent Franks?

20  A.  Not that I can remember.

21  Q.  You don't recall whether Special Agent Franks did?

22  A.  No.

23  Q.  Did Special Agent Catalano?

24  A.  No.

25  Q.  He didn't or you can't recall?

P8CDGup3                        Sandobal - Cross

1   A.  Not that I can remember.

2   Q.  What about Special Agent Brannon?

3   A.  Not that I recall here.

4   Q.  After the meeting, did you record what happened in any

5   documents?

6   A.  No.

7   Q.  Did you email anybody about the meeting?

8   A.  Not that I can recall.

9   Q.  Before testifying today, did you search for any document

10  related to that meeting?

11  A.  No.

12           MR. LI:  Objection.

13           THE COURT:  Overruled.

14  Q.  So the purpose of that meeting was to discuss an arrest

15  plan, correct?

16  A.  Yes.

17  Q.  And you wanted to discuss the broad parameters for that

18  plan, correct?

19  A.  No.

20  Q.  But you wanted to discuss an arrest plan, correct?

21  A.  Yes.

22  Q.  Okay.  And the Czechs said the DEA said, as in you all,

23  couldn't come into the airport during the arrest; is that

24  right?

25  A.  Inside the airport, correct.

P8CDGup3                          Sandobal - Cross

1    Q.  And the Czechs said they would arrest him in the airport,

2    correct?

3    A.  Yes.

4    Q.  And during this meeting, the Czechs also said you could go

5    into the van, and then you could talk to Mr. Gupta during the

6    drive from the airport?

7    A.  Yes.

8    Q.  Do you recall anything else the Czechs said during that

9    meeting?

10   A.  No.

11   Q.  All right.  Now, you testified in response to direct

12   questions about Mr. Gupta's phones coming up.

13            Do you recall those questions?

14   A.  Yes.

15   Q.  That was a topic raised by the DEA, correct?

16   A.  Yes.

17   Q.  You just testified as to what you recall the Czechs saying.

18   The Czechs didn't say anything about the phones, correct?

19   A.  Yes.

20   Q.  So the DEA raised Mr. Gupta's phones to the Czechs,

21   correct?

22   A.  Yes.

23   Q.  The DEA wanted the Czechs to seize those phones, correct?

24   A.  I wouldn't phrase it like that.

25   Q.  Well, the DEA told the Czechs to seize the phones during

1    the meeting, correct?

2    A.  I wouldn't phrase it like that.

3    Q.  I believe you testified that a DEA agent said during the

4    meeting that, "we would like to get Mr. Gupta's phones,"

5    correct?

6    A.  Yes.

7    Q.  Now, the DEA wasn't the arrest team, correct?

8    A.  No.

9    Q.  The Czechs were the arrest team, correct?

10   A.  Yes, sir.

11   Q.  He was saying that to the Czech officers, correct?

12   A.  Yes.

13   Q.  Just to go back, because I believe you were asked, you

14   didn't say that, right?

15   A.  No.

16   Q.  Did Special Agent Franks say that?

17   A.  Not that I can recall.

18   Q.  Did Special Agent Catalano say that?

19   A.  Not that I can recall.

20   Q.  Did Special Agent Brannon say that?

21   A.  I cannot recall who might have said that.

22   Q.  But it definitely wasn't you, correct?

23   A.  Yes.

24   Q.  But it was one of the other three --

25   A.  Yes.

P8CDGup3                          Sandobal - Cross

1   Q.  -- correct?

2           Now, the Czechs did end up seizing Mr. Gupta's phones,

3   correct?

4   A.  Yes.

5   Q.  Now, the DEA agent who you're not sure who said it also

6   said something else, correct?

7   A.  Yes.

8   Q.  He said he wanted to get the phones unlocked, correct?

9   A.  I wouldn't phrase it like that.

10  Q.  Okay.  So how would you phrase it?

11  A.  What we -- the way I would phrase it is, if he has any

12  property on him, cell phones, we would like for it to be seized

13  and if they're unlocked, even better.

14  Q.  Okay.  If they're unlocked, even better?

15  A.  Yes, with his consent.  Excuse me.

16  Q.  No.  I'm sorry.  I cut you off.  Go ahead.

17  A.  With his consent.

18  Q.  So the DEA agent said, we would like to get them unlocked,

19  and even better with his consent?

20  A.  If they're unlocked, yes.

21  Q.  Okay.  Now, you wanted to get the phones unlocked, correct?

22  A.  Of course.

23  Q.  Because if they weren't unlocked, there was a chance you

24  wouldn't be able to search them, correct?

25  A.  I wouldn't have been able to search them either way.

1    Q.  Well, certainly if they were not unlocked, there was no

2    chance of searching them, correct?

3    A.  No.

4    Q.  Okay.  And that could have been a problem for the

5    investigation, correct?

6    A.  Yes.

7    Q.  And it could have been a problem because, at this point,

8    you were relying on information that had been provided by a

9    source, correct?

10              MR. LI:  Objection.

11              MR. LAROCHE:  It goes directly to why --

12              THE COURT:  Overruled.

13              MR. LAROCHE:  Thank you, your Honor.

14   A.  Yes.

15   Q.  Just to be clear, at this point you didn't have access to

16   Mr. Gupta's phones in any other way?

17   A.  No.

18              THE COURT:  Asked and answered.

19              MR. LAROCHE:  I'm sorry, Judge?

20              THE COURT:  Asked and answered.

21   Q.  And I -- okay.  So it was important to you to get

22   Mr. Gupta's phones unlocked, correct?

23   A.  If we could.

24   Q.  Okay.  And you talked about how the agents said it would be

25   even better if the phones were unlocked with consent, correct?

P8CDGup3                          Sandobal - Cross

1    A.   Yes.

2    Q.   Now, after the DEA agent said it would be even better if he

3    gets the phone unlocked, the Czech officers didn't object to

4    that, did they?

5    A.   No.

6    Q.   They didn't say to you they weren't going to do that?

7    A.   No.

8    Q.   They didn't say to you that they weren't going to seize the

9    phones, correct?

10   A.   No.

11   Q.   They didn't say they weren't going to try to get his

12   passcodes, correct?

13   A.   No.

14   Q.   And the way to get a phone unlocked is to use passcodes,

15   correct?

16   A.   Yes.

17   Q.   And after this was said, you certainly didn't say to

18   anybody on the Czech side that, "we're not directing you to do

19   that," correct?

20   A.   No.

21   Q.   You didn't say, "don't get the passcodes," correct?

22   A.   No.

23   Q.   No DEA agent said, "listen, we are not directing you to do

24   any of these things," correct?

25   A.   No.

P8CDGup3                          Sandobal - Cross

1   Q.  And I believe you were asked on direct about what your

2   understanding of those statements meant, correct?

3   A.  Yes.

4   Q.  But, to be clear, you didn't actually talk to the Czech

5   officers about what those statement meant, correct?

6   A.  No.

7   Q.  You didn't say to him, "my understanding of what he just

8   said is --"

9            THE COURT:  Mr. LaRoche, asked and answered.  It's

10  getting repetitive --

11           MR. LAROCHE:  I'll move on, your Honor.

12           THE COURT:  -- and cumulative.

13  Q.  So let's go on to the -- I believe you testified about

14  another meeting on June 30 with the Czech officers, correct?

15  A.  Yes.

16  Q.  And that was involving generally the same agents; is that

17  right?

18  A.  Yes.

19  Q.  And this meeting was much shorter, correct?

20  A.  Yes.

21  Q.  And your testimony is, during this meeting, you don't

22  recall anyone discussing the phones; is that right?

23  A.  No.

24  Q.  And then at some point you went to the airport that day,

25  correct?

1    A.  Yes.

2    Q.  Now, before you did that, you were back at the hotel at

3    some point during the day before you went to the hotel; is that

4    fair?

5    A.  Yes.

6    Q.  And Special Agent Franks was also at the airport?

7    A.  Yes.

8    Q.  And while you were -- sorry.  I misspoke.  You were both at

9    the hotel at some point during the day?

10   A.  Yes.

11   Q.  And that's before you went to the airport, correct?

12   A.  Yes.

13   Q.  And while you were at the hotel, one of you printed the

14   advice of rights form; isn't that right?

15   A.  Yes.

16   Q.  And that's because you didn't have a copy with you in the

17   Czech Republic; is that correct?

18   A.  Yes.

19   Q.  So you printed one copy of the form at the hotel; is that

20   right?

21   A.  If I may?  If I may explain?

22   Q.  First answer my question.  Did you print one copy of the

23   form at the hotel?

24   A.  No.

25   Q.  Did Special Agent Franks print one copy of the form at the

1   hotel?

2   A.  No.

3   Q.  Okay.  Did he print multiple copies of the form at the

4   hotel?

5   A.  Yes.

6   Q.  How many copies did he print?

7   A.  At the very least, two.

8   Q.  Okay.  So let's look at -- if we can post for the witness

9   and the parties and the Court what's been marked as 3501-12.

10          Okay.  I'm going to point you to just the top of this

11  form, which has -- I'm going to represent to you that this is

12  an extraction report of what is a chat between you and Special

13  Agent Franks.

14          Do you see that?

15  A.  Yes.

16  Q.  And as part of your preparation, you've reviewed this with

17  the government; is that right?

18  A.  Yes.

19  Q.  And these messages accurately reflect the chats between the

20  two of you on June 30, 2023; is that right?

21  A.  Yes.

22          MR. LAROCHE:  Your Honor, we'd offer this as Defense

23  Exhibit 113, your Honor.

24          THE COURT:  Mr. Li?

25          MR. LI:  No objection, your Honor.

P8CDGup3                          Sandobal - Cross

1            THE COURT:  Admitted, without objection.

2            (Defendant's Exhibit 113 received in evidence)

3            MR. LAROCHE:  Thank you, your Honor.

4   Q.  Just to walk through the blue at the top, June 30, 2023, a

5   message from Special Agent Franks, "you downstairs," do you see

6   that?

7   A.  Yes.

8   Q.  And then you respond in the green below, "good now to try

9   and print the paper."  Do you see that?

10  A.  Yes.

11  Q.  And if we can go to the next page, please.  Thank you so

12  much.

13          And at the top, Special Agent Franks says, "I'm at the

14  front desk getting it printed."  Do you see that?

15  A.  Correct.

16  Q.  Your understanding of what he's referring to here is the

17  advice of rights form, correct?

18  A.  Yes.

19  Q.  And at this point neither one of you had a copy of the form

20  with you in the Czech Republic?

21  A.  No.

22  Q.  Okay.  And this refers to getting it printed.  Do you see

23  that?

24  A.  Yes.

25  Q.  Do you see anywhere in this chat where he indicates how

1   many copies were printed?  There's only one more page, if you'd

2   like to look.

3   A.  No.

4   Q.  Okay.  We can pull that down.

5          So, you arrived at the airport sometime in the

6   afternoon; is that correct?

7   A.  Late afternoon, yes.

8   Q.  And you got into the Sprinter van at the airport; is that

9   right?

10  A.  Yes.

11  Q.  And it was a black Sprinter van; is that right?

12  A.  Yes.

13  Q.  And it was parked outside of the airport?

14  A.  When we arrived at the airport, yes.

15  Q.  I'm sorry.  I missed that.

16  A.  When we arrived at the airport, yes.

17  Q.  And while you were waiting in the van, the Czechs were

18  providing updates on the WhatsApp chat; is that right?

19  A.  Yes.

20  Q.  You were on the chat; Special Agent Franks was on the chat,

21  correct?

22  A.  Yes.

23  Q.  And also Special Agents Catalano and Brannon, correct?

24  A.  Yes.

25  Q.  Now, Mr. Li walked you through this chat on direct,

P8CDGup3                         Sandobal - Cross

1   correct?

2   A.  Yes.

3   Q.  If we could just pull up the chat.

4           I'm not going to ask you all the questions the AUSAs

5   asked you, but I do have one question.  So, if you go to page

6   seven of the chat.  Okay.  And this is from June 30, 2023,

7   which you discussed earlier with Mr. Li.

8           You see that Petr says, "still shopping for perfume.

9   He's at border control."  Do you see that?

10  A.  Yes.

11  Q.  And then Mr. Brannon puts an emoji in.  Do you see that?

12  A.  Yes.

13  Q.  Do you know whether Mr. Brannon called Petr after the

14  messages about shopping for the perfume?

15  A.  No.

16  Q.  Do you know whether anyone else called Petr around this

17  time from the DEA?

18  A.  No.

19  Q.  Okay.  We can take that down.

20          Okay.  Now, you testified you weren't in the airport

21  during Mr. Gupta's arrest and interrogation, correct?

22  A.  Can you repeat the question, please?

23  Q.  You weren't in the airport during Mr. Gupta's arrest and

24  interrogation by the Czech officers, right?

25  A.  I was not inside the airport.

P8CDGup3                         Sandobal - Cross

1   Q.  And you weren't present for the interrogation, correct?

2   A.  As far as I know.  As far as I know about the

3   interrogation, I was not inside.  I don't know what transpired.

4   Q.  So you are not aware of whether Mr. Gupta was brought to a

5   private room in the airport?

6   A.  No.

7   Q.  You don't know what the Czech officers said to him in that

8   room?

9   A.  No.

10   Q.  You don't know how many Czech officers were in the room?

11   A.  No.

12   Q.  You don't know whether Czech officers told Mr. Gupta to

13   strip down so he could be searched?

14   A.  No.

15   Q.  You don't know whether Mr. Gupta was informed of any rights

16   while in that room?

17   A.  No.

18   Q.  You don't know if the Czech officers ordered Mr. Gupta to

19   unlock his phones?

20   A.  No.

21   Q.  Okay.  So, you said earlier that while Mr. Gupta was being

22   arrested in the airport, you waited in the van, correct?

23   A.  Yes.

24   Q.  And that van had windows for the driver's side door and

25   passenger side door, correct?

1   A.  Yes.

2   Q.  So, those windows were tinted; is that right?

3   A.  Yes.

4   Q.  Were there any other windows on the Sprinter van?

5   A.  All around the van.

6   Q.  So all around the van, and those windows were tinted as

7   well; is that correct?

8   A.  Yes.

9   Q.  Okay.  You said there were three rows behind the driver and

10  passenger, correct?

11  A.  At the very least.

12  Q.  Okay.  Do you think there were more than three rows?

13  A.  As far as I can remember, there were three rows.

14  Q.  So driver, passenger, then three rows, right?

15  A.  Driver and three rows.

16  Q.  Sorry.  That's a better way to say it.  Thank you.

17          Three rows.  Were they bucket seats rows or were they

18  captain seats?

19  A.  Bucket seat rows, all one seat.

20  Q.  Okay.  And before Mr. Gupta arrived, you sat in the second

21  to last row with Mr. Franks; is that correct?

22  A.  Yes.

23  Q.  And before he arrived, were there any other Czech officers

24  in the van?

25  A.  No.

1    Q.  And eventually the Czech officers arrived with Mr. Gupta,

2    correct?

3    A.  Yes.

4    Q.  And you testified at this point you moved to the last row,

5    right?

6    A.  Yes.

7    Q.  And Mr. Gupta sat to your right; is that correct?

8    A.  Yes.

9    Q.  Mr. Gupta was handcuffed at this time, correct?

10   A.  Yes.

11   Q.  And he was less than a foot away from you; is that right?

12   A.  Yes.

13   Q.  You testified Mr. Franks sat in the row in front of you?

14   A.  Yes.

15   Q.  And I believe the testimony was that he turned around; is

16   that correct?

17   A.  Who turned around?

18   Q.  Mr. Franks turned around?

19   A.  He was facing the rear of the van.

20   Q.  Was he looking over the seat to see both of you?

21   A.  I don't remember.  Sorry.

22   Q.  Okay.  You testified a moment ago that you thought they

23   were just rows, correct?

24   A.  Yes.

25   Q.  So there was no spacing in between, correct?

1   A.  They were just -- I don't even know how to call it.  Just

2   long seats is how I can describe it.  Not individual seats.

3   The row was on the side, and the seats to the left.

4   Q.  With Special Agent Franks turning around and looking over

5   the seats; is that correct?

6   A.  Yes.

7   Q.  And when Mr. Gupta got in the van, he wasn't free to move

8   around, correct?

9   A.  The space is limited.

10  Q.  And he wasn't free to move around, correct?

11  A.  No.

12  Q.  Now, you were hoping that Mr. Gupta would speak to you in

13  the van?

14  A.  Of course.

15  Q.  You wanted him to cooperate?

16  A.  Yes.

17  Q.  You wanted him to share what he knew, correct?

18  A.  Yes.

19  Q.  You wanted him to share what was in his cell phones, right?

20  A.  No, not at that moment.

21  Q.  Okay.  But it was important to you to find out what was in

22  his cell phones, correct?

23  A.  Yes.

24  Q.  And this was the first time you ever met Mr. Gupta in

25  person, correct?

P8CDGup3                          Sandobal - Cross

1    A.  Yes.

2    Q.  And you knew it might be the only chance to speak with him

3    before he had a lawyer, correct?

4    A.  Yes.

5    Q.  And if Mr. Gupta started talking, you wanted to make sure

6    you had a good record of what he said, right?

7    A.  Yes.

8    Q.  And you wanted that record to be accurate, right?

9    A.  Yes.

10   Q.  It was important to have a complete record of what happened

11   during that car ride, correct?

12   A.  Yes.

13   Q.  Yet you didn't take a single note of his interaction with

14   Mr. Gupta, correct?

15   A.  No.

16   Q.  You didn't take a note during the ride?

17   A.  No.

18   Q.  You didn't write anything down when you got to the

19   detention facility?

20   A.  No.

21   Q.  You didn't write anything down the next day?

22   A.  No.

23   Q.  Not a week after?

24   A.  No.

25   Q.  Never.  And Mr. Franks didn't do that either, did he?

P8CDGup3                         Sandobal - Cross

1    A.  As far as I can remember.

2    Q.  He didn't take any notes during the ride, correct?

3    A.  Not that I can remember.

4    Q.  As far as you know, he didn't?

5    A.  No.

6    Q.  And I believe you said you didn't take any notes, because

7    you didn't know what the rules were?

8    A.  Yes.

9            MR. LI:  Objection.

10   A.  It was more in terms of --

11           THE COURT:  Overruled.

12   Q.  I'm sorry.  I will just ask the question again.  I believe

13   you said you didn't take any notes because you didn't know what

14   the rules were?

15           MR. LI:  Objection.

16           THE COURT:  Overruled.

17   A.  That's not what I said, sir.

18   Q.  Okay.  So why didn't you take notes during your interview?

19   A.  I didn't have at the time a notepad with me.

20   Q.  You didn't testify on direct you weren't sure what the

21   rules were when you were in a foreign country?

22   A.  In terms of recording devices.

23   Q.  Okay.  That just had to do with recording devices?

24   A.  Yes, sir.

25   Q.  Okay.  So your testimony is you didn't record it like in

P8CDGup3                          Sandobal - Cross

1   terms of audio recording because you weren't sure of those

2   specific rules, correct?

3   A.   Correct.

4   Q.   But you didn't bring a notepad with you is why you didn't

5   take a note, correct?

6   A.   No, sir.

7   Q.   Okay.  Now, I believe you testified that when Mr. Gupta got

8   into the van, you and Special Agent Franks introduced yourself;

9   is that correct?

10  A.   Once he sat down, yes.

11  Q.   Okay.  And you said you introduced yourselves by name,

12  correct?

13  A.   Yes.

14  Q.   And you said you gave your full name, correct?

15  A.   Yes.

16  Q.   Now, you've met with the AUSA's several times in the past

17  couple months in preparation for your testimony?

18  A.   Several days, yes.

19  Q.   Isn't it true you told the AUSAs at one point you didn't

20  remember whether you gave him your full name?

21  A.   I do not remember saying that at this moment.

22  Q.   Okay.  And you also testified that I believe you told them

23  that there was an arrest warrant from America; is that correct?

24  A.   Yes.

25  Q.   Okay.  So he was clear that you were Americans, correct?

1   A.  Yes.

2   Q.  And then you testified that both you and Special Agent

3   Franks showed Mr. Gupta your credentials when you got into the

4   van; is that correct?

5   A.  Correct.

6   Q.  But you told the AUSAs in recent meetings you don't

7   remember Special Agent Franks showing his credentials; is that

8   right?

9   A.  I don't remember saying that.  Sorry.

10  Q.  You understood when you met with the AUSAs that they were

11  taking notes of those meetings?

12  A.  Yes.

13  Q.  And you understood those notes would become your 3500

14  materials?

15  A.  Yes.

16  Q.  And would it refresh your recollection to look at those

17  notes to see what you said during the meetings?

18  A.  I do not know what kind of notes the prosecutor takes

19  during my interviews.

20  Q.  My question is slightly different.  Isn't it possible if

21  you looked at those notes during the meetings it might refresh

22  your recollection of what you said to the prosecutors during

23  the meeting?

24  A.  Yes.

25  Q.  Okay.  Can we please post for the witness and the parties

P8CDGup3                         Sandobal - Cross

1    only 3501-06, and go to page two?

2              Okay.  So I'm going to focus you on the middle

3    paragraph that starts, "both MF and I introduced ourselves."

4    A.  Okay.

5    Q.  And then I just want you to read down to, "I showed," down

6    through that line, "I showed Gupta my credentials."  Tell me

7    when you're done, please.

8    A.  "I showed Gupta my credentials.  Don't recall --"

9    Q.  I'm sorry.  Just read it to yourself.

10   A.  Sorry.

11   Q.  I'm sorry.

12   A.  Yes.

13   Q.  Okay.  So does that refresh your recollection you told the

14   AUSAs you don't recall if Special Agent Franks showed his

15   credentials as well?

16   A.  Yes.

17   Q.  Earlier -- what I just had you read, doesn't that also

18   refresh your recollection that you don't recall if you gave

19   your last names?

20   A.  At this moment, sir, when I gave this interview -- I didn't

21   remember the entire interview.  This was back in 2023.

22   Q.  You are saying when you spoke with the AUSAs, you didn't at

23   that point recall everything about the interview?

24   A.  Correct.

25   Q.  And so this meeting with the AUSAs was in July of 2023, and

P8CDGup3                        Sandobal - Cross

1   you're saying at that point you didn't remember everything

2   about --

3           MR. LI:  Objection.

4           MR. LAROCHE:  Sorry, Mr. Li.

5   Q.  -- July of 2025?

6   A.  Yes.

7   Q.  And your testimony is at this point in July of 2025, you

8   didn't remember everything about the interview?

9   A.  Correct.

10  Q.  So your testimony is your memory has gotten better as we've

11  gotten closer to your testimony today?

12  A.  Yes.

13  Q.  But back to my question, because I don't think you answered

14  it, but does this also refresh your recollection that you don't

15  recall whether you gave your last names during the interview?

16          MR. LI:  Objection.  This is asked and answered.

17          THE COURT:  Sustained.

18  Q.  You testified that Agent Franks read -- I'm sorry.  We can

19  take that down.

20          You testified that Agent Franks read the advice of

21  rights form before questioning began, correct?

22  A.  Yes.

23  Q.  And it was him who read the form and not you, correct?

24  A.  Yes.

25  Q.  Before you read the form, did he ask you to do anything?

P8CDGup3                          Sandobal - Cross

1    A.  Who?

2    Q.  Before he said it --

3    A.  Who read it?

4    Q.  Before Special Agent Franks read the form, did he ask you

5    to do anything?

6    A.  Not that I can recall.

7    Q.  Did he ask the Czechs to do anything before he read the

8    form?

9    A.  No.

10   Q.  Mr. Gupta is sitting next to you at that point; is that

11   right?

12   A.  Yes.

13   Q.  And your testimony is Mr. Franks pulled out the form and

14   read it to Mr. Gupta, correct?

15   A.  Pulled out the form, provided Mr. Gupta with a copy of the

16   form.

17   Q.  And we're going to come back to that form, but I want to

18   ask you, Special Agent Franks didn't ask the Czechs to turn

19   additional lighting on in the van, correct?

20   A.  No.

21   Q.  And he didn't ask you to shine a flashlight so he could

22   read the form?

23   A.  Not that I remember.

24   Q.  Isn't it true it was dark at that point?

25   A.  No.

P8CDGup3                        Sandobal - Cross

1   Q.  You and Mr. Gupta were in the last row of the van with

2   tinted windows, correct?

3   A.  Yes.

4   Q.  Yet your testimony is that Franks could read that form

5   without any additional lighting?

6   A.  Yes.

7   Q.  And at some point in the ride, Mr. Franks took a picture of

8   Mr.Gupta's phone?

9   A.  Yes.

10  Q.  And that's Government Exhibit 5, you were shown during your

11  direct, correct?

12  A.  Yes.

13  Q.  So if we could pull that up, please.

14          Now, this was taken in the van during the ride with

15  Mr. Gupta, correct?

16  A.  Yes.

17  Q.  You see the phone screen in front of you there?

18  A.  Yes.

19  Q.  And it's lit up, correct?

20  A.  Yes.

21  Q.  And there's a silhouette of a finger on the left of the

22  phone, holding it, right?

23  A.  Yes.

24  Q.  You can barely see the finger, right?

25  A.  Yes.

P8CDGup3                          Sandobal - Cross

1   Q.  And you see another finger behind to object, the rest of

2   the picture that's in a small amount of light?  Do you see

3   that?

4   A.  It could be a finger.

5   Q.  Okay.  Maybe I'll just circle it.

6           Do you see that?

7   A.  Yes.

8   Q.  Okay.  And it looks like there's some light emitting from

9   something there, doesn't it?

10  A.  It looks bright.

11  Q.  Okay.  Isn't it true someone turned on a cell phone

12  flashlight to take this picture?

13  A.  I do not remember, sir.

14  Q.  Okay.  But it looks like someone has turned on a cell phone

15  flashlight to take this picture, right?

16          MR. LI:  Objection.

17          THE COURT:  Sustained.

18  Q.  You were asked a number of questions to interpret a video

19  you weren't even present for, correct?

20  A.  Correct.

21          MR. LI:  Objection.

22  Q.  You were asked a dozen questions about a video where

23  Mr. Gupta was provided -- provided his cell phone password,

24  correct?

25          MR. LI:  Objection.

P8CDGup3                      Sandobal - Cross

1                THE COURT:  Overruled.

2   A.  Yes.

3   Q.  And one of the things they asked you is to say, please

4   describe the lighting, correct?

5   A.  Yes.

6   Q.  How would you describe the lighting in this picture?

7   A.  It's obviously dark, because of the photograph -- the

8   photograph that was taken.

9   Q.  It's pitch black.

10  A.  It's not pitch black.

11  Q.  Other than this light in the middle of the picture, this is

12  pitch black; is that right?

13  A.  Okay.  Understood.

14  Q.  Is that right?

15  A.  Yes, sir.

16  Q.  But it's your testimony they were able to read this form

17  without any additional lighting at the time in the van?

18  A.  This was not the way it looked like inside the van.

19  Q.  But this is a picture inside the van, correct?

20  A.  Yes.

21  Q.  This is a picture inside the van when Mr. Gupta was there,

22  correct?

23  A.  Yes.

24  Q.  And this picture reflects it looks dark inside the van; is

25  that right?

P8CDGup3                          Sandobal - Cross

1   A.  Yes, it looks dark.

2   Q.  We can take that down.  If we can please pull up Government

3   Exhibit 101.

4           Okay.  Do you see that on your screen, sir?

5   A.  Yes.

6   Q.  And the government asked you, Mr. Li asked you what

7   portions of this form you recall reading -- or Special Agent

8   Franks reading, correct?

9   A.  Yes.

10  Q.  And you said you were certain he read everything from, "you

11  have the right to remain silent," through the consent, correct?

12  A.  Yes, sir.

13  Q.  And is it true that Franks didn't stop when he read this

14  form to Mr. Gupta?

15  A.  That Franks what?

16  Q.  Didn't stop?  He just read the form straight through?

17  A.  Yes, sir.

18  Q.  Okay.  So let's just take the statements one by one.  So

19  you testified that he said, "you have the right to remain

20  silent.  Even if you have already spoken to others, you do not

21  have to speak to us now."

22          You said he said that to Mr. Gupta?

23  A.  Yes.

24  Q.  After Mr. Franks read this statement, he didn't stop to ask

25  Mr. Gupta if he understood this statement, did he?

P8CDGup3                          Sandobal - Cross

1    A.  Yes, he did.

2    Q.  He did?

3    A.  Yes, sir.

4    Q.  You just said a second ago that he read this form straight

5    through, correct?

6    A.  Yes, sir.

7    Q.  Without stopping?

8    A.  Correct.

9    Q.  And now your testimony is he stopped question by question

10   and asked Mr. Gupta questions throughout?

11   A.  Well, he's reading it.  As he reads each question, you have

12   the right -- do you understand?  Yes.  And he would move on.

13   So that would be an ongoing --

14   Q.  Okay.  Where does this form say "do you understand" after

15   each of these points?

16   A.  Nowhere.

17   Q.  And your testimony before was he read this form straight

18   through, correct?

19   A.  And asking after each, "do you understand?"

20   Q.  Okay.  But a moment ago you said he read this form straight

21   through, correct?

22   A.  Yes, sir.

23   Q.  Now.  Mr. Li also read -- if we can go down just a little.

24   Thank you -- the statement below the consent that starts, "I

25   have read this statement," correct?

P8CDGup3                          Sandobal - Cross

1    A.  Yes.

2    Q.  And your testimony is that Mr. Franks read this to

3    Mr. Gupta, correct?

4    A.  Yes.

5    Q.  Now, the form also has lines below it for Mr. Gupta's name

6    and signature, right?

7    A.  Yes.

8    Q.  But no one asked him at this point whether he was willing

9    to sign the form, correct?

10   A.  No.

11   Q.  You didn't ask him that, correct?

12   A.  No.

13   Q.  And you testified you didn't have him sign the form,

14   because the van was moving, correct?

15   A.  Yes.

16   Q.  Did you ever give him the option of signing at that time?

17   A.  We couldn't.

18   Q.  Did you ever give him the option of signing at that time?

19   A.  No.

20   Q.  Now, you testified when Mr. Franks first read the form he

21   gave a copy to Mr. Gupta to read along, correct?

22   A.  Yes, sir.

23   Q.  And this gets back to printing the copies at the airport,

24   correct?  Those were one of the two copies he printed at the

25   hotel?

P8CDGup3                          Sandobal - Cross

1   A.  Yes.

2   Q.  Okay.  Now, your testimony is he takes out -- Mr. Franks

3   takes out one copy, and he gave one copy to Mr. Gupta, correct?

4   A.  Yes, sir.

5   Q.  And this happened while the van was moving, correct?

6   A.  Yes.

7   Q.  So this wasn't while you were stopped at the detention

8   facility, correct?

9   A.  No.

10  Q.  But isn't it true you told the AUSAs during meetings with

11  them that Franks didn't give Gupta the form until the van

12  stopped at the jail?

13  A.  To sign the form, he gave it to him back.

14  Q.  So your testimony is he gave him the form, correct?

15  A.  Yes.

16  Q.  And then he asked for it back?

17  A.  And we gave it back to him to sign the form.

18  Q.  And then he gave it back to them a second time?

19  A.  Yes.

20  Q.  That's your testimony?

21  A.  Yes.

22  Q.  Okay.  Now, when you gave the form -- when the form was in

23  Mr. Gupta's hand and the van had stopped, you asked him to sign

24  the form, correct?

25  A.  Yes.

1   Q.  At that point, you didn't ask anyone to turn additional

2   lighting on, correct?

3   A.  No, sir.

4   Q.  You didn't ask anyone to turn the phone flashlight on so

5   Mr. Gupta can read it, correct?

6   A.  Not that I can remember.

7   Q.  I'm sorry?

8   A.  Not that I can remember, sir.

9   Q.  Did Mr. Gupta ask any questions about the form?

10  A.  He was asking, "where do I sign," and I was pointing, print

11  your name here, which is the name, and sign at the bottom.

12  Q.  Did he ask any other questions about this form?

13  A.  No.

14  Q.  Up until this point, you testified he was very cooperative,

15  correct?

16  A.  Yes.

17  Q.  And then I believe you testified he asked for a phone call;

18  is that right?

19  A.  Yes.

20  Q.  And then a Czech officer said, "we'll be able to give you a

21  phone call later," correct?

22  A.  Yes.

23  Q.  And it's your testimony that's why he didn't sign the

24  advice of rights form?

25  A.  Correct.

1    Q.  And then someone wrote "refused" on the form, correct?

2    A.  Yes.

3    Q.  And that was Special Agent Franks, correct?

4    A.  Yes.

5    Q.  And you don't recall who wrote the date and time on the

6    form, correct?

7    A.  I'm not 100 percent sure.

8    Q.  Okay.  If we could put up Government Exhibit 107, please.

9             Okay.  You were shown this exhibit by Mr. Li, correct?

10   A.  Correct.

11   Q.  And the top message -- and this is a chat message between

12   AUSAs and you and Special Agent Franks, correct?

13   A.  Yes, sir.

14   Q.  Okay.  And this is from the day of the arrest, correct?

15   A.  Correct.

16   Q.  Okay.  And the top message from Ms. Fletcher is, "is he

17   talking?"  Do you see that?

18   A.  Yes.

19   Q.  And Mr. Franks response:  "We had limited time.  He did,

20   but he was playing fuck fuck games.  We think he will

21   ultimately cooperate.  We can fill you in more."

22             Do you see that?

23   A.  Yes.

24   Q.  Do you have an understanding of what he meant by "fuck fuck

25   games?"

P8CDGup3                          Sandobal - Cross

1   A.  He kept interjecting our questions by saying, "listen, just

2   take me to America.  Just take me now.  Take me now.  I'll tell

3   you anything you want.  Just take me to America."

4   Q.  So he was being cooperative?

5   A.  Yes.

6   Q.  Okay.  And you're saying he was interjecting that between

7   your questions?

8   A.  Yes.

9   Q.  Okay.  And then there's a message that says,

10  "congratulations, guys.  Really incredible work."  Ms. Fletcher

11  says, "truly."  Someone says, "did we grab the phones?"

12          Do you see that?

13  A.  Yes.

14  Q.  Do you understand that to be the phones that Mr. Gupta had

15  on him when he was at the airport?

16  A.  Yes.

17  Q.  And you respond:  "Yes.  He gave the codes to unlock them

18  to the arrest team."

19          Do you see that?

20  A.  Yes.

21  Q.  And your reference to the arrest team there is to the

22  Czechs, correct?

23  A.  Correct.

24  Q.  And those were the passcodes needed to get into the phones,

25  correct?

P8CDGup3                    Sandobal - Redirect

1    A.  Yes.

2    Q.  So those phones could be unlocked with those passcodes,

3    correct?

4    A.  Yes.

5           MR. LAROCHE:  One moment, your Honor.

6           Nothing further, your Honor.

7           THE COURT:  Mr. Li.

8           MR. LI:  All right.  Ms. Roberts, could we pull up

9    105, which is in evidence?  And let's publish it, please.

10   REDIRECT EXAMINATION

11   BY MR. LI:

12   Q.  Officer Sandobal, you were asked on cross-examination about

13   the lighting in this photograph.  Do you recall that?

14   A.  Yes.

15   Q.  Can you explain why it appears so dark in this photograph?

16   A.  If you have to use the phone -- if you have used the phone

17   in the past, you know the phone itself, when pointed at a

18   particular item, you can touch the screen and the phone by

19   itself will automatically lock into the lightest -- the object

20   you needed to capture, and that's what's happening in the

21   screen here.  It would make the background darker, so you could

22   see what you need to see.

23   Q.  So, in other words it's reflecting the camera that is being

24   used to take this photograph?

25   A.  Yes.

P8CDGup3                          Sandobal - Redirect

1    Q.   And why is it that the camera would make it appear darker

2    in the background in order to capture this image?

3    A.   Because it's focusing on the lightest image, but if I were

4    to touch on the camera, it would light up the background a

5    little lighter.

6    Q.   At the time that this photograph was taken in the van, was

7    there sunlight out?

8    A.   Yes.

9    Q.   Did that sunlight get into the van?

10   A.   Yes.

11   Q.   How dark were the tints on this van?

12   A.   If I had to take a wild guess, those would be the factory

13   set tints.

14   Q.   Is it blackout tints?

15   A.   No.

16   Q.   Was there enough light inside the van at this time to read

17   a piece of paper?

18   A.   Plenty of light.

19          MR. LI:  Ms. Roberts, let's pull up Government Exhibit

20   101, please.

21   Q.   So you were asked in cross-examination about the lighting

22   when the defendant was asked to sign this form at the end of

23   the van ride.

24          Do you recall that?

25   A.   Yes.

P8CDGup3                          Sandobal - Redirect

1    Q.   And I think you testified on cross-examination that nobody

2    turned on the lights or used a flashlight at that point, right?

3    A.   Correct.

4    Q.   Who wrote the name Nikhil Gupta on this form?

5    A.   Mr. Nikhil Gupta wrote it himself.

6    Q.   Did he have any trouble with the lighting writing his name?

7    A.   No.

8    Q.   Who wrote the word "refused?"

9    A.   That's Special Agent Franks.

10   Q.   Did he have any trouble writing the word "refused" due to

11   the lighting?

12   A.   No.

13   Q.   You were asked about how many times this form was given to

14   the defendant on paper.  Do you recall that?

15   A.   Yes.

16   Q.   So let's go through this.  When the defendant was read the

17   rights by Special Agent Franks, how many copies of the form

18   were in the van?

19   A.   At least two.

20   Q.   And where were those forms?

21   A.   Special Agent Franks had them.

22   Q.   Was he reading from one physical copy?

23   A.   Yes.

24   Q.   Where was the other physical copy?

25   A.   Mr. Nikhil Gupta had a copy of it.

1    Q.  What was he doing as Special Agent Franks was looking at

2    his copy of the form?

3    A.  He was looking at the form himself with his glasses on.

4    Q.  When you say "he was looking at the form," are you

5    referring there to the defendant?

6    A.  Yes.

7    Q.  So after Special Agent Franks read the form, did the

8    defendant agree to talk to you?

9    A.  Yes.

10   Q.  Do you recall what he said?

11   A.  He said, "yes.  What do you want to know, my friend?"

12   Q.  So what happened to the piece of paper the defendant was

13   holding at that point?

14   A.  It was given back to Special Agent Franks.

15   Q.  So after Special Agent Franks read the rights and after the

16   defendant agreed to talk to you, Special Agent Franks took both

17   copies of the forms; is that right?

18   A.  Yes.

19   Q.  So at the end of the car ride, when the defendant was asked

20   to sign the form, was he given a copy of the form?

21   A.  It was given back to him, yes.

22           MR. LI:  All right.  Ms. Roberts, we can take that

23   down.

24   Q.  You were asked on cross-examination about whether you

25   needed to get into the cell phones.

P8CDGup3                        Sandobal - Redirect

1           Do you recall that?

2    A.  Yes.

3    Q.  I think you testified that if a phone is locked, you can't

4    get to the contents.

5           Did I get that right?

6    A.  Correct.

7    Q.  In your experience as a law enforcement official, have you

8    encountered times when forensic examiners have been able to

9    break into a phone that is locked?

10   A.  Correct.

11   Q.  So do you know for sure whether the government would have

12   been able to get into the defendant's phone if they didn't know

13   the passcode?

14   A.  No.

15   Q.  You were asked about the importance of the content of the

16   phones to your investigation.

17          Do you recall that?

18   A.  Yes.

19   Q.  At the time that the Czech Police arrested the defendant,

20   did you have other evidence in this case besides the phones?

21   A.  Yes.

22   Q.  Can you describe generally what types of evidence you had?

23   A.  Video, audio, text messages, images.

24   Q.  Did you have videos of the defendant?

25   A.  Yes.

P8CDGup3                          Sandobal - Redirect

1   Q.  Did you have text messages with the defendant?

2   A.  Yes.

3   Q.  Did you have audio recordings with the defendant?

4   A.  Yes.

5   Q.  Generally speaking, what was the content of some of those

6   recordings?

7   A.  Giving further information on what to do and what his

8   people, Mr. Nikhil Gupta's people needed done.

9   Q.  When you say "needed done," what do you mean by that?

10  A.  One of those things is requesting a specific location of

11  where the intended victim was located.

12  Q.  So, fair to say you had evidence directly from the

13  defendant's mouth about the murder for hire?

14  A.  Yes.

15  Q.  In your view, was it essential to get into the phones in

16  order to prove this case?

17  A.  No.

18  Q.  I want to ask you a few questions about your relationship

19  with Special Agent Brannon and Special Agent Catalano.  You

20  were asked I think at the beginning of cross-examination about

21  the kind of information you provided to Special Agent Catalano.

22          Do you recall that?

23  A.  Yes.

24  Q.  When you and Special Agent Franks first reached out to

25  Special Agent Catalano, what types of information did you relay

1    to Special Agent Catalano?

2    A.   That we needed him to make contact with the Czech Police;

3    that we would have an arrest warrant for an individual and we

4    needed their assistance and approval in effect in that arrest.

5    Q.   Did you strategize with Special Agent Catalano about the

6    investigation?

7    A.   No.

8    Q.   Did you ask him for advice on what kind of interviews you

9    should conduct?

10   A.   No.

11   Q.   Did you ask him for advice on what kind of surveillance you

12   should do?

13   A.   No.

14   Q.   Why did you reach out to Special Agent Catalano?

15   A.   Because we needed to travel to the Czech Republic, and we

16   needed them in advance to make contact with their counterparts,

17   the Czech Police.

18   Q.   You were asked about a time Special Agent Catalano referred

19   to the confidential source in this case.

20        Do you recall that?

21   A.   Yes.

22   Q.   Why did you provide information to Special Agent Catalano

23   about the confidential source?

24   A.   Because the confidential source was going to be landing

25   also in Prague.

1   Q.   Why was that?

2   A.   We needed him to be aware of it for any safety concerns we

3   might have had at the time.

4   Q.   Why did you have the confidential source come to Prague?

5   A.   In case there might have come a time where Mr. Gupta did

6   land in Prague and somehow he managed to elude law enforcement

7   and exit the airport.

8   Q.   So as part of planning for operational contingencies, did

9   you inform Catalano the source was also in the country?

10   A.   Yes.

11   Q.   You testified about your job as one of the case agents; is

12   that right?  Is that what you are?

13   A.   Yes.

14   Q.   And what do you understand your job to be as a case agent?

15   A.   To best guide the investigation into the best direction

16   it's leading us into.  And, at this moment, it was into Prague

17   to effect the arrest with the assistance of the Czech Police.

18   Q.   In the course of this investigation, who decided where you

19   should try to get the defendant arrested?

20   A.   Well, Mr. Gupta opted to land in a particular place.  He

21   wanted -- he didn't want to land in other locations.

22   Q.   As part of this investigation, who decided to send a

23   provisional arrest request to the Czech Republic?

24   A.   We did.

25   Q.   When you say "we," who are you talking about?

P8CDGup3                         Sandobal - Redirect

1    A.  The government.

2    Q.  And who specifically?

3    A.  The prosecution.

4    Q.  Anyone else?

5    A.  And the DEA.

6    Q.  Who in the DEA?

7    A.  Special Agent Franks, Special Agent Sandobal, and the

8    country attache.

9    Q.  Why did the country attache get involved?

10   A.  Because he was the liaison between the DEA in Prague and

11   the DEA in New York.

12   Q.  And did you reach out to the country attache before you

13   decided that you might want to do the arrest in the Czech

14   Republic?

15   A.  Yes.

16   Q.  And why was that?

17   A.  I'm sorry.  I had a -- do you mind repeating the question,

18   please?

19   Q.  Of course.  Did you reach out to the country attache in the

20   Czech Republic before you and Agent Franks decided that you

21   might want to do this arrest in the Czech Republic?

22   A.  Yes.

23   Q.  And why was that?

24   A.  Because we needed to coordinate in advance and make sure we

25   worked out the legality of logistics with that country.

1    Q.  Did the country attache make the decision to try to do the

2    arrest in the Czech Republic?

3    A.  No.

4    Q.  Who did?

5    A.  We did.

6    Q.  Who's "we?"

7    A.  The DEA and the U.S. Government.

8    Q.  Who specifically within the DEA?

9    A.  Special Agent Mark Franks, TFO Jose Sandobal, and the

10   country attache.

11   Q.  You just said a second ago the country attache did not make

12   the decision to do this.

13   A.  No, he did not make the decision.  I'm sorry.

14   Q.  Okay.  What I'm trying to do is I'm trying to be clear

15   about who is responsible for what.  So, let me try it a

16   different way.

17            Did Special Agent Brannon or Special Agent Catalano

18   have any investigative responsibilities in this case?

19   A.  No.

20   Q.  What was their job in connection with this case?

21   A.  They were the liaison between the police and the DEA.

22   Q.  Did either Special Agent Brannon or Special Agent Catalano

23   ever conduct surveillance in this case?

24   A.  No.

25   Q.  Did they ever interview witnesses in this case?

P8CDGup3                    Sandobal - Redirect

1    A.  No.

2    Q.  Did they ever swear out a search warrant?

3    A.  No.

4    Q.  Did they ever review electronic evidence to your knowledge?

5    A.  No.

6    Q.  Did they participate in charging decisions?

7    A.  No.

8    Q.  Did they participate in your post-arrest interview with the

9    defendant?

10   A.  No.

11   Q.  Were they physically present anywhere near the airport to

12   your knowledge when the defendant was arrested?

13   A.  No.

14   Q.  Were they in the van?

15   A.  Were they in the van?  No.

16   Q.  You were asked on cross-examination about your meeting at

17   the National Drug Headquarters the day before the arrest

18   operation.

19        Do you recall that?

20   A.  Yes.

21   Q.  And I think you testified that someone from the DEA said

22   something to the effect of, "we hope he consents, and if his

23   phones are unlocked, even better."  Did I get that right?

24   A.  Yes.

25   Q.  And I think you were asked about, did anybody say that we

P8CDGup3                          Sandobal - Redirect

1   were not directing the Czech Police to get his passcode.  Do

2   you recall that conversation?

3   A.  Yes.

4   Q.  Is it your understanding that the DEA is able to direct the

5   Czech Republic police to make an arrest?

6   A.  That we can direct them?

7   Q.  Yeah.  Do you understand that the DEA can direct the Czech

8   Police to make an arrest?

9   A.  No.  We can request.

10  Q.  To your understanding, can the DEA direct the Czech Police

11  to seize evidence?

12  A.  No.

13  Q.  To your understanding, can the DEA direct the Czech Police

14  to do anything within the Czech Republic?

15  A.  No.

16  Q.  You were asked on cross-examination whether you knew

17  whether the Czech Police had ordered the defendant to unlock

18  his phones.

19          Do you recall that?

20  A.  Yes.

21  Q.  Did the Czech Police tell you how he came to unlock his

22  phones?

23  A.  No.

24  Q.  Did they tell you whether he had provided his passcodes?

25  A.  Yes.

1   Q.  And what did they tell you about that?

2   A.  That consent -- he voluntarily provided the passcode, and

3   he consented to a search of the phone.

4              MR. LI:  Ms. Roberts, could we please pull up

5   Government Exhibit 108 for identification?

6   Q.  Officer Sandobal, do you recognize Government Exhibit 108?

7   A.  Yes.

8   Q.  What is it?

9   A.  This is a DEA report, typed.

10  Q.  And what's the date on the DEA report?

11  A.  It is July 12, 2023, date prepared.

12  Q.  And what is the general subject matter of this DEA report?

13  A.  It's just the substance of what transpired.

14  Q.  What transpired when?

15  A.  On the day of the arrest.

16  Q.  Who wrote this report?

17  A.  Special Agent Franks.

18  Q.  Before Special Agent Franks submitted this report, did you

19  review it?

20  A.  Yes.

21  Q.  Did you review it carefully?

22  A.  Yes.

23  Q.  Is it true?

24  A.  Yes.

25  Q.  And is this a fair and accurate copy of the report?

1  A.  Yes.

2           MR. LI:  Your Honor, the government offers Government

3  Exhibit 108.

4           MR. LAROCHE:  No objection.

5           THE COURT:  Admitted, without objection.

6           (Government Exhibit 108 received in evidence)

7           MR. LI:  May we publish, your Honor?

8           THE COURT:  Yes.

9           MR. LI:  Ms. Roberts, let's go to page two, please.

10 Q.  Officer Sandobal, could you please read the last sentence

11 of paragraph four?

12 A.  "It is to be noted, at approximately 12:11 p.m. Eastern

13 Standard Time, Gupta texted via WhatsApp the undercover

14 officer, UC, his new number --"

15 Q.  I don't mean to interrupt you.

16 A.  Excuse me.

17 Q.  I'm actually asking you to read the last sentence of

18 paragraph four.

19 A.  My apologies.

20           That is, "Special Agent Franks and TFO Sandobal were

21 informed that Gupta voluntarily provided them with the phone

22 passwords."

23 Q.  Is that sentence accurate?

24 A.  Yes.

25 Q.  When was this report prepared?

1   A.  On July 12, 2023.

2   Q.  And who told you and Special Agent Franks that Gupta

3   voluntarily provided the phone passcodes?

4   A.  The Czech Police.

5              MR. LI:  One moment, your Honor.

6              Nothing further, your Honor.

7              MR. LAROCHE:  Very briefly, your Honor.

8              THE COURT:  Very briefly.

9              MR. LAROCHE:  Thank you.

10  RECROSS EXAMINATION

11  BY MR. LAROCHE:

12  Q.  You were just asked about this statement that says you were

13  informed that Mr. Gupta voluntarily provided them with the

14  phone password.

15             Do you see that?

16  A.  Yes, sir.

17  Q.  You weren't present when Mr. Gupta provided the phone

18  passwords, correct?

19  A.  No.

20  Q.  So other than this statement, you have no basis to know

21  whether or not he provided them voluntarily, correct?

22  A.  No.

23  Q.  You were asked a number of questions about the evidence in

24  this case.

25             Do you recall those questions?

P8CDGup3                     Sandobal - Recross

1   A.  Yes.

2   Q.  And they said, what was the state of the evidence at the

3   time of the arrest, and you referred to recordings, correct?

4   A.  Yes.

5   Q.  And you recorded the chats, correct?

6   A.  Yes.

7   Q.  To be clear, those chats were provided by a source,

8   correct?

9   A.  Both.

10  Q.  And the recordings were provided by a source, correct?

11  A.  Yes.

12  Q.  But at the time of this interview, you had known that some

13  of the chats on the CS's phone had been deleted, correct?

14  A.  Some of this.

15  Q.  So some of the original chats between the CS and Mr. Gupta

16  were deleted at the time that you were in the Czech Republic,

17  correct?

18  A.  No.

19  Q.  But you understood, by June 30, 2023, that the CS's phone

20  had deleted some of the chats with Mr. Gupta, correct?

21  A.  Yes.

22  Q.  You were asked about Special Agent Catalano's participation

23  in the investigation, correct?

24  A.  Yes.

25  Q.  And you said you had no role in the investigation; is that

P8CDGup3                          Sandobal - Recross

1    correct?

2    A.   That he had no role --

3    Q.   In the investigation.

4    A.   Correct.

5    Q.   Are you aware that Special Agent Catalano was involved in

6    transporting evidence in this case?

7    A.   Transporting evidence from where to where?

8    Q.   That he was involved in transporting evidence anywhere in

9    this case?

10   A.   Not to my knowledge.  If you were to specify --

11   Q.   Do you know that Special Agent Catalano was responsible for

12   transporting Mr. Gupta's phones to New York in this case?

13   A.   To my knowledge, I do not believe that he transported

14   phones physically.

15   Q.   Did he mail phones?

16   A.   I believe it was mailed.

17   Q.   And that means the phones were at one point in his

18   possession; is that correct?

19   A.   I would believe so.

20   Q.   And you recall him doing so, correct?

21   A.   Yes.

22            MR. LAROCHE:  Nothing further, your Honor.

23            THE COURT:  Thank you.

24            MR. LI:  Your Honor, may I ask one question just to

25   clarify something he said?  It's just one question.

1           THE COURT:  All right.

2    REDIRECT EXAMINATION

3    BY MR. LI:

4    Q.  The question is, when you were testifying about the

5    messages being deleted from the source's phones, how did they

6    come to be deleted?

7    A.  When we had an in-person meeting with the source, we were

8    reviewing the content of the conversation, and at which point I

9    realized that Mr. Gupta's setting was set to delete every 24

10   hours.

11          MR. LI:  Nothing further, your Honor.

12          THE COURT:  All right.  You may step down.  You are

13   excused.

14          THE WITNESS:  Thank you, sir.

15          THE COURT:  Mr. Li, are you prepared to proceed with

16   the next witness or do we take a break at this point for lunch?

17          MR. LI:  We can take a break, your Honor.  The

18   government has no further witnesses for this hearing.

19          THE COURT:  No further --

20          MR. LI:  Nothing further, your Honor.  We did make

21   available the other case agent, because the defense indicated

22   they may wish to call the other case agent.  So he is available

23   if the defense wishes to call him.

24          THE COURT:  All right.

25          MR. LAROCHE:  Your Honor, with -- I'm sorry.

1          THE COURT:  Yes.  What is defense's view about this

2     point?  Should we proceed or take a break?

3          MR. LAROCHE:  Your Honor, I think we would request

4     just five minutes to confer and decide whether we're going to

5     call the witness.  If we're not going to call the witness, I

6     think we're done with the hearing, but we would like a moment

7     to confer with our client about that.

8          THE COURT:  All right.  Why don't we take a recess of

9     10 minutes then.

10          MR. LAROCHE:  Thank you, your Honor.

11          (Recess taken)

12          THE COURT:  Thank you.  Be seated.

13          Mr. LaRoche.

14          MR. LAROCHE:  Thank you, your Honor.  We are not going

15     to call an additional witness.  The defense is going to enter

16     three exhibits without objection, but then we're going to rest,

17     your Honor.  So, those exhibits, for the record, are Defense

18     Exhibits 103, 104, and 105, your Honor.

19          MR. LI:  No objection.

20          THE COURT:  All right.  Those exhibits will be

21     admitted, without objection.

22          (Defendant's Exhibits 103, 104, and 105 received in

23     evidence)

24          MR. LAROCHE:  Thank you, your Honor.

25          I understand the government -- obviously, they can

P8CDGup3                          Sandobal - Redirect

1     speak for themselves, but I understand they plan to put in a

2     submission in response to our letter, so I would defer to them

3     in terms of next steps on that.

4                 THE COURT:  Mr. Li.

5                 MR. LI:  Yes, your Honor.  We think it might be

6     efficient, if the Court's amenable, if the government submits a

7     letter in one week responding to the defense motion of late

8     last night or early this morning regarding the scope of the

9     prosecution team and their request for discovery.

10                THE COURT:  Fine.  The government is prepared to rest

11    at this hearing?

12                MR. LI:  Yes, your Honor.

13                THE COURT:  All right.  You asked for one week in

14    which to respond to the letters of this morning?

15                MR. LI:  Yes, your Honor.

16                THE COURT:  All right.  Assuming then that you submit

17    your response in one week, Mr. LaRoche, how much time would you

18    need to respond?

19                MR. LAROCHE:  We'd ask for three days, your Honor.

20    And, your Honor, I guess we would also ask the Court, if it

21    would prefer post-hearing briefing?

22                THE COURT:  You --

23                MR. LAROCHE:  I'm sorry, your Honor.  We would like

24    three days to respond to their --

25                THE COURT:  Yes, I got that.

1          MR. LAROCHE:  The second question is whether the Court

2     would prefer the parties to file post-hearing briefing.

3          THE COURT:  How long a brief would the government

4     contemplate on its motion, Mr. Li?

5          MR. LI:  Your Honor, we don't think any briefing is

6     necessary.  I think the law has been pretty laid out in the

7     motions, and the facts are pretty simple.  There was one

8     witness.  If the Court would like us to put it together, we're

9     happy to do so.  Ten pages, your Honor?  But, again, we don't

10    think it's necessary.

11         MR. LAROCHE:  I was going to propose simultaneous

12    briefing, both limited to 10 pages, your Honor.

13         THE COURT:  Why don't we do simultaneous submissions.

14    It will be I think more efficient that way.

15         MR. LAROCHE:  And may I propose two weeks, your Honor,

16    for those?

17         THE COURT:  Yes.

18         MR. LAROCHE:  And, Judge, just for the record, I know

19    we said it earlier, but we reserve our right, to the extent the

20    discovery issues require the government to produce additional

21    materials, we reserve our right, depending on what the

22    discovery shows, to reopen the hearing, or request to reopen

23    the hearing.

24         THE COURT:  Well, if there's nothing else, then we

25    will stand adjourned.

P8CDGup3                          Sandobal - Redirect

1              MR. LAROCHE:  Thank you, your Honor.

2              MR. LI:  Thank you, your Honor.

3              THE COURT:  The Court will deem the hearing to be

4    closed.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3    JOSE SANDOBAL

 4   Direct By Mr. Li . . . . . . . . . . . . . . . 7

 5   Cross By Mr. Laroche . . . . . . . . . . . . .76

 6   Redirect By Mr. Li . . . . . . . . . . . . . 122

 7   Recross By Mr. Laroche . . . . . . . . . . . 136

 8   Redirect By Mr. Li . . . . . . . . . . . . . 139

 9                    GOVERNMENT EXHIBITS

10   Exhibit No.                           Received

11    111   . . . . . . . . . . . . . . . . . . .26

12    112   . . . . . . . . . . . . . . . . . . .39

13    102   . . . . . . . . . . . . . . . . . . .45

14    103   . . . . . . . . . . . . . . . . . . .50

15    104   . . . . . . . . . . . . . . . . . . .51

16    101   . . . . . . . . . . . . . . . . . . .54

17    105   . . . . . . . . . . . . . . . . . . .64

18    107   . . . . . . . . . . . . . . . . . . .72

19    106   . . . . . . . . . . . . . . . . . . .75

20    108   . . . . . . . . . . . . . . . . . . 135

21                    DEFENDANT EXHIBITS

22   Exhibit No.                           Received

23    113   . . . . . . . . . . . . . . . . . . .98

24    103, 104, and 105   . . . . . . . . . . . 140

25
```