**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

UNITED STATES OF AMERICA

Plaintiff,

v.

NIKHIL GUPTA,

Defendant

-------------------------------------------------------------x

Case No.: 23-CR-289-S2 (VM)

**DEFENDANT NIKHIL GUPTA'S SENTENCING MEMORANDUM**

## I. PRELIMINARY STATEMENT

Nikhil Gupta appears before this Court for sentencing on Counts One through Three of the Second Superseding Indictment, to which he pleaded guilty on February 13, 2026. The Probation Department calculated an advisory Guidelines range of 235 to 293 months and has recommended a substantial downward variance from that range to 144 months imprisonment followed by three years of supervised release. We join in Probation's request for a significant downward variance from the Guidelines.

Probation's recommendation reflects a considered judgment by the officer who interviewed Mr. Gupta, reviewed the full investigative record, and weighed the statutory factors under 18 U.S.C. § 3553(a). It takes into account that Mr. Gupta has no criminal history of any kind, that he was suffering from untreated alcohol dependence at the time of the offense, and that any lengthy sentence for a fifty-five-year-old man is significant.[1] This memorandum sets out the personal history, family circumstances, and context for Mr. Gupta's conduct that support the recommendation Probation has already made and responds to the victim impact statement.

---

[1] Mr. Gupta was born on October 2, 1971, and turned fifty-five on October 2, 2026. This memorandum uses his current age.

Mr. Gupta does not minimize the seriousness of what he did. He agreed to arrange the murder of another person, and that conduct warrants a term of imprisonment. But the sentence this Court imposes should be sufficient, and not greater than necessary, to serve the purposes of sentencing as to this defendant. 18 U.S.C. § 3553(a). Probation's recommendation of a significant variance goes a long way towards striking that balance.

## II. PROCEDURAL HISTORY

Nikhil Gupta and Vikash Yadav[2] were charged in the Second Superseding Indictment with Murder for Hire Conspiracy (Count One), Murder for Hire (Count Two), and Money Laundering Conspiracy (Count Three), in connection with a plot to murder an individual in New York City between approximately May and June 2023. The Department of Justice first charged Mr. Gupta in a sealed indictment dated June 13, 2023, with a murder-for-hire conspiracy and murder-for-hire. The laundering charge, Count Three, was added in the Second Superseding Indictment on October 17, 2024.

Mr. Gupta was arrested in the Czech Republic on June 30, 2023 at the request of the United States, and was extradited to this district on June 14, 2024. He has remained in continuous custody since his arrest.

On February 13, 2026, Mr. Gupta pleaded guilty to the Second Superseding Indictment before Magistrate Judge Sarah Netburn. The Department of Justice's letter dated February 9, 2026, provided to Mr. Gupta pursuant to *United States v. Pimentel*, 932 F.2d 1029 (2d Cir. 1991), calculated the same Guidelines range of 235 to 293 months that Probation reached. Sentencing before this Court is scheduled for November 20, 2026.

---

[2] The record is inconsistent as to Mr. Yadav's first name. The caption of the civil action in which Mr. Gupta is also named as a defendant refers to him as "Vikram Yadav." (*Pannun v. Gov't of India*, No. 1:24-cv-07021-KPF (S.D.N.Y.), ECF No. 44-1 at 1.) This memorandum uses "Vikash," the name used in the Second Superseding Indictment.

Mr. Gupta's codefendant, Vikash Yadav, is alleged to have been employed by India's Cabinet Secretariat, which houses the Research and Analysis Wing, India's foreign intelligence service (S2 indictment, ¶ 2). Yadav has not been apprehended and remains a fugitive.

## III. <u>OFFENSE CONDUCT</u>

### *A. Mr. Gupta's Role in the Offense*

Mr. Gupta was recruited into this offense by Vikash Yadav on May 29, 2023. Mr. Gupta believed that Yadav was connected to Indian intelligence. Yadav directed Mr. Gupta to arrange for a hitman who could assist in the murder of an individual located in New York. Gupta contacted an individual whom he met years before, who he believed was a convicted drug dealer. In fact, this individual was a confidential source working with law enforcement. Over the following weeks, Mr. Gupta served as the communications link between Yadav in India and the confidential source and undercover officer in New York, relaying instructions, surveillance requests, and updates in both directions.

The money discussed in these communications—including the $15,000 advance and the $100,000 Yadav agreed to pay when the murder was completed—was for the purported hitman. When the advance was delivered, an associate of Yadav's, referred to as "Individual-2" in the indictment, handed it directly to the undercover officer in Manhattan, and none of it passed through Mr. Gupta's hands or was controlled by him. Mr. Gupta was not paid to arrange this murder. Rather, Yadav had offered to resolve a matter, which involved individuals who had come to Mr. Gupta's home in India inquiring about him. These men identified themselves to Gupta's son as Gujarat police. Although Gupta had no involvement in criminal activity in India, he was concerned about these individuals and Yadav assured Gupta that he would not be bothered by them again.

The stress of this situation weighed on Mr. Gupta throughout the period of the offense. Mr. Gupta had already begun drinking heavily by 2022, but that drinking intensified as he found

himself increasingly entangled in Yadav's demands and the underlying fear that had brought him into contact with Yadav in the first place. Mr. Gupta has acknowledged that he was intoxicated during certain of his communications in furtherance of this offense, and that his drinking during this period affected his judgment.

On May 8, 2023,[3] he and Yadav discussed a separate, intended target in Nepal or Pakistan, and Mr. Gupta forwarded location information to individuals he referred to as "soldiers." From Gupta's perspective, none of this discussion was true—he had no soldiers and no actual capacity to carry out any such plan, and he has no knowledge of any completed assassination arising from it. It was mere puffery.

### *B. The Charging History and the Canada Plot*

Mr. Gupta spent nearly a year in Czech custody before his extradition on June 14, 2024, and he has been held at the Metropolitan Detention Center since his arrival in New York. By the date of sentencing he will have been in continuous custody for more than three years and four months, and more than two-thirds of that time has been at the MDC. *See infra* Part VI.F and Ex. E. The charging instrument changed twice during that time, and the last superseding indictment added the money laundering count that greatly increased Mr. Gupta's potential sentence.

The Department of Justice first charged Mr. Gupta on June 13, 2023, in a three-page sealed indictment with two counts: conspiracy to commit murder-for-hire and murder-for-hire, both under 18 U.S.C. § 1958. That indictment alleged that Mr. Gupta, "in agreement with others, hired a person [he] believed to be a hitman" and coordinated a $15,000 advance payment in New York. It contained no allegation about any Indian official and nothing about Canada.

[3] The materials describing this exchange date it May 8, 2024. Mr. Gupta was in custody in the Czech Republic from June 30, 2023, and the exchange took place around the time the plot began, in May 2023. The date appears to be a typographical error, and this memorandum uses May 8, 2023.

On June 18, 2023, Hardeep Singh Nijjar was shot and killed outside a Sikh temple in British Columbia, Canada. Yadav sent Mr. Gupta video of Nijjar's body late that evening, and Mr. Gupta's reaction to that video included a comment that he wished he had personally been involved and requested to "go to the field." Mr. Gupta was not involved in Nijjar's killing and learned of it only after the fact, when Yadav told him. Mr. Gupta later told the confidential source that Nijjar had been discussed as a target in Canada before the murder occurred, or that he referenced Nijjar's murder in subsequent calls pressing for the New York plot to move forward. Again, these comments were mere puffery.

Mr. Gupta was not charged with the Nijjar killing, and the Guidelines calculation is built on the New York plot alone, so the Canadian killing does not affect the range. Everything he knew about the Canadian murder came from Yadav. The record is consistent with that account: it was Yadav who sent Mr. Gupta the video of Nijjar's body on the evening of June 18, 2023, and who told him that "[i]t's better you do not get involved in action." None of his conversations proves that Mr. Gupta participated in the Canadian conduct.

On November 29, 2023, while Mr. Gupta was in Czech custody and extradition proceedings were pending, the Department of Justice filed a superseding indictment charging the same two counts. *Compare* Indictment dated June 13, 2023 (charging Counts One and Two under 18 U.S.C. § 1958), *with* Superseding Indictment dated November 29, 2023 (charging the same two counts). As the Court has described it, that pleading "added factual details about the murder-for-hire plot but maintained the same two charges." The new details included a co-conspirator described only as an "Indian government employee" ("CC-1"), and an account of the Nijjar killing and Mr. Gupta's reaction to it. None of those allegations appeared in the original indictment.

On October 17, 2024, four months after Mr. Gupta's extradition, the Department of Justice filed the Second Superseding Indictment. It named Vikash Yadav as a co-defendant and attributed to him the role that the prior pleading had assigned to CC-1. It also added Count Three, conspiracy to commit money laundering under 18 U.S.C. § 1956(h), together with a further forfeiture provision under 18 U.S.C. § 982(a)(1). *Compare* Superseding Indictment dated November 29, 2023 (charging two counts), *with* Second Superseding Indictment dated October 17, 2024 (charging three).

Count Three rests on the same conduct as Counts One and Two, the single $15,000 cash payment in Manhattan. Count Three is based on the same conduct alleged during the extradition proceedings: that Gupta helped transmit the advance of $15,000.

Between June 2023 and October 2024, nothing changed about what Mr. Gupta was alleged to have done in New York. The payment was the same $15,000, and the plot was the same. What changed is the Department of Justice's account of the case, which came to include the Nijjar killing and Yadav's connection to both plots.

Mr. Gupta pleaded guilty to all three counts, so he does not ask the Court to disregard Count Three. He respectfully asks the Court to consider the fact that the Department of Justice added the money laundering charge based on the exact same conduct described in the Second Superseding Indictment. The Department of Justice contends that the money laundering charge drives the Guidelines calculation. The defense disagrees. It is in any event clear that the charge was added to the indictment to increase Mr. Gupta's sentencing exposure.

**C. *The Nijjar Murder***

On July 1, 2026, the very same Department of Justice that included the Nijjar killing in the instant indictment obtained an indictment in the Central District of California which charged nine

defendants with racketeering conspiracy and offenses related to the Nijjar plot in British Columbia. (Indictment, *United States v. Bishnoi*, No. 2:26-cr-00428-WLH (C.D. Cal.), ECF No. 5 at 1.) The indictment alleges that the Lawrence Bishnoi Organized Crime Group, an Indian criminal syndicate, was responsible for the murder. (*Id.* at 14.) That indictment alleges that Bishnoi and Satinderjeet Singh ordered the June 18, 2023 killing of "H.S.N."[4] It does not name Mr. Gupta or Yadav as defendants or co-conspirators.

***D. The June 12, 2023 Calls***

The Department of Justice has cited a June 12, 2023 video call as an example of Mr. Gupta telling the undercover officer that the co-conspirators directing the plot from India had extensive resources and were closely monitoring its progress. In that account, Mr. Gupta turned his camera toward several other men present in a conference room. It appears that the Department of Justice's position conflates two separate conversations that occurred on June 12, 2023[5]—one with the confidential source and one with the undercover officer—and that the recording of the relevant call is incomplete and does not show any other men present. A separate, audio-recorded call from that day clearly demonstrates that he was intoxicated at the time, and that the only other voices audible in the background were those of women present in his apartment. He has no recollection of any other men being present during either call. As stated above, Mr. Gupta was drinking heavily and daily, and he was intoxicated during certain of his communications with Yadav and others in connection with this offense.

[4] The *Bishnoi* indictment identifies the victim only by the initials "H.S.N." H.S.N. is Mr. Nijjar. *See id.* at 14 (Overt Act Nos. 1, 4) (alleging that H.S.N. was killed on June 18, 2023 outside a Sikh temple in Surrey, British Columbia).

[5] The defense objections letter gives the date of these calls as July 12, 2023. That date is an error. The calls took place on June 12, 2023.

***E. Steps Taken to Limit Harm***

While carrying out Yadav's instructions, Mr. Gupta tried to impose a limit on the harm being done. In the June 22, 2023 communications describing how the undercover officer should proceed if the victim were not alone, Mr. Gupta instructed that the individuals involved should confirm the target was inside his home before entering and should not harm women or children.

***F. Arrest and Post-Arrest Statement***

Mr. Gupta was arrested in Prague on June 30, 2023. The Department of Justice claimed that Mr. Gupta waived his Miranda rights and agreed to speak with DEA agents. According to the Government, Mr. Gupta explained that he had been approached by "Amanat"—later identified as Yadav—who offered to help resolve a matter involving the Gujarat police in exchange for Mr. Gupta's assistance in arranging a killing in New York. Mr. Gupta had never been charged with anything in India. Men who said they were Gujarat police had come to his home and left their names with his son, and Yadav later called the matter a "fake case." This was his "payment" for participating in this conduct. (*See infra* Part V.A.)

## IV. <u>THE GUIDELINES CALCULATION</u>

***A. Defendant's Guideline Calculation***

The Probation Department calculated a total offense level of 38 and a criminal history category of I, resulting in a Guidelines range of 235 to 293 months. The statutory maximum is ten years on each of Counts One and Two and twenty years on Count Three.

Probation recommends 144 months, consisting of 120 months on each of Counts One and Two and 144 months on Count Three, all to run concurrently, followed by three years of supervised release. Probation explains the recommendation of a significant variance by pointing to Mr. Gupta's untreated alcohol dependence, which, if addressed, "may reduce the defendant's recidivism risk and obviate the necessity of a guidelines term of imprisonment," and to the need to

avoid sentences longer than necessary and unwarranted disparities among similarly situated defendants.

1. The Amended Guidelines Govern, and They Eliminate Grouping

Since Mr. Gupta's sentencing was originally scheduled for September 25, 2026, Probation applied the 2025 Guidelines Manual and grouped the three counts of conviction pursuant to § 3D1.2(c) and former Application Note 6 to § 2S1.1. However, this Court must apply the Manual in effect on the date of sentencing. Sentencing is set for November 20, 2026, after the Amendments operative on November 1, 2026 took effect. U.S.S.G. § 1B1.11(a); 18 U.S.C. § 3553(a)(4)(A); *see, e.g.*, *Collier v. United States*, 989 F.3d 212, 214 n.2 (2d Cir. 2021) (applying Guidelines "in effect on the date the defendant is sentenced" under § 3553(a)(4)(A)). Amendment 840 deleted former §§ 3D1.2 through 3D1.5, as well as former Application Note 6 to § 2S1.1, and replaced them with a single Guideline, § 3D1.1, that does not combine counts into a group. *See* U.S.S.G. § 3D1.1 & historical note (Nov. 1, 2026).

Under § 3D1.1, the Court determines the offense level for each count or set of counts and then uses the highest. The Court should employ § 3D1.1(c) to determine the combined offense level because subsections (a) and (b) do not apply.[6] Accordingly, the Court should determine the offense level for each count separately. The Court therefore need only ask which count produces the highest offense level when each is calculated on its own.

2. Murder-for-Hire Carries the Highest Offense Level

Counts One and Two carry an offense level of 37: a base offense level of 33 under § 2A1.5(a), reached through § 2E1.4(a)(2), plus four levels under § 2A1.5(b)(1) because the offense

[6] Counts One and Two both fall under the murder-for-hire Guideline, § 2E1.4, which refers to § 2A1.5; both are Guidelines covered by subsection (b). But subsection (b) adds levels only for counts involving "different victims or the same victim on different occasions," and a conspiracy count and a substantive count charging the same plot against the same victim do not qualify. U.S.S.G. § 3D1.1(b)(1)(C) & cmt. n.4.

involved the offer of something of pecuniary value for undertaking the murder. U.S.S.G. §§ 2E1.4(a)(2) & cmt. n.1, 2A1.5(a), (b)(1); *see United States v. Lisyansky*, 806 F.3d 706, 709–10 (2d Cir. 2015).

3. The Guideline Calculation for Count Three Is Controlled by § 2S1.1(a)(2)

Probation improperly employs § 2S1.1(a)(1) to calculate the offense level for Count Three. Section 2S1.1 supplies two base offense levels. Subsection (a)(1) applies only where the defendant committed "the underlying offense from which the laundered funds were derived." Otherwise, subsection (a)(2) applies: 8 plus the § 2B1.1 table level for the value of the laundered funds. Count Three charges promotion laundering under 18 U.S.C. § 1956(a)(2)(A), which has no proceeds element. The funds were not generated by a murder; they were offered to bring one about. They were paid *for* the murder-for-hire, not *derived from* it.

Courts addressing promotion laundering have drawn exactly that line. In *United States v. Dhafir*, the government argued, and the district court held, that § 2S1.1(a)(2) governed promotion-laundering counts because they "are not based on the source of the funds but rather on the offense which their transfer was intended to promote," making subsection (a)(1) "inapplicable." No. 5:03-CR-64 (NAM), 2005 WL 8158837, at *2 (N.D.N.Y. Aug. 31, 2005); *see* 577 F.3d 411, 413–14 (2d Cir. 2009). The Second Circuit did not disturb that choice. It stated that it did "not hold that the district court erred in determining that the appropriate Guidelines provision was § 2S1.1(a)(2)," and held that, after *Booker*, a court "is not bound in ambiguous circumstances . . . to choose one Guidelines range in particular" and may take a "hybrid" approach. *Id.* at 415. In *United States v. Amirov*, a murder-for-hire prosecution with promotion-only laundering, Judge McMahon found the defendants' "paid for" argument supported by § 2S1.1(b)(1)(B), which treats proceeds and promotion as "two separate types of funds," and by the jury's verdict acquitting on the proceeds

theory. No. S8 22 CR 438 (CM), 2025 WL 3028334, at *1 (S.D.N.Y. Oct. 29, 2025). She observed that murder "is not a crime that ordinarily generates proceeds," that the payment "was not the 'proceeds' of the murder," and that under § 2S1.1(a)(2) "money laundering ceases to be the crime that drives the grouping calculation," because "the driving criminal force . . . was killing [the victim], not using the money . . . paid to kill her." *Id.* at *2. She acknowledged the contrary view, that the defendants "derived" the payment by being paid to commit the crime, and, following *Dhafir*, calculated both ways and declined to choose. *Id.* at *2–*3.[7] Other circuits likewise describe subsection (a)(1) as reaching the defendant who "commits the crime that produces the illicit funds." *United States v. Campbell*, 764 F.3d 874, 877 (8th Cir. 2014); *accord United States v. Blackmon*, 557 F.3d 113, 119 (3d Cir. 2009).

The Department of Justice will say Mr. Gupta "derived" payment from the plot because he was paid to participate in it. *Amirov* acknowledged that argument and did not adopt it. 2025 WL 3028334, at *2–*3. The argument also leaves subsection (a)(2) with nothing to do in a promotion-laundering case, since every such count would take the offense level of the promoted crime. The decisions applying subsection (a)(1) involved funds the underlying crime generated. *See United States v. Abbas*, 165 F.4th 659, 664–65 (1st Cir. 2026) (wire fraud was the "underlying offense that

[7] *Amirov*'s sentences do not bear on which subsection applies. Judge McMahon imposed statutory-maximum sentences on every count of conviction, and the laundering sentence was twice as long as the others. 2025 WL 3028334, at *4–*5. But she did so after expressly declining to decide between § 2S1.1(a)(1) and (a)(2), *id.* at *3, and on § 3553(a) findings specific to that case: a planned politically motivated assassination, defendants she described as career criminals who were "jockeying for position in a criminal enterprise," a leadership-role enhancement, and a separate firearms count carrying a mandatory consecutive sentence. *Id.* at *2–*5. Her observation that the payment amount "bother[ed] [her] not a whit" rested on her finding that the defendants were to be paid $500,000 in all, so that the $30,000 actually paid "understates the true amount of money that was part of this plot." *Id.* at *5. Those sentencing judgments are not a ruling on how § 2S1.1(a) should be read, and Mr. Gupta's § 3553(a) factors, addressed in Parts V through VII, are different: he has no criminal history, Probation found no role adjustment, he faces no firearms count, and he pleaded guilty.

produced the laundered money"); *United States v. Diaz-Menera*, 60 F.4th 1289, 1293–95 (10th Cir. 2023) (funds derived from the distribution the conspiracy carried out).

In ordinary usage, funds are "derived from" an offense when the offense produces them, as the proceeds of a drug sale or a fraud do. A murder that has not happened produces nothing. Here the money moved toward the murder-for-hire, from the people who wanted a killing to the person they believed would carry it out. Calling that payment "derived from" the killing it was meant to buy reverses the direction of the transaction.

The Department of Justice relies on two pieces of Guidelines commentary. Neither supports applying subsection (a)(1) here.

*First*, Application Note 3(A) to § 2S1.1 states that subsection (a)(2) applies to "any case in which (i) the defendant did not commit the underlying offense; or (ii) the defendant committed the underlying offense . . . but the offense level for the underlying offense is impossible or impracticable to determine." U.S.S.G. § 2S1.1 cmt. n.3(A). That note describes two situations in which subsection (a)(2) applies. It does not say they are the only ones, and it cannot erase the condition in the Guideline's text that subsection (a)(1) applies only to "the underlying offense from which the laundered funds were derived." Commentary is authoritative only so long as it is not "inconsistent with, or a plainly erroneous reading of, that guideline." U.S.S.G. § 1B1.7 cmt. (quoting *Stinson v. United States*, 508 U.S. 36, 38 (1993)). A reading of Note 3(A) that applies subsection (a)(1) whenever the defendant committed the promoted offense, whatever the source of the funds, would delete "from which the laundered funds were derived" from the Guideline. The *Dhafir* court reached the same conclusion about this note. It read the "did not commit the underlying offense" language as describing third-party launderers and held that a promotion-

laundering count "not based on defendant's conduct in generating the funds" falls in subsection (a)(2). 2005 WL 8158837, at *2 n.5.

*Second*, a new illustration in the commentary to § 3D1.1 describes a defendant who "laundered proceeds that were wired to him as advanced payment for murder" and states that the laundering count takes the offense level for the murder conspiracy under subsection (a)(1). U.S.S.G. § 3D1.1 cmt. n.5(C) (Nov. 1, 2026). That example is not a ruling on the meaning of "derived from." It appears in a note explaining how the multiple-count rules interact with Chapter Three adjustments, assumes without analysis that the funds were derived from the murder, and describes them as "proceeds." Mr. Gupta's count charges promotion laundering under § 1956(a)(2)(A), which requires no proceeds at all. And in the example the defendant *received* the payment, so the money arrived as consideration for a crime. Mr. Gupta, by contrast, is charged with transmitting funds to pay the purported assassin. The $15,000 was arranged through Yadav's network of associates, and one of them, not Mr. Gupta, handed it to the undercover officer in Manhattan. To the extent the example is read to mean that any payment connected to a murder-for-hire is "derived from" it, it is inconsistent with the Guideline's text and cannot be followed. U.S.S.G. § 1B1.7 cmt. The example appears in the commentary added by Amendment 840, which rewrote the multiple-count rules, and it illustrates how those rules operate. It does not purport to interpret "derived from." *See* U.S.S.G. App. C, amend. 840 (Nov. 1, 2026).

Under § 2S1.1(a)(2), the base offense level is 8 plus the § 2B1.1 table level for the value of the laundered funds. Under the Guidelines Manual in effect at sentencing, a laundered-funds value of $15,000 falls in the tier "more than $9,000," which adds two levels. U.S.S.G. § 2B1.1(b)(1)(B) (Nov. 1, 2026). The offense level for Count Three is therefore 8 + 2 = 10, plus six levels under § 2S1.1(b)(1) because Mr. Gupta knew the funds were intended to promote a crime of violence, plus

two levels under § 2S1.1(b)(2)(B), for a total of 18. The Department of Justice has argued that Mr. Gupta conspired to launder $100,000, but even at that value Count Three would be 22 under the 2026 table, well below 37.

Even if the Court views the question as open, *Dhafir* permits it to calculate both ways and decline to choose. 577 F.3d at 415. Mr. Gupta asks the Court to find that § 2S1.1(a)(2) controls. At a minimum, the Court should treat the subsection (a)(1) range as overstating the seriousness of promotion-only laundering and grant a significant variance in imposing sentence.

4. The Murder-for-Hire Guideline Already Accounts for the Payment

The structure of the Guidelines supports treating the murder-for-hire counts as the controlling counts. The payment that Count Three charges as laundered is the $15,000 advance for the murder, and the murder-for-hire Guideline already takes that payment into account. Section 2A1.5(b)(1) adds four levels when the offense "involved the offer or the receipt of anything of pecuniary value for undertaking the murder," and Probation applied that increase on the basis of the $15,000 offered to the assassin. U.S.S.G. § 2A1.5(b)(1). The offense level of 37 for Counts One and Two therefore reflects both the planned murder and the payment made to carry it out.

Section 2S1.1 addresses the seriousness of the promoted crime in its own way when subsection (a)(2) applies. It sets the base offense level from the value of the laundered funds and adds six levels where the defendant knew the funds were intended to promote a crime of violence. U.S.S.G. § 2S1.1(a)(2), (b)(1). It is consistent with that design for Count Three to produce a lower offense level than Counts One and Two. The laundering charged in Count Three consists of transmitting the payment for the murder, and the murder-for-hire Guideline already carries both the murder and the payment. Under § 3D1.1, the Court uses the highest offense level, which is the level for Counts One and Two, and no part of the payment is left out of that calculation. *Cf. Amirov*, 2025

WL 3028334, at *2 (the "driving criminal force" was the killing, "not using the money that one was paid to kill her").

5. Mr. Gupta's Finalized Calculation

Applying the amended Guidelines, Mr. Gupta's offense level is calculated as follows. Counts One and Two carry a base offense level of 33, plus four levels for the offer of pecuniary value, for an offense level of 37. U.S.S.G. § 2A1.5(a), (b)(1). Count Three carries an offense level of 18, as calculated above. Under § 3D1.1(c), the offense level for all counts is the highest, 37. No role adjustment applies, and, for the reasons below, the obstruction adjustment does not. Mr. Gupta receives three levels for acceptance of responsibility, for a total offense level of 34. At Criminal History Category I, the Guidelines range is 151 to 188 months.

If the Court applies the obstruction enhancement, the total offense level is 36 and the range is 188 to 235 months. If the Court instead agrees with Probation's use of § 2S1.1(a)(1), the total offense level is 38 and the range is 235 to 293 months. Probation recommends 144 months, below each of these ranges, and Mr. Gupta asks the Court to grant a significant variance from the Guidelines range.

6. The Obstruction Enhancement Does Not Apply

The two-level enhancement in Probation's calculation rests on a single document: the affidavit Mr. Gupta submitted in support of his motion to suppress. Section 3C1.1 applies only where the defendant "willfully" obstructed justice. U.S.S.G. § 3C1.1. When the enhancement rests on allegedly false sworn statements, the Court must "find by a preponderance of the evidence that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *United States v. Orelien*, 119 F.4th 217, 228 (2d Cir. 2024) (quoting *United States v. Thompson*, 808 F.3d 190, 194–95 (2d Cir. 2015)). "Willfully" in this context means "willful intent to provide false testimony, rather than as a result of

confusion, mistake, or faulty memory." *Id.* (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)); U.S.S.G. § 3C1.1 cmt. n.2. Willfulness is a distinct element, separate from falsity and materiality, and the Court must find it. *Orelien*, 119 F.4th at 229–34.[8]

The Court has made no such finding. It denied the motion because it credited the testifying agent over the affidavit, noted that Mr. Gupta did not testify, and found his account of his missing glasses "not credible." (ECF No. 118 at 33–35.) A finding that a witness is not credible is not a finding that he lied. The Second Circuit has warned that if a credibility determination "without more" amounted to a finding of willful intent, "nearly every denial of a motion to suppress would support an enhancement for obstruction of justice." *Orelien*, 119 F.4th at 228 (quoting *United States v. Pena*, 751 F.3d 101, 106 (2d Cir. 2014)); *see id.* at 233 (rejecting "per se rule" that "any time a court credits officer testimony over that of a defendant, the defendant must have given knowingly false testimony" (citation omitted)). Nor is this a case where the falsity itself shows intent, as with the detailed affidavit in *United States v. Lincecum*, 220 F.3d 77, 79–80 (2d Cir. 2000), which the defendant "had to have known" was false. *See Orelien*, 119 F.4th at 233–34. Mr. Gupta's affidavit concerned his recollection of the lighting in a van, whether he had his glasses, and what he was told during a late-day arrest in a foreign country, matters on which honest recollection can differ from the agents' account.

Even if the Court finds the enhancement applies, it adds two levels for a single pretrial filing that was fully litigated and resolved against Mr. Gupta, and that did not prevent the Department of Justice from proceeding. Probation itself found this an "extraordinary case" in

[8] Mr. Gupta also maintains his objection that the affidavit was not material to the outcome of the case, because he pleaded guilty and the suppression ruling therefore had no effect on the disposition. He recognizes that Application Note 6 defines "material" as information that, "if believed, would tend to influence or affect the issue under determination," U.S.S.G. § 3C1.1 cmt. n.6, and that the Department of Justice relies on that definition. He preserves the objection. *But see United States v. Orelien*, 119 F.4th 217, 229 (2d Cir. 2024).

which both § 3C1.1 and § 3E1.1 apply. (U.S.S.G. § 3E1.1 cmt. n.4.) The Court should weigh the affidavit under § 3553(a) rather than as a basis for a higher range. *See* U.S.S.G. § 3C1.1 cmt. n.3, n.5 (conduct "may warrant a greater sentence within the otherwise applicable guideline range").

***B. The Money Laundering Count Did Not Involve Personal Gain***

The money laundering count drives the range in Probation's calculation, because Probation treats Count Three as the most serious count and uses it to set the offense level. The Court should therefore consider what the laundering here consisted of. The funds were the price of a murder that Yadav wanted carried out. Yadav agreed to pay $100,000, an associate of Yadav's delivered the $15,000 advance to the undercover officer in Manhattan, and none of the money was directed to Mr. Gupta. Mr. Gupta relayed messages and arranged the payment. Nothing in the record shows that he expected to gain from it.

The victim's statement points the same way. He writes that the seriousness of the offense cannot be measured without understanding why he became the target of an assassination plot at the hands of the Indian government, and he describes the offense as an assault on the rule of law carried out by a foreign government. He calls Mr. Gupta "a foot soldier acting at the behest of an Indian State." Whatever the Court makes of the victim's political views, his account places the motive for this plot, and its direction, with others. It also fits Mr. Gupta's account that he saw nothing in it for himself.

Count Three is not a typical money laundering charge. No one was paid for a crime and then tried to conceal the money. The funds moved from Yadav's side to the intended hitman as part of the plot itself. The conduct that makes up Counts One and Two was charged again as laundering, and that count then supplied both the two-level enhancement and the base offense level that now sets the Guidelines range. A count that reaches this conduct only because of how the payment for

the murder was labeled should carry little weight at sentencing. Mr. Gupta pleaded guilty to Count Three and admitted that he sent the $15,000 knowing it would pay someone to commit the murder.

The Guidelines calculation does not account for the absence of personal gain. The four-level increase for an offer of payment and the two-level increase for the money laundering conviction apply whether or not the defendant stood to gain anything, and together they add six levels. The Court should weigh the absence of personal gain, and the victim's description of Mr. Gupta as an instrument of someone else's purpose, in deciding how much weight the resulting range deserves. Those considerations support the variance Probation has recommended.

## V. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

The victim impact statement submitted in this case asks the Court to look past Mr. Gupta entirely. It asks the Court to impose the statutory maximum as a rebuke to the government of India and a vindication of decades of historical grievance, including the 1984 violence, Operation Woodrose, and the Khalistan movement's account of its persecution. The Court should take a victim's fear seriously. Being the target of a murder-for-hire plot is a real and lasting harm, and nothing in this memorandum asks the Court to minimize it. But 18 U.S.C. § 3553(a) requires a sentence "sufficient, but not greater than necessary" to reflect this defendant's conduct, history, and characteristics. A sentence meant to send a message about a foreign government would rest on conduct that Mr. Gupta did not direct and had no power to direct. Whatever the merits of the broader dispute the victim describes, Mr. Gupta's role has to be assessed on its own terms.

The conflict between the Indian government and the Sikh separatist movement is among the most consequential political disputes in India, and it has been for decades. The Indian government regards the separatist groups as terrorist organizations, and it has banned the victim and his organization from the country. The Indian government also regards the sympathetic positions that countries such as the United States and Canada have taken toward these groups as an

existential threat to India. The Court does not need to weigh the merits of either side to appreciate how seriously the subject is held there. Mr. Gupta has lived in India all his life, in a country where this conflict is regarded as a matter on which the unity of the nation is at stake.

None of this excuses what was planned. Mr. Gupta writes that he has "come to realize that I should never adopt a path that disrupts peace," and that "nothing is more powerful than positivity, faith, kindness, love and selfless service towards others." (Ex. A (Nikhil Gupta Ltr.) at 3.) The Court should understand the setting for one purpose: to assess how a man in Mr. Gupta's position came to regard a request from Yadav, whom he believed to represent the Indian government, as one he could not refuse.

### *A. Mr. Gupta's Conduct Cannot Be Understood in Isolation from the Environment That Produced It*

Mr. Gupta became entangled in this offense because Vikash Yadav approached him—a man who represented himself as a "Senior Field Officer" with India's foreign intelligence service and who had served in India's largest paramilitary force.

Mr. Gupta was never charged with a crime in India. Rather, individuals who identified themselves as police from Gujarat came to Mr. Gupta's home asking to speak with him and left their names with his teenage son. No one explained to Mr. Gupta who these men were or what they wanted. He was suspicious because he had never been to Gujarat and was concerned about the presence of unknown law enforcement at his family home. A short time later, he met Yadav and asked him to address this concern. Yadav told him repeatedly that the matter was "all clear," that "nobody will ever bother you again," and that the Gujarat contact had been a "fake case" that Yadav himself had made disappear by "spok[ing] with the boss." Yadav also offered to arrange a meeting between Mr. Gupta and a Deputy Commissioner of Police, reinforcing the impression that

he had real authority to make Mr. Gupta's problem worse or better, depending on how Mr. Gupta conducted himself.

Yadav told Mr. Gupta that a criminal case existed, and he asked Mr. Gupta to arrange the murder in exchange for his assistance in securing its dismissal. Yadav's later messages speak of that case as a real one under his control: on May 12, 2023, he told Mr. Gupta that "your criminal case" had "already been taken care of," and on May 23, 2023, that he had "spoke[n] with the boss about your Gujarat [case]." The Department of Justice has since been unable to identify any such charge. The case that Yadav offered to resolve did not exist, and Mr. Gupta had no way of knowing that while Yadav was holding it over him.

The Court does not need to decide whether the Gujarat contact was ever a genuine legal threat, because Mr. Gupta could not have made that assessment himself at the time. He knew only that unidentified men had come looking for him, and that the person offering to make the problem disappear was someone he believed to be connected to Indian intelligence. These are precisely the sort of circumstances that § 3553(a)(1) asks the Court to consider in weighing Mr. Gupta's history and characteristics.

The setting in which Mr. Gupta made these choices bears on whether he believed he had room to refuse. A man who believes that the Indian government has opened a criminal case against him, and that an officer of its intelligence service is the only person able to close it, has reason to fear what refusal would cost him and his family. Nothing in the record suggests that this fear was unreasonable in India. In *Pannun v. Government of India*, No. 1:24-cv-07021-KPF (S.D.N.Y.), the victim in this matter brought a civil action in this District. In a declaration filed in that case, the victim's counsel stated that he spoke with no fewer than ten Indian attorneys about assisting with a lawsuit against the Indian government. *See* Ex. B (*Pannun*, ECF No. 44-1 (Decl. of Oliver J.

McNicholas)). Every attorney who gave a reason for declining said it was too dangerous to support, or even appear to support, such a case. *Id.* at 2–3. Mr. Gupta, who believed the request came from that government's intelligence service, did not regard himself as free to refuse it, and he acted in part to protect himself and his family.

***B. Mr. Gupta's Personal History Illuminates, Without Excusing, His Vulnerability to This Pressure***

Mr. Gupta was born in Delhi in 1971 and has lived in India all his life. The early 1980s brought a series of events that are remembered across India, among them the killing of Hindu passengers taken from a bus at Dhilwan in October 1983, the army's assault on the Golden Temple complex in June 1984, the assassination of Prime Minister Indira Gandhi that October and the violence that followed in Delhi and other cities, and the bombing of Air India Flight 182 in June 1985, which killed 329 people. The insurgency in Punjab kept the conflict alive through the 1980s and 1990s. Families across northern India lived through these events, and for many of them, Mr. Gupta's family included, they remain a matter of personal memory.

Those events reached Mr. Gupta's family. His father had bone cancer and was scheduled to undergo an operation in October 1984. The instability surrounding Operation Blue Star, and the violence before and after it, severely disrupted his father's treatment, and he died on February 10, 1985, at the age of thirty-five. Mr. Gupta was thirteen. Mr. Gupta began working at fourteen, attending school at night, to help support the household.

A man raised in that environment learned early how quickly political violence and instability could reach into a family's most basic affairs, such as a father's medical care. Decades later, a man he believed spoke for the Indian government told him that his cooperation would end the matter of the Gujarat police and that nobody would bother him again. Mr. Gupta had no independent means of investigating that offer and little reason to think he could decline it. None of

this excuses what Mr. Gupta did. It explains why a threat that looks ambiguous, or even manufactured, in hindsight felt urgent and real to the person facing it.

The victim's statement traces his advocacy to the events of 1984. Mr. Gupta's family remembers the same period through his father's illness and death. The Court need not resolve any disagreement about that history. It is enough that the period left its mark on many families, Mr. Gupta's among them.

***C. This Context Distinguishes Mr. Gupta's Culpability from Yadav's***

The record also shows that Mr. Gupta, even while carrying out Yadav's instructions, drew a line: in his communications with co-conspirators, he told them not to harm women or children. A person acting purely out of independent conviction in a murder-for-hire scheme has little reason to impose limits like this one. A person carrying out someone else's plan under pressure, while still trying to hold onto some sense of restraint, has every reason to.

Yadav remains a fugitive, shielded by distance and, in all likelihood, by the same state apparatus he claimed to represent when he recruited Mr. Gupta. Mr. Gupta is the only person before this Court. The sentence the Court imposes should account for the real difference between the two of them. Yadav directed this plot from a position of claimed institutional power and used an unverified threat to obtain Mr. Gupta's cooperation.

## VI. THE COURT SHOULD GRANT A SIGNIFICANT VARIANCE FROM THE GUIDELINES RANGE

Under 18 U.S.C. § 3553(a), the Court must impose a sentence "sufficient, but not greater than necessary" to satisfy the purposes of sentencing, considering the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and avoid unwarranted sentencing disparities.

Probation has already undertaken this analysis and concluded that a sentence of 144 months, followed by three years of supervised release, satisfies these purposes—a variance of more than seven years below the bottom of the 235-to-293-month Guidelines range. Mr. Gupta asks the Court to adopt the recommendation that a substantial variance from the Guidelines range is appropriate.

***A. The Guidelines Range Overstates Mr. Gupta's Culpability***

The offense level driving the Guidelines range in this case, 38, is calculated using a base offense level for conspiracy or solicitation to commit murder, enhanced for the offer of payment, the money laundering conviction, and obstruction of justice. That calculation treats Mr. Gupta as a paid conspirator who stood to gain from the scheme he facilitated. The record does not bear that out. The money discussed throughout this offense—the advance payments, the $100,000 ultimately promised for the murder—was payment for the hitman. No portion of it was ever directed to Mr. Gupta. What Mr. Gupta received was a stranger's assurance, from a man he believed to be connected to Indian intelligence, that an unresolved and unverified threat against him and his family would be made to disappear.

That distinction matters to how the Court should weigh the Guidelines range against the purposes of § 3553(a). A defendant who commits murder-for-hire for profit and a defendant who is induced into the same conduct by a claimed intelligence operative wielding an unverified threat are not equally culpable, even where the offense conduct on paper looks similar. The Guideline calculation does not draw that distinction; § 3553(a) permits the Court to.

The way Mr. Gupta understood Yadav's request also bears on his culpability. Mr. Gupta believed that Yadav was associated with the Indian government and acting on its behalf. The Department of Justice's own description of Yadav supports that belief: an employee of the Cabinet Secretariat of the Government of India, which houses the Research and Analysis Wing, holding the title of Senior Field Officer, who directed the plot from India. For an Indian national living in India,

a request from such a man carried the weight of the state behind it, and Mr. Gupta did not perceive himself as free to refuse it. His statements during the offense reflect this understanding. He told the confidential source that "we are doing their job, brother," referring to the individuals directing the plots from India. When he asked Yadav for permission to "go to the field" after the Nijjar killing, Yadav told him it was better that he not get involved in action. Yadav decided what Mr. Gupta would do, and Mr. Gupta followed those instructions because he believed Yadav spoke for a government he could not refuse.

### *B. A Significant Variance from the Guidelines Reflects the Seriousness of the Offense and Provides Just Punishment*

Mr. Gupta does not ask the Court to treat this offense as anything other than serious. He agreed to help arrange the murder of another human being, and for a period of weeks he actively worked toward that end—relaying surveillance, pressing for the plot to move forward, and communicating with those he believed capable of carrying it out. Twelve years in prison is a long time for a fifty-five-year-old man, and he will serve it away from his family and his country. Probation recommended that term after considering the seriousness of the offense.

A twelve-year sentence does not need to match the Guidelines range to provide just punishment. That range rests on an offense level that includes enhancements Mr. Gupta disputes and that treats him as a financial beneficiary of a scheme from which he received nothing. Just punishment is measured by the defendant's conduct and culpability, and the Guidelines range is one input into that judgment.

### *C. A Significant Variance from the Guidelines Provides Adequate Deterrence Without Exceeding What Is Necessary*

A substantial federal sentence for conspiring to commit murder on American soil serves general deterrence. The imposition of any "double digit" sentence in prison is substantial. Each year added beyond that does little to strengthen the message that such conduct will be met with

serious consequences. Probation's justification for its recommendation recognizes that general deterrence is "an especially important sentencing objective" in this case while still concluding that a sentence below the Guidelines range achieves it. Mr. Gupta submits that the same reasoning applies to individual deterrence: any sentence in excess of ten years, for a man with no prior criminal history anywhere in the world, provides ample deterrent effect without requiring the additional years that separate Probation's recommendation from the bottom of the Guidelines range.

### *D. Mr. Gupta Does Not Present a Meaningful Risk to the Public, and a Guideline Sentence Is Not Necessary to Protect It*

Mr. Gupta has no criminal history of any kind, in any country, and is properly placed in Criminal History Category I. He has no training in weapons, firearms, or martial arts. The conduct underlying this offense arose in the specific circumstances described above—Yadav's recruitment, the leverage exerted through the Gujarat matter, and Mr. Gupta's untreated alcohol dependence, which he acknowledges affected his judgment and decision-making during the relevant period. Mr. Gupta attempted to enter outpatient alcohol treatment before his arrest and was unable to complete it only because he was taken into custody. He has stated that he would welcome treatment if offered. Probation itself identified Mr. Gupta's alcohol abuse as a factor that, "if sufficiently addressed, may reduce the defendant's recidivism risk," and recommended a special condition of substance abuse treatment as part of supervised release. A defendant whose supervising agency identifies a specific, treatable driver of his offense conduct—and recommends treatment as the mechanism for addressing it—does not present the kind of ongoing risk to the public that would require a sentence at or near the top of the Guidelines range to manage.

Mr. Gupta intends to return to India and to his family, and his family has said it will help him there. His niece, Hricha Shandily, writes that the family is prepared to support him with

financial help, employment, counseling, treatment, and accountability, and that he will not face the future alone. (Ex. D (Hricha Shandily Ltr.) at 3; *see infra* Part VII.C.2.) That support bears directly on the treatment Probation recommended, because it gives Mr. Gupta relatives who can help him enter and complete alcohol treatment after his release.

The Court should also weigh that Mr. Gupta is a citizen of India with no lawful immigration status in the United States and will, in all likelihood, be deported following any term of imprisonment. Any risk Mr. Gupta poses on release would be addressed by his removal to India.

***E. A Significant Variance from the Guidelines Avoids Unwarranted Sentencing Disparities***

The Sentencing Commission's Judiciary Sentencing Information (JSIN) data reflect that, over the last five fiscal years, there were an insufficient number of defendants sentenced under the same primary Guideline, final offense level, and criminal history category as Mr. Gupta to generate comparative data. That absence of a data set cuts against imposing a sentence at the high end of an unusually severe Guidelines range calculated for a rare offense type, and in favor of the individualized approach Probation has already taken—crediting Mr. Gupta's lack of criminal history, his personal circumstances, and the absence of any comparable body of sentences against which a Guideline sentence could be tested for consistency.

Sentences in comparable murder-for-hire cases show that the 144 months recommended by Probation is already a substantial sentence. In *United States v. Massarone*, No. 7:23-cr-00448-CS (S.D.N.Y.), the defendant opened the contact herself, wired a down payment, urged the hitman on for weeks, threatened to find someone else when he hesitated, and named a second target. (ECF No. 32 at 1–2.) Judge Seibel called the offense "about as serious as it gets without there being actual violence" and sentenced her to 114 months. (Sentencing Tr., ECF No. 49, at 72, 76–77.) The Department of Justice had asked for 120 months, the statutory maximum for her single count. (ECF

No. 32 at 1.) The sentence Probation recommends for Mr. Gupta is thirty months longer than hers, and the range Probation calculated for him is roughly twice as long.

Other recent sentences point the same way. A defendant in the Northern District of New York who arranged a killing by phone with an undercover agent received 87 months. (U.S. Att'y's Office, N.D.N.Y., Colonie Man Sentenced to 87 Months for Murder-for-Hire Plot (Feb. 10, 2026).) In the Iran-directed plot against Masih Alinejad, the Southern District sentenced Carlisle Rivera, who agreed to carry out the killing for $100,000 and <u>had a prior criminal record</u>, to the statutory maximum on each of his two counts, 180 months in all. That was the top of his effective Guidelines range of 168 to 180 months. (Judgment, *United States v. Rivera*, No. 1:24-cr-00670-LJL-2 (S.D.N.Y. Jan. 28, 2026); Sentencing Letter on Behalf of Carlisle Rivera at 2 (Jan. 14, 2026).) The district judge also sentenced Jonathan Loadholt, who surveilled the victim and helped buy a firearm, to 120 months. (U.S. Att'y's Office, S.D.N.Y., Press Release No. 26-140, Staten Island Man Sentenced for His Role in Plot to Stalk and Murder a Journalist and Prominent Critic of the Iranian Government (May 27, 2026).)

The statutory maximum for a single count under 18 U.S.C. § 1958 is 120 months, and the Department of Justice asked for exactly that in *Massarone*. The Guidelines range provided for in the PSR is higher because the Department of Justice built Count Three on the same $15,000 payment that underlies Counts One and Two, and because that count sets the offense level for the group. (*See supra* Parts III.B, IV.B.) Imposing a considerably shorter sentence than that called for by the Guidelines would avoid an unwarranted disparity with these defendants. The 235-to-293-month range follows from the way the case was charged and does not reflect greater culpability than theirs.

### *F. Time in Czech Custody and Conditions of Confinement Support the Recommended Sentence*

Mr. Gupta has been in custody continuously since June 30, 2023, when he was arrested at the Prague airport at the request of the United States. From June 30, 2023 until his extradition on June 14, 2024, a period of about eleven and a half months, he was held in Czech custody. That detention resulted from the United States' request. Section 3585(b) directs credit for time in official detention before a sentence begins as a result of the offense of conviction, but the Bureau of Prisons, not the sentencing court, computes that credit, and a court's recommendation does not bind the Bureau. 18 U.S.C. § 3585(b); *United States v. Wilson*, 503 U.S. 329, 333–35 (1992); *United States v. Pineyro*, 112 F.3d 43, 45 (2d Cir. 1997). Mr. Gupta therefore asks the Court to state in the judgment that the sentence takes his time in Czech custody into account, and to recommend that the Bureau award credit from June 30, 2023.

During the year he awaited extradition, Mr. Gupta was frequently held in solitary confinement. (Ex. A (Nikhil Gupta Ltr.) at 2.) A day served in those conditions is harder than a day in a United States facility, and the Court may weigh that difference under § 3553(a)(2)(A) in deciding what sentence provides just punishment.

Since his extradition Mr. Gupta has been held at the Metropolitan Detention Center in Brooklyn, for more than two years. Recent press reports, collected at Exhibit E, document the conditions there. On September 6, 2026, a gang-related fight involving at least twenty inmates broke out on the seventh floor of the jail's west building, where Mr. Gupta is housed. (Ex. E at 3, 6.) The Bureau of Prisons confirmed that some inmates "sustained injuries requiring outside medical treatment" (Ex. E at 3, 6), and the Daily News reported that the fight left several inmates stabbed and slashed and was followed by "days of lockdowns." (Ex. E at 3.) It was not an isolated event. The same reporting describes two stabbing deaths in the summer of 2024, a February 2025 unit-

wide fight in which at least ten inmates were stabbed or slashed, and two further deaths in 2026. (Ex. E at 4, 8.) The Bureau of Prisons formed an "urgent action team" in 2024 to address staffing shortfalls, contraband, and other problems at the facility. (Ex. E at 3.) Mr. Gupta describes "[c]onstant threats of violence from fellow inmates and gangs" as his "new reality" at the MDC. (Ex. A at 3.) Judges in this District and the Eastern District have recognized that these conditions bear on the sentence. Judge Furman has observed that "it has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC," and that prosecutors "no longer even put up a fight." *United States v. Chavez*, 710 F. Supp. 3d 227, 229 (S.D.N.Y. 2024) (continuing a defendant's release pending sentencing because of those conditions). Judge Brown held that a sentence served at the MDC is "materially different and necessarily disparate from one served elsewhere," and imposed a nine-month sentence that converts to home incarceration if the Bureau of Prisons designates the MDC. *United States v. Colucci*, 743 F. Supp. 3d 452, 461 (E.D.N.Y. 2024). Mr. Gupta was housed in the affected unit. He was caught in the middle of the fighting before he reached cover.

Mr. Gupta has suffered persistent, severe abdominal pain during his detention and has submitted repeated requests to be seen by a medical professional. He reports that he has not received adequate medical attention.[9] The Court should consider these conditions, together with the time in Czech custody, as further reasons why a significant variance from the Guidelines is warranted.

---

[9] On October 1, 2026, Mr. Gupta was finally able to see a gastroenterologist by videoconference. Unfortunately, as is common place in the MDC, he has received no diagnostic tests or any treatment for his condition, which remains chronic and painful.

## VII. MITIGATING PERSONAL CIRCUMSTANCES

### *A. Family Circumstances*

Mr. Gupta is fifty-five years old and has spent his entire life in India. His father, Jawhar Gupta, died of bone cancer in February 1985 at the age of thirty-five, when Mr. Gupta was thirteen. His father's death forced Mr. Gupta to begin working at age fourteen while attending school at night, in order to help support the household during a period of financial hardship. His mother and two of his sisters describe those years in letters to the Court. (*See infra* Part VII.C.1.)

Mr. Gupta's mother, Manorama Gupta, is seventy-five years old and resides in Delhi. [redacted] Mr. Gupta's sister, Abha Gupta, [redacted] Mr. Gupta reports that his family is aware of his legal situation and anxiously awaits his return.

Mr. Gupta married Sangeeta Gupta in India in 1994.[10] They have two adult children, Siddhi, age thirty, and Sagar, age twenty-eight, both of whom reside in Delhi. Ms. Gupta suffers from mobility and spinal issues resulting from two separate accidents, verified by translated medical records, and relies on their children for financial and medical support.

### *B. History of Charitable and Volunteer Conduct*

Before his arrest, Mr. Gupta volunteered at children's orphanages across India, providing financial and emotional support to five children each year since 1991. He also donated consistently to the poor, the elderly, and animal welfare organizations, and he depleted his savings supporting others during the COVID-19 pandemic. Mr. Gupta wishes to return to India to support his family and regrets the suffering he has caused them. (*See* Ex. A.)

---

[10] Mr. Gupta's wife's name appears in some records as "Sangeepa Kala." She signed her letter to the Court "Sangeeta Gupta" (Ex. C (Sangeeta Gupta Ltr.) at 15), and this memorandum uses that name.

### *C. Letters of Support from Family and Friends*

More than forty people have written to the Court on Mr. Gupta's behalf, and their letters extend well beyond his immediate family.[11] His mother, wife, children, and sisters write of the husband, son, father, and brother whose absence they feel every day. Joining them are his nephews and nieces, his brothers-in-law, friends of his children who came to regard his home as their own, a former subordinate, and associates from his business life. So are the people who worked in and around his home and neighborhood: carpenters, an electrician, a gardener, a painter, a welder, pharmacy and taxi-stand workers, security guards, and neighbors. Together they describe a man who is respected in the community around him and sorely missed. Their letters also recount episodes from the writers' experience.

#### *1. Mr. Gupta's Immediate Family*

The family letters begin with what happened after Mr. Gupta's father died. His mother, Manorama Gupta, writes that "Nikhil suddenly grew up. He became the man of the house, and he would take care of me as though I were his own child." (Ex. C (Manorama Gupta Ltr.) at 4.) He "even started working alongside me, going to sites, loading trucks, so that we could live our lives, become financially independent, and make a living." (*Id.*) His sister Archna Shandily was in twelfth standard when their father died, and she recalls that her brother "was only in his teenage. From then only, suddenly he grew up and started absorbing all the hard time of our lives." (Ex. C (Archna Shandily Ltr.) at 6.) She remembers him riding a scooter, with their mother seated behind him, to factories far away, "in the very high temperature, at a very younger age." (*Id.*) His sister

[11] Mr. Gupta's letter to the Court is Exhibit A. The letters from others are submitted in two exhibits. Exhibit C contains letters from six members of Mr. Gupta's immediate family: his mother, his wife, his daughter, his son, and his two elder sisters. Exhibit D contains thirty-nine letters from nephews and nieces, brothers-in-law, an uncle and cousins, friends of the family and of his children, a former colleague, business associates, and people who have worked in and around his home and neighborhood. Three of the letters in Exhibit C were written in Hindi. Mr. Gupta's children translated them into English, and the translations accompany the originals. (Ex. C.)

Abha Gupta describes the same work: "Through every season, winter, summer, monsoon, day and night, with no fixed hours, he went to the mines, arranged truck loads, brought in stock, got it refined, and sent it to the factories." (Ex. C (Abha Gupta Ltr.) at 10.) Despite the hardship, she writes, "his heart always remained gentle, he loved everyone and looked after everyone." (*Id.*) These accounts are consistent with Mr. Gupta having begun work at age fourteen.

Mr. Gupta's wife, Sangeeta Gupta, has known him since college and married him in 1994. (Ex. C (Sangeeta Gupta Ltr.) at 14.) She recalls an afternoon after college when a crowd gathered outside a burning apartment building. "No one had the courage to go inside, and after a little while we realized Nikhil was no longer with us. Twenty minutes later, Nikhil came out of that building carrying an elderly woman he had rescued." (*Id.*) In 2014 she fractured her spine in a road accident and was bedridden for months. (*Id.* at 15.) "Through that entire difficult time, Nikhil never once left my side, he stood by me every single day. . . . [H]e personally supervised my physiotherapy, slowly taught me to walk again, and helped me get back on my feet." (Ex. C (Sangeeta Gupta Ltr.) at 15.) During the pandemic, she writes, he spent his days delivering food and giving financial help to people in need. When she told him she was afraid he would fall ill, he answered "that God was with him, and that God had chosen him for this work." (*Id.* at 14–15.)

Sagar and Siddhi knew their father best. Each wrote to the Court. Sagar recalls that his father came to all of his cricket matches, often as the only parent sitting in the sun, and brought fruit for the entire team. He woke at 4:00 a.m., after sleeping late the night before, to drive Sagar to cricket coaching. (Ex. C (Sagar Gupta Ltr.) at 16.) Although his father lost his own father young, Sagar writes, "I have never once heard him complain about how difficult his life has been." (Ex. C (Sagar Gupta Ltr.) at 17.)

Siddhi writes that "[u]nlike most Indian parents, he never imposed himself on us or dictated what career my brother and I should choose." (Ex. C (Siddhi Gupta Ltr.) at 19.) During the pandemic, she writes, he "went out relentlessly to bring supplies to people in need." (Ex. C (Siddhi Gupta Ltr.) at 20.) She used to be irritated by his habit of checking where she was and when she would be home. "As much as his endless fussing used to annoy me, I miss it more than ever now." (Ex. C (Siddhi Gupta Ltr.) at 20.) She tells the Court that "[i]t feels as though my guiding light has been taken from me and I have been left alone in the dark." (*Id.*) His absence has affected her health. "I have been depressed for two years, and I do not know how I will get through this without him." (*Id.*) Shubham Aggarwal, who has been her close friend since they were schoolchildren, saw this period at close range. [redacted] (Ex. D (Shubham Aggarwal Ltr.) at 6.) Through it all, he writes, she has held on to the hope that her father will come home. (*Id.*) She tells the Court that the family is "prepared to do whatever it takes to help him and to take full responsibility for him." (Ex. C (Siddhi Gupta Ltr.) at 20.)

The letters also record what his absence has cost his mother. Manorama Gupta, who is seventy-six, writes: "For three years now, I have not seen my son's face. All I hope for is to look at him to my heart's content, to hold him close, to feed him a home-cooked meal, and to talk with him for hours." (Ex. C (Manorama Gupta Ltr.) at 4–5.) Abha Gupta reports that their mother "seems to have forgotten how to laugh these past three years" and says, repeatedly, "Someone bring my son back to me." (Ex. C (Abha Gupta Ltr.) at 11.) Sangeeta Gupta writes that the work of running the household has fallen on the children and that her mother-in-law has fallen ill repeatedly since her son's arrest. (Ex. C (Sangeeta Gupta Ltr.) at 15.) Archna Shandily, whose daughter is to be married

next year, writes: "My brother was always my best friend. My life feels empty without my best friend." (Ex. C (Archna Shandily Ltr.) at 7.)

***2. Extended Family, Friends, and Colleagues***

The writers in Exhibit D know Mr. Gupta in different ways. Several describe him acting at some risk or expense to himself.

Pradeep Kala, a brother-in-law, writes that when his family fell ill at the height of the pandemic and his mother's condition became critical, "it was Nikhil who stepped in without hesitation. Every day for a week, he personally visited my home with medical personnel and supplies, without any regard for his own safety." (Ex. D (Pradeep Kala Ltr.) at 8.) Mr. Kala later learned that Mr. Gupta had given the same help to many others in their community. (*Id.*) Anchal Gupta, a niece, was diagnosed with tuberculosis two weeks before her wedding, during the pandemic. [redacted] (Ex. D (Anchal Gupta Ltr.) at 11.) Her brother, Kartik Gupta, grew up hearing relatives speak "about the times he entered burning buildings to help complete strangers," and he observes that "the same man who could be fearless in dangerous situations became incredibly gentle the moment he came home." (Ex. D (Kartik Gupta Ltr.) at 13.)

Other writers describe his generosity within the family and at work. Tarun Gupta, a brother-in-law who is an Administrative Officer (Judicial) at the Delhi High Court, writes that "[w]henever our family faced financial hardship, he came forward and helped us financially as well. He supported us without ever making us feel burdened or embarrassed." (Ex. D (Tarun Gupta Ltr.) at 16.) Anil Kumar worked under Mr. Gupta and writes: "I never felt that I was simply an employee working under him. I found a mentor and, more importantly, a friend who wanted to see me do well in life." (Ex. D (Anil Kumar Ltr.) at 20.) Ashutosh Verma, an entrepreneur who knew Mr. Gupta in

business, writes that Mr. Gupta "conducted himself as someone who valued his word, honored commitments, and treated people with dignity irrespective of their position or background," and he calls this case "a tragic departure from the character that I personally observed." (Ex. D (Ashutosh Verma Ltr.) at 21–22.)

Many of the letters come from people with no family or business tie to Mr. Gupta, who describe what they saw him do over years. Surender Kumar, who worked as a gardener at Mr. Gupta's home, writes that when he explained that he could not afford better schools for his sons, Mr. Gupta "told me that every child deserves a good education" and, "[w]ithout my asking, . . . offered to pay my sons' school fees." (Ex. D (Surender Kumar Ltr.) at 23.) Manoj Sahani, a contractor who fell from a ladder while working at the house, writes that Mr. Gupta drove him to the hospital and, when he could not work for two months, paid his children's school fees and arranged for their books. (Ex. D (Manoj Sahani Ltr.) at 25.) Jabir Ansari, a painter who worked at the house each year before Diwali, writes that when his mother lost her eyesight to cataracts and his family could not afford surgery, Mr. Gupta "immediately helped me financially," so that "we were able to arrange my mother's cataract operation." (Ex. D (Jabir Ansari Ltr.) at 27.) Pradeep Prajapati, a carpenter who first met Mr. Gupta eleven years ago when he was hired to build a show rack at the house, writes that Mr. Gupta "gave clothes for me and my children" on several occasions. "My children were especially happy to receive them," he writes, and "these gestures meant a great deal to me because of my financial circumstances." (Ex. D (Pradeep Prajapati Ltr.) at 31.) Arvind Chauhan, a gardener who is now an independent carpenter, writes that Mr. Gupta saw his aptitude and introduced him to an experienced carpenter who trained him; in his words, "the greatest form of help is not simply giving someone money, but empowering them with the skills and opportunity to become self-reliant." (Ex. D (Arvind Chauhan Ltr.) at 32.) Sushil Kumar, a

security guard, writes that for several winters Mr. Gupta stopped at the guards' post with blankets and warm jackets, so that "[i]t became something we waited for every winter because we knew someone remembered us." (Ex. D (Sushil Kumar Ltr.) at 34.) Subash Chand, who works at a pharmacy, writes that Mr. Gupta kept an account there so that people who could not pay for essential medicines could receive them and the cost would be charged to him; "[t]hese are not stories I heard from others—they are events I personally observed." (Ex. D (Subash Chand Ltr.) at 37.) Mohammad Iftekar, a welder in Delhi, wrote that Mr. Gupta helped one of Iftekar's workers get access to an eye doctor that he otherwise would not have been able to see. (Ex. D (Mohammad Iftekar Ltr.) at 54.) Several other writers describe similar help. (*E.g.*, Ex. D (Ajay Bisariya Ltr.) at 39; Ex. D (Devinder Tanwar Ltr.) at 41; Ex. D (Pooja Tanwar Ltr.) at 42; Ex. D (Satish Yadav Ltr.) at 43.)

Two writers speak to Mr. Gupta's attitude today and to the support waiting for him. Vinay Shandily, a brother-in-law, writes from his conversations with Mr. Gupta that "this period has caused him to reflect deeply on his actions and their consequences. He has spoken with regret about the decisions he made and has accepted that he was wrong." (Ex. D (Vinay Shandily Ltr.) at 45.) Mr. Kala reports that the man he knows "has reflected deeply on his actions and carries with him a profound sense of remorse and personal responsibility." (Ex. D (Pradeep Kala Ltr.) at 8.) Hricha Shandily, a niece, writes that "[o]ur family is prepared to support him in whatever ways are necessary, including financial, employment, counseling, treatment, accountability, or any other support as needed. He will not have to face the future alone." (Ex. D (Hricha Shandily Ltr.) at 3.) That commitment bears on Mr. Gupta's alcohol dependence and on his prospects after release.

The theme common to these letters is stated most directly by Kartik Gupta: "No person is defined entirely by their best moments, just as no person should be defined entirely by their worst."

(Ex. D (Kartik Gupta Ltr.) at 15.) The letters in Exhibits C and D are offered for what they show about Mr. Gupta's history and characteristics under 18 U.S.C. § 3553(a)(1) and about the family support available to him when he returns to India. Several writers say expressly that his good character does not excuse the offense. (*E.g.*, Ex. D (Pradeep Kala Ltr.) at 8; Ex. D (Hricha Shandily Ltr.) at 3.)

***D. Employment History***

Mr. Gupta has worked continuously since the age of fourteen. He began at his family's silica trading business, M.J. Minerals, in Delhi, and went on to import metal scrap from Dubai, export marble and handicrafts to Dubai and Turkmenistan, and, in more recent years, trade commodities and broker real estate. He has no history of unemployment and no gaps in his work history reflected in the record.

***E. Physical and Mental Health***

Mr. Gupta has no history of hospitalization or surgery prior to his current detention. He has reported ongoing abdominal pain during his detention at the MDC. The pain is persistent and severe, and he has submitted repeated requests to be seen by a medical professional. He states that he has not received adequate medical attention.[12] He has no history of diagnosis or treatment for any mental or emotional health condition.

***F. Substance Use***

Mr. Gupta has acknowledged a substance use disorder involving alcohol, which he reports began in 2010 and escalated to daily, heavy drinking by 2022. That escalation coincided with, and intensified during, the period in which Yadav approached him and pressed him to participate in this offense; the stress of the underlying situation—an unexplained threat to his family, followed by demands from a man he believed connected to Indian intelligence—led Mr. Gupta to drink more as

[12] *See supra* note 9.

the scheme progressed. Mr. Gupta voluntarily sought outpatient treatment in Delhi before his arrest, but was unable to complete that treatment as a result of being taken into custody, and has stated he would welcome treatment now if offered. In his letter to the Court, Mr. Gupta writes that when he drank heavily, “everything went from bad to worse.” (Ex. A at 2.)

## VIII. ACCEPTANCE OF RESPONSIBILITY / POST-OFFENSE CONDUCT

Mr. Gupta accepted responsibility for his offense. He pleaded guilty on February 13, 2026, to all three counts of the Second Superseding Indictment before any trial began, and at the plea hearing he admitted: “In the spring of 2023, I agreed with another person to have another individual to murder a person in United States. And in furtherance to that crime, I had delivered $15,000 in cash via cellular phone to another individual in United States.” (ECF No. 138-1 at 21–22.)

Probation found that Mr. Gupta “clearly demonstrated acceptance of responsibility” and applied the full three-level reduction under § 3E1.1(a) and (b). It did so with the obstruction enhancement in view. Probation recognized that conduct warranting an enhancement under § 3C1.1 ordinarily indicates that a defendant has not accepted responsibility, and it concluded that this is one of the “extraordinary cases” in which both adjustments apply, because Mr. Gupta presented the affidavit before he pleaded guilty and afterward accepted responsibility. (U.S.S.G. § 3E1.1 cmt. n.4.) The Guidelines also recognize that litigating a suppression motion does not make a plea untimely: “[p]reparations for pretrial proceedings (such as litigation related to a charging document, discovery motions, and suppression motions) ordinarily are not considered ‘preparing for trial.’” U.S.S.G. § 3E1.1(b). The Department of Justice’s Pimentel letter likewise states that, assuming Mr. Gupta accepted responsibility, it would move for the additional one-level reduction under § 3E1.1(b) because he gave timely notice of his intent to plead guilty.

Mr. Gupta’s regret appears in what his family reports and in his own words to the Court. Vinay Shandily writes that Mr. Gupta “has spoken with regret about the decisions he made and has

accepted that he was wrong." (Ex. D (Vinay Shandily Ltr.) at 45.) Pradeep Kala writes that Mr. Gupta "has reflected deeply on his actions and carries with him a profound sense of remorse and personal responsibility." (Ex. D (Pradeep Kala Ltr.) at 8.) *See supra* Part VII.C.2.

Mr. Gupta has also written to the Court. (*See* Ex. A.) He tells the Court that he wishes he could "turn back time to 2023 and undo my mistakes," and that when he looks back, "I don't even recognize the man I had become." (Ex. A at 2.) He describes how, in early 2023, he became distant from his family and began drinking heavily almost every night. (*Id.*) Of his family and the people around him, he writes: "I deeply regretted the suffering I caused them and the people around me." (*Id.*) He tells the Court that he is "so thankful that my actions did not result in the loss of human life or injury," which "would have been the greatest regret of my life." (Ex. A at 3.)

Mr. Gupta writes that the time he spent in solitary confinement in the Czech Republic gave him a reason to reflect: "All I had was time, in great abundance, to reflect on my own actions." (Ex. A at 2.) He spent that time reading, meditating, and practicing yoga, and he continues those practices at the MDC, where fellow inmates joined his yoga practice and he spent extra hours guiding and helping them. (Ex. A at 2–3.) He has concluded "that one should never take solace in substances, no matter how big the crisis is," and he has resolved to "devote my life to helping those in need, whether animal or human." (Ex. A at 3.) He closes by telling the Court that "whatever the decision of this Court may be, I will accept it as I have full faith in Your Honor." (*Id.*) His custody record contains one infraction, in September 2024, when an officer found a cell phone in his pocket. He handed it over when ordered, and the sanction of disciplinary segregation was suspended.

These facts support the reduction Probation applied. They also bear on § 3553(a): a defendant who admits what he did and has his family's support for treatment is less likely to

reoffend. (Ex. D (Hricha Shandily Ltr.) at 3.) To the extent the Court applies the obstruction enhancement, Mr. Gupta asks the Court to treat the affidavit as the isolated pretrial filing it was and to keep the acceptance-of-responsibility reduction in place.

## IX. <u>CONCLUSION</u>

Mr. Gupta pleaded guilty to a serious offense, and he does not minimize it. The Court must still sentence him as the whole person the record shows. He has no criminal history. He acted under pressure from Yadav, a man he believed had the power of the Indian state behind him, while his untreated alcohol dependence clouded his judgment. He did not stand to gain from the payment that is the basis of all three counts. He has spent more than three years in custody, first in the Czech Republic and then at the Metropolitan Detention Center, and he has the support of a family and community who will help him rebuild his life.

The Guidelines calculation that Probation applied overstates the seriousness of his conduct. Under the Guidelines Manual in effect at sentencing, murder-for-hire carries the highest offense level, and the money laundering count adds nothing to it. Probation nonetheless recommended a sentence well below the Guidelines range.

Mr. Gupta respectfully asks the Court to adopt Probation's recommendation as it relates to a variance from the Guidelines and asks that the Court impose a much reduced sentence. Given all the factors cited herein, any sentence imposed by this Court that is sufficient, but not greater than necessary, to serve the purposes of 18 U.S.C. § 3553(a) would be appropriate.

Dated: New York, New York
November 13, 2026

CLAYMAN ROSENBERG
KIRSHNER & LINDER LLP

*Attorneys for Defendant*

/s/ Isabelle A. Kirshner
By: Isabelle A. Kirshner (IAK-7133)
Brian D. Linder (BDL-3581)

60 East 42nd Street
New York, New York 10165
(212) 922-1080
kirshner@clayro.com
linder@clayro.com