**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

November 13, 2026

**By ECF**
The Honorable Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: *United States v. Nikhil Gupta*, 23 Cr. 289 (VM)**

Dear Judge Marrero:

On November 20, 2026, Nikhil Gupta, the defendant, will appear before the Court for sentencing[1] in connection with his efforts to orchestrate the assassination of an activist living in the United States. On February 13, 2026, Gupta pleaded guilty, without a plea agreement, to (i) one count of murder-for-hire conspiracy, in violation of 18 U.S.C. § 1958; (ii) one count of murder-for-hire, in violation of 18 U.S.C. §§ 1958 and 2; and (iii) one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

The defendant and his co-conspirators, including at least one Indian Government employee, plotted to kill an American citizen on U.S. soil because of the victim's political ideology. It is a crime of the utmost seriousness and demands an equally serious penalty. For the reasons explained below, the Government submits that a sentence at the top of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 235 to 293 months' incarceration is necessary to serve the legitimate purposes of sentencing.[2]

---

[1] At the outset of the sentencing, the Government respectfully requests the Court allocute the defendant on a preliminary matter. In June 2026, the defendant's current counsel informed the Government that the defendant had concerns about advice he received from prior counsel before entering his guilty plea regarding the scope of his appellate rights, including as to the rule of specialty. Over the past four months, the Government has repeatedly asked defense counsel whether the defendant intends to move to withdraw his plea. Given his submission of sentencing materials, it appears the defendant does not intend to make such a motion. Nevertheless, for clarity of the record, the Government respectfully requests the Court confirm with the defendant that, after having fully discussed his concerns with his new attorneys, he is not seeking to withdraw his plea.

[2] Pursuant to § 5D1.1(c), no term of supervised release is recommended as the defendant is subject to deportation.

## I. Factual Background

### Overview

Beginning in approximately May 2023, Gupta — an Indian citizen who at all relevant times was living in India — worked with a Government of India employee, Vikash Yadav, a/k/a "Vikas," a/k/a "Amanat" ("Yadav"), to plot the assassination in the United States of Gurpatwant Singh Pannun, an attorney and political activist in New York City (the "Victim" or "Pannun"). (Presentence Investigation Report ("PSR") ¶ 13.) Pannun, who is a U.S. citizen of Indian origin, is a vocal critic of the Government of India and leads a U.S.-based organization that advocates for the secession of Punjab, a state in northern India that is home to a large population of Sikhs, an ethnoreligious minority group in India. (PSR ¶ 11.) Pannun has publicly called for Punjab to secede from India and establish a Sikh sovereign state called Khalistan, and the Government of India has banned Pannun and his separatist organization from India. (*Id.*) U.S. law enforcement detected and disrupted the plot to murder Pannun. (PSR ¶ 12.)

Yadav used "Amanat" as an alias, resided in India, and directed the assassination plot from India. (PSR ¶ 9.) Yadav was employed by the Cabinet Secretariat of the Government of India, which houses India's foreign intelligence service, the Research and Analysis Wing ("RAW"). Yadav has described his position as a "Senior Field Officer" with responsibilities in "Security Management" and "Intelligence." (*Id.*) Yadav has also served in the Central Reserve Police Force, India's largest paramilitary force. Yadav has described his position there as an "Assistant Commandant," with command of a 135-man company. Yadav has reported receiving "[c]ounter [i]ntelligence," "battle craft," "weapons," and "paratrooper" training. (*Id.*)

Below is a photograph of Yadav in military fatigues.



In or about May 2023, Yadav recruited Gupta to orchestrate Pannun's assassination in the United States. (PSR ¶¶ 14, 39.) Gupta is an associate of Yadav and has described his involvement in international narcotics and weapons trafficking in his communications with Yadav and others. (PSR ¶ 10.) Gupta expressed that he saw this operation as a "test" that could lead to additional opportunities with Yadav's organization. (PSR ¶¶ 26, 29.)

At Yadav's direction, Gupta contacted an individual whom Gupta believed to be a criminal associate, specifically, a large-scale drug trafficker, but who was in fact a confidential source working with U.S. law enforcement (the "CS"), for assistance in contracting a hitman to murder Pannun in New York City. (PSR ¶ 13.) The CS introduced Gupta to a purported hitman, who was in fact an undercover U.S. law enforcement officer (the "UC"). Yadav subsequently agreed, in dealings brokered by Gupta, to pay the UC $100,000 to murder Pannun. (*Id.*) On or about June 9, 2023, Yadav and Gupta arranged through an associate of Yadav for the delivery of $15,000 in cash to the UC in Manhattan, New York, as an advance payment for the murder. (PSR ¶ 24.)

In or about June 2023, in furtherance of the assassination plot, Yadav provided Gupta with personal information about Pannun — including Pannun's home address in New York City, phone numbers associated with Pannun, and details about Pannun's day-to-day activities—which Gupta then passed to the UC. (PSR ¶ 31.) Yadav directed Gupta to provide regular updates on the progress of the assassination plot. Gupta complied by forwarding to Yadav, among other things, surveillance photographs of Pannun that the UC had sent to Gupta. (PSR ¶ 36.) Gupta directed the UC to carry out the murder as soon as possible, but Gupta also specifically instructed the UC not to commit the murder around the time of the Indian Prime Minister's official state visit to the United States, which was scheduled to begin on or about June 20, 2023. (PSR ¶¶ 18, 19, 26.)

On or about June 18, 2023, approximately two days before the Indian Prime Minister's state visit to the United States, masked gunmen murdered Hardeep Singh Nijjar outside a Sikh temple in British Columbia, Canada. (PSR ¶ 31.) Nijjar was an associate of Pannun, and like Pannun, was a leader of the Sikh separatist movement and an outspoken critic of the Government of India. (*Id.*) Later that evening, just hours after the Nijjar murder, Yadav sent Gupta a video clip that showed Nijjar's bloody body slumped in his (Nijjar's) vehicle; about an hour later, Yadav sent Gupta the street address for Pannun's residence in New York City. (PSR ¶ 32.) On or about June 19, 2023, the day after the Nijjar murder, Gupta told the UC that Nijjar "was also the target" and "we have so many targets."[3] (*Id.*) Gupta added that, in light of Nijjar's murder, there was "now no need to wait" to kill Pannun. On or about June 20, 2023, Yadav sent Gupta a news article about Pannun and messaged Gupta, "[i]t's [a] priority now." (PSR ¶¶ 32, 33.)

On or about June 30, 2023, Gupta was arrested in the Czech Republic at the request of the United States in connection with his participation in the plot to murder Pannun. (PSR ¶ 38.)

---

[3] Gupta and the UC communicated in English. Gupta and the CS communicated in English with occasional Spanish phrases. Gupta and Yadav largely communicated in English, and Gupta sometimes left Yadav voice notes in Hindi. All communications are described in substance and in part, and are based on draft transcriptions and (where necessary) English translations. Grammatical and typographical errors appear as in the original communications unless otherwise indicated.

## Yadav Recruits Gupta to Arrange Pannun's Murder

Beginning in or about early May 2023, in a series of telephonic and electronic communications between Yadav and Gupta over encrypted applications, Yadav asked Gupta to arrange the murder of Pannun in exchange for Yadav's assistance in securing the dismissal of a criminal case against Gupta in India. (PSR ¶ 13.) Gupta agreed to orchestrate the assassination. In addition to their electronic communications, Gupta also met Yadav in-person in New Delhi in furtherance of the plot. (*Id.*)

On or about May 6, 2023, at the outset of their conversation over a particular encrypted messaging application, Yadav wrote Gupta: "This is Vikas... Save my name as Aman." Gupta saved the telephone number on Gupta's phone as "Amanat." (PSR ¶ 14.) A few minutes later, Yadav messaged Gupta that Yadav had a "target in New York" and another target in "California." Gupta replied: "We will hit our all Targets." (*Id.*) The telephone number used by Yadav has an India country code and is registered to an email account that, based on Internet Protocol data, accessed the Internet on numerous occasions during the period of the murder plot from the vicinity of New Delhi. (*Id.*)

Around the same time that they began arranging Pannun's murder, Yadav and Gupta also targeted another individual in Nepal or Pakistan. (PSR ¶ 15.) For example, on or about May 8, 2023, Gupta wrote Yadav that the hitmen had "already arrived [in Pakistan] and [were] looking for" the intended victim. In the following days, Yadav requested updates and told Gupta to offer additional funds to the hitmen to encourage them to get the job done the next day because it was urgent — just as Yadav would later press Gupta to kill Pannun. (*Id.*) Yadav provided the target's locations in Nepal to Gupta to pass on to the hitmen, whom Gupta described as "soldiers," and, on or about May 14, 2023, instructed Gupta that "if they have really captured the target.. they should kill him. Else we won't get another chance." It is not clear from their communications whether Yadav and Gupta successfully killed the target in Nepal or Pakistan. (*Id.*)

On or about May 12, 2023, Yadav notified Gupta that his criminal case "has already been taken care of," and that "nobody from Gujrat police is calling."[4] (PSR ¶ 16.) On or about May 23, 2023, Yadav again assured Gupta that Yadav had "spoke[n] with the boss about your Gujarat [case]," that it was "all clear," and "nobody will ever bother you again." Yadav further offered to arrange a meeting between Gupta and a "DCP," which is an acronym used in India for Deputy Commissioner of Police. (*Id.*)

Following Yadav's assurances, Gupta pressed forward to arrange Pannun's murder. On or about May 29, 2023, Gupta asked the CS by phone if the CS knew anyone who would be willing to carry out a murder-for-hire in the United States. Gupta explained that the intended victim was a lawyer who split time between New York City and Los Angeles. The CS responded that he would reach out to his contacts. (*Id.*)

---

[4] Gujarat is a state in western India.

Over the ensuing weeks, Gupta engaged in a series of electronic and recorded communications with the CS and later the UC, including by phone, video, and text message, during which they discussed, among other things, the logistics and price of the murder. For example, during a video call, Gupta reminded the CS that Pannun worked as a lawyer and suggested that the CS's associates could contact Pannun under the guise of obtaining legal advice in order to lure him to a place where he could be more easily executed. (PSR ¶ 17.) Gupta also directed the CS to a website where the CS could find New York and Los Angeles addresses for Pannun's offices. On or about May 29, 2023, Gupta messaged the CS Pannun's name and other information about Pannun, and advised that Pannun spent most of his time in New York. In response, the CS asked Gupta for additional information about Pannun and details about payment for the murder. (*Id.*)

On or about May 29, 2023, Gupta sent screenshots to Yadav of Gupta's text messages with the CS, in which the CS requested details about Pannun and about payment for Pannun's murder. Yadav responded that "we are ready to pay $150000... the offer will go higher depending upon the quality of the work...and if it's done as soon as possible," referring to the murder ("the work") and executing the plot quickly. (PSR ¶ 18.) Gupta replied to Yadav with a screenshot of the CS requesting "100 k." Yadav responded "Ok," and then added that while an advance payment was not possible, "the whole money will be paid with in [sic] 24 hours after the work is done." (*Id.*) On or about June 1, 2023, Yadav sent Gupta the street address for Pannun's home in New York City, which Yadav described to Gupta as "the locality of [Pannun's] House." (*Id.*)

On or about June 2, 2023, Yadav messaged Gupta, asking for "any update" on the murder plot, stating "[i]t's important and less time." (PSR ¶ 19.) Gupta responded that he expected to have an update the following day. The next day, on or about June 3, 2023, Gupta spoke with the CS by audio call, and urged the CS to have his associates carry out the murder soon, stating: "finish him brother, finish him, don't take too much time . . . push these guys, push these guys . . . , finish the job." (*Id.*) Gupta directed the CS to a particular cellphone application that records Global Positioning System ("GPS") coordinates and enables the user to take photographs (the "GPS Application"). Yadav had previously sent Gupta the GPS Application on or about May 25, 2023. Gupta then asked the CS to have the CS's associates in New York use the GPS Application to transmit surveillance of Pannun. Later that day, Gupta messaged Yadav that Gupta had "spoke[n] with the NY group" and "told them they have to discharge [Pannun] as soon as possible." On or about June 4, 2023, Gupta again spoke with the CS by audio call, and promised the CS that "if this job is done successfully" then Gupta would "bring the chief" to meet the CS. Gupta further noted that Gupta would be speaking with those directing the murder. (*Id.*)

**Yadav and Gupta Make an Advance Payment for the Murder**

As their plotting continued, and Yadav and Gupta sought to orchestrate the assassination as soon as possible, Yadav and Gupta agreed to make an upfront cash payment to the purported hitman. (PSR ¶ 20.) As set forth below, Yadav and Gupta arranged, through Yadav's network of associates, the payment of $15,000 in cash to the UC in Manhattan, as an advance payment for Pannun's murder. (*Id.*)

On or about June 4, 2023, the CS sent Gupta a purported surveillance photograph of Pannun taken using the GPS Application (the "Surveillance Photo"). (PSR ¶ 21.) The CS represented to

Gupta via text message that the Surveillance Photo was proof that the CS's New York associates were monitoring Pannun, and that Pannun would be killed as soon as they received an advance payment of $25,000. On or about June 5, 2023, Gupta sent the Surveillance Photo and a screenshot of the CS's messages to Yadav. Gupta asked Yadav to "check with [his] NY dealer if he can arrange the 25k [payment] there." (*Id.*)

On or about June 6, 2023, Gupta messaged the CS asking to be put directly in touch with the CS's New York associates who would receive the advance payment and carry out Pannun's murder. (PSR ¶ 22.) In response, the CS introduced Gupta through electronic messages to the UC, who was purporting to be the CS's associate in New York. That same day, Gupta sent screenshots to Yadav of Gupta's messages with the CS discussing the advance payment and introducing the UC. Yadav replied "Ok bhai ji."[5] (*Id.*)

On or about June 7, 2023, Gupta messaged Yadav that Gupta's associate did not have the funds available in New York to make the advance payment, and asked that Yadav check with his contact. Gupta added that he could "pay here in Delhi also." (PSR ¶ 23.) The next day, on or about June 8, 2023, Yadav replied to Gupta with the name of an associate ("Individual-1"), and a phone number for Individual-1 with an Indian country code. (*Id.*)

On or about June 9, 2023, Yadav messaged Gupta, "Bhai ji I guess you are in communication with [Individual-1], he said payment will be made today positively.. Let's activate the team and get it done this weekend," referring to executing Pannun's murder during the ensuing weekend. (*Id.*) Gupta responded in the affirmative. Approximately two hours later, Gupta informed the UC by text message and voice note that another associate ("Individual-2") would call Gupta to arrange the delivery by noon that day of the "parcel," meaning the advance cash payment for the murder (the "Advance Payment"). (*Id.*) A few minutes later, Individual-2 called the UC and stated that Individual-2 had $15,000 for the UC. In separate communications with Gupta, the CS agreed to pay an additional $10,000 on Gupta's behalf to the purported hitman, thus totaling the full $25,000. (*Id.*)

Later, on or about June 9, 2023, Individual-2 met with the UC in Manhattan to make the Advance Payment. (PSR ¶ 24.) During the meeting, which took place in the UC's vehicle, the UC called Gupta and facilitated a conversation between Gupta and Individual-2, during which Gupta and Individual-2 discussed, among other things, Gupta's location in India. Individual-2 then handed $15,000 in cash to the UC. (*Id.*) A still image of the Advance Payment is shown below.

---

[5] "Bhai ji" is a respectful Hindi term for "brother."




On or about June 10, 2023, Gupta sent to Yadav screenshots of Gupta's text message conversations with the CS and the UC, in which both confirmed that the Advance Payment had been made. Yadav responded, "Ok bhai ji." (PSR ¶ 25.)

**Yadav and Gupta Instruct That the Murder Should Not Occur During the Indian Prime Minister's State Visit to the United States**

As they plotted Pannun's murder, Gupta specifically and repeatedly instructed the CS not to carry out the assassination during the Indian Prime Minister's visit to the United States, which was scheduled to begin in late June. (PSR ¶ 26.) For example, on or about June 6, 2023, on an audio call, Gupta advised the CS that "our prime minister Modi is visiting America on 20th so at least we need to calm down everything 10 days . . . so at the time of our prime minister visit, it's not good." (*Id.*) Gupta explained that, given Pannun's public profile as an activist, there could be protests in the wake of his death, which could lead to "political things," referring to geopolitical fallout if Pannun were assassinated on U.S. soil while the Indian Prime Minister was on an official state visit to the United States. (*Id.*) Gupta added that "our prime minister will be there for three days, 20, 21, 22," and "after that they have more jobs, more jobs," referring to more targeted killings like that of Pannun to be carried out after the conclusion of the Indian Prime Minister's visit. (*Id.*)

Consistent with the instructions that Gupta later relayed to the CS, Yadav instructed Gupta not to carry out Pannun's assassination in the immediate lead-up to, or during, the Indian Prime Minister's visit to the United States. (PSR ¶ 27.) For example, on or about June 11, 2023, after receiving from Gupta additional purported surveillance photographs of Pannun, Yadav messaged

Gupta: "It looks promising.. but we have today only.. if it doesn't happen today it will be done after 24th," that is, after the Prime Minister's expected departure from the United States. (*Id.*)

**Gupta Informs the CS and the UC that His India-Based Co-Conspirators Directing the Murder Plot Were Targeting Other Victims, Including in Canada**

During Gupta's communications with the CS and the UC, Gupta repeatedly emphasized that his co-conspirators directing the assassination plot from India had extensive resources and were closely monitoring the progress of the plotting. (PSR ¶ 28.) For example, on or about June 12, 2023, the UC received a video call from Gupta, who appeared to be in a conference room. During the call, Gupta turned the camera toward approximately three other men in the room who were dressed in business attire, sitting around a conference table with Gupta. As Gupta turned the camera back toward himself, he told the UC "we are all counting on you." (*Id.*) Approximately two days later, on or about June 14, 2023, Gupta messaged the UC that Gupta had a "m[essage] from our friends for you brother." Gupta then forwarded a message that Gupta had received from Yadav, stating: "follow [Pannun] till the time he enters his house or any other final place." (*Id.*)

Gupta also informed the CS and the UC that after Pannun's murder, Gupta's confederates would provide the CS and the UC with additional victims to kill. (PSR ¶ 29.) For example, on or about June 9, 2023, Gupta told the CS during a call that Pannun's murder would change the UC's life because "we will give more bigger job more, more job every month, every month 2-3 job." (*Id.*)

On or about June 12, 2023, on a call with the CS, Gupta stated that there was a "big target" in Canada. A few days later, on or about June 14, 2023, Gupta messaged the CS that "we will be needing one good team in Canada also, [t]omorrow I will share you the details." (PSR ¶ 30.) The following day, on or about June 15, 2023, Gupta advised the CS by phone that Gupta was still "waiting [for] the details" about the Canadian target. On or about June 16, 2023, on another call with the CS, Gupta told the CS that "we are doing their job, brother. We are doing their New York [and] Canada [job]," referring to the individuals directing the targeting plots from India. (*Id.*)

**Nijjar Is Murdered in Canada, and Yadav and Gupta Accelerate the Plan to Murder Pannun in New York City**

On or about June 18, 2023, masked gunmen shot and killed Nijjar, an associate of Pannun and another leader of the Sikh separatist movement, outside a Sikh temple in Canada. Later that evening, Yadav sent Gupta a video clip showing Nijjar's bloody body slumped in his (Nijjar's) vehicle. (PSR ¶ 31.) Gupta replied that he wished he had personally conducted the killing and asked Yadav for permission to "go to the field." (*Id.*) Yadav responded that "secrecy [is] important," and "[i]t's better you do not get involved in action." Approximately one hour later, Yadav sent Gupta the street address for Pannun's residence in New York City. (*Id.*)

Gupta forwarded the video clip showing Nijjar's bloody body to the CS and the UC minutes after receiving it from Yadav. (PSR ¶ 32.) Soon after, on or about June 19, 2023, Gupta spoke with the UC by audio call, and Gupta told the UC that Nijjar "was also the target" but that Nijjar was "#4, #3" on the list, and "not to worry [because] we have so many targets, we have so many targets. But the good news is this, the good news is this: now no need to wait." (*Id.*) Separately, Gupta also

held an audio call with the CS, during which Gupta confirmed that Nijjar was the target that Gupta had previously mentioned as the potential Canadian "job" stating: "This is the guy, I send you the video. . . . We didn't give to [the UC] this job, so some other guy did this job . . . in Canada." In a change from his prior instruction to delay killing Pannun until after the Indian Prime Minister's visit, Gupta told the CS that the UC should kill Pannun as soon as possible, informing the CS that "we got the go-ahead to go anytime, even today, tomorrow—as early as possible. [The UC] has to finish this job, brother." (*Id.*) Gupta also told the CS to expect Pannun to be more careful in the wake of the Nijjar murder: "He will be more cautious, because in Canada, his colleague is down. His colleague is down. I sent you the video. So he will be more cautious, so we should not give them the chance, any chance." Gupta added: "If he is not alone, [if] there are two guys with him in the meeting or something . . . put everyone down, put everyone down." A still image from the video clip circulated by Gupta is below. (*Id.*)

**Still Image from Video Circulated by Yadav and Gupta Showing Nijjar Shot to Death**




The following day, on or about June 20, 2023, Yadav sent Gupta a news article about the Victim. Yadav then messaged: "It's [a] priority now." (PSR ¶ 33.) Shortly thereafter, Gupta spoke to the CS by audio call, and Gupta directed the CS to "find the opportunity" to kill the Victim and to "do it quickly." Gupta stated that before the "29th [of June] we have to finish four jobs," *i.e.*, Pannun and, after that, "three in Canada." (*Id.*)

**Yadav and Gupta Continue Working to Orchestrate Pannun's Murder**

After the Nijjar murder in Canada, Gupta demanded rapid updates from the UC on the progress of the plot to murder Pannun, which Gupta then reported to Yadav. Gupta simultaneously

relayed intelligence on Pannun's whereabouts from Yadav to the UC. (PSR ¶ 34.) At one point, on or about June 22, 2023, Yadav messaged Gupta that Pannun "is somewhere else," that "[h]e is not at home," and that Yadav "got the message from boss." Gupta immediately attempted to call the UC. When the call went unanswered, Gupta messaged the UC that Pannun "is not at home according to our sources . . . [m]ake sure his presence before entering inside." (*Id.*) A few minutes later, Yadav messaged Gupta, instructing: "let them also verify by their own... if they are able to get some proof that he is inside..it will be a go ahead from us," a reference to giving the green light to assassinate Pannun as soon as it could be verified that he was at his residence. (*Id.*)

As an additional incentive to complete the murder of Pannun, Gupta requested that Yadav arrange airport clearance for the CS's purported drug-laden airplane and also provide weapons to sell to the CS — transactions on which Gupta expected to profit. (PSR ¶ 35.) Yadav agreed to Gupta's proposal, on the express condition that Pannun be killed. (*Id.*) For example, on or about June 22, 2023, Yadav wrote Gupta that Yadav could arrange the sale of "Ak 56 /81/94" rifles and "Tokorev / M20" pistols, as well as airplane clearance in Imphal, the capital city of the Indian state of Manipur. (*Id.*) Yadav told Gupta, however, that Yadav's assistance would depend on how well the "task at hand" was executed, meaning Pannun's murder: "Most things will depend upon the task at hand.. if it's done in an impeccable manner..all will be take care of bhai ji." (*Id.*)

On or about June 24, 2023, Yadav messaged Gupta that "today we must get the App based location pic," referring to obtaining surveillance of Pannun using the GPS Application. (PSR ¶ 36.) Yadav explained that "[n]ow it's a clear go ahead..we will also be able to help your team if they are sending location." (*Id.*) Consistent with Yadav's instruction, Gupta messaged the UC and directed the UC to transmit "[p]ictures only through the application." On or about June 25, 2023, the UC sent Gupta a series of photographs of the vicinity of Pannun's residence and neighborhood, which bore GPS coordinate stamps from the GPS Application. Gupta, in turn, sent portions of the photographs to Yadav. (*Id.*) The next day, on or about June 26, 2023, Yadav replied to Gupta: "Excellent . . . [t]hey are proving that they are quite serious now." Yadav added that "[t]he coming 24 hours will be crucial," that Pannun "will definitely come to either home or office," and that Gupta should tell the UC "to be ready for both the locations." Gupta relayed Yadav's instruction, directing the UC to "keep eyes at his house, his office and the cafe he used to visit." (*Id.*)

Also on or about June 26, 2023, the UC sent Gupta another series of photographs of Pannun's neighborhood taken using the GPS Application. (PSR ¶ 37.) Gupta transmitted portions of the photographs to Yadav, who then provided Gupta with a total of four "[o]ffice" and "[p]ersonal" telephone numbers for Pannun. (*Id.*) That same day, Gupta asked Yadav to check about the "toys," meaning firearms; Yadav reiterated that he would be able to obtain the weapons for Gupta once the "work" (meaning Pannun's murder) was completed. (*Id.*) On or about June 29, 2023, Gupta messaged the UC that "[w]e have the Intel that the [Victim] . . . has arrived back to his home" and "[t]oday he should come out definitely." Gupta instructed the UC to carry out the murder, stating: "[t]ry to get this done if you have the visuals and if you are sure." (*Id.*)

**Gupta Is Arrested in the Czech Republic**

On or about June 30, 2023, Gupta traveled from India to the Czech Republic. Upon his arrival at the Prague airport, Gupta was arrested by Czech law enforcement authorities at the request of the United States. (PSR ¶ 38.)

Czech law enforcement officers seized three cellphones from Gupta in connection with his arrest. (*Id.*) These cellphones contained, among other things, hundreds of WhatsApp Messenger communications between Gupta and Yadav, some of which are described and quoted above. In these messages, which spanned from May 6, 2023 through June 29, 2023, Gupta and Yadav planned Pannun's murder on a day-to-day basis. Gupta and Yadav also discussed the murder of other individuals, including Nijjar and a person in Nepal or Pakistan, as well as Yadav's ability to supply Gupta with weapons for sale to the CS as well as airport clearance for the CS's plane. (*Id.*)

Shortly after his arrest, Gupta waived his *Miranda* rights and agreed to speak with DEA agents. (PSR ¶ 39.) During his interview, Gupta stated, in substance and in part, that he had been approached in India by someone named "Amanat" — later identified as Yadav — who offered to assist Gupta in clearing a robbery summons in India in exchange for Gupta's assistance in having someone in New York City killed. (*Id.*) Gupta acknowledged that he knew someone (apparently referring to the CS) and admitted that Gupta had helped to facilitate the murder-for-hire. (*Id.*)

Gupta was extradited to the United States on or about June 14, 2024. (*Id.*)

## II. The Plea and Guidelines Calculation

On February 13, 2026, the defendant pleaded guilty to Counts One, Two, and Three of the operative S2 Superseding Indictment (the "Indictment"). The defendant did not plead guilty pursuant to a plea agreement. Rather, pursuant to the suggestion of the Court in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991), the defendant pleaded guilty to the charges in the Indictment after having been advised of the Government's view at the time of the application of the United States Sentencing Guidelines.

The Government concurs with the enhancements applied in the Guidelines calculation set forth in the PSR. Because the PSR calculates the Guidelines level using the November 1, 2025 Guidelines Manual, the Government briefly sets forth below the calculation under the now-applicable November 1, 2026 Guidelines Manual. Although this does not change the ultimate Guidelines calculation, it does change the mechanics of the grouping analysis. In addition, the Government explains below the applicability of two disputed enhancements: money laundering (U.S.S.G. § 2S1.1(a)(1)) and obstruction of justice (U.S.S.G. § 3C1.1).

### A. Each Count is a Separate Group Under U.S.S.G. § 3D1.1

The November 1, 2026 Guidelines Manual makes changes to the mechanisms of the grouping analysis. Under U.S.S.G. §§ 3D1.1(c) and (d), because none of the counts fall under subsections (a) or (b), the offense level for each count should be calculated separately and the offense level applicable to all counts of conviction will be the highest offense level.

**B. U.S.S.G. § 2E1.4 Applies to Counts One and Two**

Pursuant to U.S.S.G. § 2E1.4, the base offense level for Counts One and Two is that calculated under U.S.S.G. § 2A1.5, as the underlying conduct in this case is soliciting the murder of a victim. Under U.S.S.G. § 2A1.5, the base offense level is 33. A four-level enhancement is added because the murder-for-hire involved the offer of something of pecuniary value for undertaking the murder. Accordingly, the offense level on Counts One and Two is 37.

**C. U.S.S.G. § 2S1.1(a)(1) Applies to Count Three**

U.S.S.G. § 2S1.1(a)(1) requires that the offense level for the underlying conduct be applied if (A) "the defendant committed the underlying offense" (murder-for-hire), and (B) "the offense level for that offense can be determined." Gupta argues that the applicable guideline is instead U.S.S.G. § 2S1.1(a)(2) on the ground that "there were no laundered funds that were derived from the underlying criminal activity (murder for hire)." (PSR at 34). That is incorrect. In this case, there is no dispute that Gupta laundered $15,000, and conspired to launder a total of $100,000, to pay a hitman to murder Pannun in New York. The laundered funds were therefore "derived" from the "underlying offense" of murder-for-hire, triggering application of U.S.S.G. § 2S1.1(a)(1), not (a)(2). As the First Circuit recently explained:

> § 2S1.1(a) — to simplify just a bit — differentiates between "direct money launderers" under U.S.S.G. § 2S1.1(a)(1) and "third party money launderers" under U.S.S.G. § 2S1.1(a)(2). *See* U.S.S.G. Supp. to App. C., Amend. 634, at 167 (2001). "[D]irect money launderers" are "offenders who commit[ted]" the crime that "generated the criminal proceeds," while "third party launderers" are "offenders who launder[ed] the proceeds generated from [the] underlying [crimes]" that they didn't "commit." *Id.* Not surprisingly, direct-money launderers sentenced under U.S.S.G. § 2S1.1(a)(1) often get *higher* sentences than less culpable third-party launderers sentenced under U.S.S.G. § 2S1.1(a)(2).

*United States v. Abbas*, 165 F.4th 659, 663 n.6 (1st Cir. 2026) (internal quotation marks, citation, and prior alterations omitted). Here, Gupta was clearly a "direct money launderer" who engaged in the murder-for-hire scheme that generated the proceeds. He was not a "third party money launderer" who merely laundered the proceeds of a crime he didn't commit. Accordingly, the applicable Guideline for Count Three is U.S.S.G. § 2S1.1(a)(1), not (a)(2).

And if there were any doubt, the commentary to U.S.S.G. § 3D1.1 expressly applies U.S.S.G. § 2S1.1(a)(1) to an example mirroring the facts of this case:

> Defendant C is convicted of money laundering, in violation of 18 U.S.C. § 1956, and one count of conspiracy to commit murder, in violation of 18 U.S.C. § 1117. Defendant C laundered proceeds that were wired to him as advanced payment for murder, which never took place. Money laundering is referenced in Appendix A (Statutory Index) to §2S1.1, while conspiracy to commit murder is referenced to

> §2A5.1.[6] ***For the money laundering count, §2S1.1(a)(1) instructs to determine the offense level for the underlying offense from which the laundered funds were derived. Therefore, the base offense level for the money laundering count is determined by applying § 2A5.1, the guideline applicable to the conspiracy to commit murder.***

U.S.S.G. § 3D1.1 app. n. 5(C) (emphasis added).

In this case, the base offense level under § 2S1.1(a) is 37, as set forth above as to Counts One and Two. Pursuant to § 2S1.1(b)(2)(B), a two-level increase applies because the defendant was convicted under 18 U.S.C. § 1956. Accordingly, the offense level for Count Three is 39.

### D. The Offense Level for Counts One through Three is 39

Pursuant to U.S.S.G. § 3D1.1(d)(3), because Count Three produces the highest offense level of any count, the total offense level for Counts One through Three is that of Count Three, which is 39.

### E. An Obstruction of Justice Enhancement Under U.S.S.G. § 3C1.1 is Applicable

A two-point enhancement for obstruction of justice applies, pursuant to U.S.S.G. § 3C1.1, because the defendant intentionally submitted a false affidavit in support of his motion to suppress his post-arrest statement. (*See* Dkt. 67.) Gupta objects to the enhancement because "[t]he Court's decision not to credit the defendant's testimony is an insufficient basis alone to establish that the defendant willfully obstructed the prosecution." (PSR at 35). But neither the Probation Office nor the Government is asking the Court to impose an obstruction enhancement based solely upon falsity. Rather, the Court should impose an obstruction enhancement because the defendant committed perjury, meaning the Court should "find by a preponderance of the evidence that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *United States v. Orelien*, 119 F.4th 217, 228 (2d Cir. 2024) (internal quotation marks omitted).

Importantly, the defendant's false affidavit was material notwithstanding that the Court denied his motion to suppress and he subsequently pleaded guilty. In the context of a suppression-motion affidavit, U.S.S.G. § 3C1.1 applies when a defendant "knowingly made false statements under oath expressly for the purpose of supporting a motion to suppress, and that those statements, if credited, would have led to the suppression of evidence." *United States v. Lincecum*, 220 F.3d 77, 81 (2d Cir. 2000). "If a defendant testifies to a detailed account that is demonstrably false, the enhancement has been found to apply." *United States v. Lewis*, 62 F.4th 733, 747 (2d Cir. 2023). As the Second Circuit explained in *Lincecum*, "Section 3C1.1 applies not only to successful obstructions but also to attempts." 220 F.3d. at 80–81. Accordingly, the obstruction enhancement applied in that case even though Lincecum withdrew his motion to suppress. *Id.* The enhancement likewise applies here even though Gupta pleaded guilty after his motion to suppress was denied.

---

[6] The references to U.S.S.G. § 2A5.1 in the application note appear to be a typographical error. The Guideline applicable to conspiracy to commit murder is U.S.S.G. § 2A1.5.

As to the specifics of his attempts to obstruct justice, in his affidavit, Gupta provided a detailed account containing materially false statements, including the following:

- "Neither Task Force Officer Sandobal nor Special Agent Franks told me their names and they did not identify themselves as law enforcement." (Dkt. 67 ¶ 19).

- "Neither Special Agent Franks nor Task Force Officer Sandobal informed me that I had any rights, including the right to remain silent or to an attorney, before they began asking me questions." (*Id.* ¶ 21).

- "At the end of the car ride, after driving around for a while, we arrived at a building. Task Force Officer Sandobal handed me a piece of paper and told me to print my name. It was dark in the car, and I did not have my glasses, so I could not read what the paper said. . . . Additionally, Task Force Officer Sandobal did not give me the time necessary to read the document, and so I printed my name without knowing what the document said." (*Id.* ¶ 24).

- "My hands were cuffed for the entire car ride. It was dark in the car, and I did not have my glasses. I cannot read without my glasses, especially when the light is bad." (*Id.* ¶ 18).

On October 3, 2025, after holding a suppression hearing at which TFO Sandobal (but not Gupta) testified, the Court denied Gupta's motion to suppress. (Dkt. 118). In a written opinion, the Court found that "the DEA Case Agents advised Gupta of his rights before substantively questioning him." (*Id.* at 36). In particular, the Court credited TFO Sandobal's testimony that "the DEA Case Agents introduced themselves by name when Gupta entered the van and informed him that they were with U.S. law enforcement authorities, and specifically, the DEA," (*id.* at 31), and that "SA Franks then read Gupta every right on the Advice of Rights form, which apprised Gupta, among other things, that he had 'the right to remain silent,' that anything he said 'could be used against [him] in court,' that he had 'the right to talk to a la[w]yer,' and that if he decided 'to answer questions now without a lawyer present,' he had 'the right to stop answering at any time,'" (*id.* at 31–32). The Court expressly found that "SA Franks adequately apprised Gupta of his Miranda rights by reading him the Advice of Rights form." These findings necessarily mean that Gupta's first two statements quoted above — that the DEA Case Agents did not identify themselves and did not advise Gupta of his rights — were false.

In its opinion denying Gupta's motion to suppress, the Court also rejected Gupta's third and fourth statements quoted above — *i.e.*, that Gupta never read the advice of rights form because it was too dark in the car and because he was never given his glasses. As to the lighting, the Court found that "the Advice of Rights form was readable inside the van" and that "SA Franks could, and did, read Gupta the Advice of Rights form." (*Id.* at 34). As to the glasses, the Court "credit[ed] TFO Sandobal's testimony that Gupta was provided his glasses at the beginning of the van ride." (*Id.* at 41). The Court expressly found "Gupta's claim about his glasses is not credible." (*Id.* at 40).

Gupta indisputably made these false statements willfully and intentionally, having filed them in a sworn affidavit to the Court. And because Gupta's false statements in his affidavit could

have led to suppression of his post-arrest statement, the false statements were material. Indeed, Gupta's false claims that (1) the DEA Case Agents did not identify themselves, (2) the DEA Case Agents did not advise Gupta of his rights, (3) the DEA Case Agents did not provide Gupta his glasses, and (4) it was too dark to read the written advice of rights form, all cut to the heart of Gupta's suppression motion. Because Gupta submitted these materially false statements to the Court in an effort to obstruct justice, the two-point enhancement of U.S.S.G. § 3C1.1 applies here.

### F. The Guidelines Range is 235 to 293 Months' Imprisonment

After application of the two-point obstruction enhancement, the resulting offense level is 41. Assuming a reduction for acceptance of responsibility applies under U.S.S.G. § 3E1.1, [7] the total offense level is 38. The Government agrees that the defendant has zero criminal history points and is therefore in Criminal History Category I. At an offense level of 38 and Criminal History Category I, the resulting Guidelines range is 235 to 293 months' imprisonment.

## III. Discussion

### A. A Top of the Guidelines Sentence of 293 Months' Imprisonment is Necessary and Appropriate

The Government respectfully submits that the statutory sentencing factors set forth in Title 18, United States Code, Section 3553(a) weigh in favor of a sentence at the top of the Guidelines range of 293 months' imprisonment. The factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant and others, and to promote respect for the law. 18 U.S.C. § 3553(a)(2)(A)-(C).

In its simplest terms, this is a case about an attempted political assassination. The defendant sat in a foreign country and enthusiastically — at times almost gleefully — directed individuals whom he believed to be armed hitmen to conduct surveillance and kill a United States citizen on U.S. soil, to make money for himself and serve the political ideologies of others. When presented with the opportunity to make money by taking a life, the defendant readily agreed and pursued the assignment relentlessly. The defendant's actions were a threat to American sovereignty and undercut core American values. In a strikingly similar case involving an attempt to assassinate an Iranian dissident in the United States, *United States v. Omarov and Amirov*, Judge McMahon sentenced the defendants to terms of incarceration of 25 years, explaining "[i]t is highly relevant that foreign citizens who were agents of a foreign power conspired to commit, and tried to commit, and almost succeeded in committing, a murder inside the United States—s where, presumably, an American citizen like [Pannun] should be safe in her own home" and reasoning that "the fact that the defendants would commit a murder for ANY amount of money causes me to conclude that they should be punished to the maximum extent permitted by law." *United States v. Omarov and Amirov*, 22 Cr. 438 (CM), Doc. No. 163, slip op. at 9-10 (Oct. 29, 2025). The same is true here.

---

[7] Although the Government believes a factual record exists that would support denial of a reduction under U.S.S.G. § 3E1.1, Application Note 4, given the defendant's timely plea, the Government intends to move for a one-point reduction under § 3E1.1(b) if the Court applies a two-point reduction under § 3E1.1(a).

The danger in this case is not illusory. On June 12, 2023, Gupta told the UC that there was a "big target" in Canada. In the following days, Gupta continued to suggest that he was involved in the efforts to kill individuals other than Pannun on behalf of the Government of India, explaining that, "we are doing their New York [and] Canada [jobs]." (PSR ¶ 30). Days later it became real. On June 18, 2023 — while the defendant was helping to direct the plot to kill Pannun — Hardeep Singh Nijjar, a leader of the Sikh separatist movement and Pannun's associate — was murdered in British Columbia. It was a brutal death. While sitting in the driver's seat of his truck, masked gunmen approached and sprayed bullets into the vehicle. His upper body was struck multiple times. He died in his seat. After Nijjar's murder, Gupta told the UC that Nijjar was "also the target" — one of "so many." (PSR ¶ 32). That is, Nijjar's death was part of the same campaign of violent political repression of which Pannun was also a target. Seemingly spurred on by Nijjar's death, Gupta doubled down on his efforts —undeterred by the loss of life and, instead, motivated by it. Gupta lamented to Yadav and expressed disappointment that he had not been involved directly in Nijjar's killing, asking that he be sent "to the field." (PSR ¶ 31). Yadav counseled Gupta that "[i]t's better you do not get involved in the action." (PSR ¶ 31). Thereafter Yadav passed Gupta Pannun's address and encouraged Gupta to push the hitman with urgency, telling Gupta that Pannun's murder was a "priority now." Gupta conveyed the same to the UC, telling him that there was now no need to wait to kill Pannun. Chillingly, Gupta made clear his directions to the UC: "If [Pannun] is not alone . . . put everyone down, put everyone down." (PSR ¶ 32). The defendant was participating in a very real plot that would have likely ended with more bloodshed had law enforcement not intervened.

The defendant's conduct is horrifying. And he knew full-well the scope of his crime. Repeatedly, Gupta told the CS that he understood those with whom he was working in India were "really big." He demonstrated that he was in a direct relationship with the other planners, on one occasion participating in a video call with approximately three other men in business attire and telling the UC "we are all counting on you." (PSR ¶ 28). He displayed knowledge that this killing could disrupt international diplomatic relations, acknowledging that it would be problematic if the killings took place when the Indian prime minister was on U.S. soil. For example, on June 6, 2023, Gupta told the CS that "our prime minister Modi is visiting America on 20th so at least we need to calm down everything 10 days . . . so at the time our prime minister visit, it's not good." (PSR ¶ 26). Gupta wanted to make sure that there were no disruptions during the state visit but, reassured the CS, telling him that after the visit, "they have more jobs, more jobs." (PSR ¶ 26).

The defendant was far from a passive participant in this crime. He was a critical node, sitting between Yadav and those in the United States who he wanted to carry out the killing. He relayed messages and directed the activities of the UC and CS on Yadav's behalf. But he also contributed his own insight, showing himself to be an active member of the conspiracy. At one point, mindful of Pannun's employment as a lawyer, the defendant suggested that the CS lure Pannun under the guise of obtaining legal advice. (PSR ¶ 17). The defendant was eager and willing to advance the plot, urging the CS to "finish the job" and to "discharge [Pannun] as soon as possible." (PSR ¶19). He was directly involved at every step. When Yadav wanted information about Pannun's whereabouts relayed or had questions about progress, he communicated through Gupta. (PSR ¶ 31-32, 34, 37). When money was changing hands in New York City as an advance

payment to the supposed hitman, Gupta was on the phone, making it happen. (PSR ¶24). He was a central player in a scheme that could have ended with bloodshed in the United States.

Although Gupta is new to the U.S. criminal justice system, he is not new to crime. To suggest otherwise defies logic. This was a complex, sensitive operation with the potential to result in the loss of life in at least two countries. It was no accident that when Yadav sought out someone to help orchestrate a murder, Gupta was his call. And when Gupta needed an assassin, he knew where to look. Gupta was not an amateur. In fact, this does not even appear to have been the first time he participated in a murder-for-hire plot. As described in the PSR, around the same time that the defendant began hunting Pannun, he also planned with Yadav to deploy hitmen in Pakistan and Nepal. (PSR ¶ 15).

The defendant entered this conspiracy steeped in the criminal element, as evidenced by his established relationship with the CS, whom he understood to be a large-scale drug trafficker, and Yadav's selection of Gupta as his trusted agent. Gupta's own communications evidence his familiarity with serious crime. He told the CS during the offense that he understood that the CS was motivated by potential future drug and gun transactions and that he had communicated the same to the Government officials with whom he was working to coordinate violence. For example, on a recorded call with the CS, Gupta recounted telling his associates orchestrating the murder (*i.e.*, Yadav) that the CS was "just helping [with the murder] because you have to provide him all the toys [*i.e.*, weapons]" and "[t]hey told no problem . . . [i]f he, he can bring his airplane, we can load the entire airplane, what he wants, we will put everything in." The defendant demonstrated that he was no stranger to the criminal space. He spoke to the CS, using slang and coded language fluently, while planning for future large-scale drug and gun trafficking that he hoped to facilitate upon the successful completion of the murders. For example, on a recorded call with the CS, Gupta referenced a "2000 kilogram" shipment and told the CS "[y]ou take your chartered plane . . . [p]ut everything, your production [*i.e.*, drugs] in that plane . . . [a]nd from the same place you take the toys [*i.e.*, weapons], and put in your plane and go back." Gupta discussed his plans for future crimes directly with Yadav. Yadav told Gupta that he could arrange for the sale of firearms but only if the Gupta carried out Pannun's execution successfully, telling him "most things will depend upon the task at hand . . . if it's done in an impeccable manner…all will be take[n] care of . . ." (PSR ¶ 35).

Gupta is sophisticated. He cannot escape culpability in this case by suggesting he was swept up in rash decision making or duped by others. The defendant is a college-educated, bilingual, and well-traveled man. At the time of his arrest, he was in possession of English language novels (e.g., The Alchemist) and periodicals (e.g., The Economist). Since the age of 14, he has maintained consistent employment. (PSR ¶ 87-89). He claims to have most recently worked in commodities trading and real estate brokerage. (PSR ¶ 90). Simply put, the defendant was not acting out of desperation. He is not a man without options who turned to crime because he felt as though he had no other choice. Instead, the defendant is a man who ran headlong towards a moneymaking opportunity, completely undeterred by the fact that this opportunity would cost human lives. In fact, he was excited about the chance to prove himself, yearned to participate directly in the murder, and was optimistic about future opportunities to make money by targeting others on the Government of India's behalf. The defendant viewed this murder as a stepping stone to an even bigger "job," (meaning other assassinations) telling the CS, on a recorded call, that

"everything depends upon this first job. . . [t]hey're testing us." It was simply a gateway to even more criminality.

The defendant's statements in the PSR meekly attempt to minimize his culpability by blaming his persistent engagement in a weeks-long effort to carry out an international murder-for-hire scheme on "whiskey." (PSR ¶ 85). He claims that under the influence of alcohol, he would "make wrong decisions" and that because of his intoxication he was "not thinking straight" during the offense conduct. (*Id.*). That is an absurd claim. The defendant is not charged with a crime that represents a brief lapse in judgment or decision made in a drunken haze. Day after day, week after week, the defendant worked across the ocean and several time zones to carry out a murder. He sent text messages, participated in video calls, coordinated surveillance, relayed messages, coordinated travel, and personally arranged for $15,000 to be delivered in New York, with the promise of much more to follow after the murder was done. During the offense conduct, he showed himself to be deliberative and focused on his objective — killing Pannun. The defendant's self-serving attempt to now offload his culpability is not just sheepish. It is patently false.

In his sentencing submission, the defendant argues that his conditions of confinement in the Czech Republic[8] and at the Metropolitan Detention Center in Brooklyn ("MDC") warrant a downward variance. (Dkt. 157 at 28-29). They do not. Gupta's submission relies in part on generalized criticisms of the MDC, including descriptions of institutional conditions from 2024 that do not reflect the current conditions, nor do they reflect the conditions for the majority of his period of incarceration. Indeed, courts in this District have recognized substantial improvements at the MDC, including increased staffing and fewer lockdowns. *See* May 14, 2025 Tr. at 24, *United States v. Reshard*, 24 Cr. 392 (JMF) (S.D.N.Y.) (observing that conditions at the MDC were "a lot better" than when the court decided *United States v. Chavez*); May 21, 2025 Tr. at 44, *United States v. Burgos*, 24 Cr. 650 (LTS) (S.D.N.Y.) (acknowledging improvements at the MDC, including increased staffing).[9]

---

[8] Gupta asks the Court to "state in the judgment that the sentence takes his time in Czech custody into account, and to recommend that the Bureau award credit from June 30, 2023." (Dkt. 157 at 28). The Court should decline. Pursuant to 18 U.S.C. § 3585(b)(1), which is implemented in BOP Policy Statement 5880.28, a defendant is given credit towards his sentence for "any time he has spent in official detention prior to the date the sentence commences . . . as a result of the offense for which the sentence was imposed . . . that has not been credited against another sentence." While the Government anticipates that the BOP will credit Gupta's time in Czech extradition detention, the "credit to be granted a defendant under § 3585(b) for time during which he was held in federal custody prior to sentencing is administered by the Bureau of Prisons." *United States v. Luna-Reynoso*, 258 F.3d 111, 117 (2d Cir. 2001). Section "3585(b) does not authorize a district court to compute the credit at sentencing." *United States v. Wilson*, 503 U.S. 329, 334 (1992).

[9] Gupta notes that he experienced "persistent, severe abdominal pain" during his incarceration but acknowledges that he did receive medical attention. (Dkt. 157 at 29). The Government has no record of Gupta raising these medical concerns with the Government to request assistance before including them as a justification for a downward variance.

This was far from a victimless crime. Attached hereto as Exhibit A is Pannun's impact statement, wherein Pannun describes, among other things, how Gupta's murder-for-hire plot has impacted his personal freedoms and sense of security. He writes, in part, as follows:

> It has been 1,200 days Now that I have been living with a security detail. For 1,200 days, I have not met a client in person and have to solely rely on virtual meetings with the client. Sitting across from a client and hearing why they need my help was an ordinary part of my work life as an attorney and human rights lawyer. For 1,200 days, that part of my life has been gone. I have been warned by multi country intelligence agents that the threat to my life remains active. I live under heightened security. Traveling, attending a public gathering, or sitting down with Khalistan referendum activists now takes advance planning. As an American citizen, I used to exercise those freedoms without having to ask whether I could get there safely or whether my presence would put other's life at risk too. Now I have to ask those questions every time.
>
> I have had to take additional precautions for my safety and change how I travel. Both have imposed substantial, recurring costs. I continue to incur those costs because the threat to my life persists even after U.S. law enforcement foiled the plot.
>
> When I ask a fellow organizer to join me in public, I have to weigh what that appearance could mean for their safety and the safety of their family. Decisions I once made without a second thought now carry that weight. 1200 days of Living under that strain, day after day, has effects that are real, widespread and hard to be explained in full detail at this time.

(Victim Impact Statement at 4.) Pannun's statement makes clear that the defendant's crime was a serious one with profound effects on the sense of security for an entire community of activists. A top-of-the-Guidelines sentence is necessary, among other reasons, to provide just punishment given the nature of the offense and the life-changing impact it had on Pannun and others in the community.

## IV. Conclusion

The defendant's conduct was as brutal as it was brazen. He was a crucial participant in a foreign plot to execute a U.S. citizen on U.S. soil. The Court should impose a sentence that reflects the magnitude of the crime and sends a message that the violent silencing of voices in this country will not be tolerated. For these reasons, and all the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 293 months' imprisonment.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: /s/
Ashley C. Nicolas/Alexander Li/
Camille Fletcher
Assistant United States Attorneys
(212) 637-2467

cc: Isabelle Kirshner, Esq. (by ECF)